CO-COUNSEL FOR PLAINTIFF

Timothy W. Seaver
Seaver & Wagner, LLC
421 West First Ave., Suite 250
Anchorage, Alaska 99501
Tel. 907-646-9033
Fax. 907-276-8238
Email: tseaver@seaverwagner.com

George T. Freeman
 Attorney at Law
1152 P Street
Anchorage, Alaska 99501
Tel. 907-274-8497
Fax 907-274-8497 (call first)
Email: gtf@gci.net

## UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF ALASKA

| | |
|---|---|
| DANIELA VALENOTE,<br><br>       Plaintiff,<br><br>vs.<br><br>METROPOLITAN LIFE<br>INSURANCE<br>COMPANY, and RIM<br>ARCHITECTS<br>(ALASKA), INC.,<br><br>       Defendants. | <br><br><br><br><br><br><br><br><br><br><br><br>Case No. 3:05-cv-00196 (TMB) |

## PLAINTIFF DANIELA C. VALENOTE'S MOTION FOR SUMMARY JUDGMENT AND ACCOMPANYING MEMORANDUM

## Table of Contents

1.      Standard of Review……………..………………………………………..2

2.      Metlife LTD Policy Definition of Disability………………………….....4

3.       Record for Consideration by the Court………………………………5

4.      Factual History…………………………………………………………..6

        a.  The August 29, 2003 Denial…………………………………………8

        b.  The September 3 Appeal and the November 26 Denial……………..13

        c.  The May 4 Appeal and the June 22, 2004 Denial……………………26

5.      Argument………………………………………………………………31

        a.  MetLife's Provided Inconsistent Reasons for its Denial……………31

        b.  MetLife Improperly Relied on the Alleged Lack of Objective Evidence
            to Deny Ms. Valenote's Claim…………………………………………..33

        c.  MetLife's Basis for Denial Failed to Give Ms. Valenote a Full and Fair
            Review of the Denial………………………………………………………..35

        d.  MetLife Failed to Ask the Plaintiff for Necessary Evidence and to
            Properly Investigate the Claim…………………………………………...35

        e.  MetLife's Failure to Consider Evidence Received After the First Denial
            is Arbitrary and Capricious………………………………………………39

        f.  MetLife Failed to Credit Ms. Valenote's Reliable Evidence and Cherry
            Picked other Evidence……………………………………………………39

        g.  MetLife Failed to Provide Necessary Records to its "Independent"
            Consultants………………………………………………………………42

        h.  MetLife's Numerous and Substantial Procedural Irregularities
            Require Heightened Scrutiny and Mandate the Review of Additional
            Evidence………………………………………………………………43

-i-

6.    Ms. Valenote is Entitled to Benefits Under the LTD Plan....................43

Conclusion..............................................................................47

## Attachments

Cases referenced in Plaintiff's motion but not cited in a National Reporter System

Affidavit of Dr. Gregory R. Polston, M.D. and attachments

Affidavit of Plaintiff Daniela C. Valenote

Affidavit of Virginia Valenote

MetLife Record in Chronological Order                    MR1 through MR327

### Additional Medical Documents

| | |
|---|---|
| Alaska Open Imaging Center LLC | V79-V88 |
| Advanced Pain Centers of Alaska [Dr. Anderson & Dr. Polston] | V131-V512 |
| Advanced Pain Centers of Alaska | V513-V623 |
| Advanced Pain Centers of Alaska [Dr. Twombley] | V624-V650 |
| Alaska Chiropractic and Therapy [Dr. Lorentzen] | V651-V896 |
| Backstrum – Physical Therapist | V890-V896 |
| Advanced Physical Therapy of Alaska | V897-V939 |
| Dr. Voke | V940-V954 |
| Neurological Consultants of Alaska LLC [Dr. Downs] | V955-V985 |
| Dr. Merkouis | V999-1021 |
| Dr. Schlosstein | V1022-V1034 |
| Advanced Pain Centers of Alaska [Dr. Polston 1/06-8/06] | V1538-1562A |
| Attachments to Dr. Polston's Progress Notes [1/06-8/06] | V1563-1721 |

## Table of Authorities

### Statutes

29 U.SC. § 1133 (ERISA)……………………………………………………..2

20 CFR Section 404.1567……………………………………………7, 12, 46

### Case Authorities

*Abatie v. Alto Health & Life Ins. Co.*, 458 F.3d  955 (9th Cir. 2006)………………passim

*Baker v. MetLife*, 2006 WL 3782852 (M.D.Tenn.)………………….....………34, 35, 42, 45

*Bendixon v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)…………..……………3

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (203)……………….……………42

*Booten v. Lockheed Med. Benefit Plan*, 110 F.3d 1461 (9th Cir. 1997)…………………36

*Calvert v. First Star Finance, Inc.*, 409 F.3d 286 (6th Cir. 2005)…………….…………42

*Glenn v. MetLife*, 461 F.3d 660 (6th Cir. 2006)………………………………...39, 40, 41, 42

*Kalish v. Liberty Mutual/Liberty Life*, 419 F.3d 501 (6th Cir. 2005)………..…………...42

*Lang v. Long-Term Disability Plan of Sponsor
Applied Remote Technology, Inc.*, 125 F.3d 794 (9th Cir. 1997)…………………………3

*May v. Metropolitan Life Ins. Co.*, 2004 WL 2011460 (N.D. Cal. 2004)……..…………34

*McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161 (6th Cir. 2003)…..………..42

*Quinn v. Blue Cross and Blue Shield*,  161 F.3d 472 (7th Cir. 1998)……………………42

*Railey v. Cooperative Benefit Administrators, Inc.*, 2006 WL 1548968 (W.D.Ky)…42, 43

*Rementer v. MetLife*, 2006 WL 66721 (M.D.Fla.)………………………………...40, 41

*Sin v. Metropolitan Life Ins. Co.*, 2006 WL 3716750 (D.Or. Dec. 13, 2006)...3, 34, 36, 37

-iii-

*Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587(9th Cir. 1984)...........................47

*Smith v. Continental Cas. Co.*, 450 F.3d 253(6th Cir. 2006)............................42, 42

*Yearger v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381-82 (6th Cir. 1996)..........45

-iv-

CO-COUNSEL FOR PLAINTIFF

Timothy W. Seaver
Seaver & Wagner, LLC
421 West First Ave., Suite 250
Anchorage, Alaska 99501
Tel. 907-646-9033
Fax. 907-276-8238
Email: tseaver@seaverwagner.com

George T. Freeman
 Attorney at Law
1152 P Street
Anchorage, Alaska 99501
Tel. 907-274-8497
Fax 907-274-8497 (call first)
Email: gtf@gci.net

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF ALASKA

| | |
|---|---|
| DANIELA VALENOTE,<br><br>    Plaintiff,<br><br>vs.<br><br>METROPOLITAN LIFE<br>INSURANCE<br>COMPANY, and RIM<br>ARCHITECTS<br>(ALASKA), INC.,<br><br>    Defendants. | <br><br><br><br><br><br><br><br><br><br><br>Case No. 3:05-cv-00196 (TMB) |

## PLAINTIFF DANIELA C. VALENOTE'S MOTION FOR SUMMARY JUDGMENT AND ACCOMPANYING MEMORANDUM

Plaintiff Daniela Valenote, through her attorneys, hereby moves for summary judgment on her claim against MetLife for long term disability. The grounds for this motion are addressed below.

