"posterior tear at extreme increase in pain that is concordant with patient's complaint" and concluding that Ms. Valenote suffered "provocative and concordant pain" at L-5-S1. [MR228] By November 11, 2003, MetLife was also aware that Dr. Anderson was going to perform a surgical procedure on December 3, 2003 called a "nucleolysis" [MR243] and that this would require "some time for post-operative recovery." [ML246] These records demonstrate that MetLife had substantial information that Ms. Valenote suffered severe debilitating pain that contradicted its preposterous assertion that Ms. Valenote's pain was essentially limited to her "right buttock."

Perhaps most importantly, MetLife had the conclusions of its own expert demonstrating both that there appeared to be objective evidence of Ms. Valenote's pain and that her treatment was consistent with severe pain. [MR171] It is all the more incredible that armed with this report, MetLife had the gall to conclude its denial with the assertion that "[t]he objective medical evidence we reviewed is incongruent with a long-term disability." As discussed further below, even if this claim were true, MetLife's reliance on an alleged lack of objective medical evidence is in itself arbitrary and capricious. But for MetLife to rely on this conclusion in the face of its own consultant's contrary conclusion is nothing short of remarkable. That MetLife failed to disclose even the existence of the report strongly suggests not only that MetLife knew that it was acting in bad faith, but that it intended to take steps to cover it up.   [MR243]

MetLife certainly cannot be heard to claim that its failure to mention the report was merely an oversight or that it somehow failed to receive the report. In fact, MetLife cherry picked a single sentence out of the report. Ironically, that sentence was the obviously false assertion that Ms. Valenote was "allegedly working 10 hours a week in June of 2003...." [MR249 and MR244]. Yet, despite meticulously cataloguing the limited documents on which it supposedly relied for its denial, MetLife made absolutely no mention of the report. [MR248-49]

ERISA requires that MetLife not only state the specific reasons for its denial, but

Lorentzen in May 2003. [See MR271-274, MR281-282, V662 *et seq* and V891-896]

that it "afford [Ms. Valenote] a reasonable opportunity ... for a full and fair review" of the denial. MetLife's affirmative efforts to suppress the existence of the consultant's report at the same time that it ignored statements in that report that supported Ms. Valenote's claims violate the most basic requirements of fairness and indicate nothing if not bad faith.

In summary, MetLife's November 26 assertion that Ms. Valenote was not prevented from "performing the duties of your occupation" was completely without a rational basis. Metlife had the architect job descriptions from RIM and Ms. Valenote showing the job as a light to medium job. Yet, MetLife made no attempt to relate the chronic pain limitations on sitting, walking or other movement shown in the medical records to the job description or MetLife's LTD policy definition of disability. Nor did MetLife ask its consultant to address this issue. This latter failure is significant, because it seems likely that if MetLife had requested such a response from the consultant and had actually given the consultant all of the relevant information the answer would have supported Ms. Valenote's claim. [39]

---

[39]     The consultant's "Synopsis of Reviewed Material" shows that MetLife withheld numerous important documents from the consultant including the following: RIM's June 12 employer statement with her job description and stating that she had not worked since February 21 [MR77-78, 80-82]; Ms. Valenote's October 6 job description [MR202]; the June 5 Attending Physician Statement from Dr. Beard's office [MR73-75]; the July 3 statement from Dr. Beard's office that her return to work date was "unknown at present" [MR89]; the notes from Dr. Beard's office for March 27, April 29, June 10, and July 24 showing Ms. Valenote suffered "chronic back pain," had not worked since February 21 and other information. [MR90-95, 106-107]; the March 27 document from Dr. Beard's office that she was being evaluated for "persistent pain" [MR123]; Dr. Orzechowski's notes for December 2002 and January 2003 [MR125-139]; Ms. Valenote's September 3, 2003 letter [MR164]; Ms. Valenote's September 26 letter [MR173]; Advanced Physical Therapy of Alaska's July 31 and September 2 notes [MR188]; Advanced Physical Therapy of Alaska's "Basic Function Exam" on July 3 showing extreme pain at numerous body functions [MR189-194]; the April 29 "Plan of Care" document from Dr. Beard's office showing no return to work recommendation [MR195]; the June 10 "Plan of Care" document from Dr. Beard's office without a return to work recommendation and only stating that she "consider part time 12-14 hr/wk" [MR196]; Ms. Valenote's October 15 letter and her attached letter to Dr. Beard correcting the return to work issue

MetLife also knew that both Dr. Beard and Dr. Anderson recommended a FCE. Yet, MetLife failed to investigate or ask Ms. Valenote to undergo the functional capacity evaluation. This is particularly important because the objective finding of the February 2005 FCE shows Ms. Valenote met the definition of disability within the meaning of the policy. Indeed, the February 2005 FCE states that Ms. Valenote is incapable of performing even a sedentary level of work. There is no reason to believe that a FCE in October 2003 would have reached a different conclusion.

### c. The May 4 Appeal and the June 22, 2004 Denial

On May 4, 2004, Ms. Valenote appealed the November 26, 2003, denial. In connection with this appeal, the patient advocate sent MetLife a letter on May 20, 2004 once again stating that Ms. Valenote had not worked since February 2003, and that Ms. Valenote had never received a note from a medical provider releasing her to return to work. [MR314-316] As stated above, this letter followed the patient advocate's conversation with a MetLife claim analyst who had informed the advocate that MetLife understood that Ms. Valenote had not worked since February 2003.[40] The patient advocate's May 20, 2004 letter also stated that MetLife had not contacted Dr. Anderson and Dr. Lorentzen, the primary treating doctors. The letter from the patient advocate states that "[w]e trust that you will avail yourself of the opportunity to contact all of Daniela's physicians to assist you in making a fair determination." [MR316]

