Westlaw.

Slip Copy

Page 1

Slip Copy, 2006 WL 3716750 (D.Or.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Sin v. Metropolitan Life Ins. Co.D.Or.,2006.Only the Westlaw citation is currently available.
United States District Court,D. Oregon.
Bonnearin SIN, Plaintiff,
v.
METROPOLITAN LIFE INSURANCE COMPANY, Defendant.
**No. 05-725-KI.**

Dec. 13, 2006.

David J. Hollander, Hollander, Lebenbaum & Gannicott, Portland, OR, for Plaintiff.
Katherine S. Somervell, Bullivant Houser Bailey PC, Portland, OR, for Defendant.

OPINION AND ORDER
KING, Judge.
*1 Plaintiff Bonnearin Sin, a retail sales clerk at Nordstrom, injured her head when she fell from a ladder at work. She made a claim for long-term disability benefits from Nordstrom through the claims administrator, defendant Metropolitan Life Insurance Company (MetLife). MetLife denied the claim. Before the court are the parties' cross-motions for summary judgment. For the following reasons, I grant plaintiff's motion for summary judgment (# 33) in part, and deny MetLife's motion (# 27). Additional proceedings are necessary to determine whether plaintiff qualifies for disability benefits.

**LEGAL STANDARDS**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In ERISA actions, however, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir.1999).

ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (internal quotation and citation omitted). When a denial of benefits is challenged under ERISA's 29 U.S.C. § 1132(a)(1)(B), the court's review of the administrator's decision is de novo unless the plan unambiguously confers discretion on the administrator to determine eligibility for benefits or to construe the terms of the plan. If the plan confers discretion on the administrator, the court reviews the decision for an abuse of discretion and can only set aside the discretionary determination if it is arbitrary and capricious.[FN1]

> FN1. The Ninth Circuit has noted that the standards of "arbitrary and capricious" and "abuse of discretion" differ in name only. *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1321 n. 1 (9th Cir.1995).

The Ninth Circuit's recent decision teaches that the abuse of discretion standard applies even if the administrator has a conflict of interest. *Abatie v. Alta Health & Life Ins.*, 458 F.3d 955, 967 (9th Cir.2006) (en banc). Similarly, minor procedural irregularities do not shift the standard of review from abuse of discretion to de novo. *Id.* at 972. Rather, pursuant to *Abatie,* the court should use the abuse of discretion standard and "tailor its review to all the circumstances before it," *id.* at 968, rendering the conflict of interest and minor procedural irregularities as factors to consider.

However, the Ninth Circuit instructed that procedural irregularities may be "so substantial as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  Page 2
Slip Copy, 2006 WL 3716750 (D.Or.)
**(Cite as: Slip Copy)**

to alter the standard of review" from abuse of discretion to de novo. *Id.* at 971. In order for the de novo standard to apply, the administrator must have engaged in violations of the procedural requirements of ERISA that "are so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm." *Gatti v. Reliance Standard Life Ins. Co.,* 415 F.3d 978, 985 (9th Cir.2005) (as amended).

## BACKGROUND

*2 Nordstrom's long-term disability plan ("Plan") defines disability as follows:
Disability means that, due to sickness, injury or other medical condition, you're unable to work and, as a direct result, experience a substantial loss of earnings.

You are considered to be disabled under this program if:
• For the first 30 months of your disability, you are unable to earn more than 80% of your indexed pre-disability earnings performing each of the material duties or the essential functions of your own occupation for any employer in your local economy; and
• After the first 30 months of your disability, you are unable to earn more than 60% of your indexed pre-disability earnings from any employer in your local economy at any gainful occupation for which you are reasonably qualified-taking into account your training, education, experience and pre-disability earnings.

Decl. of Katharine Somervell in Supp. of Mot. for Summ. J. ("Somervell Decl."), Ex. C at 1.

The Plan Summary explains that MetLife, as the claims administrator, will "[g]ather information about your condition," and will assign a case specialist who "will work with you and your *physician* to review all circumstances related to your case and determine if benefits are available to you." Ex. C at 42 (emphasis in original).

Plaintiff's doctor, Dr. Oisin O'Neill, a Board certified neurosurgeon, supplied medical records of plaintiff's injury documenting that she suffered from mild headaches and symptoms consistent with post-concussion head injury syndrome. Plaintiff also provided the names of four other physicians who had treated her. MetLife contacted only Dr. O'Neill for medical records.

On January 28, 2004, MetLife sent plaintiff a form entitled *Authorization to Disclose Information About Me.* The letter accompanying the form directed plaintiff to "complete and fax this form to the number provided above. Also, provide a copy to your attending physician(s) for their records." Somervell Decl., Ex. A at CLM 0003. The letter explained that MetLife needed the form "completed to obtain pertinent medical information concerning your disability." *Id.*

On April 19, 2004, MetLife denied plaintiff's claim for benefits. Plaintiff appealed and, as part of its review of her appeal, MetLife asked Dr. Joseph Jares, a Board Certified neurologist employed through Elite Physicians, to review plaintiff's medical records and offer his opinion on her injury. Dr. Jares opined that plaintiff's condition was based solely on symptomatic reports and that no objective tests or measures were available to review. Elite Physicians are providers of "evidence-based medical solutions for the insurance, managed care, legal, and medical industries." Decl. of David J. Hollander ("Hollander Decl."), Ex. 2 at 1.

On May 30, 2004, Dr. O'Neill submitted an Attending Physician's Statement to MetLife diagnosing plaintiff with post-concussion head injury syndrome, and opining that she could not work, but improvement was possible. He stated that plaintiff needed occupational therapy, job modification, and vocational rehabilitation.

*3 On June 7, 2004, MetLife upheld its decision to deny plaintiff's claim for benefits, stating in part, " The consultant indicated that there was insufficient information to determine disability. The consultant indicated that Dr. O'Neill's most recent office notes did not address any neurological deficits and [you are] alleging disability based merely upon your

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                        Page 3
Slip Copy, 2006 WL 3716750 (D.Or.)
**(Cite as: Slip Copy)**

subjective symptoms." Somervell Decl., Ex. A at CLM 0052. It also provided that it had "insufficient information to support an impairment that would prevent you from performing the duties of a retail salesperson." *Id.*

On November 26, 2004, plaintiff's counsel requested a complete copy of plaintiff's file from MetLife. On December 3, 2004, MetLife provided an incomplete copy of the file. MetLife contends the missing pages were inadvertently left out.

## DISCUSSION

Since the Plan provides that the plan administrator has discretion to construe and interpret the terms of the Plan, determine all questions as to eligibility, and make all determinations on a claim based on the terms of the Plan, and gives the plan administrator authority to delegate this discretion to the claims administrator, MetLife's decision would normally be reviewed under the abuse of discretion standard. However, plaintiff claims that a conflict of interest and procedural irregularities require a de novo evaluation of MetLife's decision.

