Westlaw.

Slip Copy                                                                                                                Page 1

Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Baker v. Metropolitan Life Ins. Co.M.D.Tenn.,2006.Only the Westlaw citation is currently available.
United States District Court,M.D. Tennessee,Nashville Division.
Robert Lyn BAKER, Plaintiff,
v.
METROPOLITAN LIFE INSURANCE COMPANY, Defendant.
No. 3:05-0262.

Dec. 20, 2006.

William Hance Lassiter, Jr., Jennifer S. Ghanem, John O. Belcher, Lassiter, Tidwell & Hildebrand, Nashville, TN, for Plaintiff.
Joel T. Galanter, James Edward Gaylord, Adams and Reese /Stokes Bartholomew, Nashville, TN, for Defendant.

MEMORANDUM
HAYNES, District J.
*1 Plaintiff, Robert Lyn Baker, filed this action under the Employees Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* seeking an award of long-term disability benefits under his former employer's group disability income policy. Plaintiff's former employer's policy is issued by the Defendant Metropolitan Life Insurance Company ("Metlife"), that also administers that policy. The Defendant filed the Administrative Record ("AR") (Docket Entry Nos. 8 through 12) as well as its Summary Plan Description ("SPD"). (Docket Entry No. 13, Attachment thereto). The Court granted Defendant's request to seal those filings. (Docket Entry No. 14).

Before the Court are the parties' cross-motions for judgment on the administrative record. (Docket Entry Nos. 19 and 21) and their respective responses thereto. (Docket Entry Nos. 26 and 30).

In sum, Plaintiff argues that the Defendant's decisions terminating and denying long term benefits were arbitrary and capricious because: (1) in its dual role as insuror and administration, the Defendant had a financial conflict of interest; (2) in its decisions, the Defendant failed to consider the Plaintiff's actual job requirements; (3) the Defendant required objective medical proof that is not required by the policy; (4) the Defendant's medical consultants relied upon incomplete and flawed data: and (5) the Defendant failed to consider the medical and lay proof that Plaintiff has serious chronic pain that disables him from performing his regular occupation.

The Defendant contends, in sum, that its decisions to terminate benefits were based upon the medical proof that Plaintiff and his physicians lacked objective medical proof to establish Plaintiff's assertions of disabling chronic pain. Metlife asserts that its decision that Plaintiff is capable of performing his work, as an attorney, is based upon substantial medical evidence.

A. REVIEW OF THE RECORD

Baker was an attorney, partner and senior shareholder at the Nashville office of the law firm, Baker. Donelson, Bearman & Caldwell, P.C. (" Baker, Donelson"), his former employer. Baker, Donelson purchased a policy from the Business Men's Assurance Company of America ("BMA") providing long-term disability benefits plan ("the Plan") that pays benefits for any disability of its attorneys. (Docket Entry No. 13, Administrative Record ("SPD") at 0001-0029). MetLife is BMA's successor and now serves as the Plan's insuror and administrator.

The Plan defines "Disability" as when "the Insured cannot perform the essential duties of his or her regular occupation on a full-time basis because of sickness or Injury." (SPD at 0013). In addition, the "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2

Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
**(Cite as: Slip Copy)**

Disability" must:
1. result from sickness or injury;
2. require the regular attendance of a physician;
3. result in a loss of income; and
4. begin while the insured is covered under the policy.

*Id.*

The Plan defines "Sickness" as "illness, disease, pregnancy or complications of pregnancy and " Injury" as "bodily harm or infirmity resulting directly from an accident and independent of all other causes [and]... [t]he Injury must occur and Disability must begin while the person is insured under the Policy." (Docket Entry No. 13, SPD 0023-4). The "proof" required by the Plan must include "the date the Disability started, the cause of Disability, and the degree of Disability." *Id.* at SPD 0018. Under this Plan, its Administrator has "the right to have an Insured examined by a Physician or vocational expert" at the Plan's expense, and the Plan can exercise this right "as often as reasonably required." *Id.* Under the Plan, benefits due to " Mental Illness" are limited to a lifetime maximum of twenty-four (24) months, unless the "Insured" is in a "Hospital" or "Institution" at the end of the twenty-four (24) month period. *Id., SPD 0017. The Plan defines "Mental Illness" as "mental, nervous or emotional diseases or disorders of any type." *Id.*

*2 On January 9, 2001, Baker was seriously injured as the result of a rear-end automobile collision. (AR 1166). In August 2001, Dr. Roy Elam, Baker's physician, referred Baker to Dr. Everett Howell, a neurosurgeon for his pain in his head, neck, shoulder, and back. *Id.* Dr. Howell's impressions were cervical spondylosis, lumbar spondylosis and carpel tunnel. *Id.* Dr. Howell ordered lumbar and cervical myelograms. (AR 1168-69). Dr. Howell's analysis was that these tests "[s]how spondylosis at C-5 and 6-7 with degenerative disk and an old, calcified disc protrusion to C6-7. This would be a reasonable explanation for his neck pain, shoulder pain and some of the pain up to the base of his skull." *Id.* at 1169. Dr. Howell observed that Baker's symptoms would not respond to surgery. *Id.* According to Dr. Howell, these tests did not show any injury due to "whiplash," but Dr. Howell observed that the spondylitic changes in the myelogram were likely dormant and activated as a result of the automobile accident. *Id.*

Baker continued working at Baker, Donelson through February 18, 2002. (AR 1197). According to Baker, his pain increased daily and his production level at work decreased each day. (AR 0412). On many days, Baker had to "lie on the floor " by his desk and take telephone calls. *Id.* Baker could not sleep without medication. *Id.* On some days, Baker could not get out of bed due to his fatigue and pain. *Id.*

On April 2, 2002, Baker filed a claim with the Plan for long-term disability benefits. (AR 1199). Baker's primary care physician, Dr. Roy Elam, an internist, opined that Baker "was totally disabled and needed to stop working." (AR at 0412). Dr. Elam advised Metlife that Baker could not perform any of the regular duties of an attorney due to his " [r]elentless and continual chronic pain all over the body" with attendant fatigue and depression. (AR 1162). Dr. Elam noted Baker's referral to the University of Miami Comprehensive Pain and Rehabilitation Center ("CPRC") and Dr. Elam deferred further comment on Baker's prognosis until that evaluation was completed. *Id.*

On June 9, 2002, Baker entered CPRC's intensive inpatient treatment program that included four (4) weeks of physical therapy, occupational therapy, biofeedback, behavioral intervention, and vocational services. (AR 0674-76). After that program, Baker's condition improved and upon his discharge on July 6, 2002, Baker pain level was reduced to a rating of one (1) out of ten (10). *Id.* Baker's pain was intermittent, but Baker could control that pain. *Id.* Baker's ranges of motion were normal or greater than normal, and his muscles strengths were five out of five in all four extremities. (AR 0677). In occupational therapy, Baker reached his functional goals, attaining a score of 96% at discharge. *Id.* Baker also performed simulations of his job duties as an attorney. i .e., ergonomics and "reached his goals." *Id.* Dr. Serge Podrizki, a doctor of physical medicine and rehabilitation at CPRC, who discharged Baker, opined as follows:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                     Page 3
Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
(Cite as: Slip Copy)

**\*3** DISCHARGE DIAGNOSES: Peripheral (cervical and lumbar) enthesopathies and allied syndromes. Dysesthetic pain of the neck, head, interscapular area, hands, and feet. Dysthymia. Pain disorder associated with both psychological factors and a general medical condition (chronic). Hypertension. Gastritis. Hypercholesterolemia.

*Id.* at 674. Dr. Podrizki also noted that Baker's " [d]epression was greatly improved," *id.,* but advised Baker to continue with "follow-up" psychiatric care upon his return home. (AR 0675, 677). Dr. Podrizki recommended that Baker return to a full and functional lifestyle. (AR 0677).

For these conditions, Baker was prescribed thirteen medications, in addition to aspirin and vitamins:
DISCHARGE MEDICATIONS: Klonopin 0.5 mg p.o. in the morning, 0.75 mg p.o. at 5 p.m., and 1 mg p.o. h.s. Senokot 1 tab. p.o. b.i.d. Topomax 50 mg p.o. h.s. Midrin 2 tabs. p.o. stat start of a headache and 1 tab. q1/2h. p.r.n. for maximum of 5 tabs in 24 hours. Welburtin SR 250 mg p.o. in the morning at 150 mg p.o. at noon. Lidoderm patches to the neck 12 hours on and 12 hours off. Citrate of magnesium p.o. p.r.n. constipation. Centrum Silver 1 tab p.o. daily in the morning. Asprin 81 mg p.o. daily in the afternoon. Famotidine 10 mg p.o. b.i.d. Ambien 10 mg p.o. h.s. Norvasc 5 mg p.o. b.i.d. Vioxx 25 mg p.o. daily in the morning. Lipitor 20 mg p.o. daily in the morning. Propecia 1 mg p.o. daily in the morning. Celexa 20 mg p.o. daily in the afternoon.

