CO-COUNSEL FOR PLAINTIFF

Timothy W. Seaver
Seaver & Wagner, LLC
421 West First Ave., Suite 250
Anchorage, Alaska 99501
Tel. 907-646-9033
Fax. 907-276-8238
Email: tseaver@seaverwagner.com

George T. Freeman
Attorney at Law
1152 P Street
Anchorage, Alaska 99501
Tel. 907-274-8497
Fax 907-274-8497 (call first)
Email: gtf@gci.net

## UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF ALASKA

|  |  |
|---|---|
| DANIELA VALENOTE,<br><br>    Plaintiff,<br><br>vs.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, and RIM ARCHITECTS (ALASKA), INC.,<br><br>    Defendants. | <br><br><br><br><br><br><br><br><br><br>Case No. A05-0196 CV (TMB) |

## **AFFIDAVIT OF DR. GREGORY R. POLSTON, M.D.**

STATE OF ALASKA       )
THIRD JUDICIAL DISTRICT    ) ss.

    Dr. Gregory R. Polston, upon oath, deposes and states:

    1.    I am a medical doctor at the Advanced Medical Centers of Alaska.  The former name of my clinic was the Advanced Pain Centers of Alaska.  I have a Diplomate American Board of Anesthesiologist, ABA and a Diplomate Subspecialty Pain Medicine, ABA.  I have knowledge of the facts herein.

2.      I have treated my patient Daniela C. Valenote from June 2004 to the present.

3.      Exhibit 1 to this affidavit is a copy of my February 16, 2006 opinion letter regarding Ms. Valenote.

4.      Exhibit 2 to this affidavit is a copy of a letter to me from Timothy Seaver dated February 10, 2006.

5.      Exhibit 3 to this affidavit is a copy of a page designated ML00016/DEF00017 and a page ML00017/DEF00018 that Mr. Seaver indicated is from the MetLife long term disability insurance policy and the Mr. Seaver provided to me.

6.      Exhibit 4 to this affidavit is a copy of my progress note for Ms. Valenote dated March 15, 2005.

7.      Exhibit 5 to this affidavit is a copy of a job description for an architect dated October 6, 2003 signed by Ms. Valenote and provided to me by Mr. Seaver.

8.      Exhibit 6 to this affidavit is a copy of 20 CFR Section 404.1567 Physical exertion requirements referenced in my opinion letter.

9.      Exhibit 7 to this affidavit is a copy of Physical Work Performance Evaluation Summary by Advanced Physical Therapy of Alaska dated February 14, 2005 provided to me by Mr. Seaver.

_____
Dr. Gregory R. Polston, M.D.


SUBSCRIBED AND SWORN TO before me this ___ day of January, 2007.

Notary Public in and for Alaska
My commission expires: _____

My Commission Expires March 01, 2009

2

Affidavit of Gregory R. Polston
PLAINTIFF VALENOTE'S MOTION FOR SUMMARY JUDGMENT
*Valenote v. Metropolitan Life Insurance Company*
*and Rim Architects (Alaska), Inc.*, Case No. A05-0196 CV (RRB)

Grant T. Roderer, M.D.
Lawrence W. Stinson, M.D.
Gregory R. Polston, M.D.
Nancy E. Cross, M.D.
Mo Hillstrand, M.D.
Marc Slominski, M.D.



Rafael L. Prieto, M.D.
Lois Michaud, Ph.D.
Deborah Kiley, ANP
Connie Judd, ANP
Jimmy Cobden, M.D.
Catherine Barrett, M.D.

February 16, 2006

Law Offices of Seaver and Wagner, LLC
Attn: Timothy W. Seaver
421 West First Street
Suite 250
Anchorage, Alaska 99501

**RE: VALENOTE, DANIELA**
**DOB: 02-17-1969**
**SS#: 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**

Dear Mr. Seaver;