Since February 2003, Daniela Valenote, an architect, has been unable to work due to a disability. This conclusion is supported by the opinion of Ms. Valenote's current treating physician who recently stated that Ms. Valenote is disabled and unable to sustain

even sedentary work for 80% of an eight hour day. At the time Ms. Valenote became disabled, Ms. Valenote was employed by RIM Architects. As an employee of RIM, Ms. Valenote was covered under a long term disability policy ( "LTD") offered and administered by MetLife.[1]    When Ms. Valenote sought coverage under the policy, MetLife denied her claim despite overwhelming evidence demonstrating Ms. Valenote's eligibility for coverage.

The undisputed facts show that MetLife promoted its own interests over those of Ms. Valenote. That is, MetLife provided inconsistent reasons for denial, failed to adequately investigate the claim or request relevant evidence, cherry picked information and suppressed other information, and failed to credit Ms. Valenote's reliable evidence. Because MetLife's decision was clearly contrary to the evidence and to its statutory obligations as an ERISA fiduciary, Ms. Valenote moves for summary judgment against MetLife and RIM Architects, Inc. ("RIM") declaring Ms. Valenote eligible for benefits under the plan, for back benefits from the date of her disability to the date of judgment, for interest on her back benefits, and for costs and attorneys' fees.

## 1. <u>Standard of Review</u>

ERISA requires that every employee benefit plan shall:

> **(1)** provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> **(2)** afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.[2]

In ERISA actions, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such

---

[1]    Plaintiff is providing the administrative record in a chronological order for ease of reference. It is referred to herein as "MetLife Record" or "MR."

[2]    29 U.SC. § 1133.

as whether a genuine dispute of material fact exists, do not apply."[3]

In the present case, the parties do not dispute that the plan grants discretion to the administrator. However, this of course does not end the inquiry regarding the standard to be applied. Rather, pursuant to the Ninth Circuit's recent opinion in *Abatie v. Alto Health & Life Ins. Co.,*[4] the Court must weigh a number of factors in determining what standard to apply to its review of the administrator's decision.

Rejecting prior precedent, *Abatie* applies a case-by-case analysis that asks first whether a "structural" conflict exists. *Abatie* states that a "structural" conflict is present where "an insurer… acts as both the plan administrator and the funding source for benefits." There is no dispute that MetLife had this structural conflict of interest.

*Abatie* further provides that, even standing alone, a "structural" conflict requires skepticism by a court in reviewing an administrator's denial of benefits. That skepticism increases in the presence of various other procedural irregularities including: 1) "inconsistent reasons for denial;" 2) failure to "adequately investigate a claim or ask the plaintiff for necessary evidence;" and 3) failure to "credit a claimant's reliable evidence."[5] *Abatie* also makes clear that this list is not intended to be exclusive and that other acts of "malice" and "bad faith" can diminish or completely negate any deference to the administrator's decision. As *Abatie* concluded, procedural irregularities may be so "substantial as to alter the standard of review" from abuse of discretion to de novo.[6] *Abatie* cites the tacking on of a new reason for the final denial as an example of a substantial violation of ERISA, which alone merits de novo review.[7]

In addition, *Abatie* provides that under certain situations a court may consider

---

[3]     *Bendixon v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).
[4]     458 F.3d 955 (9th Cir. 2006).
[5]     *Abatie*, 458 F.3d at 968-69.
[6]     *Id.* at 971, *see also, Sin v. Metropolitan Life Ins. Co.*, 2006 WL 3716750 (D.Or. December 13, 2006).
[7]     *Abatie*, 458 F.3d at 974 and 974 n. 9, (citing with approval *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Technology, Inc.*, 125 F.3d 794, 798-99 (9th Cir. 1997)).

additional evidence outside of the administrative record. As *Abatie* concluded regarding this issue:

> Even when procedural irregularities are smaller, though, and abuse of discretion review applies, the court may take additional evidence when the irregularities have prevented full development of the administrative record. In that way the court may, in essence, recreate what the administrative record would have been had the procedure been correct.[8]

It cannot be disputed that MetLife, in denying Ms. Valenote's claim, operated under a "structural" conflict. In addition, numerous facts demonstrate that MetLife engaged in a variety of procedural irregularities including those listed in *Abatie* (quoted above). Taken together, MetLife's structural conflict and numerous procedural regularities mandate that the Court apply a de novo standard. Under *Abatie*, the application of this standard would necessarily permit the allowance of additional evidence to "recreate what the administrative record would have been had the procedure been correct."[9] But as quoted above, the Court may still take additional evidence even if it applies an abuse of discretion standard where irregularities have prevented the full development of the administrative record." In the present case, regardless of the standard applied, MetLife's process prevented full development of the record. Finally, Ms. Valenote would nevertheless be entitled to summary judgment as the administrative record, even standing alone, demonstrates that MetLife abused its discretion in denying Ms. Valenote benefits under the plan.

## 2. <u>MetLife LTD Policy Definition of Disability</u>

The MetLife long term disability policy provides for monthly disability payments for a disabled employee under age 60 until the employee reaches age 65. [MR13] The LTD policy defines Disabled" or "Disability" as follows:

> "Disabled" or Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis and

---

[8]     *Abatie*, 458 F.3d at 973.

[9]     *Abatie*, 458 F.3d at 973.