Ms. Valenote's May 4, 2004 appeal and attachments provided a detailed list of her medical history, including her December 3 and her January 2004 procedures by Dr. Anderson, and meticulously explained why MetLife's factual conclusions in the November 26, 2003 denial were contradicted by the record. [MR261-285] Specifically, Ms. Valenote again pointed out that she had performed no work after February 21, 2003,

---

[MR206-217]; RIM's October 28 letter stating again that she had not worked since February 21 [MR232]; and Ms. Valenote's November 11 letter to MetLife stating that she never told Dr. Beard's office that she was working and explicitly stating that "I have not worked a day since February 21, 2003." [MR237][39]

[40]    Affidavit of Virginia Valenote at para. 11.

and that she had never been released by any care provider to return to work. Moreover, she offered extensive rebuttal to each of and every one of MetLife's factual assertions. The rebuttal included notes on Dr. Anderson's operation on December 3 [MR277-279] , and physical therapist Joy Backstrum's notes from April 2003. [MR271-274] The rebuttal included a March 5, 2004 letter from Dr. Lorentzen to MetLife stating that Ms. Valenote's "injuries have been debilitating and at no time since she initiated care with my office has she been able to return to work" and that since "she became a patient at my office [on May 11, 2003] to her current status, she has been unable to work." [MR255; 281] Dr. Lorentzen thus finally and completely refuted any claim that Ms. Valenote had done even part-time work.

In response to Ms. Valenote's detailed May 4, 2004 appeal, and apparently unhappy with the conclusion of the prior undisclosed, "independent" review, MetLife shopped for another paid consultant. [MR318-319] This eventually lead to MetLife asserting new reasons for the denial at the last appeal. Yet, by failing to provide the new consultant with the information necessary to make a reasoned analysis, MetLife virtually guaranteed that this report would be fatally flawed. Indeed, the second review was marked by the same kind of shocking contempt for fair and reasoned analysis that MetLife exhibited throughout the claim process. For example, the second report carefully selected a single sentence from Dr. Lorentzen's letter and completely omitted his opinion that Ms. Valenote had been unable to work since May 2003 because of her disabling chronic pain. It also omitted the opinion from the first consultant that Ms. Valenote suffered from "severe" pain" that was consistent with a "severe impairment." The report also listed Ms. Valenote's medications as including Neurotin, gabatril, Bextra, Viox, Zanaflex, Norflex, Glucosamine/Chondrotin, Lexapro, Pamelor, Elavil, and Topomax without discussing the reasons for or the effects of so many medications.

Despite this, the second paid consultant noted that on "12/3/03 she underwent discography, with finding that injection of L5-S1 gave pain concordant with that of which she complained. At that sitting, therefore, she also underwent intradiscal electrothermal

therapy (IDET) of L5-S1." [MR318]    The report then stated that "there seems to be no formal follow up re: the effect of the IDET." This statement, however, was totally false. MetLife knew that Ms. Valenote was under the continual care of Dr. Anderson at Advanced Pain Centers of Alaska, and Dr. Lorentzen after the IDET. Dr. Lorentzen's March 5, 2004 letter to MetLife notes this continual care. [MR255-256; 281-282] The follow-up after the IDET was evident from Ms. Valenote's May 4, 2004 appeal letter stating that Dr. Anderson performed an "Epidural Injection" in January and that Dr. Lorentzen referred her to an Eagle River physical therapist closer to her home. [MR263] MetLife also could have easily requested the medical records on the follow-up. [See V219-266; V709 et seq.] Thus, even if the second paid consultant's ignorance was somehow innocent (it is hard to know given the total absence of any indication what the physician relied on for his conclusions), MetLife upon receiving the report cannot possibly claim that it was unaware of the truth. Thus, MetLife essentially relied on a report that it knew to be based on inaccurate statements.

Even putting aside MetLife's bad faith, the actual conclusions of the second report do not support MetLife's denial. The report's conclusion was at best equivocal. For example, the report states that "it does not appear to me that there was any amelioration of symptoms following 2/22/03 [the first day of the elimination period] that would have rendered EE more able to work, at least until the IDET." [MR319] This statement clearly implies that Ms. Valenote was unable to work long past her elimination period, which, according to MetLife, was May 23, 2003. [MR162B]

The report also states that "in sum, unless something is missing, the records support at least an ongoing slight functional impairment on the basis of pain, limiting EE to sedentary and perhaps light duty work from 2/22/03 through IDET."[41]    But, MetLife knew full well that "something was missing." This included the extensive follow-up records from Dr. Anderson and Dr. Lorentzen after the IDET. Moreover, there is nothing

in this second report to suggest that the paid consultant made even a cursory attempt to analyze Ms. Valenote's actual functional work capacity, the demands of her job as intern architect, and MetLife's actual definition of disability. Indeed, the absence of any mention of these things suggests that MetLife, even though it had two job descriptions, failed again to provide the second paid consultant with the relevant definition or the actual duties of Ms. Valenote's job.

The above facts demonstrate that, because Ms. Valenote had completely rebutted the November 26 denial, MetLife decided to come up with a completely new and previously undisclosed reason for denying the May 4, 2003 appeal. Not surprisingly, given the equivocal nature of the second report, MetLife again carefully cherry-picked from the second report to deny Ms. Valenote's claim. As its June 22, 2004 denial letter stated:

> There did not appear to be a formal follow-up regarding the effect of the IDET and it was your chiropractor's opinion that you needed to become involved in a more frequent and active physical therapy program. The medical records support a slight impairment on the basis of pain and this would not limit you from your own occupation.

[MR322] By setting forth a completely different reason for the denial, MetLife once again failed to discharge its fiduciary duty. In addition, even taken on its face, the denial was arbitrary and capricious for several reasons.