### I. *Conflict of Interest*

Plaintiff claims that a conflict of interest exists because the claims administrator is also the payor; this is referred to as a structural conflict of interest. *Abatie,* 458 F.3d at 965. However, plaintiff admits that for the first 30 months, her benefits would be funded by the employer (not the claims administrator). Only after 30 months of disability benefits have been paid would future benefits be funded by an insurance policy issued by MetLife. Plaintiff was not eligible for benefits until February 2004, and MetLife issued its final decision on plaintiff's claim in June 2004, only four months into the disability period.

Although plaintiff asserts that in order to avoid paying benefits after the 30 months have lapsed, MetLife would have to initiate a separate proceeding to terminate benefits, and may still be required to pay benefits in the future-sufficient indicia of a conflict-in fact, after 30 months the definition of disability changes. Accordingly, MetLife would have to reassess whether plaintiff qualifies for benefits under the new definition requiring that she be unable to work at "any gainful occupation." Somervell Decl., Ex. B at 20.

Since MetLife has no economic interest in the outcome of plaintiff's claim, no conflict of interest exists. Accordingly, this factor does not affect the standard of review.

### II. *Procedural Irregularities*

A. *Whether MetLife Properly Investigated the Claim*

Plaintiff claims the administrator failed to properly investigate the claim, in line with *Booton v. Lockheed Medical Benefit Plan,* 110 F.3d 1461, 1463-64 (9th Cir.1997), in which the administrator was chided for "lacking necessary and easily obtainable information ." Plaintiff also asserts that the Plan and administrator gave conflicting statements about whether plaintiff or the administrator was responsible for gathering evidence of plaintiff's disability. MetLife responds that plaintiff bears the burden of proving her disability and that, in both the Plan and in its communications with her, it repeatedly informed her she was to submit information to substantiate her claim of disability.

*4 ERISA itself does not require administrators to seek out evidence. However, the statute is not the sole source prescribing the duties of the administrator. The terms of the Plan further explain how the process works.

In this case, the Plan states:
At your expense, you must provide documented proof of your Disability. Proof includes, but is not limited to:
1. The date your Disability started;
2. The cause of your Disability; and
3. The prognosis of your Disability.
You will be required to provide signed authorization for us to obtain and release medical

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                   Page 4
Slip Copy, 2006 WL 3716750 (D.Or.)
**(Cite as: Slip Copy)**

and financial information, and any other items we may reasonably require in support of your Disability.

Somervell Decl., Ex. B at 33. While the language of the Plan is somewhat contradictory-making it the claimant's burden to provide documentation of her disability-it clearly places the burden of obtaining medical records on the administrator. Plaintiff must provide the signed authorization, but the language specifically provides the authorization is needed " **for us to obtain**" the medical information.

The Plan Summary further supports this reading of the Plan. MetLife will "gather information about your condition" and will assign a "Case Specialist" " who will work with you and your *physician* to review all circumstances related to your case and determine if benefits are available to you" and who will "gather information about your medical condition from your *physician*." Somervell Decl., Ex. C at 42-43 (emphasis in original). Moreover, " [o]nce you have filed your claim with MetLife, your Case Specialist contacts your *physician* to collect information regarding your medical condition.... Please let your physician know a Case Specialist will be calling and make sure you have the necessary 'release of information' forms on file with your physician ." *Id.* at 43.FN2

> FN2. This language in the Plan Summary directly refutes MetLife's argument that the statement in the medical authorization form directing plaintiff to provide a copy of the form to her physicians for their records implies that MetLife expected plaintiff's doctors to forward relevant information to the company.

MetLife sent the medical authorization form to plaintiff stating, "In order to continue with our review of your claim, we must have the attached ... form completed to obtain pertinent medical information concerning your disability." Somervell Decl., Ex. A at CLM 0003. In addition, consistent with its statements in the Plan and Plan Summary, MetLife itself sought medical records from Dr. O'Neill. Finally, in her claim, plaintiff specifically listed the names of the physicians she consulted after her injury, gave the phone numbers and addresses, and described their specialties. One glance at the list would indicate that the medical records from these physicians would be relevant to a finding of whether or not plaintiff was disabled. MetLife neglected to seek information from those physicians.

Even its initial letter to plaintiff following her claim, in which MetLife identified specific items plaintiff needed to submit, did not do much to clarify MetLife's expectations of plaintiff. The letter stated,

To consider benefits for this claim, specific information will be needed from your physician. This information should include:
*5 1. Copies of the two most recent:
• Office notes.
• Diagnostic test results.
• Operative reports and discharge summaries if applicable.
• Rehabilitation or therapy notes, if applicable.
2. Names and dosages of all current medications.
3. Functional abilities.
4. Expected return to work date.
The requested information should be received by February 11, 2004. Failure to submit this information timely will result in closure of your claim.

Somervell Decl., Ex. A at CLM001. The letter does not ask plaintiff to submit copies of her medical records, and indicates that the information should come from plaintiff's physician. Again, in its Plan Summary, MetLife states that it will contact physicians to obtain the necessary medical records.

The conflicting statements in the Plan and the Plan Summary, as well as MetLife's conduct, demonstrate that MetLife committed a procedural error in not obtaining additional medical records. This is a factor that affects the standard of review.

B. *Objective Finding Requirement*

Plaintiff asserts that, by definition, her impairment is not one that is capable of diagnosis based on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 5
Slip Copy, 2006 WL 3716750 (D.Or.)
**(Cite as: Slip Copy)**

objective testing and other findings, yet MetLife denied her claim based on this lack of objective findings. Plaintiff states that the Plan does not require that disability be objectively verified.

MetLife responds that it does not dispute that plaintiff suffers from post-concussion syndrome. Rather, it disputes that her syndrome impeded her ability to perform her occupation as a retail sales clerk. *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 877 (9th Cir.2004) (the administrator determined that " although [plaintiff] had been diagnosed as having fibromyalgia, the record the administrator had did not show that she was unable to work because of it" ). Here, the Plan requires that the claimant provide proof that "due to ... accidental injury" plaintiff must be "unable to earn more than 80% of [her] Predisability Earnings ... at [her] own occupation." Somervell Decl., Ex. C at 1. Other than Dr. O'Neill's conclusory assertion that plaintiff "could not work" there is little evidence in the record supporting any functional limitations plaintiff may have. Dr. O'Neill, for example, opined that plaintiff could work "zero" hours per day, but did not state how many hours plaintiff could sit, stand or walk. Somervelle Decl., Ex. A at CLM065.

MetLife may well have denied plaintiff's claim because there was little or no evidence that the post-concussion syndrome affected her ability to work. However, the administrator's letter does not clearly state that conclusion. The administrator wrote, "Based on our review of the information provided, we have determined that we have insufficient information to support an impairment that would prevent you from performing the duties of retail salesperson," Somervell Decl., Ex. A at CLM0052. This sentence could be read to mean either that the administrator denied benefits because plaintiff did not suffer from an impairment in the first place or that plaintiff submitted insufficient evidence of her functional limitations.