*Id.* at 674.

On August 5, 2002, Metlife initially approved Baker's long-term disability claim and its "LTD Approval Summary" stated:
This 57 yr old male has worked for current ER as attorney/shareholder since 7/24/93. EE left work on 2/21/02 due to musculoskeletal system disease, depression and anxiety. EE has completed pain management program and *AP states he is not a malingerer. He does however have a fair amount of psychiatric abnormalities consisting of anxiety and depression. EE has complaints of total body pain and headaches which he states causes his depression and anxiety.* He is on multiple medications .... EE is also seeking alternative treatments .... Current medical conditions.

(AR 0006) (emphasis added). MetLife set a follow-up review in six months. *Id.*

Baker had a second re-evaluation at the CPRC, arising from dispute with MassMutual Financial Group,[FN1] another disability insurer. (AR 0702). In an October 8, 2002, letter to MassMutual, Dr. Podrizki reported his October 3, 2002 re-evaluation of Baker and opined that Baker's ranges of motion and muscle strengths were at that time within normal limits. *Id.* Dr. Podrizki reported that since the first visit to CPRC, Baker's pain was much reduced. *Id.* Dr. Podrizki deemed Baker " independent in all activities of daily living," but noted that:

> FN1. MassMutual ultimately determined that Mr. Baker was disabled and awarded him full benefits. (AR 0085, 0276).

In my original discharge report, the phrase "resume a normal and functional lifestyle" meant a resumption of work, at his customary occupation of attorney. The findings of my re-evaluation visit are still the same. I believe Mr. Baker is physically capable of resuming gainful employment. However, during his visit, Mr. Baker indicated that he does not feel able to handle the emotional stress of his previous occupation. This is outside my expertise and I would have to defer to a specialist in a more appropriate area-perhaps psychiatry-to address this issue.
**\*4** *Id.*

On December 4, 2002, Dr. David Fishbain, a neuropsychiatrist and pain medicine physician at the CPRC also evaluated Baker. Baker's chief complaints upon re-evaluation were low back pain, neck pain, and debilitating headaches. (AR 0694). Baker reported that his pain increased while sitting, as well as driving, and that "his inability to concentrate leads to memory difficulties and getting confused easily." (AR 00695). Baker informed Dr. Fishbain that because of his pain and fatigue, he had difficulty concentrating and his inability to control

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
(Cite as: Slip Copy)

the pace of his work. *Id.* Baker did not believe he could return to his work as an attorney in "a highly specialized" area requiring "a high level of productivity, concentration, and eight hours of daily billing. *Id.* Baker also reported an inability to handle "a lot of environmental stimuli at the same time" citing "not being able to have more than one grandchild over at his house at one time." *Id.*

Dr. Fishbain reviewed Baker's medical history, including his prior CPRC treatment. Dr. Fishbain noted that Baker's problems with pain, headaches, and depression improved after treatment at CPRC " but did not completely resolve." (AR 0694). Dr. Fishbain observed that Baker's pain "appears to be increased by sitting. This pain is associated with significant fatigue." (AR 0695). Considering these complaints, Dr. Fishbain wrote that Baker's " general cycle" was "increased pain which leads to increasing fatigue and loss of energy which in turn leads to increasing depression." (AR 0695).

In sum, Dr. Fishbain noted "Baker continues to be significantly depressed." (AR at 697). Dr. Fishbain diagnosed Baker with dysthymia (a form of depression characterized by a lack of enjoyment or pleasure in life that continues for at least six months) and with adjustment disorder with anxious mood. (AR 0696). Baker's mental status examination was within normal limits except for symptoms of depression and anxiety. *Id.* Dr. Fishbain deferred to Baker's Nashville psychiatrist on whether Baker could return to work. (AR 0698).

On December 4, 2002, Dr. Podrizki of the CPRC also re-evaluated Baker for his physical complaints. (AR 0131-36). Baker reported his pain level increased to a present 6 to 7 out of 10 from a 2 to 3 out of 10 at his prior discharge from the CPRC. (AR 0133). Baker reported that he was in pain most of the time. *Id.* During the examination of his lower back, Baker reported pain at the coccyx and a tender point at the left trochanter. (AR 0133-34). Baker also reported a new pain for the past two weeks in the left occipital area that radiated from there to the left side of his body. Dr. Podrizki, however, could not find a trigger point in that area, and Baker did not report any pain there on examination. (AR 0134).

After his interview and examination of Baker. Dr. Podrizki reiterated his earlier findings:
At this time, I have no physical reasons to restrict him from work. I would encourage him to try to return. I believe he has the physical capability. If he cannot do the key aspects of his job, then he will know he has, at least, made an appropriate effort. It may well be that he will find that he is able to accomplish more than he thought possible. On the other hand, if he continues to think of a return to his occupation with such apprehension, any return will be difficult.

*5 (AR 0135). Dr. Podrizki placed a limitation on his earlier findings:As I have said on previous occasions. I cannot comment on Mr. Baker's claim that he is unable to handle the emotional stressors of his occupation; this is outside my area of expertise. I would have to defer to a specialist in psychiatry or psychology .... I also indicated that I am not sure how his present medications would impair his thought processes, since they are the ones he was taking during treatment here and he did function well.

(AR 0134).

Later, Dr. Hubert Rosomoff, Ph.D., a neurologist and CPRC's medical director elaborated on Dr. Podrizki's statements about Baker's ability to resume his work duties as an attorney. (AR 0287-88). Dr. Rosomoff explained that the CPRC program utilizes a multidisciplinary approach, and that
[i]n order for there to be a conclusion that Mr. Baker could return to his customary law practice, the entire team would have to make an evaluation based on his specific job and the duties required. Every attempt was made by the team to do so, but we did appreciate that Mr. Baker had continuing psychiatric problems which would require further evaluation and treatment. Dr. Prodrizki's summary reflects the conclusion that Mr. Baker *physically* is capable of returning to work, but the issue of his mental capabilities was deferred to his follow-up treating physicians, including his psychiatrist.

(AR 0288)(emphasis in original).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 5
Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
**(Cite as: Slip Copy)**

After noting his awareness of Baker's continuing care from his treating physicians since his discharge from CPRC, Dr. Rosomoff wrote: "I have read the opinions of Dr. Elam and Dr. Akin, both of whom [have] opined that Baker is totally disabled. They are the current treating physicians. The CPRC has exhausted its treatment options for Baker, and therefore, *we defer to the judgment of the current treating providers who see Baker on a regular and consistent basis who are the physicians in the best possible position of rendering an opinion.*" (AR 0287-88).(emphasis added).

After its initial payments of Baker's long-term disability benefits for one year and eight months, in April, 2003, MetLife's ordered a follow-up review of Baker's condition. (AR 0012). MetLife requested Baker's current medical records from Dr. Elam, his primary care physician since 1999 as well as the treatment notes of Dr. Judith Akin, Baker's psychiatrist since 2002. (*Id.*)

In a April 15, 2003 letter. Dr. Elam cited diagnoses of an earlier "peripheral (cervical and lumbar) enthesopathies and allied syndromes; dysesthetic pain of the neck, head, inerscapular area, hands and feet." (AR 1020-21). Dr. Elam also cited his diagnoses that Baker has "Chronic Myofascial Pain Syndrome, Fibromyalgia [FN2] "and perhaps other related diseases." *Id.* Dr. Elam attached to his letter his notes on Baker's medical records and various tests. (AR 1023-1037). Dr. Elam explained that the side effects of Baker's ten medications "to reduce his physical pain" caused cognitive deficits and that his chronic pain caused sleep interruption, depression, and interference with daily activities. (AR 1021). As a result, Dr. Elam opined, "there is no way to predict when or if Baker will be relieved of his chronic pain and be able to resume his normal activities of daily living." *Id.* At that time, Dr. Elam concluded that Baker was "incapable of resuming his duties as a practicing attorney." *Id.*

> FN2. Fibromyalgia is pain in the fibrous tissues, muscles, tendons, ligaments, and other white connective tissues, frequently affecting the low back, neck, shoulders, and thighs. See The Merck Manual, pp. 1369-70 (16th ed.1992). The Court notes that Dr. Robert E. Clendenin with the Tennessee Orthopaedic Alliance also noted that Baker may have fibromyalgia. (AR 0544).