This letter is in regards to your request for a medical opinion on Daniela Valenote versus MetLife Insurance Company and Rim Architectures. You have asked if Ms. Valenote meets the definition of disability within the meaning of part 1 of MetLife Longterm Disability Policy definition of disabled. It is my opinion that Ms. Valenote does meet the definition of disability and disabled and is incapable of working as an architect for 80% of an 8 hour day, 5 days a week during a 24 month period starting in March of 2003. Dr. Susan Anderson and myself provided appropriate medical care in attempts to return Ms. Valenote back to work. Dr. Anderson began her care primarily with some medications and an annuloplasty of her lumbar spine. I assumed care after Dr. Anderson's departure from the practice and return to the lower 48. During my care Ms. Valenote has undergone extensive medications, physical therapies, injections with limited success. The patient underwent a functional capacity evaluation at Advanced Physical Therapies of Alaska on February 14, 2005. The patient was found to be incapable of sustaining a sedentary level of work for an 8 hour day. In review of Ms. Valenote's job description of an architect dated October 6, 2003 taken from U.S. Department of Labor Occupational Outlook Handbook it appears that this is at a minimum a light duty to medium level of work as classified by the Department of Labor. Based on her clinical presentation, diagnoses and objective findings on the physical capacity evaluation I feel that Ms. Valenote does meet the definition of disability and disabled. If there are further questions I would certainly be able to be available and to provide any assistance that would be required.

EXHIBIT / Page / of 2    **V-1597**

**Valley**
3035 E. Palmer-Wasilla Hwy, Unit 501
Wasilla, AK 99654
(907) 357-8330 telephone
(907) 357-8377 facsimile

**Anchorage**
1917 Abbott Road, Suite 100
Anchorage, AK 99507
(907) 278-2741 telephone
(907) 743-8284 facsimile

**Fairbanks**
506 Gaffney Road, Suite 200
Fairbanks, AK 99701
(907) 374-6602 telephone
(907) 374-6604 facsimile

RE: VALENOTE, DANIELA
Page 2

Sincerely,

Gregory R. Polston, M.D.
Diplomate American Board of Anesthesiologists, ABA
Diplomate Subspecialty Pain Medicine, ABA

GRP/MEDQ
DD 02/16/2006
DT 02/16/2006
JOB # 610575

cc:     Timothy W. Seaver Law Offices of Seaver and Wagner, LLC
        421 West First Street, Suite 250
        Anchorage, Alaska
        Phone #907-646-9033
        Fax #907-276-8238 99501

V-1598

EXHIBIT / Page 2 of 2

LAW OFFICES OF
# SEAVER & WAGNER, LLC

TIMOTHY W. SEAVER
JENNIFER A. WAGNER

OF COUNSEL TO
MIDDLETON & TIMME, P.C.

421 WEST 1ST AVENUE, SUITE 250
ANCHORAGE, ALASKA 99501
(907) 646-9033
FAX (907) 276-8238

February 10, 2006

HAND DELIVERED

Dr. Gregory Polston, M.D.
Advanced Pain Centers of Alaska
1917 Abbott Road, Suite 100
Anchorage, Alaska 99507

Re:    Daniela Valenote v. MetLife Insurance Company and Rim Architects
       Request for a Medical Opinion Report

Dear Dr. Polston:

I, along with George Freeman, represent Daniela Valenote in an action seeking to obtain disability benefits for Ms. Valenote under her prior employer's disability benefit plan. Although Mr. Freeman and I had initially hoped to meet with you in person to discuss this matter, Ms. Valenote's very difficult financial circumstances requires us to minimize her costs as much as possible. As a result, we are seeking a report from you at the rate indicated in your "price list."

Specifically, we are requesting a report of your medical opinion on whether Ms. Daniela Valenote is disabled within the term "disability" in the MetLife long term insurance policy at issue in Ms. Valenote's case and on her medical condition. We understand that you have been treating Ms. Valenote from June 18, 2004 until the present.

Dr. Susan Anderson of your clinic also treated Ms. Valenote from July 16, 2003 until you became her treating physician. Prior to this, Ms. Valenote was treated by other medical doctors and licensed medical practitioners after Dr. Michael Orechowski released her from work at Rim Architects starting in late 2002 or early 2003.

To facilitate our request, I am providing you with the following documents:

(1)    Pages 6 and 7 of the MetLife long term disability insurance
       policy setting forth MetLife's "Definition of Disability" [Def 0017-18];

(2)    Ms. Valenote's "Job Description of an Architect" dated October 6, 2003 taken
       from the U.S. Dept. of Labor Occupational Outlook Handbook [V-0026-28];

EXHIBIT 2 Page 1 of 2        V-1599

Dr. Gregory Polston, M.D.
February 10, 2006
Page 2

(3)    Your March 15, 2005 Progress Note referencing the "functional capacity evaluation" undergone by Ms. Valenote on February 14, 2005 [V-0016].