1.  during your Elimination Period and the next 24 month period, you are unable to earn more than 80% for your Predisability Earnings or Indexed Predisability earnings at your Own Occupation for any employer in your Local Economy; or

2.  after the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings. [MR17]

The policy defines the "Elimination Period" as the 90 day period beginning "the day you become disabled." [MR12; MR16]  According to MetLife, the elimination period began on February 22, 2003, and terminated on May 23, 2003. [MR162B]  During the elimination period, no benefits are payable and the employee must be under the continuous care of a doctor. [MR16]  The policy defines "Doctor" as a person "who is licensed to practice medicine" and who is providing care "within the scope of his or her license." [ML17] "Own Occupation" means "the activity that [the insured] regularly perform[s] and that serves as [her] source of income." [ML18]  The LTD provides for a medical records release "for us to obtain and release medical and financial information and any other items we may reasonably require in support of your disability." [MR29]  The LTD permits MetLife to examine Ms. Valenote by a medical specialist at MetLife's request. [MR31]

### 3. Record For Consideration By The Court

Ms. Valenote submits three categories of documents in support of her motion. First, she submits the MetLife administrative record in chronological order.  Second, Ms. Valenote submits her affidavit, the affidavit of her patient advocate and the affidavit of Dr. Gregory R. Polston, M.D, her current treating physician.  Dr. Polston's affidavit attaches his February 16, 2006 opinion that Ms. Valenote meets the MetLife definition of disability.  Dr. Polston opines that Ms. Valenote's chronic pain condition precludes even

sedentary work and that the architect job description constitutes light to medium work. Dr. Polston's affidavit also attaches Ms. Valenote's February 14, 2005 Functional Capacity Examination, her architect job description and the Code of Federal Regulations definition of physical exertion requirements. Dr. Polston relied on these documents in reaching his opinion. Third, Ms. Valenote submits her medical records demonstrating that she has been under the continuous and extensive care of a physician as well as other health care providers since she stopped working due to her disability.[10]

### 4. Factual History

Ms. Valenote started working with RIM Architects on February 7, 2000. [MR81][11] In October 2002, Ms. Valenote hurt her back carrying some heavy bags. [MR318][12] She went to Dr. Michael Orzechowski, her family doctor, for treatment of low back pain on November 5, 2002. [MR174] On December 11, 2002, a MRI at Alaska Open Imaging Center disclosed protrusions at L5-S1 and L3-4. [MR176] By October 14, 2003, a lumbar discography performed by Ms. Valenote's treating physician Dr. Susan Anderson showed a "posterior tear extreme increase in pain that is concordant with patient's complaint" at L5-S1 and Dr. Anderson opined that "L5-S1 considered provocative and concordant pain." [ML228]

Based on her chronic pain and Dr. Orzechowski's authority, Ms. Valenote stopped working on December 18, 2002. [MR174] Ms. Valenote tried part time work with RIM in January 2003 but had to stop working because of her continuing chronic pain. [MR261; MR268] Due to her chronic pain, Ms. Valenote ceased working on February 21, 2003. [MR232; MR237; MR261] Ms. Valenote has not worked either part-time or full-time for any employer since February 21, 2003. [MR237; MR265][13] Ms. Valenote

---

[10]   Since November 2002, Ms. Valenote has been under the continuous care of Dr. Michael Orzechowski, Dr. Joella Beard, Dr. Mary Downs, Dr. Susan Anderson, Dr. Gregory R. Polston (after Dr. Anderson at the same clinic specializing in pain medicine), Dr. Peter Lorentzen, and other medical professionals for her chronic pain condition.

[11]   Affidavit of Daniela C. Valenote at para. 3.

[12]   Affidavit of Daniela C. Valenote at para. 5.

[13]   Affidavit of Daniela C. Valenote at para. 15.

has been under the continuous care of a doctor since November 5, 2002 for her chronic pain.[14] [See MR68, MR73, MR89-95, MR106-109, MR112-117, MR125-139, MR164, MR173-197, MR220, MR225-230, MR255, MR261-285, V131-650, V651-889, V940-954, V955-985, V1022-1034, V1538-1721]

Dr. Gregory R. Polston, M.D. has provided an affidavit attaching his opinion that Ms. Valenote meets the MetLife definition of disability.[15] Dr. Polston is Ms. Valenote's treating doctor at the Advanced Medical Centers of Alaska. Dr. Polston is a specialist in pain medicine and has treated Ms. Valenote from June 2004 to the present.[16] Dr. Polston started treating Ms. Valenote after her prior pain specialist Dr. Susan Anderson left his clinic.[17] In reaching his opinion, Dr. Polston reviewed the relevant part of the LTD policy, an architect job description, a functional capacity examination and the physical exertion requirements description in 20 CFR Section 404.1567.[18] Dr. Polston opined that the job description of an architect at a minimum is light duty to medium level of work.[19] Dr. Polston also opined that Ms. Valenote is incapable of sustaining a sedentary level of work for an 8 hour day.[20]

As discussed further below, MetLife engaged in numerous procedural irregularities in denying Ms. Valenote's claim. Among other things, those irregularities included adding new reasons for denial in its final decision as well as failing to adequately set forth the reasons for its denial. These irregularities permit the admission of Dr. Polston's affidavit and attachments. These irregularities also permit admission of the other affidavits and Ms. Valenote's medical records since November 2002 to permit a full development of the record as if those irregularities had not existed.

---

[14]    Affidavit of Daniela C. Valenote at para. 7.
[15]    Affidavit of Dr. Gregory R. Polston M.D at Exhibit 1.
[16]    Affidavit of Dr. Gregory R. Polston M.D at paras. 1 and 2
[17]    Affidavit of Dr. Gregory R. Polston M.D at Exhibit 1.
[18]    Affidavit of Dr. Gregory R. Polston M.D at Exhibits 2-7.
[19]    Affidavit of Dr. Gregory R. Polston M.D at Exhibit 1.
[20]    Affidavit of Dr. Gregory R. Polston M.D at Exhibit 1.

### a. **The August 29, 2003 Denial**

After the events described above, Ms. Valenote officially resigned her employment with RIM Architects effective on May 1, 2003. [MR164] She was unaware that her employer had a long term disability plan at that time.[21] Ms. Valenote sumitted claims for short term disability claim and long term disability on or about May 15, 2003. [LTD claim at MR68] The LTD claim cited "chronic pain" and stated that the last day worked was "February 21, 2003." [Id.] The claim referenced Dr. Orzechowski, Dr. Merkouris, Dr. Voke and Dr. Beard. [Id.]