First, MetLife knew or could have easily confirmed that there had been formal follow-up regarding the IDET. Second, MetLife's double standard in its reliance on the Dr. Lorentzen's "opinion" is so distorted as to support no conclusion other than bad faith. Dr. Lorentzen's actual "opinion" on March 5, 2004 was that Ms. Valenote's "injuries have been debilitating and at no time since she initiated care with my office has she been able to return to work." [MR255] Incredibly, although relying on Dr. Lorentzen's "opinion" to support its denial, MetLife failed to mention that his opinion actually

---

[41]    Again, the Affidavit of Dr. Gregory R. Polston M.D. at Exhibits 1 and 7 indicates that Ms. Valenote is incapable of performing even sedentary work and that her job

supported Ms. Valenote's claim. Instead, like its second paid consultant, MetLife carefully cherry-picked a single sentence from Dr. Lorentzen's letter.    As for Dr. Lorentzen's statement that Ms. Valenote needed to become "involved" in more frequent physical therapy, the letter makes clear that this statement was merely offered to explain his belief that she should transfer her care from him to a therapist in Eagle River to reduce Ms. Valenote's travel time.  In fact, Dr. Lorentzen made such a referral and Ms. Valenote diligently followed up on it.  [See MR275] This also was known to MetLife when it made its decision, as Ms. Valenote included the Eagle River therapist's record in her May 4, 2004 appeal. [Id.]  For MetLife to carefully cherry-pick and then misrepresent Dr. Lorentzen's statement to imply that Ms. Valenote was somehow failing to take the necessary steps for her own care shows not only self-dealing but also further proves MetLife's bad faith.

In addition, MetLife distorted the second paid consultant's statement from something highly equivocal to something far less so.  But once again MetLife lacked any rational basis to support its assertion that Ms. Valenote's chronic pain did not prevent her from "performing the usual duties of your own occupation." [MR322]  MetLife had two architect job descriptions showing the level of work to be light to medium work.  [MR82, MR202]  MetLife had the July 3 "Basic Function Exam." [MR189] MetLife also knew that Dr. Beard and Dr. Anderson had recommended functional capacity evaluations but did not investigate or request a FCE.  [MR74, 229] Once again neither MetLife nor its second paid consultant tried to relate Ms. Valenote's chronic pain disabilities shown in the medical records to the job descriptions.  Indeed, the medical records showed that Ms. Valenote was incapable of performing even sedentary work for an 8 hour shift.  And, MetLife knew that Ms. Valenote had not been able to work at all since February 21, 2003.

Finally, whatever justification MetLife might offer for its completely new rational in the June 22, 2004 denial (there is none), it cannot possibly defend the fact that it

---

description describes light to medium level of job duties.

altered its rationale for denying the claim without giving Ms. Valenote an opportunity to respond. In other words, the final denial completely abandoned any claims that Ms. Valenote had been "released" for work during the elimination period or that she continued to work during the elimination period. Clearly, MetLife finally concluded that to continue to rely on these justifications for denial failed the straight face test so it invented another reason entirely. This time MetLife came up with the wholly unsupported assertion that she was not generally disabled. Moreover, the claim of "no follow up" regarding the IDET was both false and new (necessarily so) without giving Ms. Valenote any opportunity to refute the claim.

### 5. Argument

As indicated above, in reviewing MetLife's decision here, the Court must engage in a three part analysis: first, the Court must determine what degree of deference is due to MetLife's decision to deny Ms. Valenote's claim; second the Court must determine whether MetLife engaged in irregularities that prevented the development of a full and complete record; and third, the court must determine whether Ms. Valenote is entitled to benefits under the plan. Although the first and second parts are interrelated, the Ninth Circuit's decision in *Abatie* makes clear that they are distinct. As *Abatie* states "[e]ven when procedural irregularities are smaller, though, and abuse of discretion applies, the court may take additional evidence when the irregularities have prevented full development of the administrative record."[42]

As the discussion below indicates, MetLife engaged in numerous and substantial irregularities that mandate a de novo review and that require the review of additional evidence outside of the administrative record. Alternatively, as shown below, the Court is justified in ruling that MetLife acted arbitrarily and capriciously in denying Ms. Valenote's LTD claim.

### a. MetLife's Provided Inconsistent Reasons for its Denial

Because of its primacy to a "full and fair" review, *Abatie* singled out for

---

[42]     *Abatie*, 458 P.3d at 973.

condemnation the situation in which an administrator provides "inconsistent" reasons for denial. This irregularity is particularly flagrant when the inconsistency results in a new reason at the end of the claim process.[43]  Thus, in considering whether MetLife provided Ms. Valenote with a "full and fair" review of the administrator's decision, substantial emphasis must be placed on the second denial.  This is because the second denial provided the last opportunity for Ms. Valenote to challenge the administrator's decision.

The second denial primarily relied on the repeated, incorrect claim that Ms. Valenote had failed to meet the elimination period. Almost as an afterthought, the denial then tossed out an apparent second basis for denial. As the letter stated:

> In conclusion, the information received and reviewed by Metlife fails to establish that you are experiencing a level of continued impairment that prevents you from performing the duties of your occupation as an Intern Architect. The objective medical evidence we reviewed is incongruent with a long-term disability.

To the extent that this paragraph is at all comprehensible, the first sentence appears to relate to the false information regarding Ms. Valenote's return to work and the second sentence appears to relate to the actual medical information received by MetLife.