*6 Furthermore, it appears likely that MetLife was at least influenced by the fact that plaintiff did not provide objective evidence proving her diagnosis. In the denial letter MetLife wrote, "[You are] alleging disability based primarily on your subjective symptoms." *Id.* at CLM0052. In addition, rather than quote Dr. Jares' conclusion that the " information on file is insufficient to determine whether or not Ms. Sin retains ability to work in her usual or any other occupation," the administrator quoted the lack of information concerning any neurological deficits, even though Dr. Jares also stated that no neurological deficits would be noted with the post-concussion syndrome. In other words, MetLife may have terminated benefits due to the lack of objective evidence substantiating the diagnosis, when the Plan does not require such evidence, and when the diagnosis is not capable of being objectively verified. *See Maronde v. Sumco USA Group Long-Term Disability Plan,* 322 F.Supp.2d 1132, 1139 (D.Or.2004) ("Unless a plan contains specific requirements for objective medical evidence, a plan administrator cannot deny a claim ... simply because the plaintiff presents no such evidence.").

I find that MetLife's denial did not "set[ ] forth in a manner calculated to be understood by the claimant ... [t]he specific reason or reasons for the denial." 29 C.F.R. § 2560.503-1(f). In addition, MetLife may have been influenced to deny the claim due to the lack of objective evidence supporting the diagnosis, when the Plan does not require such evidence in the first place, and when the diagnosis is not one that can be objectively verified. These errors affect the standard of review.

*C. Provide Information*

Plaintiff complains that the administrator failed to maintain and provide a copy of the letter from the administrator to Elite Physicians requesting assistance in evaluating plaintiff's claim. Plaintiff argues "[w]ithout that letter neither Plaintiff nor the Court is able to determine whether the letter provided information that was foolish, misleading, leading on suggestions of a certain response." Pl's. Reply Memo. in Supp. of Pl's. Mot. for Summ. J. at 4-5, n. 4. MetLife responds that the letter was just a single-page referral form containing questions which Dr. Jares repeated in his evaluation.

In addition, plaintiff asserts that on November 26,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 6
Slip Copy, 2006 WL 3716750 (D.Or.)
**(Cite as: Slip Copy)**

2004, plaintiff's counsel requested a copy of plaintiff's claims file from MetLife. The copy counsel received did not contain critical documents that were later provided to counsel by MetLife's attorney during the course of discovery. The missing documents were some medical records and log notes. The cover letter accompanying the copy of the record refers only to medical records and outgoing correspondence, and does not reference log notes. Plaintiff asserts that MetLife carefully chose its words to cover up the existence of those records. Plaintiff contends that the danger in MetLife's failure to provide the entire file is that plaintiff's attorney might not have taken the case.

*7 MetLife responds that its notes indicate it provided a complete copy of the file to plaintiff's counsel, and that any documents that were missing was due to an inadvertent mistake. At the time plaintiff's counsel requested the file, MetLife had already issued its final decision, so none of the documents were needed for any appeal. Furthermore, MetLife's counsel provided a complete copy of the file well in advance of the cross-motions for summary judgment.

First, I find that MetLife's failure to keep the referral letter to Elite Physicians is a "minor irregularity" as opposed to evidence of bad faith. *Abatie,* 458 F.3d at 972.

Second, the timing of MetLife's failure to provide all requested documents is determinative of whether the violation to provide a full copy of the file is flagrant enough to alter the standard of review. Here, the decision was issued long before plaintiff's request for the file was made. Furthermore, MetLife's counsel provided a complete copy of the file, well before summary judgment. While plaintiff's counsel's argument is compelling-that review of the full file is critical to a decision about whether to represent the client-MetLife's failure to turn over the full file did not alter the relationship between plaintiff and her employer or MetLife. Moreover, the error was realized and corrected in time for this action to proceed with plaintiff having the benefit of the full file. Finally, it is too big a leap to accept that the cover letter accompanying the record demonstrates that MetLife purposefully

left the log notes out of the copy presented to plaintiff's counsel simply because no reference to the log notes was made in the letter. This conclusion is buttressed by the fact that some medical records were also missing. I conclude that the error is not a violation flagrant enough to alter the standard of review.

D. *Use of Elite Physicians*

MetLife sent plaintiff's records to Elite Physicians Ltd, a company that provides "evidence-based medical solutions for the insurance, managed care, legal, and medical industries." Plaintiff claims the company is not an independent reviewer of claims, and furthermore that the company should have sent her to an independent medical examiner ("IME").

Plaintiff also points out the administrator did not alert plaintiff that it had sent her records to the company, and did not provide her with a copy of the company's report until six months after the final denial of her claim. As a result, plaintiff had no opportunity to rebut the report. Indeed, in response to the administrator's question about what information is lacking to support functional limitations, Elite Physicians responded that there were no recent neurological or neuropsychological reports but, rather than requesting the information from plaintiff, MetLife denied the claim. In addition, the claims administrator did not send plaintiff's entire file to Elite Physicians. Her initial hospital record and the accompanying initial MRI were not provided. Finally, plaintiff claims the report served as a new reason, or at least new evidence, supporting denial of her claim, and she should have been allowed to address the evidence.

*8 MetLife responds that Dr. Jares concluded only that plaintiff did not provide sufficient information that her syndrome had affected her functionality, not that plaintiff did not suffer from the syndrome at all. MetLife is entitled to rely on its own physicians over those of a claimant's treating physician. *Taft v. Equitable Life Ins. Soc.,* 9 F.3d 1469, 1473 (9th Cir.1993). Furthermore, courts have held that it is not an abuse of discretion to fail to obtain an IME. *Litt v. Paul Revere Life Ins. Co.,* 2006 WL 1095847

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  
Slip Copy, 2006 WL 3716750 (D.Or.)  
**(Cite as: Slip Copy)**

Page 7

(N.D.Cal.2006). MetLife also argues that Elite Physicians did not offer a "new reason" for denying plaintiff's claim.

There is no evidence that Elite Physicians did not provide an independent review of the file, and there is no requirement that plaintiff be notified when her file is sent out for an independent review. The Plan specifically permits MetLife to "consult with a health care professional." Somervell Decl., Ex. B at 43. I do note that I am bothered by the fact that plaintiff was not given a copy of the report until six months after it was issued and that she did not have an opportunity to respond to it. Nevertheless, in this case, where the report provided no new reason to reject plaintiff's claim, I do not find this violation to be flagrant enough to alter the standard of review. Finally, plaintiff does not explain how Elite Physicians' conclusion would have been different had it been sent the initial hospital record and MRI. Accordingly, this is not a factor that affects the standard of review.