*6 In her April 22, 2003 letter to MetLife, Dr. Akin, Baker's psychiatrist, wrote: "The psychological factors that Baker deals with are predominantly secondary to his physical condition and the limitations associated with his chronic pain. With the cognitive side effects of his prescribed medication regimen, together with the physical limitations he is experiencing, *it is my professional medical opinion that with reasonable certainty, he is not capable of any type of gainful employment.*" (AR 1039) (emphasis added). Dr. Akin's notes from Baker's several office visits reflects as follows: January 8, 2003, Baker classified his pain as a 10 out of 10, stated to Dr. Akin that he "couldn't function" and had episodes of slurred speech; January 29, 2003, Baker complained of a "stabbing pain" that was disrupting his sleep; February 18, 2003, Baker reported "burning pain all over"; and April 9, 2003, Baker informed Dr. Akin that he could not "sit in front" of a computer for fifteen minutes and that he remained sleepy during the day no matter how much he slept that prior night. (AR 0461-77).

Aside from the medical proof, in the spring or early summer of 2003, Baker's wife and children expressed to Baker their concern over the side effects of his medications. (AR 0413). Baker's wife and children told Baker that he had become a different person and urged him to find other ways to deal with his pain. *Id.* After consulting with his doctors, Baker selected a physician who practiced natural medicine. *Id.* Over the next few months, Baker was gradually weaned off his medications and received intravenous injections of vitamins, minerals, and supplements. *Id.* Baker continued to receive massage and physical therapy as well as acupuncture treatments. *Id.* Due to his painful withdrawal, Baker hired a person to drive him to and from the treatments. (AR 0414). By the fall of 2003. Baker had been weaned off most of his medications. (AR 0414). By the end of the year, his pain level because almost unbearable. *Id.* Baker

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 6
Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
(Cite as: Slip Copy)

discontinued the vitamins and mineral injections and began a pain medication program in early 2004. *Id.*

On May 6, 2003, MetLife referred Baker's file to Dr. Gary Greenhood for independent medical review with this question: "Does the medical information in the file and that obtained in teleconference with Dr. [Rosomoff] support the patient's inability to work in a sedentary job?" (AR 0891). Dr. Greenhood, an internist, reviewed the medical information provided by MetLife and information obtained in a teleconference on July 25, 2002 with Dr. Rosomoff. From a physical viewpoint, Dr. Greenhood determined that Baker's medical file lacked objective evidence to support Baker's inability to work in a "sedentary job". (AR 0891, 0894). In particular, Dr. Greenhood cited Dr. Rosomoff's statement that from a physical viewpoint, Baker "is capable of anything he wants to do." (AR 0891). Dr. Greenhood remarked that, despite the lack of "objectively-abnormal findings" for Baker's pain. Dr. Elam remained convinced that Baker's functional status was very poor. (AR 0894). To clarify Baker's condition, Dr. Greenhood recommended an independent medical examination by a rheumatologist and multi-day surveillance of Baker. *Id.* Dr. Greenhood further noted that for any decision regarding Baker's ability to work from a "mental/nervous" viewpoint, an assessment by a mental health professional was necessary. *Id.*

*7 MetLife arranged an independent psychiatric review of Baker. (AR 0988-92). On June 25, 2003, Dr. Bettina Kilburn, a consulting psychiatrist, reviewed the available medical information on Baker's level of function. (AR 0991). Although Dr. Akin deemed Baker to have a serious functional impairment. Dr. Kilburn observed that Baker's "physicians and the previous physician consultant have already noted that the claimant's pain complaints lack substantial objective correlation. The claimant's complaints of cognitive deficits also lack defined objective correlation by Mental Status Exam. Mini-Mental Status Exam, or other evaluation." *Id.* Dr. Kilburn recommended an independent psychiatric medical examination to include neuropsychological testing and concurred with Dr. Greenhood's recommendations of additional direct observation of Baker. (AR 0992).

During this time, MetLife required Baker to file an application for Social Security disability benefits and Baker did so. Baker's application was initially denied, (AR 1011, 1013), but Baker requested reconsideration and received a favorable determination on October 10, 2003. (AR 0999, 0976). Baker then reimbursed MetLife $25,527.40. (AR 108).

On November 11, 2003, Baker underwent an independent psychiatric examination by Dr. Scott Ruder, a consulting psychiatrist. (AR 0959-0963). Prior to this examination, Dr. Ruder reviewed "[a] number of records" that MetLife provided. (AR 0959). Dr. Ruder's examination found that although there was "minimal to mild evidence of specific cognitive defect," Baker's "was not significantly impaired." (AR 0962). Other than his trouble remembering words on several occasions, Dr. Ruder opined that Baker "was cognitively intact. He had an excellent memory for his medical and psychiatric history. His concentration and focus were normal, and did not appear to be impacted." *Id.* Dr. Ruder observed that, during the examination, Mr. Baker appeared "in some discomfort" and that Baker had to switch from sitting to standing intermittently due to his pain. (AR 0961). Dr. Ruder concluded that "the examination indicates that the mild cognitive deficits noted on examination would not significantly, in themselves, impact the tasks of an occupation commensurate with the examinee's training, education, and experience." *Id.* Dr. Ruder's diagnosis was that Baker had a dysthymic disorder, "pain disorder, due to condition secondary to motor accident of January of 2001," and "psychosocial and [e]nvironmental problems." *Id.* Dr. Ruder recommended neuropsychological testing by the physician consultant. (AR 0962).

Dr. Kilburn, MetLife's psychiatrist consultant reviewed Dr. Ruder's report and found that Dr. Ruder's examination "show[ed] no compelling evidence of psychiatric functional impairment from the standpoint of any occupation." (AR 0957). Yet, Dr. Kilburn also recommended an independent neuropsychological examination of Baker based upon "the history of cognitive complaints and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 7
Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
(Cite as: Slip Copy)

inconsistencies noted previously," citing the June 25, 2003 independent physician consultant review. *Id.* In Dr. Kilburn's opinion, such testing was necessary for "a clearly definitive assessment of the claimant's cognitive level of function." *Id.*

**\*8** On January 30, 2004, Dr. Akin wrote to MetLife that "Mr. Baker's cognitive functioning varies, and is influenced by the severity of his pain, fatigue, meds, and stress. He has a chronic low resiliency to stress, and what he describes in his office visits is consistent and has been substantiated by his wife during independent conversations with her. He absolutely could not function as an attorney." (AR 476-77). Dr. Akin opined that Baker's disability would be long-term. *Id.*

At MetLife's request, Baker underwent an examination by Dr. Kenneth Anchor, a licensed/board certified clinical psychologist. (AR 0901-06). Prior to the appointment, Baker called Dr. Anchor's office to see if he would be permitted to bring ice packs for his pain. (AR 0415). On the day of his appointment, Baker rated his pain level at 9 out of 10. *Id.* Dr. Anchor's evaluation of Baker lasted four and one-half hours. (AR 0906) but Dr. Anchor was physically in the same room with Baker for only one-half hour. (AR 0109). According to Baker, Dr. Anchor's receptionist/office assistant administered all tests and during the tests, this person left the room periodically to answer the telephone and receive other patients. (AR 0416). During the testing process, Baker asked the receptionist/office assistant for a break due to his pain and was permitted to take a ten minute rest during which time he applied ice to his neck, back, shoulders, and head; turned out the lights; and stretched out on the conference room floor. *Id.* According to Baker, Dr. Anchor never inquired about the level of his pain, the nature or origin of his pain, and how the pain affected Baker's daily activities. *Id.*

Dr. Anchor's written report reflects that Baker scored average or above on a battery of tests that measured IQ, psychomotor speed, speech output and fluency. (AR 0903). Dr. Anchor reported that "[t]est data appear to support patient's claim of mild to moderate pain but not severe or chronic pain."

(AR 0905). Dr. Anchor diagnosed Baker with undifferentiated somatoform disorder, pain disorder secondary to motor vehicle accident in 2001 (mild), and psychosocial and environmental problems. (AR 0904). Dr. Anchor opined that somatization was " likely" and suggested that patients like Baker often make "vague" complaints "without a clear organic basis" and exaggerate their symptoms. *Id.* Dr. Anchor stated that Baker "seem[ed] preoccupied with feelings of pain" and "[t]his patient appears to have developed a lifestyle centered around his complaints of pain. He is limiting his own independence and freedom of movement by choice. However, test findings do support his claim that exposure to high stress or pressure may exacerbate some of his symptoms and complaints." (AR 0906).

Dr. Anchor further opined that, although "no permanent mental capacity restrictions" were identified, to the extent that Baker's "pain is not satisfactorily managed, such pain would likely produce distractability and interfere or disrupt his level of attention to detailed or complex focus tasks. " (AR 0905). Ultimately, Dr. Anchor's report concluded:

**\*9** Based upon Mr. Baker's training, education and experience, he should be able to engage in whatever pursuits he chooses for himself. As far as processing information, making decisions, managing data, interacting with others, managing finances, keeping a schedule, social activities, he can probably perform in each of these areas *if he chooses to do so.* Testing did not yield evidence of neurocognitive deficits that would impair him from performing those functions at this time. Since he complains that fatigue is often a result of his pain experience, engaging in each of these activities may only be feasible for him for a limited period of time or, alternatively, with regularly scheduled rest breaks.