In the event that you need to consult the FCE again, it should be in Ms. Valenote's medical records at your clinic. If you need another copy of the FCE, please contact me.

Of course, your clinic has your medical records on Ms. Valenote and we assume that Ms. Valenote's prior medical treatment records are included in these records.

**In sum, we are requesting a report stating your opinion on Ms. Valenote's medical condition <u>and</u> stating your opinion whether Ms. Valenote meets the definition of "disability" within the meaning of Part "1" of the MetLife long term disability policy definition of "disabled," i.e., could Ms. Valenote regularly perform her activities in her "Own Occupation" as an architect for 80% of an eight hour day five days a week during the 24 month period that started in March 2003.**

We assume that the 24 month period started in March 2003 and the "elimination period" mentioned in the policy ended when Ms. Valenote started receiving short term disability payments from MetLife in March 2003. Metlife may contend that the 24 month period started on May 2003.

We expect you can also indicate that Dr. Anderson and you are "Doctor[s]" within the meaning of the policy and that both Dr. Anderson and you have been "providing appropriate care and treatment" for Ms. Valenote since she began her treatment at your clinic in July 2003.

If possible, we want to provide this report to the defendants by February 18, 2006. Finally, would you be so kind as to provide a copy of your curriculum vitae along with the report.

We understand that the cost for this report is $275.00. Please send me a bill and I will ensure prompt payment. We will contact you if we require further assistance on this matter.

Very truly yours,

Timothy W. Seaver

Enclosures

**V-1600**

EXHIBIT 2 Page 2 of 2

**Temporary Recovery During Your Elimination Period**

If you return to work for 30 days or less during your Elimination Period, those days will count towards your Elimination Period. However, if you return to work for more than 30 days before satisfying your Elimination Period, you will have to begin a new Elimination Period.

Temporary Recovery means you cease to be Disabled. During a period of Temporary Recovery you will not qualify for any change in coverage caused by a change in any of the following:

1.      the rate of earnings used to determine your Predisability Earnings; or

2.      the terms, provisions, or conditions shown in your Certificate of Insurance.

**Definition of Disability**

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

1.      during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or

2.      after the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury. Economic factors such as, but not limited to, recession, job obsolescence, paycuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.

For an employee whose occupation requires a license, "loss of license" for any reason does not, in itself, constitute Disability.

"Appropriate Care and Treatment" means medical care and treatment that meet all of the following:

1.      it is received from a Doctor whose medical training and clinical experience are suitable for treating your Disability;

2.      it is necessary to meet your basic health needs and is of demonstrable medical value;

3.      it is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies;

4.      it is consistent with the diagnosis of your condition; and

5.      its purpose is maximizing your medical improvement.

"Doctor" means a person who: (i) is legally licensed to practice medicine; and (ii) is not related to you. A licensed medical practitioner will be considered a Doctor:

1.      if applicable state law requires that such practitioners be recognized for the purposes of certification of disability; and

2.      the care and treatment provided by the practitioner is within the scope of his or her license.

V-1601

ML 00016

EXHIBIT 3 Page 1 of 2

DEF 00017
*Valenote v. Met. Life*

"Own Occupation" means the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position you held with your Employer. It may be a similar activity that could be performed with your Employer or any other employer.

"Local Economy" means the geographic area surrounding your place of residence which offers reasonable employment opportunities. It is an area within which it would not be unreasonable for you to travel to secure employment. If you move from the place you resided on the date you became Disabled, we may look at both that former place of residence and your current place of residence to determine local economy.

### Work Incentive

While you are Disabled, you are encouraged to work or participate in a Rehabilitation Program during your Elimination Period or while Monthly Benefits are being paid to you.  Reimbursement for Eligible Family Care Expenses may also be available when you work or participate in an approved Rehabilitation Program while Disabled.

When you work while Disabled, you will receive the sum of the following amounts:

1.    your Monthly Benefit (including your Rehabilitation Incentive when applicable);

2.    the amount of your earnings for working while Disabled; and

3.    the amount of Family Care Expenses for which you are eligible.