Ms. Valenote provided MetLife with a general release for medical records. [MR70] On June 5, Dr. Beard's office provided a "Disability Claim Attending Physician Statement" to MetLife. [MR73-74] This document states that Dr. Beard started seeing Ms. Valenote on February 18, 2003, and that she had referred Ms. Valenote to Dr. Downs and Dr. Schlosstein. [Id.] This document states as to "Physical Capacities" that a physical capacity examination or FCE would be needed. [Id.] The document mentions advice from a nurse of "no work" from March 27 through May 1. [Id.] This document has the language "work release written for RTW 5/1/03." [MR74] Ms. Valenote was unaware that this statement had this language. [MR164, 208, 263]

In its August 29, 2003, letter denying Ms. Valenote's claim, MetLife solely focused on the fact that Ms. Valenote had not met her elimination period. In other words, MetLife asserted that Ms. Valenote's treating physician had released Ms. Valenote from her care and Ms. Valenote had returned to work during the 90 day elimination period. This conclusion was obviously false. MetLife reached this conclusion by relying on the ambiguous language quoted above from the attending physician statement that "work release written for RTW 5/1/03." In fact, the evidence in MetLife's own file demonstrated unequivocally that Dr. Beard had never released Ms. Valenote to return to full time work and had only considered recommending minimal part time work followed by an evaluation. Indeed, the sheer volume of contrary information in MetLife's

---

[21]     Affidavit of Daniela C. Valenote at paras. 15, 16.

possession at the time of its denial is nothing short of shocking. What follows is a complete picture of MetLife knew and absolutely ignored in denying Ms. Valenote's claim.

On June 25, MetLife sent Ms. Valenote a letter requesting information from a physician. [MR84] On July 3, Dr. Beard's office sent the letter back to MetLife with attachments. [MR88]  <u>Significantly, the returned letter from Dr. Beard's office states that the "expected return to work date" is "unknown at present."</u> [Id.][22] Dr. Beard's letter attached medical notes for March 27, April 29 and June 10, 2003 each referencing "chronic back pain" and a Healthsouth record showing the transfer of Ms. Valenote's physical therapy to Joy Backstrum [MR90, 92, 94, 98] These notes indicate that Ms. Valenote has been "Unable to Work Since" February 21, 2003. [Id.] Significantly, the April 29 notes do <u>not</u> indicate there was any recommendation that Ms. Valenote return to work on May 1. Instead, the notes indicate that Dr. Beard <u>never</u> recommended return to full time work.[23]

Dr. Beard's office notes describe Ms. Valenote's ongoing chronic pain as "Dull," "Sharp," "Burning," "Tingling," "Aching," "Muscle tensing," "Stabbing," "Throbbing," "Shooting," "Soreness," and "Stiffness." [Id.] The notes also state that Ms. Valenote suffered "Numbness," "Tingling," "Muscle weakness," "Difficulty walking," and that exacerbating factors included "Movement," "Activity," "Bending," "Exercise," "Sitting," "Standing," "cold/damp," and "twisting." [Id.]

The June 10 note records the worst pain level at 9 out of 10. [MR90] The June 10 note states she had seen a chiropractor named Dr. Lorentzen three or four times and that this treatment only provided "brief relief." [Id.] The June 10 note indicates that Ms.

---

[22]    MetLife "redacted" two references from this important document. MetLife should provide Plaintiff an un-redacted copy of this document so Plaintiff may supplement the record. If MetLife declines this, the Court may draw the inference that the redactions demonstrate further self-dealing by MetLife.

[23]    Significantly, the April 29 "Plan of Care" document initialed by Ms. Valenote does not have a return to work recommendation. [MR195] MetLife received the April 29 "Plan of Care" document on September 26. [MR173]

Valenote could only sit for 15 minutes before experiencing pain. [Id.] The June 10 notes include a recommendation of trying part-time work at "10-15" degree of work and "evaluate tolerance." [MR91]  Dr. Beard's office also provided MetLife with a May 12 HealthSouth record stating that Ms. Valenote transferred her physical therapy to Joy Backstrum. [MR98]

On August 8, Dr. Beard's office sent MetLife the July 24 notes and re-sent the June 10 notes.  [MR105] The July 24 notes indicate right hip, leg and foot pain and that Ms. Valenote had difficulty opening her hands in the mornings. [MR106]  The July 24 note again states "chronic back pain" and that Ms. Valenote had been unable to work since February 21, 2003. [Id.] The July 24 note records the worst pain at 9 on a scale of 10.  [Id.]    The July 24 notes indicate that Ms. Valenote had seen Dr. Anderson, Dr. Downs, Dr. Trombly, Dr. Voke and Dr. Lorentzen. [Id.] [24]

On August 18, Dr. Downs sent MetLife medical records for visits on February 5, June 3 and July 7 based on a medical release from Ms. Valenote.  [MR111-117]  The June 3 note contains the medical diagnosis: "chronic pain" and that she had seen multiple specialists. [MR113] The July 7 note indicates "continued pain" and that Ms. Valenote was "frustrated that she is now unable to work at her choosen profession due to her pain." [MR112] The July 7 note states that Dr. Downs would refer her to "the pain clinic" and a copy was sent to Dr. Anderson at the Advanced Pain Centers of Alaska. [Id.]

On August 20, Dr. Beard's office sent MetLife documents on "your request for return to work information."  [MR119]   These documents re-sent the June 5 "Attending Physician Statement" and another document.   The additional document is dated March 27, 2003. [MR123]    This March 27 document does not have a return to work

---

[24]    Before the first August 29 denial, MetLife did not request any medical records from Dr. Anderson at the Advanced Pain Centers of Alaska, even though this doctor saw Ms. Valenote on July 21, 2003, August 5, 2003, and August 12, 2003. [MR0183-86, 182, 179-80] MetLife also did not request a complete copy of the records of Dr. Lorentzen, Dr. Voke, Dr. Trombly, Dr. Merkouris, Dr. Schlosstein, or Joy Backstrum even though it had notice of these medical care providers.  MetLife never actually requested a full copy of these records at any time.  This motion supplies a copy of these records.

recommendation. Significantly, it states that "Ms. Valenote is being evaluated for persistent pain and should not return to work until at least May 1, 2003." [ML123] This document neither did nor could it have indicated that Ms. Valenote had been "released" to work. Moreover, subsequent patient notes from Dr. Beard's office for April 29, June 10, and July 24 repeatedly stated that Ms. Valenote had been unable to work since February 21, 2003 because of chronic pain.

On August 20, Dr. Orzechowski's office sent MetLife records based on a medical records release from Ms. Valenote. [MR125-135][25] These records included notes from December 12, 18, 19, 20, 24, 26, 30, and January 13 and 20, 2003. [Id.]