For its first claim, MetLife apparently initially relied on the statement of Beard's office that Ms. Valenote had returned to work for 10 hours per week in June 2003.   In fact, even as early as July 3, MetLife had received information from Dr. Beard's office contradicting this information when it sent MetLife a facsimile on which it wrote the words "unknown at present" after MetLife's question "expected return to work date." [MR89] In addition, RIM itself had provided an "Employer Statement" on June 16, clearly stating that Ms. Valenote's first date of absence was February 22, 2003 and that her absence since that time had been continuous. [MR81] Most importantly, as discussed in detail above, there was not a shred of evidence that Ms. Valenote had been "released" to return to work or that she had been released from a physician's care. Indeed, as to the latter point, MetLife clearly knew that Ms. Valenote's "release" from Dr. Beard was for

---

[43]      *Id.* at 974.

the sole purpose of referral to Dr. Anderson, a practitioner with more specialized skill in pain medicine than that possessed by Dr. Beard.  [See MR220]

In any case, following the initial August 29, 2003, denial, Ms. Valenote reiterated all of the same information that MetLife already had.  Incredibly, despite specifically informing Ms. Valenote's patient advocate that it no longer believed that Ms. Valenote had returned to work since February 21, 2003, [44] MetLife again trotted out this reason as the primary reason for its second denial.  Yet, in its third denial MetLife absolutely abandoned any discussion of the elimination period and instead concluded for the first time that Ms. Valenote was generally not disabled.  As MetLife stated, the "medical records support a slight impairment on the basis of pain and this would not limit you from your own occupation."  Although Ms. Valenote will address further below why this conclusion is nonsense, the critical point here is the degree to which MetLife altered its focus from the second to the third, and final, denial.

Nor can MetLife rely on its ambiguous and completely unexplained claim that the "objective medical evidence <u>we reviewed</u> is incongruent with a long-term disability."  As discussed further below, the statement implied only that the records were incomplete, not as MetLife claimed in its third denial, that Ms. Valenote was generally not disabled.

### b. <u>MetLife Improperly Relied on the Alleged Lack of Objective Evidence to Deny Ms. Valenote's Claim</u>

Even putting aside the ambiguity of MetLife's claim of the lack of "objective evidence" the statement clearly indicates that MetLife violated ERISA in another critical way.  That is MetLife improperly injected into the claim process a requirement of "objective evidence."  Indeed, MetLife's mistaken belief that Ms. Valenote had failed to present "objective evidence" colors virtually every act of bad faith in this case.

The issue of MetLife's improper reliance on an "objective evidence" standard was

---

[44]    Affidavit of Virginia Valenote at para. 11;  *see also,* May 4, 2004 appeal letter ("In my conversation with my patient advocate, Virginia Valenote, METLife assured her it understood I never returned to work.").  [MR265]

very recently addressed in *Sin v. MetLife*.[45] There MetLife employed the following offending language: "Based on our review of the information provided, we have determined that we have insufficient information to support an impairment that would prevent you from performing the duties of a retail salesperson."[46]    Based on this language, which is notably less explicit then MetLife employed here, *Sin* determined that MetLife's denial was improper because it introduced a requirement of "objective" evidence when the plan included no such requirement. *Sin* also noted that the particular condition from which the plaintiff suffered was not usually susceptible of objective evidence. These conclusions are precisely analogous with the present case where the plan includes no requirement for objective evidence of disability and where Ms. Valenote's condition, chronic pain, is generally not "objectively" determinable. [47]

Notably, in prior cases, MetLife has repeatedly attempted to inject an objective-evidence requirement and federal courts have repeatedly rejected MetLife's efforts to do so. Thus, in addition to *Sin*, the court in *May v. Metropolitan Life Ins. Co.*[48] determined that MetLife had acted arbitrarily and capriciously by imposing a requirement of objective evidence when the patient suffered from chronic pain syndrome. And in *Baker v. Metropolitan Life Ins*,[49] the court cited to numerous circuit court decisions for the principle that

> as a matter of law... an ERISA administrator's reliance on the lack of objective medical evidence is arbitrary and capricious where the claimant's illness or sickness cannot be objectively determined. As the Sixth Circuit aptly stated in an ERISA action: "As many courts have observed, pain evades detection by objective means."[50]

Notably, *Abatie* determined that the Court should weigh an administrator's

---

[45]    2006 WL 3716750 (D. Or. Dec. 13, 2006).

[46]    *Id.* at 5.

[47]    It is only one of several ironies in this case that Ms. Valenote did, in fact, produce "objective" evidence of her condition (this is discussed further below).

[48]    2004 WL 2011460 (N.D. Cal. 2004).

[49]    2006 WL 3782852 (M.D. Tenn. 2006).

[50]    *Id.* at 18 (internal citations omitted).

structural conflict heavily where an administrator has "repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly...."[51]  The remarkable number of recent reported decisions regarding MetLife's improper application of an objective standard indicates that this *Abatie* factor is also present here.

### c.  MetLife's Basis for Denial Failed to Give Ms. Valenote a Full and Fair Review of the Denial

The factors discussed above each contribute to the general conclusion that MetLife failed to give Ms. Valenote a full and fair review of the denial.  However, MetLife's statement regarding the apparent lack of "objective evidence" suffers from yet another problem.  Specifically, the statement is so vague and ambiguous that it fails to give Ms. Valenote a fair opportunity to challenge the decision.[52]   Particularly, in light of MetLife's lengthydiscussion regarding the bogus issue of the elimination period and its false claim that Ms. Valenote had been "released" to return to work, MetLife's second denial essentially sent Ms. Valenote off on a wild goose chase with no real opportunity to challenge MetLife's denial.

### d.  MetLife Failed to Ask the Plaintiff for Necessary Evidence and to Properly Investigate the Claim

*Abatie* states that an administrator is entitled to diminished deference when it "fails adequately to investigate a claim or <u>ask</u> the plaintiff for necessary evidence."[53]  For the latter point, *Abatie* cites the Ninth Circuit's decision in *Booten v. Lockheed Med. Benefit Plan,*[54] in which the court (somewhat whimsically) explained:

> "What we got here," said Strother Martin, "is a failure to communicate." This is an all-too-common occurrence when ERISA-covered health benefit plans deny claims. While a health plan administrator may-indeed must-deny benefits that are not covered by the plan, it must couch its rulings in

---

[51]   *Abatie*, 458 F.3d at 968.