### III. *Review of Plaintiff's Claim*

Since MetLife did not obtain medical records from all of plaintiff's physicians, and since it neglected to "set[ ] forth in a manner calculated to be understood by the claimant ... [t]he specific reason or reasons for the denial," it violated provisions of ERISA and of the Plan. As a result, MetLife committed procedural errors that are sufficiently egregious to warrant de novo review.

In addition, since "the administrator did not provide a full and fair hearing, as required by ERISA, 29 U.S.C. § 1133(2), the court must be in a position to assess the effect of that failure and, before it can do so, must permit the participant to present additional evidence." *Abatie,* 458 F.3d at 973. As a result, I will consider the extra-record material plaintiff submitted as it is necessary to conduct an adequate de novo review.

Because the parties focused their briefing on the standard of review rather than on the merits of plaintiff's claim, I request additional briefing. There is no need to re-submit the record or the extra-record evidence plaintiff already submitted. The parties should explain how plaintiff does or does not meet the disability criteria in the Plan.[FN3] Unless the parties agree to a staggered briefing schedule, the parties are directed to submit one brief each, of no more than ten pages, by January 22, 2007.

> FN3. MetLife requests that any award of benefits to plaintiff be offset by plaintiff's workers' compensation and Social Security. If I find that plaintiff is disabled under the terms of the Plan, I will remand the claim to the administrator for payment pursuant to the terms of the Plan. If the administrator seeks an offset, plaintiff may challenge that decision administratively.

### CONCLUSION

For the foregoing reasons, I grant plaintiff's motion for summary judgment (# 33) in part, and deny MetLife's motion (# 27). Additional proceedings are necessary to determine whether plaintiff meets the definition of disability under the Plan.

*9 IT IS SO ORDERED.

D.Or.,2006.  
Sin v. Metropolitan Life Ins. Co.  
Slip Copy, 2006 WL 3716750 (D.Or.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 3088204 (Trial Motion, Memorandum and Affidavit) Corrected Memorandum in Support of Defendant's Motion for Summary Judgment (Sep. 21, 2006) Original Image of this Document (PDF)  
• 2005 WL 1534805 (Trial Pleading) Complaint and Demand for Jury Trial (May 20, 2005) Original Image of this Document (PDF)  
• 3:05cv00725 (Docket) (May 20, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2004 WL 2011460 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
May v. Metropolitan Life Ins. Co.N.D.Cal.,2004.Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Lucky MAY, Plaintiff,
v.
METROPOLITAN LIFE INSURANCE COMPANY; Philips Electronics North America Corporation Signature Long Term Disability Plan; and Philips Electronics North America Corporation, in its capacity as Plan Administrator, Defendants.
No. C 03-5056 CW.

Sept. 9, 2004.

Julian M. Baum, Baum & Weems, Novato, CA, for Plaintiff.
Kathleen Cahill Slaught, Sarah R.S. Thomas, San Francisco, CA, for Defendants.

ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT BY THE COURT AND DENYING DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT
WILKEN, J.
*1 Plaintiff Lucky May filed this lawsuit against Metropolitan Life Insurance Company, Philips Electronics North America Corporation Signature Long Term Disability Plan, and Philips Electronics North America Corporation, alleging that Defendants violated her rights pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. (ERISA) by denying her claim for long-term disability benefits. Plaintiff now moves for judgment by the Court. Defendants oppose the motion and cross move for summary judgment. The matter was heard on August 6, 2004. Having considered all of the papers filed by the parties and oral argument on the motion, the Court GRANTS Plaintiff's motion for judgment by the Court and DENIES Defendants' cross motion for summary judgment.

BACKGROUND

Plaintiff was employed as an executive administrative assistant at Defendant Philips Electronics North America Corporation (Philips) until December 10, 2001, when she left her job as a result of chronic body pain and fatigue, which her doctors had diagnosed as caused by fibromyalgia,[FN1] and chronic headaches, which her doctors had diagnosed as cluster headache syndrome. As an employee of Defendant Philips, Plaintiff was a participant in Defendant Philips Electronics North America Corporation Signature Long Term Disability Plan (Plan). Defendant Metropolitan Life Insurance Company (MetLife) is the Claim Administrator for the Plan. Pursuant to the terms of the Plan, a participant is entitled to receive long term disability benefits during the first two years of disability following a 180 day exclusion period if the participant is "unable to work at [his or her] regular job due to an injury or illness." Summary Plan Description (SPD) 7. After that two and a half year period, a participant is entitled to receive benefits if the participant is "unable to perform any job for which [he or she is] reasonably qualified by [his or her] training, education or experience." SPD 7.

> FN1. Fibromyalgia is a "syndrome of chronic pain of musculoskeletal origin but uncertain cause." Stedman's Medical Dictionary 671 (27th ed., 2000). The diagnostic criteria for the disease established by the American College of Rheumatology include "pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest" as well as "point tenderness in at least 11 of 18 specified sites." *Id.; see*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                         Page 2
Not Reported in F.Supp.2d, 2004 WL 2011460 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

*also* MetLife 129 ("In accordance with the guidelines from the Center for Disease Control, the diagnostic criteria for Fibromyalgia is characterized by pain and tenderness upon palpitation that occurs in 11 out of 18 standardized tender points, presence of subcutaneous nodules and a history of widespread pain, headaches, abdominal pain, bloating, sleep disturbance, fatigue and irritable bowel syndrome. These symptoms will have been present for at least three months. Additional documentation to support this condition would consist of frequent office visits for symptom exacerbation, continued reports of widespread pain and the identification of tender point sites upon physical examination, physical therapy and a pharmacological treatment program.").

Plaintiff filed a claim for long-term disability benefits on June 18, 2002. In support of her claim, Plaintiff submitted an attending physician statement from her primary care physician, Dr. H.P. Chin, which indicated that she suffered from fibromyalgia and was thus unable to work as a result of chronic pain. MET 22. Plaintiff also submitted a letter written by Dr. Rajiv Dixit, a rheumatologist, that concurred in the fibromyalgia diagnosis. MET 41-42. In support of her contention that she suffered from disabling headaches, Plaintiff submitted a letter written by Dr. Robert L. Sieben, a neurologist, that diagnosed Plaintiff as suffering from cluster headaches. MET 26. The neurologist's diagnosis was supported by a headache questionnaire, in which Plaintiff reported that she was having headaches on a daily basis that lasted most of the day and rendered her barely able to function or occasionally not able to function at all. MET 46. On the headache questionnaire, Plaintiff also reported that when she experienced a headache, she simultaneously experienced loss of appetite, nausea, vomiting, irritability, tightness in head and neck, blurred vision, sparkling lights, word blocks, confused thinking, chills, hot flashes, dizziness, lightheadedness, and a spinning sensation. MET 51.