(AR 0905-06)(emphasis in original).

MetLife requested Dr. Kilburn to review Dr. Anchor's report. (AR 0895-98). In her report, Dr. Kilburn noted that the recommended " neuropsychological testing" was performed by Dr. Anchor on February 4, 2004. (AR 0896). In reviewing Dr. Anchor's report, Dr. Kilburn found "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                               Page 8
Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
**(Cite as: Slip Copy)**

no evidence of measurable, significant cognitive deficits which would impair the claimant." (AR 0897). As on June 25, 2003, Dr. Kilburn commented that Dr. Anchor's "Neuropsychological Evaluation Report" "indicates that [Baker] has the psychiatric and cognitive ability to perform the tasks of "any occupation commensurate with his training, education, and experience." (AR 0897).

MetLife also retained Chayna Weinstein, a vocational rehabilitation consultant (AR 0035), who found that based on Baker's training, education, and experience, Baker was qualified for employment in his former position as a mergers and acquisitions attorney, as well as a general practice attorney. *Id.* Weinsten reported that these occupations and potential employers were found to exist in the local economy. *Id.*

By letter dated April 23, 2004, MetLife recited its summary of the medical proof from Baker's physicians. Drs. Elam and Akins and the CPRC physicians as well as MetLife's medical consultants and Dr. Anchor's test results. In sum, MetLife noted Dr. Rosomoff's statement that "there were no objective abnormal findings on the neurological exam, although you did exhibit pain in multiple soft tissue areas." (AR 0870). MetLife stated that Baker's complaints of pain lacked "substantial medical evidence." *Id.* MetLife restated Dr. Ruder's findings of "minimal to mild evidence of cognitive deficits." (AR 0871). As to Dr. Ruder's recommendation of "neuropsychological testing." MetLife found as follows:
Based upon this review of your medical condition, it was determined that you should physically and mentally be able to perform a sedentary and/or light level demand occupation as defined by the U.S. Department of Labor. Your occupation as a Merger and Acquisition Attorney, as well as a General Practice Attorney is classified as sedentary according to the U.S. Dept of Labor Dictionary of Titles ....

(AR 0871).

*10 In its April 23rd letter, MetLife noted Dr. Ruder's statement that although there could be cognitive defects for which Dr. Ruder's recommended "neuropsychological testing." (AR 871). According to MetLife, Dr. Anchor's " Neuropsychological Evaluation" revealed that Baker did not have any permanent mental capacity restrictions; (2) that Baker had mild to moderate pain, but did not have severe or chronic pain; and (3) that there was not any evidence of neurocognitive deficits to preclude Baker from managing data, interacting with others, managing finances, keeping a schedule, and/or engaging in social activities. (AR 0871).

Baker timely appealed Metlife's denial decision and submitted more than 900 pages of documents with a twenty-three (23) page cover letter. (AR 0252-0836, 0837-1199). In support of his appeal, Baker submitted statements from Drs. Elam and Akin, his treating physician and psychiatrist. (AR 0280-86). In her letter dated September 4, 2004, Dr. Akin opined that Baker suffered from "chronic, diffuse muscle pain and spasms" and chronic pain syndrome, and that his pain medications had cognitive side effects, including memory impairment, slurred speech, and impairment of driving skills. (AR 0283). Dr. Akin noted that Dr. Robert Cochran and Dr. John Sergeant, two of the physicians to whom she had referred Baker to for further evaluation, also found that Baker suffered from chronic pain syndrome. (AR 0284). In Dr. Akin's view, Baker has difficulty following a schedule because he never knew what his pain level might be. (AR 0283-84). Dr. Akin rated Baker's level of pain as a 7 to 10 out of 10. Because of his ailments. Dr. Akin observed that Baker had " marked difficulty in his day-to-day functioning" so that "consistent sedentary work [was] impossible for him," because "[he] could not function as an attorney in his present condition," and lacked "the stamina to do physical labor." *Id.* In Dr. Akin's opinion, stressful situation would worsen Baker's pain. (AR 0284). In her medical opinion, Dr. Akin " could not understand how Mr. Baker could even think of returning to the role of an attorney, a profession that has stressful aspects and involves traveling, which he cannot perform on a consistent basis." *Id.*

Dr. Akin also challenged Dr. Anchor's diagnosis of somatoform disorder (psychological conflicts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:05-cv-00196-TMB   Document 37-4   Filed 02/02/2007   Page 9 of 19   Page 10 of 20

Slip Copy                                                                                                    Page 9

Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
(Cite as: Slip Copy)

presenting with physical complaints), noting that Baker's symptoms were inconsistent with the criteria for somatoform disorder. Dr. Akin cited physicians in Nashville and Miami who diagnosed Baker with chronic pain syndromes and neuromuscular problems. (AR 0285). Dr. Akin cited Dr. Anchor's observations of Baker's ongoing pain during his evaluation and that periods of stress exacerbated Baker's physical complaints. *Id.* Dr. Akin concurred with Dr. Ruder's diagnosis of chronic pain syndrome but stated. "[a]lthough Mr. Baker's cognitive functioning might not globally impact a variety of activities. I think his pain level certainly would affect his ability to concentrate, and if you look at his overall history, his pain has certainly impaired his social activities." *Id.* Dr. Akin's noted that Dr. Ruder's recommended course of treatment (with which she concurred) was inconsistent with undifferentiated somatoform disorder. (AR 0284-85).

*11 In his letter dated December 3, 2004, Dr. Elam reiterated his diagnoses of Baker were that Baker had "Chronic Pain Syndrome, fibromyalgia, depression, and hypertension and perhaps other related diseases." (AR.0281). In Dr. Elam's opinion, the side effects of Baker's medications also caused confusion, forgetfulness, sleep interruption, lack of concentration, somnolence, fatigue and interruption of daily activities. (AR 0281). Dr. Elam quoted CPRC's diagnoses of: Aperiphenal (cervical and lumbar) enthesopathies and allied syndromes: " dysesthetic pain of the neck, head interscapular area, hands and feet." (AR 0281). For his condition, Baker's physicians prescribed seven (7) medications. *Id.*

Commenting on Dr. Anchor's evaluation and report, Dr. Elam wrote that "the notion that Baker's prognosis is good" and that Baker can "engage in whatever pursuits he chooses for himself" is " ridiculous." (AR 0282). Dr. Elam "strongly and emphatically disagrees" with Dr. Anchor's " conclusions of non-disability." *Id.* Dr. Elam opined that he is "medically certain" that Baker "is unable to perform the essential duties of his occupation as an attorney on a full time basis." *Id.*

At his expense, Baker underwent a neuropsychological assessment with Dr. Pamela Auble, Ph.D. board-certified clinical neuropsychologist, in mid-October 2004. (AR 0388-0402). Dr. Auble personally examined Baker over a period of four days and reviewed the opinions of his treating physicians, his medical records, and the statements of witnesses. (AR 0401). Dr. Auble tested Baker's attention/concentration, memory, language, and reasoning, and concluded that Baker could not return to his work as a corporate attorney in mergers and acquisitions. Dr. Auble found his response times and intelligence were much slower than expected for someone of his age and education, and that his medications left him sleepy and unfocused. Thus, Baker had trouble with mental flexibility and multi-tasking, requiring a long time to perform work, given his consistent and significant pain. (AR 0400). Baker failed two tests designed to assess effort, a result that Dr. Auble attributed to drowsiness. (AR 0397).

Dr. Auble reviewed Dr. Anchor's report [FN3] and Dr. Auble characterized that report as unreliable and uninterpretable because Dr. Anchor's statements were inconsistent with his data. (AR 0392-96) Of the four of the tests that Dr. Anchor employed to evaluate Baker, Dr. Auble noted that Dr. Anchor did not have any notes or forms associated with those tests. (AR 0388-0404).[FN4] Second, Dr. Auble's research revealed that Dr. Anchor's tests were obsolete, unknown in the medical community, and his findings were based on partial responses. (AR 0395-96). According to Dr. Auble, Dr. Anchor used only one commonly-used and reliable test from a possible sixty-eight tests. (AR 0405-0410).

> FN3. Initially, Dr. Anchor refused to release his testing materials to Dr. Auble. (AR 0837).
>
> FN4. The Administrative Record reveals Dr. Auble informed Mr. Baker's attorneys, who then informed MetLife, that Dr. Anchor previously has been disciplined (including having his license suspended) for failure to retain supporting data for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  Page 10
Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
**(Cite as: Slip Copy)**

psychological tests, among other infractions. (AR 0114-15, 0259-260, 0419-0447).