During the 24 month period following your Elimination Period, your Monthly Benefit will be reduced if the total amount you receive from the above sources and Other Income Benefits exceeds 100% of your Predisability Earnings or Indexed Predisability Earnings. Your Monthly Benefit will be reduced by that portion of the amount you receive which exceeds 100% of your Predisability Earnings or Indexed Predisability Earnings.

After the 24 month period described above, your Monthly Benefit will be reduced by 50% of your earnings from working while Disabled. Your Monthly Benefit will be further reduced if the total amount you receive from the above sources and Other Income Benefits exceeds 100% of your Indexed Predisability Earnings. Your Monthly Benefit will be reduced by that portion of the amount you receive which exceeds 100% of your Indexed Predisability Earnings.

If your Monthly Benefit is reduced as a result of your receiving earnings from any work or service while Disabled, the Minimum Monthly Benefit will not apply.

Monthly Benefit payments will cease on the date you refuse to participate in a Rehabilitation Program in which we determine you are able to participate.

"Rehabilitation Program" means:

1.    a return to active employment by you on either a part-time or full-time basis in an attempt to enable you to resume gainful employment or service in an occupation for which you are reasonably qualified taking into account your training, education, experience and past earnings; or

2.    participating in vocational training or physical therapy. This must be deemed by one of our rehabilitation coordinators to be appropriate.

### Rehabilitation Incentive

While Disabled, your Monthly Benefit, before reduction for Other Income Benefits, is increased by 10% when you participate in a Rehabilitation Program approved by us.

## V-1602

7

ML 00017

DEF 00018

EXHIBIT 3 Page 2 of 2



**ADVANCED PAIN CENTERS OF ALASKA – ANCHORAGE**
**PROGRESS NOTE**

Name: VALENOTE, DANIELA
DOB: 02/17/1969
SSN: 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

**DATE:** 03/15/2005

**SUBJECTIVE:** The patient reports that the Kadian is helping with her pain. She is taking 20 mg twice a day. She reports the Vicodin also is being used three times per day. She says she is increasing her activities but continues to have significant pain in the neck at 7/10, low back at 6/10 and low back at 6/10. She is requesting assistance with nutrition and other supplements. The patient his undergone a functional capacity evaluation which showed limited function and very light duty. The patient has a number of concerns about the report and is discussing with the tester about that. The patient is also requesting massage therapy. She is having difficulty getting into physical therapy due to the great distance. In the remote area that she lives there is a massage therapist in her area which she feels would help with her myofascial pain.

**OBJECTIVE:** Blood pressure is 130/100, pulse is 80, temperature is 99, respirations are 16. She is awake, alert, shows no sedation, continues the patient have tenderness with palpation in the upper neck, low back and the legs with pain in the posterior occiput radiating over the top of the head. Otherwise the rest of exam is unchanged.

**ASSESSMENT:**
1. Chronic pain.
2. Chronic cervical degenerative disk disease.
3. Lumbar degenerative disk disease.
4. Muscle spasm and spasticity.
5. Right trochanteric bursitis.
6. Chronic headache.

**PLAN:** I would like her to do massage therapy two times per week for six weeks to evaluate the effectiveness of this. I referred the patient to physical medicine rehabilitation, Dr. Prieto, for consideration of nutritional support and assistance with disability. She had her Kadian reviewed 20 mg, one p.o. b.i.d. and Vicodin 7.5/500, one p.o. t.i.d.

REPORT SENT PRIOR TO REVIEW

Gregory R. Polston, M.D.
Diplomate American Board of Anesthesiologists, ABA
Diplomate Subspecialty Pain Medicine, ABA

GRP/MEDQ
DD: 03/21/2005
DT: 03/22/2005
JOB #: 260763

V-1603

EXHIBIT 4 Page 1 of 1    V-0016    COPY

Daniela C. Valenote
4514 Upper Kogru Dr.
Eagle River, AK 99577
907-622-1009

October 6, 2003

Anda Panasescu
LTD Appeals
MetLife Disability
Po Box 14590
Lexington, KY 40511-4590

Claim #:        870308078357
Employer:       Rim Architects

## JOB DESCRIPTION FOR AN ARCHITECT

In my experience as an Intern Architect, my duties have included:

- The hours for an Architect can vary from 8-24 hours per day depending on workload and deadlines.
  1. October 2002 I worked 8-17 hours per day.
  2. November 2002 I worked 8-11 hours per day.
  3. The following was taken from the U.S. Department of Labor, Bureau of Labor Statistics, Occupational Outlook Handbook, **http://stats.bls.gov/**

*Architects may occasionally be under stress, working nights and weekends to meet deadlines. In 2000, almost half of all architects worked more than 40 hours a week, in contrast to about 1 in 4 workers in all occupations combined.*

  4. Part time employment (i.e. 4 or more hours/day) is virtually unheard of within the Architecture Profession. As a Project Architect the duties require constant management of a Project Team and Professional Consultants. This position makes it difficult to work part-time.