In addition to this volume of medical evidence indicating that Ms. Valenote had not worked since February 12, 2003 that she suffered from chronic pain, and that she was under the continuous care of a physician throughout her elimination period, MetLife also had substantial contrary information from its co-administrator, RIM, indicating that Ms. Valenote was in fact disabled under the policy.

On June 12, RIM submitted a cover letter stating that Ms. Valenote's intern architect "work included occasional field supervision of projects on the construction site" and a disability claim form. [MR77-78]   On June 16, RIM submitted a more detailed employer statement. [MR80] It states Ms. Valenote was hired on February 7, 2000; her current occupation was an "intern architect" with a monthly income of "$4,250"; that the work averaged 40 hours a week; that the work could not be modified; previous absences due to "disability" from December 18, 2002 through January 4 for "chronic pain"; that the last day worked was February 21, 2003; and that the "chronic pain" condition was work related. [MR81]

RIM's June 16 statement included a job description for an intern architect. This job description states that the work involved one to two hours each 8 hour shift of walking, bending over, twisting, reaching above shoulder level, walking on uneven ground and carrying objects weighing up to ten pounds 34-66% of the time. [MR82]

---

[25]    These records were sent again on August 25. [See MR142-162]

This is a job description for light or medium work as opposed to sedentary work.[26] Significantly, Ms. Valenote's treating physician opines that her chronic pain precludes even sedentary work.[27]

As the above evidence demonstrates, the August 29 denial shows substantial irregularities and multiple failures to credit reliable evidence in MetLife's process. Significantly, MetLife ignored the July 3 statement from Dr. Beard's office that Ms. Valenote's return to work date was "<u>unknown at present</u>." [MR89]  MetLife ignored the March 27 "Return to Work Recommendation" that did <u>not</u> recommend a return to work date and which instead only stated that "Ms. Valenote is being evaluated for persistent pain and should not return to work until at least May 1, 2003."  [ML123]  As noted above, this document neither did nor could it have indicated that Ms. Valenote had been "released" to work.  Moreover, MetLife inexplicably ignored notes from Dr. Beard's office for April 29, June 10, and July 24 stating that Ms. Valenote had been unable to work since February 21, 2003.

MetLife's August 29 denial also ignored notes from Dr. Beard's office from March 27, April 29, June 10 and July 24 showing that she was under the continuous care of a doctor since February 21.  Instead, MetLife cherry picked a single sentence from the June 10 note to imply that she only had to work on her "breathing" and minor matters. MetLife also ignored Dr. Down's June 3 medical diagnosis that Ms. Valenote suffered from "chronic pain" and her July 7 notation that she had been able to work because of the pain. In addition, MetLife ignored the May 12 HealthSouth record provided by Dr. Beard's office stating that Ms. Valenote transferred her physical therapy to Joy Backstrum.  [MR98]  Finally, MetLife ignored Dr. Beard's notes and the other records showing Ms. Valenote's continuous care by Dr. Orzechowski, Dr. Downs, Dr. Anderson, Dr. Lorentzen, Dr. Schlosstein, Dr. Voke, Dr. Trombley, and Dr. Merkouris.

---

[26]    *See* 20 CFR Section 404.1567 <u>Physical exertion requirements attached to the</u> Affidavit of Dr. Gregory R. Polston M.D. at Exhibit 6. The Court may take judicial notice of this regulation pursuant to Federal Rule of Evidence 201.

[27]    *See* Affidavit of Dr. Gregory R. Polston M.D. at Exhibit 1.

### b.  The September 3 Appeal and the November 26 Denial

On September 3, 2003, Ms. Valenote appealed MetLife's August 29, 2003 denial. Stating the obvious, Ms. Valenote explained to MetLife that she had in fact been in the continuous care of a physician and that she had never been "discharged" by anyone to return to work. [MR164]  More specifically, she stated that she had been referred for more specialized care at the Advanced Pain Centers of Alaska, where she was being treated by Dr. Susan Anderson. [Id. and MR173] The name of the clinic itself should have put MetLife on notice of the severity of the ongoing pain.

In addition, the September 3 appeal informed MetLife that Healthsouth, which was providing physical therapy to her, did not release her from its care but that she stopped going to this clinic because it appeared to exacerbate her condition. [MR164] Ms. Valenote explained that she went from Healthsouth to a physical therapist named Joy Backstrum with The Therapy Place.[28] [Id.]   After this, when she did not see any improvement, Ms. Valenote starting seeing a chiropractor named Dr. Lorentzen and his therapist.  [Id. and MR173] But MetLife already knew this or could have obtained the records itself if it had sought to conduct a "full and fair" investigation.

In a separate letter also dated September 3, 2003, Ms. Valenote informed MetLife that she had a patient advocate who would be helping her on the claim.  [MR166] The patient advocate spoke with MetLife and MetLife told her that it was going to "re-investigate" the long term disability claim because "missing information needed for review had been mistakenly put in her short term disability file." [MR315][29] The patient advocate also provided MetLife with the names of Ms. Valenote's treating physicians, Dr. Anderson and Dr. Lorentzen, and understood from her conversation with MetLife that MetLife would contact them.  [Id.]   The patient advocate understood from her conversations that MetLife would conduct its reinvestigation in part by using medical

---

[28]     As stated above, the May 12, 2003 HealthSouth record that MetLife received from Dr. Beard's office on August 8 states that Ms. Valenote was going to continue her physical therapy with Joy Backstrum at the Physical Therapy Place. [MR98-99]
[29]     *See also*, Affidavit of Virginia Valenote.

releases.[30]  Ms. Valenote provided medical releases allowing MetLife to undertake its independent re-investigation. [See MR70, 111, 126, 263]

On September 11, 2003, MetLife told Ms. Valenote that it was reviewing her claim and that it had referred her claim for "independent review." [MR171]

On September 26, Ms. Valenote again informed MetLife that her primary care doctors were were Dr. Anderson and Dr. Lorentzen, and also provided the names of the several other doctors she had seen for her chronic pain condition. [MR173]  (On October 22, Dr. Beard also informed MetLife that Ms. Valenote's the primary care had been transferred to Dr. Anderson. [MR220])    Despite this, neither MetLife nor its paid consultant ever actually spoke with Dr. Anderson or Dr. Lorentzen before its November 26, 2003 denial letter. [See MR249]

Ms. Valenote's September 26 letter also attached the following important medical records:

(1) A letter from Dr. Orzechowski dated September 22, 2003 stating the first day Ms. Valenote stopped working was December 18, 2002. [MR174].