[52]   *Baker, supra, at 18* (holding that reliance on ambiguous language in the plan is inherently arbitrary and capricious because it fails to give the claimant a fair opportunity to challenge the decision).

[53]   *Abatie*, 458 F.3d at 968 (emphasis added).

[54]   110 F.3d 1461 (9th Cir. 1997).

terms that are responsive and intelligible to the ordinary reader. *See* <u>29 C.F.R. § 2560.503-1(f)</u>. If the plan is unable to make a rational decision on the basis of the materials submitted by the claimant, it must explain what else it needs. *Id.* If ERISA plan administrators want to enjoy the deference to which they are statutorily entitled, they must comply with these simple, common-sense requirements embodied in the regulations and our caselaw. The plan here did not.[55]

This same conclusion applies with equal force here.

Although stating that "the objective medical evidence we reviewed is incongruent with long term disability," MetLife gave Ms. Valenote no indication how she might repair this deficiency. In other words, there is no serious question that Ms. Valenote is in fact disabled. She has the opinions of two qualified practitioners (Dr. Polston and Dr. Lorentzen) as well as the results of a Functional Capacity Exam all of which demonstrate unequivocally that she is unable to perform the duties of an intern architect. But at the time of the second denial MetLife made no attempt to "explain what it needs" to establish that Ms. Valenote's condition was "congruent" with a long term disability. Instead, as stated above, Ms. Valenote was left to disprove what MetLife apparently already knew to be false.

In addition to MetLife's failure to ask Ms. Valenote "for necessary information," MetLife also failed to adequately investigate Ms. Valenote's claim. The court in *Sin* addressed this question in the context of plan language that is identical to that here. The language from both <u>*Sin* and Ms. Valenote's policy</u> reads:

> At your expense, you must provide documented proof of your Disability. Proof includes, but is not limited to:
>
> 1. The date your Disability started;
> 2. The cause of your Disability; and
> 3. The prognosis of your Disability.
>
> You will be required to provide signed authorization for us to obtain and release medical and financial information, and any other items we may

---

[55]    *Booton*, 110 F.3d at 1465.

reasonably require in support of your Disability. [MR29][56]

Based on this language and consistent with *Abatie*, *Sin* concluded that "while the language of the plan is somewhat contradictory—making it the claimant's burden to provide documentation of her disability—it clearly places the burden of obtaining medical records on the administrator."[57]

In the present case, MetLife obtained releases from Ms. Valenote yet failed to obtain various relevant records from Ms. Valenote. For example, in both its August 29, 2003 and its November 26, 2003 denials MetLife asserted that Ms. Valenote was "released from physical therapy on May 12, 2003...." [MR162B, MR249] In her appeal dated September 3, 2003, Ms. Valenote contradicted this claim and identified two different physical therapists, Joy Backstrum and Dr. Peter Lorentzen, who had provided ongoing physical therapy to Ms. Valenote starting in May 2003 and continuing throughout the claim process. [MR168] As is evident in the administrative record, MetLife never sought to obtain records from these providers to verify Ms. Valenote's claim.

In addition, in both the first and second denial, MetLife repeated the false claim that Ms. Valenote had been discharged from Dr. Beard's treatment. Yet, Ms. Valenote's September 3 appeal letter specifically stated that Ms. Valenote had been referred to the pain specialist Dr. Anderson. [MR164] On September 26, Ms. Valenote stated that Dr. Anderson was providing her "primary care" and attached Dr. Anderson's July 21 record noting the referral from Dr. Beard, Dr. Orzechoski and Dr. Downs. [MR183] Dr. Beard herself confirmed on October 22 that as to the referral to Dr. Anderson "[t]o our knowledge, this was ongoing treatment for the pain syndrome which was evaluated at our clinic." [MR220] Despite this, MetLife and its first consultant did not even try to speak directly with Dr. Anderson, the most important treating pain specialist. This is demonstrated by the fact that the November 26 denial letter lists all of the calls it either

---

[56] See also *Sin*, 2006 WL 3716750 at 4.
[57] *Id.*

made or attempted to make, and this list does not mention Dr. Anderson. [MR248-49, and see also MR243 as to first consultant's failure to speak with Dr Anderson][58]

MetLife also failed to either obtain or request the FCE recommended by both Drs. Beard and Anderson. As stated above, a medical diagnoses of chronic pain, which Ms. Valenoe had received, is alone a sufficient basis for a finding of disability under the plan language and therefore a FCE was not required for Ms. Valenote to "prove" her claim. Nevertheless, if MetLife had some legitimate concern regarding the actual degree of Ms. Valenote's disability it had every opportunity to request or obtain an FCE. And, of course, had MetLife taken this basic step in 2003 or 2004, there is no doubt that the FCE would have shown the same limitation to no more than 4 hours of sedentary work a day shown by the February 2005 FCE.[59]

Finally, and perhaps most flagrantly, MetLife failed to obtain the "follow-up" medical records after Ms. Valenote's December 3 operation. This failure is remarkable given that its third denial asserted the lack of "follow-up" as a completely new reason for the final denial. MetLife could have easily obtained these records if it truly believed they were important, as it knew from the May 4, 2004 appeal that Dr. Anderson and Dr. Lorentzen continued to provide follow-up after this operation. MetLife's failure to obtain these records is nothing more than a blatant effort to game the claim process.

In sum, MetLife's failure to investigate and obtain records or information from any of these care providers in itself constitutes a procedural irregularity. When combined with the fact that MetLife simply repeated the same false statements from one denial to the next, knowing them to have been contradicted by the claimant, constitutes bad faith in the extreme.