*2 A Clinical Specialist at MetLife evaluated Plaintiff's claim. As part of the evaluation process, the Clinical Specialist interviewed Plaintiff, who described her current symptoms as including tender points, fatigue, muscular pain, multiple joint pain, tender lymph nodes, unrefreshed sleep, post-exertional malaise, energy loss, and headaches. MET 136. Plaintiff reported that her symptoms significantly limited her ability to take care of herself and her family, in that while she was able to manage her own personal hygiene, she was only able to cook meals about once a week, was only able to do a minimal amount of housework, and was not able to shop independently. She also reported a complete inability to engage in her previous hobbies and interests, including painting, playing golf, biking, and skiing. MET 138. The Clinical Specialist also interviewed Dr. Chin, who reported that Plaintiff's condition was "pretty bad" and that Plaintiff was disabled because "she can't do anything and she always feels tired." MET 140.

Despite this information, the Clinical Specialist recommended that Plaintiff's long term disability claim be denied on the basis that "the medical documentation submitted does not support your claim for total impairment from performing the regular duties of your job as an administrator due to fibromyalgia and/or chronic headaches." MET 144. A MetLife Case Management Specialist wrote a letter to Plaintiff dated August 6, 2002 denying Plaintiff's claim for benefits based on the Clinical Specialist's recommendation. MET 127-30. The August 6 denial letter identified a number of deficiencies in Plaintiff's claim. More specifically, the denial letter asserted that Plaintiff had not submitted sufficient documentation to support the diagnosis of fibromyalgia, in that the documentation submitted did not indicate that Plaintiff had been given a tender point examination or that Plaintiff had frequently sought treatment for the symptoms of fibromyalgia. Similarly, the August 6 denial letter asserted that Plaintiff had not submitted sufficient documentation to support the diagnosis of cluster headaches, in that the only such documentation was a letter by her neurologist that had been written in April, 2000. The August 6 denial letter also asserted that Plaintiff had not submitted sufficient objective documentation of specific functional impairments caused by the fibromyalgia and/or the cluster headaches. MET

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 3
Not Reported in F.Supp.2d, 2004 WL 2011460 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

127-30.[FN2]

> FN2. The August 6 denial letter stated:
> In conclusion, your claim for long-term disability benefits is being denied because the medical documentation submitted does not support your claim for a total impairment from performing the regular duties of your job as an Administrative Assistant due to Fibromyalgia and/or chronic headaches.... Dr. Chin noted that you had been seeing her for about a year for symptoms of Fibromyalgia and headaches, however when asked about your ability to return to work and or what return to work is in place, Dr. Chin did not state how you are unable to work. She stated what you have reported to her, but this has not translated into specific functional impairments. The documentation received from Dr. Chin does not support that you meet the diagnostic criteria for Fibromyalgia, or that there has been a worsening of your condition from when you were first evaluated to when you last worked. There is no documentation indicating a comprehensive evaluation for Fibromyalgia, or how your symptoms are impairing you from performing the duties of your job. In addition, the medical information received from Dr. Sieben and Dr. Dixit, is dated prior to your date last worked. We requested updated medical information from their office, however we did not receive a response. Neither, Dr. Sieben or Dr. Dixit indicate that they have placed you on a disability. As the medical information on file does not support that you are unable to perform the duties of your job as an Administrative Assistant, your claim for benefits has been denied.
> MET 129-30.

In a letter dated October 22, 2002, Plaintiff appealed MetLife's decision to deny her claim for long term disability benefits. MET 60-62. She also submitted additional information in support of her claim. MET 63-117. Plaintiff responded to MetLife's concern that she had not submitted adequate evidence that she suffered from fibromyalgia and cluster headaches by explaining that she had had only a limited number of appointments with Dr. Dixit and Dr. Sieben because a change in her medical plan meant that office visits with these physicians were not covered by her health insurance.[FN3] Instead, she sought treatment from Dr. Chin, her primary care physician at Kaiser Permanente, on a frequent basis for these conditions. Plaintiff submitted the medical records of these appointments, which documented her reported symptoms and the various attempts at treating those symptoms. Plaintiff further explained that in January, 2002, Dr. Chin had referred her to Dr. Jamison, a Kaiser Permanente rheumatologist, who confirmed the diagnosis of fibromyalgia. Plaintiff submitted the medical records of that office visit. MET 104-05. Plaintiff responded to MetLife's more specific concern that the diagnosis of fibromyalgia was not supported by a tender points examination by scheduling an appointment to have Dr. Jamison conduct such an examination. Dr. Jamison examined Plaintiff in September, 2002 and concluded that the diagnosis of fibromyalgia was supported by an examination that revealed inflamed joints and fourteen out of eighteen tender points as well as Plaintiff's reports of chronic, widespread pain and sleep disturbance. MET 65-66. Plaintiff thus contended that she had submitted sufficient evidence that she suffered from fibromyalgia and cluster headaches.

> FN3. In fact, she paid for an appointment with Dr. Sieben after such an appointment was no longer covered by her health insurance because she was desperate for treatment and Dr. Sieben was able to see her sooner than a doctor covered by her new medical plan.

*3 Plaintiff attempted to address MetLife's concern that she had not submitted sufficient objective evidence of functional impairment caused by the fibromyalgia and/or the cluster headaches by more specifically describing the impairments that she experienced. Plaintiff stated that while she was still

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 4
Not Reported in F.Supp.2d, 2004 WL 2011460 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

working she experienced pain so intense that she was unable to concentrate on her job because all she could do was "sit at [her] desk and cry." MET 60-61. She explained that she was currently unable to perform her previous job because "the fingers on both [her] hands are stiff and sore and difficult to move and the grip on [her] left hand is very weak and [she is] unable to type for any period of time." MET 61. She further explained that she is currently basically unable to perform any household tasks because of pain and fatigue. [FN4] Plaintiff also supported her claim of functional impairment with a letter written by a management consultant who worked with Plaintiff and a letter written by one of the directors for whom she provided administrative support. MET 63; MET 64. The management consultant described the apparent pain that Plaintiff was in during the time period when she was still at work; the director described the negative effect that this pain was having on Plaintiff's work performance as of the time that Plaintiff left work. [FN5] Plaintiff thus contended that she had submitted sufficient evidence of functional impairment.

> FN4. Plaintiff wrote:
> I am not able to cook dinner for my family daily or do housework because I cannot with the above-mentioned symptoms, which makes even the simplest of tasks excruciating to perform. For example, when I attempt to clean my kitchen it can take the entire day because I have to take a long rest at least every 10-15 minutes. What would seem like simple tasks become unbearable, for example, taking a shower and washing my hair is exhausting. I need to sit down in the shower because I am worn out. When I get out of the shower I have to lay down for at least half an hour daily because I am exhausted.
> Because of the headaches, pain and exhaustion of fibromyalgia, I have restricted my driving except to the doctor, and my daughter now does the grocery shopping because I cannot make it through the store without becoming fatigued and worn out. If I do go to the store I have to make sure someone is with me. Many times I have to just sit on the floor and pretend I am looking for something on the lower shelves and then someone has to help me back up and on my feet.
> MET 62.