Dr. Auble also found differences in his report that Dr. Anchor provided to her and the report Dr. Anchor provided to MetLife and Baker's attorneys. (AR 0394). For example, the report that Dr. Anchor provided to MetLife was entitled "Psychological/Neuropsychological Evaluation Report." but the report that Dr. Anchor submitted directly to Dr. Auble was entitled "Psychological Evaluation Report." (AR 0304). In addition, Dr. Anchor's report to MetLife listed the tests purportedly administered by Dr. Anchor in a different order, and four tests were not listed on the report Dr. Anchor provided to Dr. Auble. One test was added to the report provided to Dr. Auble, but was not listed in Dr. Anchor's report to Metlife. (AR 0112).

*12 Finally, Dr. Auble opined that Dr. Anchor's report omitted facts that mischaracterize Baker's activities. For example, Dr. Anchor's report stated that Baker recently "made a trip to San Miguel, Mexico" without mentioning that Baker took this trip to pursue homeopathic alternatives to medication and that, while in Mexico, Baker continued his exercise program and had regular massage therapy, including craniosacial therapy. (AR 0113).

In another letter dated November 22, 2004, Dr. Auble opined that Baker is unable to work at Baker, Donelson, and that in her opinion, Baker could not work as an attorney at any law firm where the position involved stress, demands of high energy, good cognitive functioning, good communication skills, memory for details, reliability, travel, flexibility, and the ability to multi-task. (AR 0651).

In his appeal, Baker also submitted more than twelve letters from persons who witnessed the deterioration of his condition. Laurence Papel, the managing partner of the Nashville office of Baker, Donelson and Baker's supervising attorney described the demands of Baker's job and Baker's job performance prior to his current condition. Papel stated: "I have no question that Mr. Baker is not now competent to practice law in our firm, or any in similar firm" and Baker, Donelson could not offer Mr. Baker "any position whatsoever." (AR 0448-50). In Papel's view, Baker is "incapable of practicing law in any firm setting." (AR 0449). Dent Bostic, Dean Emeritus and Professor of Law at Vanderbilt University and Baker's neighbor described that after the accident, Baker was "stooped, grey, and appears to walk with great difficulty" (AR 0141-42). Barbara Jenkins, Chairman of the Board of Benton Hall School who knows Baker described how she has "watched [Baker] slowly deteriorate into a quiet, withdrawn and physically impaired person ... he walks, talks, and sits as though a million rusty needles are piercing his body" (AR 0143). Dr. Terry Smith, a friend and co-worker on community service projects, stated from his observation that Baker is in "phenomenal pain" (AR 0146-47). Dr. Randall Gill, a minister who knows Baker wrote that "watching the progression of his illness has been like watching someone disappear before your eyes" (AR 0123, 0166-67). Baker's family members wrote at length about Baker's constant pain and inability to manage the tasks of daily living (AR 0123, 0166-67).

Baker submitted his personal statement and his "pain diary." (AR 0176-200 and 0411-18) In his personal statement, Baker described his life prior to the accident, his increasing pain that creates a tremendous struggle in his daily activities, his out-of-pocket expenditures in treatment, his memory loss, slurred speech, and the impaired ability to drive due to his medications. In his daily activities. Baker experiences severe pain. (AR 0411-18). In his "pain diary," Baker chronicled his drowsiness, burning sensations, memory loss, sleeplessness, and other symptoms. (AR 0176-200). Baker's eight page statement required three months for him to prepare. (AR 0414).

*13 In January, 2005, MetLife referred Baker's file for another independent medical review. (AR 0057-0073). Dr. Philip Marion, a physician board-certified in physical medicine, rehabilitation and pain management, stated that based upon his findings, Baker's impairment was limited to the 2000 spinal MRI that showed area of bulging at C4-5, C5-6, and C6-7, and Baker's 2001 spinal MRI

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 11
Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
**(Cite as: Slip Copy)**

that showed small central disc protrusion at C6-7 and bilateral foraminal stenosis at C5-7. (AR 0060). Dr. Marion cited an electrodiagnostic study in 2001 that reflected very mild right median nerve entrapment suggestive of very early carpal tunnel syndrome. *Id.* According to Dr. Marion: "[Baker's] impairment due to objective findings is otherwise mild. There was no evidence of objective findings on numerous physical examinations that noted a normal neurologic examination. Again, his objective impairment would be mild and not affecting his ability to perform the routine duties of his usual job as an attorney." *Id.* Dr. Marion continued: "His complaints of full body pain are not substantiated by his otherwise unremarkable objective impairments of degenerative cervical spine disease and minimal evidence of early carpal syndrome on the right.... Again, there remains no significant objective impairment that would preclude him from performing the routine duties of an attorney." (AR 0061). Lastly, Dr. Marion opined that: "Mr. Baker is otherwise independent in activities of daily living with no evidence of significant objective functional impairment." *Id.*

Dr. Margaret O'Connor, Ph.D., Diplomate in Clinical Neuropsychology, reviewed Baker's medical records to determine his level of functionality from a neuropsychological standpoint. (AR 0065-0073). Dr. O'Connor did not find any significant cognitive limitations to support Baker's inability to work. (AR 0071). In particular, Dr. O'Connor opined that Baker's scores on two commonly used measures of symptom validity obtained in testing with Dr. Auble-were far below those of patients with Alzheimer's disease and were reflective of poor effort. (AR 0068-69). Dr. O'Connor stated that Dr. Auble's explanation of drowsiness was unconvincing. *Id.* Yet, Dr. O'Connor declined: "[a]ddressing the issue of pain [that] would be outside my area of expertise." (AR 0071).

On February 1, 2005, MetLife denied Mr. Baker's appeal and upheld the termination of benefits. (AR 0074-76). MetLife reviewed the findings of its consultants, including its psychiatrists and Dr. Auble's report. The only consultants that MetLife mentioned by name were Drs. Fishbain and Ruder.

It was noted by the consultant that recent testing by Dr. Auble pointed out that Mr. Baker's performance was intact in a number of areas, including fund of knowledge, vocabulary, attention span, working memory, problem solving and visual perception. She did note low range average performance on measures of processing speed and mental flexibility but the consultant was uncertain that the scores were valid indices of Mr. Baker's cognitive abilities in light of the facts that he failed 2 to 3 symptom validity tests during his evaluation with Dr. Auble.

*14 The consultant noted that Mr. Baker's level of function was defined as follows:
*Attention/Concentration:* Mr. Baker has complained of concentration problems. It is the case that pain may disrupt attention. However, recent testing by Dr. Auble suggested that his attention span and working memory fall in the normal range. There was no objective information regarding his capacity to sustain focused attention over long time intervals. Dr. Auble has documented that Mr. Baker processed information slowly; however, this was in the context of an evaluation where he failed two symptom validity tests. Therefore, the consultant felt that this data would not be considered a valid index of his abilities.
*Memory:* Dr. Auble indicated that Mr. Baker's working memory was normal. Mr. Baker has been able to recall detailed personal and medical information in his meetings with various health care providers; to this extent, his everyday memory abilities appear intact.
*Language:* Mr. Baker was able to communicate his ideas effectively. In addition, his fund of verbal knowledge was normal. He comprehends communications from others without difficulty.
*Reasoning:* Dr. Auble indicated that Mr. Baker's reasoning abilities fell in the high average range.
*Social/Interpersonal Skills:* Mr. Baker had behaved in a cordial, appropriate manner during his evaluation with various health care providers. He comes across as very depressed but this has not undermined his interpersonal compartment.
Dr. Auble attributed Mr. Baker's failure on the symptom validity tests to his sleepiness and lack of focus, but this explanation was not satisfactory, as noted above. The consultant indicated that two of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the most important tests of the neuropsychological battery were administered when Mr. Baker was allegedly asleep or when the examiner was not in the room. Moreover, his scores on the effort tests were far lower than those of patients with dementia, even though he is able to recall salient details from his personal life without difficulty. It was the consultants opinion that objective evidence of functional limitations in the context of an examination indicating that Mr. Baker was motivated to participate in the testing limitations, since he failed two of the three effort tests, hence, it is possible that poor effort undermined his task performance. As indicated in Mr. Baker's employer's Plan, to be eligible for Long Term Disability and to be considered totally disabled the insured cannot perform the essential duties of his or her regular occupation on a full-time basis because of sickness or injury.

[t]he information submitted on appeal along with the information on record did not document that Mr. Baker's condition was of a severity as to prevent him from performing his regular occupation. Therefore, he can not be considered disabled as defined by his employer's Long Term Disability Plan and the original claim determination to terminate benefits effective April 24, 2004 was appropriate.

*15 (AR 0075-76).

In its February 1st letter denying Baker's appeal, MetLife did not address the opinions of Drs. Elam and Akins treating physicians. MetLife relied upon the medical records reviews of its consultants who (except for Dr. Anchor) performed a paper review of Baker's medical file.