- Sitting for long hours at a desk, includes:
  1. Manual sketching over a flat surface.
  2. Drafting on the computer
  3. Leaning over the desk to draw – looking down 4-6 hours/day
  4. Twisting while drafting – looking from the computer to your side desk for reference on printed drawings.
  5. Bending
  6. Numerous Project related telephone calls.

**V-1604**

**V-0026**

EXHIBIT 5 Page 1 of 3

COPY

JOB DESCRIPTIO. FOR AN ARCHITECT                                    2
October 6, 2003

___

    7. Going back and forth from the desk to printers, fax machine and copier numerous times a day.
    8. Building scale models from drawings – requires use of an x-acto blade and constant leaning over the model while it's being built.

- Carrying reference manuals from the materials library and old drawing documents which can weigh 3-20 lbs. used for reference when researching precedent or working on an existing building)

- Meetings – sometimes requiring travel by car or plane
  1. During every phase of a project an Architect is on call for meetings both in and out of the office.

  2. Meetings can last from twenty minutes to numerous days.
  3. Meetings often require carrying heavy project documents and reference manuals.

Fieldwork/ Field Supervision is an essential part of the job even though the majority of our work is done in the office.  Fieldwork includes:

- Business travel – includes carrying luggage and project documents combined can weigh in excess of 20 lbs.
  1. I have been flown to Louisville, KY and back to Alaska in less than 2 days for a 2-hour meeting.
  2. I have taken weekly flights to Kenai, AK to monitor a project under construction for 2 months.
  3. I have driven to a job site weekly for meetings 3+ months for design and construction.
  4. Drive back & forth from the office to multiple meetings weekly.

- Site visits on undeveloped land – walking on uneven ground

- Site visits to existing buildings for assessment of existing conditions can take hours and include:
  1. Carrying documents and camera
  2. Bending
  3. Climbing
  4. Crawling
  5. Walking
  6. Standing

- On-site inspection and review can last hours during the construction phase:
  1. Carrying documents and camera
  2. Walking on uneven ground
  3. Climbing ladders, scaffolding and unfinished stairs
  4. Crawling

V-1605

V-0027

EXHIBIT 5 Page 2 of 3

JOB DESCRIPTIC.. FOR AN ARCHITECT                                       3
October 6, 2003

      5. Bending
      6. Standing

The job description for an Intern Architect is the same as for an Architect. The difference is an Intern has not completed the Internship Development Program and/or Architect Registration Exam. I have completed IDP and am in the process of completing the A.R.E.

Please include this supplement to the Long Term Disability Employer Statement dated by RIM Architects of June 12, 2003. I have reviewed this supplement with Matt Vogel, Architect and Principal with RIM Architects, and he takes no exceptions to the items listed. At Matt's request please contact him at 907-258-7777 to verify these items. If I can provide further clarification to the above, please give me a call at home, 907-622-1009.

Sincerely,

Daniela C. Valenote

Cc: Matthew Vogel
    Dr. Susan Anderson, M.D.
    Amy Azevedo, PT

**V-1606**

**V-0028**

EXHIBIT 5 Page 3 of 3

Previous Section:          Next Section:

## §404.1567 Physical exertion requirements.

To determine the physical exertion requirements of work in the national economy, we classify jobs as *sedentary, light, medium, heavy,* and *very heavy.* These terms have the same meaning as they have in the *Dictionary of Occupational Titles,* published by the Department of Labor. In making disability determinations under this subpart, we use the following definitions:

(a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work.* Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work.* Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

(d) *Heavy work.* Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(e) *Very heavy work.* Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