(2) Alaska Open Imaging Center's December 11, 2002 MRI medical record showing protrusions at L5-S1 and L3-4. [MR176]

(3) Dr. Anderson's medical records from Advanced Pain Centers of Alaska for visits and/or medical procedures on July 17, August 5, August 12, September 4, and September 16. [MR177, 179, 181, 182, 183]
The July 17 note indicates that Ms. Valenote suffered from severe pain including "burning and shooting pain in her SI joint, hip, leg and foot," "aching in her arm and hand," and "stabbing pain in her shoulder'; "that inactivity, sitting, lying down or activity, bending, walking on uneven ground and hard surfaces or lack of sleep can cause her pain"; and that medications included Gabitril, and Pamelor and her past medications included Neurontin, Lexapro, Elavil, Flexeril, Topamax, Zanaflex, Vioxx, Singulair, Zyrtec, Nexium and Zovia. [MR183-185]
The August 5 note states that on that day Dr. Anderson injected Ms. Valenote's right side SI joint with versed and fentanyl using 27 gauge and 25 guage needles. [MR179-180]
The August 12 note states that on that day Dr. Anderson performed a pubic symphysis injection with versed and fentanyl. [MR182]

---

[30]    Affidavit of Virginia Valenote at paras. 6 - 9.

On September 4, Dr. Anderson's progress note indicates stabbing and shooting pain right side pain, sharp and sensitive right hip pain, burning low back pain, and pain radiating to the anterior leg and on the right leg and toe. The diagnosis is discogenic pain, SI joint dysfunction and gluteal bursitis. [MR181]

The September 16 note states that on that day Dr. Anderson performed a intralaminar epidural steroid injection at L3-4 and a right gluteal bursal injection using 18 guage and 27 guage needles. The diagnosis is "L3-4 discogenic pain with radicular symptoms" and "Right gluteal bursitis." [MR177-178]

(4)   Advanced Physical Therapy of Alaska [previously called Advanced Therapeutics of Alaska] record for July 3 and September 2 showing that Ms. Valenote could sit for only 30 minutes and walk for only 15 minutes without experiencing severe pain. [MR188]

(5) Advanced Physical Therapy of Alaska's "Basic Function Exam" on July 3, 2003. [MR189-194]   This exam showed *severe pain* for "Extension," "Slump: Right Distal Initiation," "SIJ Provocation Tests: Dorsolateral," "Straight Leg Raise: Right and Left Distal Initiation,"   "Valsalva Test," "Active Straight Leg Raise Right," and "Resisted Adduction to 45 degree."

(6) Dr. Beard's April 29, 2003 "Plan of Care" document that does not have a return to work recommendation.  [MR195]   (The Court will recall that Ms. Valenote resigned her employment effective on May 1, 2003 and that  Dr. Beard's office was aware on April 29 that she resigned her employment.  [MR92-93].)

(7) Dr. Beard's June 10, 2003 "Plan of Care" document that does not have a return to work recommendation, and, instead, that suggests that Ms. Valenote "consider part time [work] of 12-14 hr/wk."  [MR196] (In fact, Ms. Valenote explained in her September 26 letter to MetLife that her pain did not allow her to work even part time.)[31]

On October 8, Ms. Valenote provided MetLife with a RIM approved architect job description based on the U.S. Department of Labor Occupational Outlook Handbook. [MR202-204]   The architect job description describes the job as light duty to medium

---

[31]    The June 10, 2003 progress note from Dr. Beard's office includes a suggestion of trying part-time work at "10-15" degree of work and "evaluate tolerance." [MR91]

duty.[32]  The job description shows requirements of sitting for long hours at a drafting desk, leaning, twisting, bending carrying manuals weighing from 3 to 20 pounds, business travel, walking on uneven ground, and site visits that required bending, climbing ladders and scaffolds, and crawling. This job description was consistent with RIM's June 16 job description of an architect as a light to medium duty job.  [MR82]

On October 16, Ms. Valenote provided a MetLife with letter indicating that a Provocative Lumbar Discography by Dr. Anderson on October 14 showed a "torn L5-S1 disc." [MR206]  This letter attached a copy of her correspondence with attachments to Dr. Beard regarding Ms. Valenote's belief that Dr. Beard's office had provided incorrect information to MetLife on the return work issue. [MR206-218]  The letter concluded with a request that MetLife let her patient advocate or her know if MetLife needed anything more from them.

On October 22, Dr. Beard sent MetLife a letter indicating that when Ms. Valenote left her clinic "the plan was for her to continue treatment as the Advanced Pain Center of Alaska." [MR220]  The letter referenced Ms. Valenote's care with Dr. Anderson, and that "that this was ongoing treatment for the pain syndrome which was evaluated at our clinic." [Id.] Significantly, this letter does not state that Ms. Valenote was released to work in May 1, 2003.[33]

On October 27, Dr. Anderson used a release to send MetLife her October 6 and October 14 progress notes. [MR226-229]  The October 6 note states that Ms. Valenote continued to suffer "low back pain … that is shooting and sharp, continuous and that she is "unable to walk on uneven surfaces or sit for long periods of time." The diagnosis is

---

[32]  *See* 20 CFR Section 404.1567 <u>Physical exertion requirements attached to the</u> Affidavit of Dr. Gregory R. Polston M.D. at Exhibit 6. The Court may take judicial notice of this regulation under Federal Rule of Evidence 201.

[33]  Dr. Beard's letter repeats erroneous information about Ms. Valenote allegedly working part time, which was not true. [MR220] On November 11, Ms. Valenote informed MetLife that she had not worked a single day since February 21. [MR237] Ms. Valenote's affidavit states that she will provide her tax returns for the period as a further refutation of the erroneous part-time work issue.

"L3-4 discogenic pain," "Right-sided sacroiliac (SI) joint arthopathy," and "Hypermobility at L5-S1." Significantly, the October 6 note states that "the patient is not declared medically stable." [MR229]  The October 6 note states that "[t]he patient will be scheduled for a functional capacity evaluation to determine limitations regarding her job description submitted today." [MR229]  This is the second doctor to recommend a FCE.  Yet, MetLife neither tried to schedule a FCE nor requested a FCE.