---

[58]    This list also shows that MetLife did not try to call Dr. Lorentzen.
[59]    *See* Affidavit of Dr. Gregory R. Polston, M.D. at Exhibit 7 (FCE performed on February 14, 2005).

**e. MetLife's Failure to Consider Evidence Received After the First Denial is Arbitrary and Capricious**

MetLife abused its discretion by failing to consider evidence submitted to it after the first and second denial. MetLife's November 26, 2003 denial lists the documents it considered denying the claim for the second time. [MR249-250] As shown above, this list does not include any reference to numerous important documents received after the August 29 denial. The documents that MetLife refused to consider included Ms. Valenote's letter that she had never worked, RIM's letter, important medical records, her architect job description, and the first consultant's report. The third denial, by asserting that there was no "formal" follow-up to Ms. Valenote's operation on December 3, also failed to consider the substantial evidence discussed in Ms. Valenote's May 4 appeal that demonstrated that there was such follow up. This repeated "omission is critical because the failure to consider evidence that is offered after an initial denial of benefits renders a final denial of benefits arbitrary and capricious."[60]

**f. MetLife Failed to Credit Ms. Valenote's Reliable Evidence and Cherry Picked Other Evidence**

*Abatie* lists the failure to "credit a claimant's reliable evidence" as another factor militating against deference to the administrator.[61]

In all three denials, MetLife consistently ignored reliable evidence that contradicted its pre-determined decision to deny Ms. Valenote's LTD claim. Compounding MetLife's bad faith was its equally consistent pattern of cherry picking language from various documents that provided superficial support for its denial. Several courts have singled out this practice for particular condemnation. Indeed, in *Glenn v. MetLife*, the Sixth Circuit stated:

> This case is not the first in which we have been called upon to review MetLife's over-reliance on an aberrational report from a physician. In *Spangler v. Lockheed Martin Energy Systems, Inc.*, a case with several

---

[60]    *Glen v. MetLife* 461 F3d 660, 672 (6th Cir. 2006).
[61]    *Abatie*, 458 F.3d at 968.

interesting parallels to this one, the plan administrator denied benefits based on the responses of the plaintiff's treating physician on the same form that Dr. Patel filled out in this case, a physical capacities evaluation that we described as "somewhat aberrant," given that "all of [the physician's] prior reports and statements clearly indicate[d] that Spangler [wa]s not able to perform any work." 313 F.3d 356, 362 (6th Cir.2002). We concluded that "MetLife, as Spangler contends, 'cherry-picked' her file in hopes of obtaining a favorable report from the vocational consultant as to Spangler's ability to work." *Id.*[62]

In another very recent case, *Rementer v. MetLife,* the court again admonished MetLife for "cherry picking" information from the record:

> What was patently unreasonable is that in denying Rementer's claim, MetLife purported to rely on the opinion of another hired medical consultant, Dr. Ito, yet ignored Dr. Ito's specifically-identified limitation of no "prolonged sitting (ie needs to change position)." Rementer AR 175. In fact, MetLife's June 29, 2004 final denial letter mentioned every single restriction identified by Dr. Ito except the one concerning sitting. This omission is telling. MetLife essentially accepted all of Dr. Ito's findings except the one that was the most damaging to MetLife's position. While it is possible MetLife could have totally rejected Dr. Ito's opinions and still rendered a reasonable decision, it was arbitrary and capricious for the insurer to "cherry-pick" among the limitations specifically identified by Dr. Ito.[63]

In the present case, MetLife engaged in similar arbitrary and capricious conduct. For example, it cherry picked from the first "independent" review the false statement that "despite the pain, the patient was allegedly working 10 hours per week in June of 2003." [See MR244 and MR249] Yet, MetLife left out the prior sentences concluding that "[s]uch intensity of service implies that the patient's pain is severe."

Other examples of cherry picking include MetLife's selective use of the second "independent medical report" (discussed in section 4.c. above). Perhaps the most egregious example of this conduct is MetLife's selective use of Dr. Lorentzen's letter of March 5, 2004. In that letter, Dr. Lorentzen opined that Ms. Valenote's "injuries have

---

[62]    *Glenn v. MetLife,* 461 F.3d 660, 672 n. 4 (6th Cir. 2006).
[63]    *Rementer v. MetLife,* 2006 WL 66721 (M.D.Fla.) at 3.

been debilitating and at no time since she initiated care with my office has she been able to return to work." [MR255 and MR281]   Not only did MetLife flatly ignore this opinion, but, as explained in section 4.c, above, it selectively quoted another of Dr. Lorentzen's statements to falsely suggest that Ms. Valenote was not, in fact, disabled. [*compare* MR255 with MR322]  Notably, this example perfectly parallels MetLife's bad faith conduct described in the above quote from *Rementer v. MetLife*.

The examples of MetLife's failure to credit or consider reliable evidence are also legion and are described at length above. They include the failure to credit Dr. Anderson's progress note from October 6, 2003 that Ms. Valenote was "not declared medically stable." The failure to credit Dr. Anderson's October 14 progress note that the discography showed that she suffered "extreme increase in pain" from her torn disc at L5-S1 and suffered "provocative and concordant pain."  The failure to credit or even consider Ms. Valenote's letters stating she had never worked part-time or full time after February 21, 2003 and that no doctor had returned her to work.[64]  MetLife also credited a brief form (which did not actually return Ms. Valenote to work) while overlooking that Ms. Valenote had never been returned to work and had never worked.[65]  MetLife also failed to credit Dr. Beard's July 3 statement that Ms. Valenote's return to work date was "unknown at present" and Dr. Beard's other forms that did not recommend return to work or release Ms. Valenote to work.[66]  MetLife also failed to credit or consider important records from the pain specialist Dr. Anderson, the physical functions testing records from Dr. Anderson's clinic, and Dr. Lorentzen's March 5, 2004 opinion that Ms. Valenote was unable to work since May 2003. Each of these documents or opinions was simply ignored without explanation.[67]

---

[64]   *See Glenn v. MetLife*, 461 F.3d at 672 (failure to consider evidence offered after an initial denial).