> FN5. Janine C. Edmunds, the management consultant, wrote:
> I saw her constantly dealing with some extreme situations with regard to her health. Lucky had swollen ankles and legs, to the point where she could not bend them. Walking seemed both painful and difficult for her. She experienced severe migraines, on 7 of my visits to San Jose, and there were times when the tears rolled down her cheeks as she tried to cope with these health issues [while] trying to accomplish the tasks I was setting her. She was determined to achieve the goal that Philips Semiconductors set her. Lucky stayed the course, and through lapses in concentration and nausea, she was a key element in helping meet the goal set by Philips Semiconductors. Several times I suggested to Lucky that she should consider going home or going to see her doctor. Each time, she told me she was seeing a Doctor, and that we needed to get this program completed. Not once did she shirk any of the tasks given her, or call in sick. I am in awe of what she went through with regard to her health during the time I worked with her.
> MET 63.
> Steve Werden, the director, wrote:
> Lucky May worked for me and supported other directors ... from January 1999 until ... November of 2000. During this entire time her health continually deteriorated. In the beginning she would have neck pains and infrequent migraine headaches but toward the end of this period she was in almost constant pain and missed enough work that her absences [were] a concern to my superiors who also depended upon Lucky for various administrative tasks.... Although Lucky consulted many doctors during this period, none of them seemed to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 5
Not Reported in F.Supp.2d, 2004 WL 2011460 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

diagnose or significantly alleviate her symptoms.
MET 64.

A MetLife Clinical Specialist reviewed Plaintiff's appeal. The Clinical Specialist noted that the "claim was denied for lack of medical [evidence] to support." MET 149. The Clinical Specialist concluded, "Additional medical has been received, which supports frequent office visit notes for exacerbated symptoms of fibromyalgia and widespread pain.... Tender points are identified on 12/10/01 and OVN's [office visit notes] begin 5/01 and continue to the present date.... OVN's also support various pharmacological intervention with only temporary relief of symptoms." MET 149. The Clinical Specialist thus recommended approval of the LTD claim. MET 149. However, that recommendation was overruled by a MetLife Program Manager, who concluded that: "Although EE has shown evidence of the factors CM informed her would need to be in place in order for the claim to be approved, there still does not appear to be any documentation of a functional impairment. The claimant is in regular treatment and taking medications as prescribed. Her complaints of discomfort are documented in the notes. None of this, however, speaks to any difficulty in her functioning." MET 149. The Program Manager thus recommended that the claim file be reviewed by a rheumatologist before a decision was made. MET 149.

MetLife sent the claim file to Dr. Amy Hopkins, a Board Certified specialist in internal medicine and occupational environmental medicine, for review. MET 149. With respect to Plaintiff's claim that she was disabled by fibromyalgia, Dr. Hopkins concluded that Plaintiff had not submitted sufficient evidence that she suffered from fibromyalgia, stating:
*4 EE carries a dx [diagnosis] of FMS [fibromyalgia syndrome] based on trigger points and somatic sx [symptoms]. Notably, there was no mention of control point testing in the notes, so the validity of these observations is questionable. Furthermore, trigger points are nonspecific and found in many disorders, including sleep disturbances and psychiatric disorders. She has a significant psychiatric history, but it was not documented if she is currently under tx [treatment]. EE's fatigue, sleep disturbances, chronic pain syndrome, trigger points, and muscle aches can all be explained on a psychiatric basis without invoking the specter of 'fibromyalgia,' so it is not clear why Drs. Chin and Jamison have not explored this likely diagnostic explanation for EE's sx [symptoms]. EE also has numerous sleep complaints, but there was no documented sleep evaluation and polysomnogram in this record. Since this could be a major factor in her fatigue and FMS [fibromyalgia syndrome] sx [symptoms], it is not clear why this has not been pursued further. If she does have a sleep disorder, it is potentially treatable, so this would be a worthwhile avenue to pursue.

MET 54. Dr. Hopkins also concluded that Plaintiff had not submitted sufficient evidence that the fibromyalgia was disabling:FMS [fibromyalgia syndrome] is not necessarily, in and of itself, a disabling disorder, and many people who carry this dx [diagnosis] are able to work. The literature suggests, in fact, that
people who carry this dx [diagnosis] overall do much better when they continue to work and stay active in life than when they stay home to 'rest,' which has not proved to be a useful treatment modality. Dr. Chin gave EE a work capacity on 6/6/02 within EE's job description. The lack of any significant impairment findings on exam is consistent with a full-time unrestricted work capacity. EE's complaints are self-reported and not consistent with her professed inability to perform duties of her own sedentary occupation.

MET 54. With respect to Plaintiff's claim that she was disabled by cluster headaches, Dr. Hopkins concluded that Plaintiff had not submitted sufficient evidence that the cluster headaches were disabling, stating: "There is no evidence in this record that her headaches have recently worsened, been unresponsive to tx [treatment], or have been causing significant difficulties with performing her own occupation. No specific impairment is attributable to her complaint of headaches." MET 54. For these reasons, Dr. Hopkins recommended that Plaintiff's long term disability claim be denied. Based on this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 6
Not Reported in F.Supp.2d, 2004 WL 2011460 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

recommendation, MetLife denied Plaintiff's appeal in a letter dated December 13, 2002. Claim File 103-05.

Plaintiff then retained an attorney, who requested that MetLife reconsider its denial of benefits on the basis that neither Plaintiff nor her doctors were given an opportunity to respond to Dr. Hopkins' Physician Consultant Review, MET 119, but MetLife denied the request, MET 131. Plaintiff repeated her request in March, 2004, after this lawsuit was filed, and submitted additional documentation in support of her claim. That documentation included a letter dated February 9, 2004 from Dr. Sieben confirming his original diagnosis of cluster headache syndrome and opining that Plaintiff is incapable of working as an executive administrative assistant because she suffers from "frequent, incapacitating cluster headaches that cause severe and significant pain." Medical Reports 1.