### B. CONCLUSIONS OF LAW

Under ERISA, judicial review of the denial of benefits under ERISA is "*de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the language of the plan grants the plan administrator discretionary authority to determine eligibility for benefits or to construe plan terms, then the arbitrary and capricious standard applies. *Id.* For the arbitrary and capricious standard of review, the plan must contain 'a *clear* grant of discretion [to the administrator] to determine benefits or interpret the plan." ' *Perez v. Aetna Life Ins., Co.,* 150 F.3d 550, 555 (6th Cir.1998)(*en banc* )(quoting *Wulf v. Quantum Chem. Corp.,* 26 F.3d 1368, 1373 (6th Cir.1994)(emphasis in original)).

Here, MetLife, as BMA's successor, is the claims administrator for the Baker, Donelson Plan. The relevant plan language provides that:
BMA shall have the sole discretion and authority to construe the terms of the Policy and resolve all disputes, claims, and all questions of eligibility under the Policy. The decision of BMA shall be final and binding on all parties, except as otherwise provided by law.

(SPD 0028).

This language in the Plan is sufficiently clear and express to grant discretionary authority to MetLife to interpret the Plan and to decide claims for Plan benefits. *See Univ. Hosps., of Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 846 (6th Cir.2000) (applying the arbitrary and capricious standard where that plan provided that the plan's administrator "shall have the discretionary authority to determine eligibility for benefits or to construe the terms of the Plan"). Accordingly, the Court concludes that the arbitrary and capricious standard applies here.

Plaintiff contends that a heightened scrutiny standard should apply to MetLife's decision citing MetLife's conflict of interest as both insurer and administrator as well as Metlife's substantial financial interest, if Baker were awarded benefits of $9,000 per month until he became sixty-five (65) years old. "[A] conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits." *Evans v. Unumprovident Corp.,* 434 F.3d 866, 876 (6th Cir.2006). In *Evans,* the Sixth Circuit synthesized a definition this conflict for ERISA purposes.
"[T]here is an actual, readily apparent conflict ....,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                            Page 13
Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
**(Cite as: Slip Copy)**

not a mere potential for one" where a company both funds and administers an LTD policy, because "it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits." ... [B]ecause [the] defendant maintains such a dual role, "the potential for self-interested decision-making is evident."

*16 *Id.* at 876 (citations omitted).

Under such facts, "the potential for self-interested decision-making is evident." *Calvert v. Firstar Fin., Inc.,* 409 F.3d 286, 292 (6th Cir.2005)(internal quotations and citation omitted). See also *Miller v. Metro. Life Ins. Co.,* 925 F.2d 979, 984 (6th Cir.1991) ("Because an insurance company pays out to beneficiaries from its own assets... its fiduciary role [as the decision-maker for benefits] lies in perpetual conflict with its profit-making role as a business, and the conflict of interest is substantial").

Given Baker's age and the amount of the benefits, the payment of his claims involves substantial funds. Under these circumstances, the Court concludes that MetLife has a conflict of interest in this action.

The existence of a conflict of interest does not alter the standard of review. In sum, "that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' " *Firestone,* 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, Comment d (1959). Less deference may be given upon proof that the denial was motivated by self-interest or bad faith. See *Peruzzi v. Summa Medical Plan,* 137 F.3d 431, 433 (6th Cir.1998). In a word, "the abuse of discretion or arbitrary and capricious standard still applies, but application of the standard should be shaped by the circumstances of the inherent conflict of interest." *Borda v. Hardy, Lewis, Pollard & Page, P.C.,* 138 F.3d 1062, 1069 (6th Cir.1998) (quoting *Miller,* 925 F.2d at 984).

"The arbitrary and capricious standard is the least demanding form of judicial review." *Hunter v. Caliber Sys., Inc.,* 220 F.3d 702, 710 (6th Cir.2000). Yet, the Sixth Circuit clearly stated that the arbitrary and capricious standard is not the equivalent of total deference to plan administrators:
[M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious ... standard does not require us merely to rubber stamp the administrator's decision." *Jones v. Metropolitan Life Ins. Co.,* 385 F.3d 654, 661 (6th Cir.2004). Indeed, "[d]eferential review is not no review, and deference need not be abject." *McDonald,* 347 F.3d at 172. Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." *Id.*

*Moon v. Unum Provident Corp.,* 405 F.3d 373, 379 (6th Cir.2005). In conducting an arbitrary and capricious review of the administrative record, only the facts known to the administrator or fiduciary at the time it made the decision are considered. *Id.* at 378-79

The administrator's decision must be "based on a reasonable interpretation of the plan," and it must be "possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Evans,* 434 F.3d at 876 (quoting *Perry v. United Foods & Commercial Workers Dist. Unions 405 & 422,* 64 F.3d 238, 241 (6th Cir.1995)). The administrator's decision "will be upheld 'if it is the result of a deliberate reasoned process and if it is supported by substantial evidence.'" *Evans,* 434 F.3d at 876 (quoting *Baker v. United Mine Workers of America Health & Retirement Funds,* 929 F.2d 1140, 1144 (6th Cir.1991)). This judicial review "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issue." *Evans,* 434 F.3d at 876 (quoting *McDonald,* 347 F.3d at 172). As a general rule, the administrator's written decision and the information in the administrative record are the bases for judicial review. *Peruzzi,* 137 F.3d at 433-34.

*17 Baker argues that MetLife's decisions to terminate his long-term disability benefits were

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 14
Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
**(Cite as: Slip Copy)**

arbitrary and capricious for several reasons: (1) MetLife failed to consider Baker's actual job requirements: (2) MetLife disregarded the clear medical and lay evidence of Baker's chronic pain; (3) MetLife required objective medical proof that is not required by the Plan; (4) MetLife's consultants relied upon incomplete data and Dr. Anchor's flawed report; and (5) MetLife changed its basis for denial to prevent a full and fair review of Mr. Baker's claim and to thwart the "exhaustion of remedies" requirement of an ERISA claim. (Docket No. 20 at 5). MetLife denies these contentions and insists that its decisions are supported by the Administrative Record and cites objective evidence in Baker's medical records that he is unable to perform his regular occupation.

MetLife's decisions terminating benefits are reflected in its two letters of denial; the April 23, 2004 letter (AR 0870-72) and the February 1, 2005 letter (AR 00074-76). The Court analyzes each letter and its findings in light of the administrative record.

First, Baker contends that MetLife's initial termination decision in its April 22, 2004 letter relied, in part, on the U.S. Department of Labor Dictionary of Titles ("DOT") "sedentary" classification for Baker's occupation." The re-evaluations of Dr. Greenhood, Dr. Kilburn and MetLife physician consultants applied an "any occupation" standard. Baker states that MetLife's policy does not mention the DOT classifications as the basis for a finding of disability. The Plan provides that disability arises where the claimant " cannot perform the essential duties of his or her regular occupation on a full-time basis because of Sickness or Injury.

This Circuit has recognized this description of sedentary work.[FN5] Although the practice of law is a physically "sedentary" occupation, the evidence clearly establishes that Baker's regular occupation was in the sophisticated and demanding legal practice involving mergers and acquisitions. Although Metlife's letter cited the DOT classification, the Court notes that MetLife's April 22rd letter also cited Dr. Ruder's assessment that Baker's "mild cognitive deficits ... would not significantly impact the tasks of an occupation commensurate with your training, education and experience." (AR 0871). The record is unclear if Dr. Ruder considered the actual and specific requirements of Baker's practice in mergers and acquisitions, but the Plan requires the administrator to consider Baker's "regular occupation." (Docket Entry No. 13, SPD at 0013). The Court agrees with Baker's contention on MetLife's noncompliance with this requirement of the Plan in its April 22rd letter.

> FN5. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and the other sedentary criteria are met." *Brooking v. Hartford Life Ins. Co.,* 167 Fed. Appx. 544, 549, n. 5 (6th Cir.2006).

The next issue with MetLife's initial termination is MetLife's reference that Baker's treating physicians lacked "substantial objective medical evidence and the CPRC's physicians failure to find any objectively abnormal findings on the neurological exam." (AR 0870). Baker argues that MetLife's reference to the lack of objective medical basis for his pain relies upon a standard that is not in the Plan and therefore such reliance is arbitrary and capricious.