EXHIBIT  6 Page  *l*  of  *l*

V—1606 A



**ErgoScience™**                                    PWPE Summary

### Physical Work Performance Evaluation Summary
#### Advanced Physical Therapy of Alaska
1917 Abbott road suite 200, Anchorage, AK 99507
Phone (907)279-4266 Fax (907)279-4272



| |
|---|
| **Name:** Valenote, Daniela |
| **Social Security:** |
| **Occupation:** Architect |
| **Employer:** RIM Architects |
| **Injury Date:** 10/31/2002 |
| **Last Date of Work:** 2/21/2003 |
| **Evaluation Date:** February 14, 2005 |
| **Diagnosis:** Right SI joint dysfunction, L3-4, L5-S1 disc protrusion, S/P nucleoplasty L5-S1, Thoracic pain, neck pain, Cervicogenic headaches |
| **Purpose of Evaluation:** Disability rating |
| **Recommendations Request:** Work modification recommendations |
| **Point in Client Care:** Prior to transitional duty, Case closure FCE |
| **FCE Type:** Whole body |

This report summarizes the results of the ErgoScience FCE Physical Work Performance Evaluation™. This evaluation is substantiated by reliability and validity research conducted at the University of Alabama at Birmingham and reported in the *Journal of Occupational Medicine*, September 1994[1].

**Tolerance for the 8-Hour Day:** Based on this evaluation, the client is incapable of sustaining the Sedentary level of work for an 8-hour day. Unable to complete the evaluation due to fatigue level and onset of right lower extremity radicular symptoms in sitting, standing, and kneeling Position Tolerance testing.



**Overall Level of Work: Sedentary** Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exist up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exist from 1/3 to 2/3 or the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may invoke walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

**Self Limiting Behavior:** Self-limiting behavior means that the patient stopped the task before a maximum effort was reached and typically is caused by either: 1) psychochosocial issues such as fear of reinjury, pain, anxiety, depression and/or 2) attempts to manipulate test results. Although it is difficult to determine the causes of self-limiting behavior, our research indicates that motivated patients self-limit on no more than 20% of test items. If the patient's self-limiting exceeds 20%, then psychosocial and/or motivational factors are affecting test results. The patient's reason(s) for self-limiting behavior was/were pain, upper quarter weakness, poor trunk control, onset of posterolateral arm pain, weakness of right leg, onset of right lower extremity radicular symptoms, onset of right foot arch sharp pain, progressive increase in headache symptoms.



[1] Lechner DE, et al. *Journal of Occupational Medicine*. September 1994 Volume 36, No. 9; pages 997-1004.

Copyright The UAB Research Foundation 1993. All rights reserved.

**V-1607**

EXHIBIT **7** Page **1** of **5**

 ErgoScience™

## MOTIVATION INVESTIGATION TRIGGERS

- Self Limiting < 20% of tasks = Within normal limits for motivated client
- **Self-Limiting 21% to 33% of tasks = Exceeds normal limits for motivated client**
- Self-Limiting > 33% of tasks = Significantly exceeds normal limits for motivated client

## JOB MATCH

The client's job match was based on a job demand description provided by both the employer and the client.



**Percent Tasks Matching Job Demands**



54%     46%

☒ No Match
■ Job Demands Match

V-1608

**Ergo Science** ™

PWPE Summary
Valenote, Daniela

Unable= <1    Sedentary=10-1    Light=20-11    Medium=50-21    Heavy=100-51    V. Heavy= >100