Even more significant, on October 14, Dr. Anderson performed a Lumbar Discography using 20 gauge and 25 guage needles.  This procedure showed a "posterior tear extreme increase in pain that is concordant with patient's complaint" at L5-S1.  Dr. Anderson diagnosed that "L5-S1 considered provocative and concordant pain" from this invasive and painful test. [MR228]

On October 28, RIM sent MetLife a letter again stating that Ms. Valenote's last day worked was February 21 and that its records did not indicate any work beyond that point. [MR232]

On November 4, Ms. Valenote sent MetLife a letter again clarifying that she had never told Dr. Beard that she was working part time or full time at any point since February 21.  Importantly, Ms. Valenote stated that "I have not worked a day since February 21, 2003." [MR237][34]  The November 4 letter concludes by stating "[i]f you have any questions please let me or Virginia Valenote, my patient advocate, know." [Id.] The patient advocate also talked with a MetLife investigator who informed her thatMetLife understood that Ms. Valenote had not worked since February 21, 2003.[35]

On November 20, a MetLife paid consultant submitted his report based on a "file only review." [MR244]  MetLife had the right to request a physical examination under the LTD policy, but declined to do so. [MR31] The report sought to answer two questions

---

[34]     Dr. Beard's mistake about the part time work is shown in her notes for April 29, June 10 and July 24 which state that Ms. Valenote had not worked at all since February 21 due to chronic pain. [MR92, 94, 106]

presumably posed by MetLife. The first of these questions was whether there was information in the file to "provide an objectively abnormal basis for the patient's pain." The report stated that there were "abnormal findings" and that these findings "may explain some of the patient's pain." Thus, the report offered some confirmation for the existence of an "objectively abnormal basis" for Ms. Valenote's pain. Certainly, nothing in this statement suggested that no there was no "objectively abnormal basis" for Ms. Valenote's pain. The second question asked whether "the plan-of-treatment [was] consistent with severe impairment." In response to this question, the physician summarized Ms. Valenote's treatment and concluded that "such intensity-of-service implies that the patient's pain is severe." [MR244] The report concluded that "if the patient has surgery on 12/3/03, then some time for post-operative recovery will be needed." Certainly, nothing in that conclusion indicated that Ms. Valenote failed to meet the definition of disability under the plan document. On the contrary, taken as a whole, the report supported Ms. Valenote's claims of severe, chronic and widespread pain.

On November 26, 2003, MetLife again wrongfully denied Ms. Valenote's claim for benefits. [MR248] The denial completely omitted any mention of its consultant's report and therefore any mention of the consultant's opinions that Ms. Valenote's treatment was consistent with "severe pain" and that there was objective evidence to explain the presence of that pain. The denial, which listed the documents relied upon by MetLife, also shows that MetLife completely ignored the numerous documents it had obtained or Ms. Valenote had provided to MetLife after the August denial.[36]

---

[35]    Affidavit of Virginia Valenote at para. 11; *see also,* May 4, 2004 appeal letter ("In my conversation with my patient advocate, Virginia Valenote, METLife assured her it understood I never returned to work."). [MR265]

[36]    **The face of the November 26, 2003 "list" of documents omits the following important documents submitted to MetLife BEFORE the August 29 denial:** the returned MetLife June 25 letter with Dr. Beard's statement that Ms. Valenote's return to work date was "unknown at present." [MR89]; the March 27 document that that does not have a return to work recommendation and which instead states that Ms. Valenote was being evaluated for "persistent pain and should not return to work until at least May 1,

Instead, MetLife went back to the prior false claims contained in the initial denial regarding the elimination period and the completely refuted return to work issue. Incredibly, it again relied on the obviously false claim that Ms. Valenote had been released "to return to work as of May 1, 2003." Indeed, the denial went a step further by asserting that Ms. Valenote had been "advised" by her doctor to return to work on May 1, 2003 and "dismissed" from her care. None of these statements were true. But to make matters worse, MetLife went on to claim that despite Ms. Valenote's "pain predominately in the right buttock region," she was "allegedly working 10 hours a week in June of 2003."

After mistating several additional facts, the letter concludes by stating: "the information received and reviewed by MetLife fails to establish that you are experiencing a level of impairment that prevents you from the duties of your own occupation as an Intern Architect. The objective medical evidence we reviewed is incongruent with a long-term disability."

---

2003" [MR123];   Dr. Orzechowski's notes for December 2002 and January 2003 [MR125-139].

**The face of the November 26, 2003 "list" of documents omits the following important documents submitted to MetLife AFTER the August 29 denial**:   Ms. Valenote's September 3, 2003 letter [MR164]; Ms. Valenote's September 26 letter [MR173];   Advanced Physical Therapy of Alaska's July 31 and September 2 notes [MR188]; Advanced Physical Therapy of Alaska's "Basic Function Exam" on July 3 [MR189-194];   Dr. Beard's April 29 "Plan of Care" showing no return to work recommendation [MR195]; Dr. Beard's June 10 "Plan of Care" document without a return to work recommendation and only stating that she "consider part time 12-14 hr/wk" [MR196];   Ms. Valenote's October 6, 2003 job description [MR202];   Ms. Valenote's October 15 letter stating that tests showed a "torn L5-S1 disc" and attaching her letter to Dr. Beard [MR206-217];   RIM's October 28 letter stating again that Ms. Valenote had not worked since February 21 [MR232]; Ms. Valenote's November 11 letter stating that she had "not worked a day since February 21, 2003" [MR237]; MetLife's November 20 paid consultant's report stating that Ms. Valenote suffered "severe" pain consistent with a "severe impairment" [MR243-246]

Ironically, the "list" includes a supposed letter dated November 11, 2003 from Nurse Kiley in Dr. Beard's office that Plaintiff has been unable to locate in the administrative record provided in discovery.

In addition to its failure to account for or even disclose the opinions of its own consultant, MetLife's denial also completely ignored credible and reliable evidence it received from Ms. Valenote and that it had gathered itself after the August denial. Again, this can be seen from the list of documents on the face of the letter. In particular, this list ignores the RIM October 28 letter stating that Ms. Valenote had not worked since February 21 [MR232] and completely ignores Ms. Valenote's November 4 letter stating she had not worked a day since February 21. [MR237] Thus, MetLife ignored and refused to credit unequivocal information that, consistent with Ms. Valenote's claims in her appeal, she had never returned to work.