[65]   See *Glenn v. MetLife*, 461 F.3d at 674 (crediting a brief report while overlooking a detailed report).

[66]   See *Glenn v. MetLife*, 461 F.3d 670.

[67]   *Calvert v. First Star Finance, Inc.,*  409 F.3d 286, 296 (6th Cir. 2005) (finding a reviewing physician's report to be inadequate because, even though the reviewing

Moreover, MetLife and its consultants repeatedly failed to relate Ms. Valenote's medical condition to her job descriptions. Courts view paid consultants with skepticism because of the incentive to save money and preserve the consulting arrangement.[68] A file only review by the paid consultants when the plan, as here, provides the right to a physical examination increases the level of skepticism.[69] Here the process for both paid consultants must be considered arbitrary and capricious. The first consultants' final conclusion must be rejected as without a rational basis because Metlife withheld the job description from him. Even more egregious, the second shopped-for consultant's unfounded belief that Ms. Valenote could perform "sedentary" work through the date of her IDET in December 2003 is both without a rational basis and meaningless because he did not relate the medical records to the job descriptions showing that an architect performs light to medium level of work.  Numerous Court's have considered similar failures to conduct a reasoned analysis to constitute arbitrary and capricious conduct.[70]

### g. <u>MetLife Failed to Provide Necessary Records to its "Independent" Consultants</u>

Although the failure to provide every record to an independent consultant may not

---

physician "does mention [the claimant's doctors] by name, he does not explain why their conclusions ⋯ were rejected out-of-hand").

[68]     *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832 (2003); *Kalish v. Liberty Mutual/Liberty Life*, 419 F.3d 501, 507 (6th Cir. 2005).

[69]     See *Glenn v. MetLife*, 461 F.3d 671; *Calvert,* 409 F.3d at 295.

[70]     *See Kalish,*  419 F.3d at 509 (denial based on belief that claimant could perform sedentary work is not rational where job was active); *McDonald*, 347 F.3d at  171 (same); *See also, Quinn*,  161  F.3d at 476 (belief that claimant could return to work was unreasonable because administrator did not know what job duties entailed); *Smith v. Continental Cas. Co.*, 450 F.3d, 253, 260 (6th Cir. 2006) (failure of consultant to review a full job description); *Baker v. MetLife*, 2006 WL 3782852 (M.D.Tenn.) at pages 17 (failure to consider actual and specific requirements of job duties of "regular occupation"); *Railey v. Cooperative Benefit Administrators, Inc.*, 2006 WL 1548968 (W.D.Ky) at page 6 ("Not only did the Defendant's physicians not personally examine the Plaintiff but they failed to relate their file only diagnoses to the Plaintiff's job descriptions.").

in itself constitute a procedural irregularity, an administrator is not excused for failing to provide records necessary to a reasoned analysis.[71]  Most importantly, MetLife failed to provide its "independent" consultants with Ms. Valenote's job descriptions.  This is evident on the face of the first report which lists the documents relied on but makes no mention of a job description.  Although the second report offers no indication of what material were reviewed by the consultant, the lack of knowledge of the actual architect job description as light to medium level work is evident from the consultant's reference to "sedentary" work.

### h. At a Minimum, MetLife's Numerous and Substantial Procedural Irregularities Require Heightened Scrutiny Pursuant to *Abatie* and Mandate the Review of Additional Evidence

Based on all of the above described "irregularities" and bad faith conduct, Ms. Valenote is entitled to a de novo review of her claim.  Alternatively, the Court should apply a heightened scrutiny pursuant to *Abatie*. In addition, these same irregularities and particularly MetLife's use of inconsistent and ambiguous bases to deny Ms. Valenote's claim "prevented full development of the administrative record."  Consequently, the Court should take additional evidence so as to "in essence, recreate what the administrative record would have been had the procedure been correct."[72]

### 6. Ms. Valenote is Entitled to Benefits under the LTD Plan

The Court is justified in granting summary judgment that Ms. Valenote is entitled to benefits under the LTD plan.  The MetLife LTD definition of disability focuses on continuous care by a doctor and the inability to earn 80% of the claimant's pre-disability earnings.  Ms. Valenote has been unable to work because of debilitating chronic pain

---

[71]    *Smith v. Continental Cas. Co.*, 450 F.3d at 260 (failure to review full job description); *Baker v. MetLife*, 2006 WL 3782852 (M.D.Tenn.) at pages 17-18 (failure to consider job duties of "regular occupation"); *Railey v. Cooperative Benefit Administrators, Inc.*, 2006 WL 1548968 (W.D.Ky) at page 6 (failure to relate file only diagnosis to job description ).
[72]    *Abatie*, 458 F.3d at 973.

since February 21, 2003 and from this date to the present has been under the continuous care of a doctor. MetLife breached its promise under the LTD to provide Ms. Valenote of 60% of her $4,250 monthly income or $2,550 per month from her disability date in February 2003.

For the reasons set out above, MetLife's decision to deny long-term benefits is <u>not</u> the product of a principled and deliberative reasoning process. MetLife acted under a conflict of interest that multiple factors show caused undisputed self-dealing. Perhaps most flagrant, MetLife abandoned the reasons for the first two denials, and asserted inconsistent new reasons in the final denial that insulated it from further appeals. Moreover, in the final denial, MetLife failed to investigate or ask for medical records which it knew easily refuted one new reason. MetLife then cherry-picked the second new reason from Dr. Lorentzen's letter, while ignoring his opinion that Ms. Valenote had been disabled from working since his treatment started in May 2003.