**\*5** The documentation that Plaintiff submitted also included a report dated February 18, 2004 written by Dr. Thomas Lewis, who is a specialist in psychiatry and neurology. Medical Reports 2-14. Dr. Lewis's report is based on a review of records and a November, 2003 office visit and was done at the request of Plaintiff's attorney. Medical Reports 2. Dr. Lewis concurred in Dr. Sieben's diagnosis of cluster headache syndrome, explaining that Plaintiff's symptoms, including "paroxysmal onset, the urge to pace or move around during acute headache pain, tearing of the eye, drainage from the nose, headaches that reliably begin at the same time of day on multiple days, short duration and multiple headaches per day, and infrequent nausea," are most consistent with cluster headache syndrome. Medical Reports 11. Dr. Lewis explained that he considered it "unlikely" that Plaintiff is "simply malingering on the basis of alleged but nonspecific headache pain" because "[m]any of the symptoms she describes (e.g., unilateral tearing of the eye, or paroxysmal onset at a specific time of day, day after day) are simply not known to the general public to be part of the experience of headaches." Medical Reports 12. Dr. Lewis concluded that Plaintiff's reports of disabling pain caused by cluster headaches is supported by the medical evidence. Medical Reports 11-12. Dr. Lewis also rejected Dr. Hopkins' conclusion that Plaintiff's symptoms can be explained on a psychiatric basis, because he could find "no evidence of current psychiatric illness whatsoever." Medial Reports 13. Dr. Lewis explained: "Since Ms. May exhibits a specific set of somatic symptoms that clearly fall within the circumscribed boundaries of two well-known medical illnesses-cluster headaches and fibromyalgia-and she exhibits essentially no symptoms that fall within the boundaries of any known psychiatric illnesses, I fail to see how it is logically possible to ascribe her symptoms to a psychiatric disorder." Medical Records 13.

Plaintiff now contends that she is entitled to an award of long term disability benefits.

LEGAL STANDARD

ERISA provides Plaintiff with a federal cause of action to recover the benefits she claims are due under the Plan. 29 U.S.C. § 1132(a)(1)(B). To evaluate Plaintiff's claim, the Court conducts a bench trial based on the administrative record. *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1094-95 (9th Cir.1999) (en banc).[FN6]

> FN6. Defendants complain that they were not on notice that the Court would be conducting a bench trial on the administrative record at this time. However, the Court's March 23, 2004 Minute Order clearly stated that the case will be decided by either cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 or cross motions for decision by the Court pursuant to Federal Rule of Civil Procedure 52. In accordance with the Court's Minute Order, Plaintiff has moved for summary judgment pursuant to Rule 56 and, in the alternative, judgment as a matter of law pursuant to Rule 52. Further, Defendants have not identified any additional information that they would have submitted had they believed that the Court was planning on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 7
Not Reported in F.Supp.2d, 2004 WL 2011460 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

conducting a bench trial on the administrative record. Therefore, for all these reasons, the Court will proceed with a bench trial on the administrative record despite Defendants' protestations.

DISCUSSION

I. Standard of Review

The standard of review applicable to a plan administrator's denial of ERISA benefits depends upon the terms of the benefit plan. Absent contrary language in the plan, the denial is reviewed under a *de novo* standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). It is only if "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan" that the Court reviews the plan administrator's decision for an abuse of discretion. *Id.*

*6 Defendants argue that the Plan gives Defendant MetLife such discretionary authority and therefore that the abuse of discretion standard applies. Defendants rely upon the language of a March, 2002 Summary Plan Description (SPD), which provides that the "Claims Administrator shall have the exclusive right, power, and authority in its sole and absolute discretion ... to determine eligibility for and entitlement to plan benefits." MET 16. Plaintiff does not dispute that this language confers discretion upon Defendant MetLife; instead, Plaintiff contends that Defendants have not proven that the March, 2002 SPD is the controlling Plan document. Plaintiff therefore seeks to rely upon an earlier version of the SPD, dated January, 2001, which does not grant discretion to the claims administrator. SPD 1-12.

It is undisputed that the controlling SPD is the SPD that was in effect at the time that Plaintiff's cause of action accrued, which was when Defendants denied her claim for benefits. *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1159-61 (9th Cir.2001) (explaining that because an employee's rights under an ERISA welfare benefit plan do not vest unless and until an employer says that they do, an employer has the right to change the terms of the plan at any time and an employee has no right to rely upon terms contained in previous plans). Defendants contend that the SPD that was in effect in December, 2003 when they denied Plaintiff's claim for benefits was the March, 2002 SPD. Plaintiff, however, argues that Defendants cannot rely upon the March, 2002 SPD because there is no evidence in the record that the March, 2002 SPD was validly enacted, in that there is no evidence that Defendant Philips agreed to this change in the terms of the Plan. *See id.* at 1161-62 (concluding that an SPD provision conferring discretion on the claims administrator was not validly enacted and thus could not be relied upon); *see also Mueller v. CNA Group Life Ins. Co.*, No. C 03-1688 MHP, 2004 U.S. Dist. LEXIS 9271, at *18-*23 (N.D.Cal. May 24, 2004). Defendants respond that there is no evidence that Defendant Philips did not.[FN7] However, "the default is that the administrator has no discretion and the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to its decision." *Kearney*, 175 F.3d at 1089. Therefore, it is Defendants who must show that the March, 2002 SPD was validly enacted. Defendants have not done so. Therefore, they have failed to establish that a standard of review other than the default *de novo* standard of review applies.

FN7. Defendants also assert that the Declaration of Laura Sullivan, in which she states that the attached March, 2002 SPD is "a true and correct copy of the Summary Plan Description," establishes that the March, 2002 SPD is the valid SPD. The Court disagrees; this statement does not address whether, let alone establish that, the March, 2002 SPD was validly enacted.

II. Consideration of Additional Evidence

"While under an abuse of discretion standard [the Court's] review is limited to the record before the plan administrator, this limitation does not apply to *de novo* review." *Jebian v. Hewlett-Packard Co.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 8
Not Reported in F.Supp.2d, 2004 WL 2011460 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

*Employee Benefits Organization Income Protection Plan,* 349 F.3d 1098, 1110 (9th Cir.2003). On *de novo* review, "new evidence may be considered ... to enable the full exercise of informed and independent judgment." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 943 (9th Cir.1995). Here, it is appropriate for the Court to consider the February, 2004 opinions of Dr. Sieben and Dr. Lewis because these opinions respond to concerns about Plaintiff's claim raised by Dr. Hopkins to which Plaintiff did not have an opportunity to respond during the course of the administrative proceedings.[FN8] Therefore, the Court denies Defendants' motion to strike these reports.

> FN8. Defendants assert that the Court had previously ruled that Plaintiff had to request leave of the Court to submit evidence not contained in the administrative record. Defendants are incorrect. The Court ruled that Plaintiff had to request permission of the Court in order to conduct additional discovery, not that Plaintiff had to request permission to submit evidence not in the administrative record. *See* March 23, 2004 Minute Order.