*18 As a matter of law, courts have held that an ERISA administrator's reliance on the lack of objective medical evidence is arbitrary and capricious where the claimant's illness or sickness cannot be objectively determined. As the Sixth Circuit aptly stated in an ERISA action: "As many courts have observed, pain often evades detection by objective means." *Brooking v. Hartford Life & Accident Ins. Co.,* 167 Fed. Appx. 544, 549 (6th Cir.2006); accord *Mitchell v. Eastman Kodak,* 113 F.3d 433, 442-43 (3rd Cir.19970 (Chronic Pain

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 15
Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
**(Cite as: Slip Copy)**

Syndrome); see also *Kosibu v. Merck & Co.*, 384 F.3d 58, 62 n. 3 (Fibromyalgia); *Green-Younger*, 335 F.3d 99, 108 (2d Cir.2002) ( fibromyalgia). In *Yearger v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381-82 (6th Cir.1996), the Sixth Circuit held that only medical evidence for a diagnoses of such a condition is necessary to find a disability from such an illness.

In addition, one court has held that MetLife's insistence upon objective evidence is arbitrary and capricious where that standard is not set forth in the plan. *May v. Metropolitan Life Ins. Co.*, No. C 03-5056, 2004 WL 2011460, *7 (N.D.Cal. Sept.9, 2004) (holding that "MetLife abused its discretion by requiring the Plaintiff meet an additional requirement for eligibility beyond those imposed by the plan. The administrator cannot exclude a claim for lack of objective medical evidence unless the objective medical evidence standard was made clear, plain and conspicuous enough in the policy to negate Plaintiff's objectively reasonable expectations of coverage ...."). See also *Pollini v. Raytheon Disability Employee Trust*, 54 F.Supp.2d 54, 59 (D.Mass.1999) ("the claim administrator's rejection of a claim solely on the basis of a purported lack of objective evidence is troubling and questionable."). (citation omitted)

The Court's review of the record reflects several instances of objective medical evidence for Baker's pain. First, after the automobile accident, Dr. Elam referred Baker to Dr. Howell, a neurosurgeon who ordered lumbar and cervical myelograms and concluded that Baker had "spondylosis at C-5 and 6-7 with degenerative disk and an old, calcified disc protrusion to C6-7. *This would be a reasonable explanation for his neck pain, shoulder pain and some of the pain up to the base of his skull.*" (AR 1169) (emphasis added). The record also reflects that MRI of Baker's spine on January 18, 2000 and April 13, 2001 as well as August 2, 2001 electrodiagnostic study showed that Baker had areas of bulging at C4-5, C5-6 and C6-7 as well as a central disc protrusion at C6-7 and a bilateral forminal stenosis at C5-6. (AR 0074). In his December 4, 2002 examination, the CPRC physician noted that Baker had pain at the coccyx and a tender point at the left trochanter. (AR 0133-34). In his April 15, 2003 letter to MetLife. Dr. Elam informed MetLife that among his diagnoses was that Baker had fibromyalgia, (AR 1020-21) a painful condition that, as discussed below, cannot be verified by objective medical tests. In his letter to MetLife, Dr. Rosomoff reported that Baker "did exhibit pain in multiple soft tissue areas." (AR 870). The Court considers these examples to be objective medical findings that at the time of MetLife's April 22, 2004 denial, Baker presented objective medical evidence of a disabling pain.

*19 In *Preston v. Secretary of Health and Human Servrs.*, 854 F.2d 815 (6th Cir.1988) (per curiam), the Sixth Circuit described fibromyalgia as a medical condition that cannot be discerned by any objective medical tests.

fibrositis [FN6] causes *severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results-a full range of motion, no joint swelling,* as well as normal muscle strength and neurological reactions. *There are no objective tests which can conclusively confirm the disease;* rather it is a process of diagnosis by exclusion and testing of certain "focal tender points" on the body for acute tenderness which is characteristic in fibrositis patients. The medical literature also indicates that fibrositis patients may also have psychological disorders. *The disease commonly strikes between the ages of 35 and 60 and affect women nine times more than men.*

FN6. In *Brazier v. Secretary of Health and Human Services,* 61 F.3d 903, 1995 WL 418079, the Sixth Circuit noted that " fibromyalgia is often interchangeably used with the terms fibromyositis or fibrositis." See *Lisa v. Secretary of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir.1991).

*Id.* at 817-18 (emphasis added).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  Page 16
Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
**(Cite as: Slip Copy)**

For fibromyalgia, the Sixth Circuit deemed objective medical tests to be "little aid or relevance" except for other medical diseases that have objective manifestations. *Id.* at 820. Moreover, " fibrositis patients, ... can not sit, stand, or maintain any one position for any length of time," *id.* at 818, but patients with this condition do have "good days, " but these days are "extremely rare," *id.* at 819. In *Preston,* the Court deemed persuasive evidence of disability to include the "systematic elimination of other diagnosis, identification of focal tender points and observation of other classic symptoms of fibrositis ..." *Id.* at 820. In *Sarchet v. Chater,* 78 F.3d 305, 306, 307 (7th Cir.1996), the Seventh Circuit cited the inherent difficulties of evaluating a claim of disability due to fibromyalgia-- a disease whose "symptoms are entirely subjective" because laboratory tests will not show the presence or severity of this disease, but the person can be " totally disabled from working." Courts look for trigger points, that when pressed, cause the patient to flinch. *Preston,* 854 F.2d at 818; *Sarchet,* 78 F.3d at 306. The Seventh circuit cited eleven trigger points as an indication of the presence of this disease, but the Sixth Circuit has not cited any number. *Id.*

Here, Dr. Ruder and Dr. Rosomoff each noted pressure points that caused Baker pain. In addition to the myelograms and the soft tissue testing, the reports of Drs. Elam and Akin of Baker's chronic pain constitute objective medical evidence of a disabling condition as found by the Sixth Circuit and other Circuits. *See also Pollini,* 54 F.Supp.2d at 59-60 ("It was unreasonable to ignore the assessments of pain made by these several trained medical professionals").

The Court also concludes that in its April 23rd letter, MetLife and its consultants relied upon flawed data in Dr. Anchor's report. Although Dr. Ruder opined, as stated in MetLife's initial denial letter, that Baker had mild cognitive defects, Dr. Ruder qualified this opinion with the recommendation that Baker undergo neuropsychological testing. MetLife selected Dr. Anchor, another MetLife consultant to perform this testing. Dr. Anchor, however is not a board-certified neuropsychologist and his examination was flawed. Dr. Anchor interviewed Baker only for thirty minutes. Dr. Anchor's receptionist/office assistant, whose credentials are unknown, administered three and one-half hours of tests to Baker. Dr. Auble, a licensed neuropsychologist described most of the tests administered by Dr. Anchor as "obsolete" and/or " unreliable." Dr. Anchor provided different versions of his reports to Metlife and to Dr. Auble. The MetLife report had a "Psychological/Neurological Evaluation Report," his report to Dr. Auble had the "Psychological Evaluation Report." Baker argues the differences suggests that Dr. Anchor attempted to avoid his lack of credentials from Dr. Auble, who is a neuropsychologist. The two reports also differed in the number and type of tests administered. When Dr. Auble requested Dr. Anchor's report, he initially refused to provide one to her. The state regulatory board suspended Dr. Anchor for his failure to retain supporting data for psychological tests and for unqualified conclusions in his evaluations.

*20 The Court concludes that Dr. Anchor's credentials, methodology, and conduct during and after his evaluation of Baker render his purported " neuropsychological" evaluation of Baker insufficient to support a denial of benefits. Based upon Dr. Auble's analysis and the state regulators' sanctions that Dr. Anchor altered report data to support his findings and lacked qualifications and direct observation required for his conclusions. Thus, the Court concludes that MetLife's first decision to terminate Baker's benefits on April 22, 2004 that was based in substantial part on Dr. Anchor's report, was arbitrary and capricious.

After Baker's appeal and in its February 1, 2005 denial letter, MetLife recognized that the medical tests of Baker's spine by its "consultant indicated that Mr. Baker does have impairment due to objective findings." (AR 00074). MetLife cited CRPC's finding that Baker did not have any " objective impairment that would preclude him from performing his routine duties as an attorney." (AR 00075). MetLife cited Dr. Fishbain's finding that Baker's mental status was normal and Dr. Ruder's assessment that Baker had a mild mental impairment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                           Page 17

Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
(Cite as: Slip Copy)

Yet, in its February 1, 2005 letter, MetLife again reiterates its view about the absence of any objective evidence of a disability impairment. As discussed earlier, this same rationale is contrary to the Sixth Circuit decisions and decisions of other circuits, that a disability based upon chronic pain evades detection by objective tests. Dr. Elam's and Dr. Akin's opinions, coupled with medical tests, establish Baker's chronic pain. Dr. Mosohoff at CRPC deferred to Baker's treating physicians on his pain and any cognitive limitations. MetLife selected portions of Dr. Auble's findings, but does not address her core finding that Baker is totally disabled.