0%=Never    1%-33%=Occasionally    34%-66%=Frequently    67%-100%=Constantly



0%=Never    1%-33%=Occasionally    34%-66%=Frequently    67%-100%=Constantly



Advanced Physical Therapy of Alaska
Page 4 of 7

V-1609

EXHIBIT 7 Page 3 of 5

ErgoScience™

## TASKS PERFORMANCE

| Activity | Patient Abilities* | Job Demand Employer | Job Demand Patient | Match Employer | Match Patient |
|---|---|---|---|---|---|
| Floor to waist lift | 6 lb. | 10 lb. | 10 lb. | No | No |
| Waist to eye level lift | 4 lb. | 5 lb. | 5 lb. | No | No |
| Two handed carrying | 5 lb. | 20 lb. | 20 lb. | No | No |
| One handed carrying | L6 R0 lb. | 20 lb. | 20 lb. | No | No |
| Pushing | 5 lb.** | 5 lb.** | 5 lb.** | Yes | Yes |
| Pulling | 0 lb.** | 5 lb.** | 5 lb.** | No | No |
| Sitting | Occasionally | Constantly | Constantly | No | No |
| Standing | Occasionally | Occasionally | Occasionally | Yes | Yes |
| Work arms over head-standing | Constantly | Occasionally | Occasionally | Yes | Yes |
| Work bent over-standing/stooping | N.T. | Occasionally | Occasionally | | |
| Work kneeling | Occasionally | Frequently | Frequently | No | No |
| Work bent over-sitting | Never | Constantly | Constantly | No | No |
| Work squatting/crouching | N.T. | Occasionally | Occasionally | | |
| Work arms over head-supine | N.T. | Never | Never | | |
| Climbing stairs | Occasionally | Occasionally | Occasionally | Yes | Yes |
| Repetitive squatting | Occasionally | Never | Never | Yes | Yes |
| Walking | N.T. | Frequently | Frequently | | |
| Crawling | N.T. | Occasionally | Occasionally | | |
| Climbing a ladder | N.T. | Occasionally | Occasionally | | |
| Repetitive trunk rotation-sitting | N.T. | Constantly | Constantly | | |
| Repetitive trunk rotation-standing | N.T. | Occasionally | Occasionally | | |
| Balance on level surfaces | N.T. | | | | |
| Balance on uneven surfaces | N.T. | | | | |
| Balance on ladder | N.T. | | | | |
| Balance on beam/scaffold | N.T. | | | | |
| Manual Dexterity | N.T. | | | | |
| Finger Dexterity | N.T. | | | | |
| Grip Strength | L50 R35 lb. | | | | |

Note: N.T. indicates this task was not tested.

\*  The Dictionary of Occupational Titles (D.O.T.) defines Occasionally as up to 1/3 of the day, Frequently 1/3 to 2/3 of the day, and Constantly as 2/3 to the full day. The weights reported above are for the Occasional category. The following algorithms, derived from unpublished research, are used by the D.O.T. to extrapolate Frequent or Constant lifting from Occasional lifting: Frequent lifting equals 50% (1/2) of Occasional and Constant lifting equals 20% (1/5) of Occasional. PLEASE NOTE: the D.O.T. extrapolations from Occasional to Frequent and Constant lifting were not studied in the research validating the Physical Work Performance Evaluation. The D.O.T. reports finger and manual dexterity scores as an aptitude. The aptitude scores translate as follows: 1 (90-100 percentile score), 2 (67-89 percentile score), 3 (34-66 percentile score), 4 (11-33 percentile score), 5 (0-10 percentile score).

\*\*  Pounds of force is the amount of force the client exerted during the pushing and pulling tasks. If your client is required to push or pull for any work activities, the force required for the job task should be measured with a force gauge and compared to the abilities documented above.

V-1610

 **ErgoScience**™

## INTERPRETATION / CONCLUSION

**Daniela's current level of physical capacity does not match up with the provided Job Description.**

**Client's major areas of dysfunction are:**
- Impaired Dynamic Trunk Strength/Stabilization which appeared to have limited her material handling capacities.
- Impaired Position Tolerance especially in sitting, sitting with lowered work and kneeling.
- Poor Endurance.
- Pain/dysfunction in multiple areas of her body.

The client was unable to perform either Fine Motor/Finger or Manual Dexterity testing today because the test was stopped prior to the testing of this area. It is in my opinion that further dexterity testing should be performed at another date, including the *Purdue Pegboard Test*, and the *Minnesota Dexterity Test*, although these test result will have no direct affect on the currently measured *Tolerance for the 8-Hour Day, Overall Level of Work, or Task Performance* results.

## RECOMMENDATIONS

**Recommendations for Future Care:**
- Continuation of Pain Management treatments.
- Participation in a Comprehensive Trunk Stabilization Program, or a Comprehensive Functional Restoration Program (FRP) that would also incorporate trunk stabilization training.
- If Daniela is able to return to work in the future, either at modified duty, at another type of work, or following an FRP, she would also benefit from a formal Ergonomic Work Site Assessment at that time which takes into account the limitations found during this test or a future similar test.
- Patient may also benefit from further Psychological testing and/or interventions.

Evaluator: Chad Ross DPT, CSCS
Phone:        907-279-4266

**V-1611**

EXHIBIT 7 Page 5 of 5