MetLife's November 26 assertion that Ms. Valenote was "released to return to work as of May 1, 2003" was equally untenable. On July 2, 2003, MetLife received a directly opposite statement from Dr. Beard's office stating that Ms. Valenote's "Expected return to work date" was "unknown at present." [MR89] On August 20, 2003, MetLife received records that included a "Return to Work Recommendations" document dated March 27, 2003, and signed by a Nurse Practitioner. [MR123] Yet, the document states only that "Ms. Valenote is being evaluated for persistent pain and should not return to work until at least May 1, 2003." As stated above, this document could not possibly constitute a release as it merely contemplated a date before which no work could be performed. Absolutely nothing in that document indicated that Ms. Valenote, in fact, should return to work following May 1. On the contrary, the obvious meaning of that document is that after May 1, the issue would need to be reevaluated. Moreover, this false assertion was directly contradicted by the April 29 "Plan of Care" document initialed by Ms. Valenote that did not have a return to work recommendation [MR195] and the April 29 progress note that Ms. Valenote had resigned her employment. [MR92-93]

In any case, MetLife had unequivocal evidence from Ms. Valenote and RIM that she had never returned to work on May 1, or any subsequent date. MetLife also told the

patient advocate that it understood she had not returned to work.[37] MetLife also failed to credit multiple progress notes that Ms. Valenote had not been able to work since February 21 and the "Plan of Care" documents from Dr. Beard's office for April 29 and June 10 that did not have return to work recommendations. [MR195, 196] Indeed, Dr. Beard's April 29 "Plan of Care" is dated only two days before the date that MetLife falsely asserted that Ms. Valenote was "released" to return to work. Nor can MetLife rely on the incorrect information previously provided from Beard's office. In addition to the mass of unequivocal contrary evidence, MetLife also had Ms. Valenote's correspondence to Dr. Beard that specifically pointed out the mistakes in Dr. Beard's records and by her staff on the return to work issue. [MR206-210] That letter was provided to MetLife by Ms. Valenote on October 16, 2003, well before MetLife's second denial.

The denial also falsely stated that Ms. Valenote was "dismissed" from Dr. Beard's care on July 24, 2003, implying that further medical care was not needed. But, as stated above, Ms. Valenote's September 3, appeal specifically MetLife that she had been referred to the pain specialist Dr. Anderson at the Advanced Pain Centers of Alaska for her chronic pain care. [MR168] On September 26, 2003, Ms. Valenote again informed MetLife that she was being treated by Dr. Anderson (and Dr. Lorenzten), [MR173] and provided MetLife with Dr. Anderson's July 7 record showing the referral. [MR0183] Finally, MetLife received information on October 22, 2006 directly from Dr. Beard that "the plan was for her to continue medical treatment" with Dr. Anderson, and that "[t]o our knowledge, this was ongoing treatment for the pain syndrome which was evaluated at our clinic." [MR220]

Other important claims in MetLife's November 26 denial letter were intentionally or recklessly false. For example, after falsely stating that she had returned to work, MetLife claimed that "[c]alls made to the other two providers, Dr. Downs and Dr. Orzechowski revealed neither advised you to stop working for your condition on or

---

[37]     Affidavit of Virginia Valenote at paras. 11.

before February 21, 2003." But MetLife's administrative record includes no record or notation showing these calls were ever made except for the self-serving reference in the denial letter. This is hardly surprising given that these alleged statements are completely inconsistent with the contemporaneous medical records.

In fact, MetLife's statement that "Dr. Orzechowski did not advise you to stop working until September 23, 2003" is obviously false and bizarrely so. The primary treating physician at that time, Dr. Orzechowski, wrote a letter dated September 22, 2003, explicitly stated that "the first day she stopped working for treatment was December 18, 2002." [MR174] If MetLife had actually spoken with Dr. Orzechowski on October 2, as claimed in the denial letter, it would have only re-confirmed the truth in his September 22 letter that he advised Ms. Valenote to stop working on December 18, 2002. [MR174]. It would have also confirmed that Dr. Orzechowski advised Ms. Valenote to try part time duty, but then advised her to stop working again on February 19. [MR268]

MetLife also falsely stated on November 26 that "[you] were released from physical therapy on May 12, 2003 per the physical therapy notes supplied by HealthSouth. This information is suggestive that your pain was not sufficiently severe to preclude work prior to March 27, 2003, and subsequent to May 1, 2003." But MetLife had the HealthSouth record and knew from the face of this document that Ms. Valenote had transferred her physical therapist care to Joy Backstrum. [MR98] And, MetLife knew from Ms. Valenote's September 3 letter that she had changed physical therapist to Joy Backstrum when she did not see improvement with Healthsouth. [MR164] MetLife also knew from Ms. Valenote's September 3 and September 26 letters that she continued her physical therapy at Dr. Peter Lorentzen's office after Joy Backstrum. [MR164, 173][38]

Ms. Valenote informed MetLife that she had been under the continuing care of the pain specialist Dr. Anderson and the care Dr. Lorentzen. Ms. Valenote's patient advocate told MetLife to contact Dr. Anderson and Dr. Lorentzen. [MR315] Incredibly, the

November 26 letter shows that MetLife made no effort to speak directly with either of these doctors.   Had MetLife contacted Dr. Lorentzen it would have learned his conclusion that Ms. Valenote's "injuries have been debilitating and at no time since she initiated care with my office has she been able to return to work."  [MR255]  MetLife also completely ignored Dr. Anderson's October 6, 2003 and October 14, 2003 progress notes provided to MetLife well before its denial.  Had MetLife spoken with Dr. Anderson it could have reconfirmed that this doctor recommended a functional capacity examination based on her architect job description on October 6, and that the painful discography test on October 14 showed that Ms. Valenote suffered "provocative and concordant pain" from the torn disc at L5-S-1[MR229]  These bizarre distortions of the record simply provide additional evidence of MetLife's total abandonment of its fiduciary obligation as an ERISA administrator.

In addition to relying on assertions that were obviously false, MetLife had substantial information indicating the extensive and severe pain Ms. Valenote was suffering on an ongoing basis.  Specifically, MetLife had the notes from Dr. Beard's office (discussed in detail above) which catalogued in dramatic terms Ms. Valenote's chronic pain.  [MR90, 92, 94, 106]  On August 18, MetLife received records from Drs. Mary and Wayne Downs, which stated that Ms. Valenote had "chronic pain" including, among other things, pain in her arms "down the biceps region on the right into a radial distribution." [MR113]  MetLife also had important information from the treating physician Dr. Anderson showing severe pain, and injections on August 5, August 12 and September 16.  [MR177-183]  It also had the Advanced Physical Therapy notes and its July 3 "Basic Function Exam" showing severe pain on numerous functions.  [MR188, 189]  It also had, but refused to credit, Dr. Anderson's October 6 progress note stating that Ms. Valenote "was not medically stable." [MR229].   It also had, but refused to credit, Dr. Anderson's October 14 progress note stating that at L5-S1 Ms. Valenote had

---

[38]    Ms. Backstrum's records show she first saw Ms. Valenote on April 21, 2003. [MR271 and V891]  Ms. Valenote saw Ms. Backstrum until she started seeing Dr.