MetLife flagrantly violated other required ERISA procedures that prevented a full and fair hearing on the claim. For example, MetLife improperly imposed a requirement of objective evidence, despite that the plan has no such requirement and MetLife knew or should have known that a diagnosis of chronic pain is a sufficient basis for LTD disability. Even putting aside its improper reliance on the alleged lack of "objective evidence," MetLife ignored substantial evidence, including the opinion of their own consultant showing that there was, in fact, "objective" evidence supporting Ms. Valenote's claim. Apparently aware that their second denial was directly contradicted by their consultant's report, MetLife actively suppressed the existence of the report. MetLife did not conduct a physical examination, even though the policy contained this right. MetLife failed to arrange or request the functional capacity evaluation that would have provided additional confirmation of Ms. Valenote's physical limitations even though a FCE had been recommended by two doctors. MetLife failed to consult with Dr. Anderson, the primary pain specialist, and ignored her medical diagnosis and testing results.

MetLife selectively considered the medical records and other evidence, and blatantly refused to consider the most important evidence received after its first denial. This inappropriately selective consideration was compounded by the fact that MetLife withheld full information from its paid consultants. As a result, both consultants failed to relate Ms. Valenote's light to medium duty job description to her medical condition. In the case of the first consultant this watered down what otherwise was an opinion supporting Ms. Valenote and in the case of the second consultant rendered the opinion without any rational basis. Despite this, MetLife cherry-picked from both reports at the same time that it ignored the parts from both reports that supported Ms. Valenote's claim.

Finally, MetLife failed to credit the overwhelming evidence that Ms. Valenote had been unable to work because of chronic pain and had never been released to work. Instead, it relied on a single record that was contradicted by numerous other records. It refused to credit reliable evidence it received before and after the first denial and ignored repeated medical diagnoses of severe chronic pain. Moreover, MetLife acted in bad faith by fabricating facts for its second denial that were contradicted by the medical records and other records MetLife received both before and after its first denial.

Taken together, these factors warrant de novo review of MetLife's decision to deny benefits. However, even if the Court were to apply an abuse of discretion MetLife's decision cannot stand. Put simply, there can be no dispute that Ms. Valenote has not been able to work as an architect since February 2003 because of her chronic pain condition. A medical diagnosis of chronic pain, and here there are several, is sufficient to find a disability from such an illness.[73]  This conclusion is clearly supported by the current administrative record. It becomes that much more obvious when viewed in light of the additional evidence that should be admitted pursuant to *Abatie*'s holding that a court should take additional evidence "when the irregularities have prevented full

---

[73]    See  *Baker v. MetLife*, 2006 WL 3782852 at page 18, citing *Yearger v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381-82 (6th Cir. 1996).

development of the administrative record...."[74]    That additional evidence includes the February 2005 functional capacity evaluation, the opinion of Dr. Polston that Ms. Valenote is disabled under the plan, and the affidavits and the medical records showing continual medical care for the chronic pain condition. The Court can also take judicial notice that the October 2003 architect job description is light to medium level work based on the physical exertion requirements in 20 CFR Section 404.1567 attached at Exhibit 6 to Dr. Polston's affidavit.

The FCE shows that Ms. Valenote is disabled under the LTD because she is unable to perform the light to medium duties of an architect shown in her job description. Indeed, it shows that she cannot perform even sedentary duties for more than four hours a day. Dr. Polston's treatment at the Advanced Pain Centers of Alaska immediately followed her treatment at the clinic by Dr. Anderson. Dr. Polston opinion is based not only on his own treatment of Ms. Valenote, but also on her prior treatment by Dr. Anderson. Thus, Dr. Polston's opinion is particularly relevant here because it connects directly to Ms. Valenote's care at the time of MetLife's second and third denials. Among so much else, Dr. Polston's opinion makes quite clear that MetLife could not rationally deny Ms. Valenote's claim.  In other words, MetLife could not deny Ms. Valenote's claim by fair means so it resorted to foul means.  But fairness is statutorily required under ERISA and mandates that Ms. Valenote receive disability as promised her by MetLife's policy.

## CONCLUSION

For all of the foregoing reasons, Ms. Valenote is entitled to an order granting her disability benefits under the plan including back benefits from the date of disability to the

---

[74]    *Abatie*, 458 F.3d at 973

date of the Court's order.  Ms. Valenote is also entitled to prejudgment interest on her back benefits pursuant to 28 U.S.C.A. § 1961.[75]  Finally, Ms. Valenote is entitled to her actual, reasonable attorneys' fees and costs in bringing this action.[76]


DATED this 2nd day of February 2007.

By:_s/ Timothy Seaver                        By: s/ George T. Freeman
Timothy W. Seaver                            George T. Freeman
Seaver & Wagner, LLC                         Attorney at Law
421 West First Ave., Suite 250               1152 P Street
Anchorage, Alaska 99501                      Anchorage, Alaska 99501
Tel. 907-646-9033                            Tel. 907-274-8497
Fax. 907-276-8238                            Fax 907-274-8497 (call first)
Email: tseaver@seaverwagner.com              Email: gtf@gci.net


CERTIFICATE OF SERVICE

I certify that on February 2, 2007
the foregoing document was served
electronically on:

Brewster H. Jamieson
Lane Powell LLC
301 West Northern Lights Blvd, Suite 301
Anchorage, Alaska 99503
Tel:  907-277-9511
Fax: 907-276-2631
Email: jamiesonb@lanepowell.com
Alaska Bar No. 84111122

s/ Timothy Seaver
Timothy Seaver

---

[75]    *Ehrman v. Henkel Corp. Long Term Disability Plan*, 194 F.Supp.2d 813 (C.D.Ill. 2002).
[76]    *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 590 (9th Cir. 1984) (holding that absent special circumstances, a prevailing ERISA employee plaintiff should ordinarily receive attorney's fees from the defendant).