### III. Reviewing Plaintiff's Claim *De Novo,* Plaintiff is Entitled to Benefits

*7 Reviewing Plaintiff's claim for benefits *de novo,* the Court concludes that Plaintiff has established that she is entitled to an award of benefits. Plaintiff has offered evidence sufficient to establish that she suffers from fibromyalgia and cluster headaches, a fact that Defendants no longer dispute. Plaintiff has also offered evidence that the fibromyalgia and cluster headaches are disabling. This evidence includes her own reports about the effect of these conditions on her ability to function, the agreement of her physicians that the symptoms that Plaintiff describes are consistent with those caused by her medical conditions, and the reports of Plaintiff's colleagues describing how her health affected her ability to work. The only evidence that undermines Plaintiff's claim for benefits is Dr. Hopkins' report. However, Dr. Hopkins is not a specialist in either rheumatology or neurology. She did not examine Plaintiff, but concluded that Plaintiff was not disabled based only the information in the administrative file. For these reasons, the Court does not find Dr. Hopkins' conclusions to be persuasive. *See Jebian,* 349 F.3d at 1109 ("On *de novo* review, a district may ... take cognizance of the fact (if it is a fact in the particular case) that a given treating physician has a greater opportunity to know and observe the patient than a physician retained by the plan administrator.") (internal quotation marks omitted). Therefore, in reviewing all of the evidence in the administrative record, as well as the supplemental reports of Dr. Sieben and Dr. Lewis, the Court finds that Plaintiff is entitled to an award of benefits.

### IV. Reviewing Defendants' Denial for an Abuse of Discretion, Plaintiff is Entitled to Benefits

Further, even if the Court were to review Defendants' denial for an abuse of discretion, the Court would still conclude that Plaintiff is entitled to an award of benefits. Defendants assert that they did not abuse their discretion in terminating Plaintiff's long-term disability benefits because "the medical evidence in the file does not support a disability as defined in the plan." Claim File 105. However, this rationale either incorrectly interprets the policy at issue or incorrectly summarizes the contents of the administrative record, and so cannot serve as a basis for denying Plaintiff's claim.

If this statement is read as indicating that MetLife denied Plaintiff's claim because Plaintiff did not offer objective medical evidence that she was disabled, MetLife abused its discretion by requiring that Plaintiff meet an additional requirement for eligibility beyond those imposed by the Plan. *See Duncan v. Continental Cas. Co.,* No. C 96-2421 SI, 1997 U.S. Dist. LEXIS 1582, at *13-*14 (N. D.Cal. Feb. 10, 1997) (The administrator "cannot exclude a claim for lack of objective medical evidence unless the objective medical evidence standard was made clear, plain and conspicuous enough in the policy to negate plaintiff's objectively reasonable expectations of coverage.") (internal quotation marks omitted). This is especially true in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 9
Not Reported in F.Supp.2d, 2004 WL 2011460 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

circumstances such as those at issue here, where Plaintiff's claim for benefits is based on medical conditions that are not of the kind which would be expected to cause disabilities that can be objectively measured. *See id.* at *16-*17 ("In the medical opinion of [the plaintiff's] physician, the plaintiff has exhibited symptoms associated with fibromyalgia or CPS [chronic pain syndrome], and has become totally disabled as a result.... [The administrator] may not deny [the plaintiff's] claim because her physician cannot provide physiological proof where the physical condition is such that physiological proof is not available."). Therefore, MetLife abused its discretion if it denied Plaintiff's claim because Plaintiff had failed to provide objective medical evidence that she is disabled.

*8 If instead MetLife's statement that "the medical evidence in the file does not support a disability as defined in the plan" is read to indicate that MetLife denied Plaintiff's claim because she did not offer credible evidence that she was disabled, MetLife abused its discretion by making a factual determination that lacks substantial support in the administrative record. As discussed in greater detail above, the administrative record is replete with evidence that Plaintiff was disabled, including her own reports about the effect of her conditions on her ability to function, the agreement of her physicians that the symptoms that Plaintiff describes are consistent with those caused by her medical conditions, and the reports of Plaintiff's colleagues describing how her health affected her ability to work. As noted, the only evidence to the contrary is Dr. Hopkins' report in which Dr. Hopkins made the indisputably true statement that not all people diagnosed with fibromyalgia are disabled and then opined that Plaintiff might be one of those people. However, a suggestion that it is possible that Plaintiff is not disabled is not the same as evidence that she is not. Therefore, MetLife abused its discretion in crediting Dr. Hopkins' supposition over the actual evidence in the record. FN9

> FN9. Defendants also claim that *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869 (9th Cir.2004), supports their contention that they did not abuse their discretion in denying Plaintiff's claim. In *Jordan,* the Ninth Circuit upheld the plan administrator's denial of the claimant's long term disability claim on the basis that the claimant had not sufficiently established that her fibromyalgia was disabling. In doing so, the Ninth Circuit contrasted the situation presented there with that presented in *Zavora v. Paul Revere Life Ins. Co.,* 145 F.3d 1118 (9th Cir.1998), in which the Ninth Circuit found that the administrator had abused its discretion in denying the claim, by noting three difference between the situations. First, in *Jordan* the administrator had had the claim evaluated by a physician who was a specialist in the relevant field, while in *Zavora* the administrator had had the claim evaluated by a physician who was not a specialist in the relevant field. Second, in *Jordan* the administrator sent the evaluating physician's report to the claimant's physician for a response, while in *Zavora* the administrator did not do so. Third, in *Jordan* the claimant's physicians offered no explanation as to why the claimant's medical condition was disabling, while in *Zavora* such an explanation was less necessary because the condition at issue was more obviously disabling. *Jordan,* 370 F.3d at 881. Here, MetLife did not have the claim evaluated by a physician who was a specialist in the relevant field of rheumatology, nor did MetLife send the evaluating physician's report to Plaintiff's physician for a response, and Plaintiff's physician had offered an explanation for why Plaintiff's fibromyalgia was disabling. Thus, the circumstances presented here are more similar to those presented in *Zavora* than to those presented in *Jordan.*

CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's motion for judgment by the Court (Docket No. 12) and DENIES Defendants' cross motion for summary judgment (Docket No. 17).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2011460 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 10

The Court also denies Defendants' motion to strike (Docket No. 17). Plaintiff shall recover her costs of action from Defendants. Judgment shall enter accordingly.

IT IS SO ORDERED.

N.D.Cal.,2004.
May v. Metropolitan Life Ins. Co.
Not Reported in F.Supp.2d, 2004 WL 2011460 (N.D.Cal.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 2159750 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Plaintiff Lucky May's Motion for Judgment by the Court and Opposition to Cross-Motion for Summary Judgment (Aug. 6, 2004) Original Image of this Document (PDF)
• 2004 WL 2159760 (Trial Motion, Memorandum and Affidavit) Defendants Metropolitan Life Insurance Company, Philips Electronics North America Corporation Signature Long Term Disability Plan, and Philips Electronics of North America Corporation in its Capacity as Plan Administrator's Reply Brief (Aug. 6, 2004) Original Image of this Document (PDF)
• 2004 WL 2159739 (Trial Pleading) Defendants Metropolitan Life Insurance Company, Philips Electronics North America Corporation Signature Long Term Disability Plan; and Philips Electronics of North America Corporation in its Capacity as Plan Administrator Answer to Complaint (Jan. 9, 2004) Original Image of this Document (PDF)
• 4:03cv05056 (Docket) (Nov. 14, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.