Baker also contends that Metlife failed to consider his personal statement, his pain diary, and letters from third parties and his physicians in evaluating. MetLife responds that the two physician consultant reports reflect that the consultants received a file of 659 documents, including 178 "MISC" documents ending with the date of December 21, 2004, the date of Mr. Baker's twenty-three page appeal letter and personal statement, diary, and letters, and the only document in the Administrative Record bearing this date. (Docket No. 30 at 5). The physician consultants neither discussed, mentioned, or referenced Baker's personal statement, pain diary, or the third party letters.

If an ERISA administrator hand-picks among the medical evidence, then the administrator acts arbitrarily and capriciously. *See Smith v. Continental Cas. Co.,* 450 F.3d 253, 261 (6th Cir.2006) (ERISA administrator that "hand picked" information provided to peer reviewer was arbitrary and capricious); *Glenn v. Metlife,* No. 05-3918, 2006 WL 2519293, at *10 (6th Cir. Sept.1, 2006) (the failure to consider evidence offered after an initial denial of benefits in denial of benefits is arbitrary and capricious). Here, MetLife ignored the favorable evidence of Baker's disability that was submitted on appeal.

*21 In its February 1, 2005 letter denying Baker's appeal of Metlife's discontinuation of benefits, MetLife abandoned its express reliance on Dr. Anchor's report. Yet, Metlife did not order a different neuropsychological evaluation that Drs. Kilbain and Ruder recommended as components of their evaluations. Drs. O'Connor and Marion performed only a paper review of Baker's medical records and appear to have relied upon Dr. Anchor's findings. Dr. Marion did not discuss Dr. Auble's criticisms of Dr. Anchor's testing methods. Dr. O'Connor reviewed some or all of Dr. Auble's report or letters, but Dr. O'Connor's report does not reflect her awareness of Dr. Anchor's past disciplinary actions, which could have materially affected her opinion of Dr. Anchor's findings.

Where the ERISA administrator relies on consultants who perform only a paper review of a claimant's medical record, such reliance can be considered arbitrary and capricious. "Whether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." *Kalish v. Liberty Mutual,* 419 F.3d 501, 508 (6th Cir.2005); See also *Calvert,* 409 F.3d at 295 ("[W]e find that the failure to conduct a physical examination ... may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination."). To be sure, a plan administrator is not required to accord special deference to the opinion of treating physicians, but the administrator may not arbitrarily refuse to consider the opinions of treating physicians. *Black & Decker,* 538 U.S. at 834.

Baker's disabling sickness is his chronic pain syndrome. Drs. Elam and Akin are the only physicians to have personally treated and repeatedly observed Baker during the entire course of his dispute with Metlife. Both treating physicians have consistently and unequivocally opined that, because of his chronic pain syndrome and the effects of his pain medication, Baker is unable to perform the essential duties required of him as a partner and attorney at Baker, Donelson. The CRPC physicians deferred to Drs. Elam's and Akin's opinions. Dr. Auble, who also personally evaluated Baker for a neurological assessment, concurred. Drs. O'Connor and Marion disagreed, but did not examine Baker. Dr. O'Connor also concluded that Baker lacks " significant cognitive problems undermining his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                     Page 18

Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
**(Cite as: Slip Copy)**

functional abilities," (AR 0071), but Dr. O'Connor expressly declined "[a]ddressing the issue of pain [that] would be outside [her] area of expertise." *Id.* [FN7] Neither Dr. O'Connor nor Dr. Marion discussed their opinions with Drs. Elam, Akin, or Auble about Baker's condition and his ability to perform the essential duties of his previous position at Baker, Donelson.

> FN7. Although Dr. O'Connor appears to suggest Baker is a "malingerer," Metlife had previously advised Drs. Kilburn and Greenhood that Baker was not a malingerer. (AR 0006, 0014, 0078).

These factual circumstance have been held to constitute arbitrary and capricious denial of ERISA benefits. See *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 170 (6th Cir.2003) ("The evidence presented in the administrative record did not support the denial of benefits when only [the administrator]'s physicians, who had not examined [the claimant], disagreed with the treating physicians."); and *Railey v. Cooperative Benefit Admins., Inc.,* No. 4:05CV-104-M, 2006 WL 1548968, at *7 (W.D.Ky. June 5, 2006)(arbitrary and capricious found where administrates physicians did not personally examine plaintiff and failed to consider plaintiff's job descriptions). For MetLife's other consultants "[w]hen a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism." *Kalish,* 419 F.3d at 507 (citation omitted).

**\*22** Finally, at Metlife's directive, Baker applied for social security benefits and ultimately secured an award of benefits and reimbursed Metlife $25,527.40. Social Security disability determination is relevant to any decision to terminate benefits under an ERISA plan. *Glenn,* 2006 WL 2519293, at ----6-7. Yet, the Social Security disability determination alone, will not support a finding of arbitrary and capricious. *Id.* MetLife discounts the Social Security determination for lack of written findings. MetLife, however, accepted the benefits of the Social Security's determination that Baker is disabled from working. The Sixth Circuit cited approvingly a Seventh Circuit decision concluding "that a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, 'casts additional doubt on the adequacy of their evaluation of... [a] claim, *even if it does not provide an independent basis for rejecting that evaluation.*" ' *Calvert,* 409 F.3d at 294-95 (quoting *Ladd v. ITT Corp.,* 148 F.3d 753, 756 (7th Cir.1998) with emphasis added).

Here, MetLife's response to the Social Security determination of Baker's disability casts further doubt on its decision to terminate Baker's benefits.

In sum, the Court concludes that the medical evidence in the Administrative Record establishes that Baker has chronic pain syndrome and coupled with the effects of his pain medications. Baker cannot perform the essential duties of his regular occupation as an attorney. Therefore, Baker is disabled under the terms of the Plan and is entitled to a judgment awarding continued long-term disability benefits.

The next issue is an awarded of prejudgment interest. The district court possesses the discretion to grant prejudgment interest on an ERISA award as a matter of equity. *Ford v. Uniroyal Pension Plan,* 154 F.3d 613, 616 (6th Cir.1998). MetLife's relied upon flawed data in its first denial letter and MetLife's erroneous determination about the lack of objective medical evidence in its second letter is contrary to clearly established Sixth Circuit precedent. The Court concludes that equity requires an award of prejudgment interest to give Plaintiff the full value of his benefits under the Plan. A decision not to award prejudgment interest would benefit MetLife and encourage erroneous decisions for an economic benefit. The rate of prejudgment interest will be determined under Tennessee law unless MetLife can demonstrate that this state law overcompensates Plaintiff. *Ford,* 154 F.3d at 619

As to whether to award attorney fees, in *Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health and Welfare Trust,* 203 F.3d 926 (6th Cir.2000), the Sixth Circuit listed the factors to be considered:
Under 29 U.S.C. § 1132(g)(1) a "court in its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 19

Slip Copy, 2006 WL 3782852 (M.D.Tenn.)
**(Cite as: Slip Copy)**

discretion may allow a reasonable attorney's fee and costs of action to either party." A district court must consider the following factors in deciding whether to award attorney fees, (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions. *Schwartz v. Gregori,* F.3d 1116, 1119 (6th Cir.1998) (quoting *Secretary of Dep't of Labor v. King,* 775 F.2d 666, 669 (6th Cir.1985)), *cert. denied,* 526 U.S. 1112, 119 S.Ct. 1756, 143 L.Ed.2d 788 (1999).

**\*23** *Id.* at 936.

For the reasons stated on prejudgment interest, the Court finds that MetLife is culpable and it is unquestioned that MetLife can afford an award of attorney fees. Such an award also discourages any erroneous decisions contrary to Sixth Circuit precedent. The latter also benefits other Plan participants. Baker's position is well supported by relevant Sixth Circuit precedent.

For the reasons stated above, the Court concludes that Plaintiff's motion for judgment on the record (Docket Entry No. 19) should be granted; that Defendant's motion for judgment on the record (Docket Entry No. 21) should be denied; Plaintiff may file an application for attorney fees and costs in accordance with Local Rule 54.01.

An appropriate Order is filed herewith.

M.D.Tenn.,2006.
Baker v. Metropolitan Life Ins. Co.
Slip Copy, 2006 WL 3782852 (M.D.Tenn.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3198521 (Trial Motion, Memorandum and Affidavit) Metropolitan Life Insurance Company's Response to Motion for Judgment on the Administrative Record (Oct. 27, 2005) Original Image of this Document (PDF)
• 2005 WL 3198520 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant's Motion for Judgment on the Administrative Record (Oct. 21, 2005) Original Image of this Document (PDF)
• 2005 WL 2802834 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Plaintiff's Motion for Judgment on the Administrative Record (Sep. 30, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 2802835 (Trial Motion, Memorandum and Affidavit) Defendant Metropolitan Life Insurance Company's Memorandum in Support of Motion for Judgment on the Administrative Record (Sep. 30, 2005) Original Image of this Document (PDF)
• 3:05cv00262 (Docket) (Mar. 31, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.