Westlaw.

2007 WL 135625                                                                    Page 1
--- F.Supp.2d ----, 2007 WL 135625 (C.D.Cal.)
(Cite as: 2007 WL 135625 (C.D.Cal.))

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
C.D. California.
Sandra FROST, Plaintiff,
v.
METROPOLITAN LIFE INSURANCE COMPANY
and the Wells Fargo & Company Long Term
Disability Plan, Defendants.
No. CV 05-2486-JFW (SSX).

Jan. 12, 2007.

**Background:** Insured employee who claimed that she was disabled by numerous serious conditions including pain, weakness, cognitive issues, and walking problems sued employer's long-term disability (LTD) plan and plan's insurer under Employee Retirement Income Security Act (ERISA) after termination of LTD benefits.

**Holdings:** The District Court, Walter, J., held that:
(1) insurer's termination decision was entitled to deference despite insurer's dual role as plan administrator and funding source, and
(2) termination decision was not abuse of discretion, considering conclusory nature of treating physicians' disability determination and other factors.
Judgment for defendants.

See also 414 F.Supp.2d 961.

[1] Labor and Employment ⇨688
231Hk688 Most Cited Cases
In order for abuse of discretion standard of review to apply under ERISA to employee benefit plan administrator's benefits denial, plan must unambiguously grant discretion to administrator or fiduciary. Employee Retirement Income Security Act, 29 U.S.C.A. § 1132(a)(1)(B).

[2] Labor and Employment ⇨688
231Hk688 Most Cited Cases
Abuse of discretion standard of review applied under ERISA to benefits denial made by employee benefit plan's long-term disability insurer, based on plan's provision that "[p]lan fiduciaries shall have discretionary authority to interpret the terms of the plan and to determine eligibility for and entitlement to Plan benefits ... Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect." Employee Retirement Income Security Act, 29 U.S.C.A. § 1132(a)(1)(B).

[3] Labor and Employment ⇨688
231Hk688 Most Cited Cases

[3] Labor and Employment ⇨690
231Hk690 Most Cited Cases
Abuse of discretion standard of review applies, under ERISA, to benefits denial made by employee benefit plan administrator granted discretion by plan, even if administrator has conflict of interest; however, if conflict of interest is present, it must be weighed as factor in determining whether there is abuse of discretion. Employee Retirement Income Security Act, 29 U.S.C.A. § 1132(a)(1)(B).

[4] Labor and Employment ⇨612
231Hk612 Most Cited Cases

[4] Labor and Employment ⇨690
231Hk690 Most Cited Cases
Where insurer acts as both employee benefit plan administrator and funding source for benefits, insurer operates under structural conflict of interest; on ERISA review of benefits denial, court applies abuse of discretion review tempered by skepticism commensurate with conflict of interest. Employee Retirement Income Security Act, 29 U.S.C.A. § 1132(a)(1)(B).

[5] Labor and Employment ⇨691
231Hk691 Most Cited Cases
When conducting ERISA review of employee benefit plan administrator's benefits denial under abuse of discretion standard modified by reason of administrator's conflict of interest, federal district court may consider evidence outside administrative record to decide nature, extent, and effect on decision-making process of such conflict; however, decision on merits must rest on administrative record once conflict, if any, has been established. Employee Retirement Income Security Act, 29 U.S.C.A. § 1132(a)(1)(B).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 135625                                                                                          Page 2
--- F.Supp.2d ----, 2007 WL 135625 (C.D.Cal.)
**(Cite as: 2007 WL 135625 (C.D.Cal.))**

**[6] Labor and Employment ⚞629(2)**
231Hk629(2) Most Cited Cases

**[6] Labor and Employment ⚞690**
231Hk690 Most Cited Cases
Employee benefit plan's long-term disability (LTD) insurer's termination of LTD benefits to insured employee was entitled to deference under ERISA despite insurer's dual role as plan administrator and funding source; in insurer's review of insured's claim, consulting physician who had derived bulk of her income from treating patients rather than from consulting for insurer reached same negative conclusion as second physician more closely aligned with insurer, consulting physicians considered treating physicians' findings, and there was no evidence of malice, self-dealing, or parsimonious claims-granting history. Employee Retirement Income Security Act, 29 U.S.C.A. § 1132(a)(1)(B).

**[7] Labor and Employment ⚞690**
231Hk690 Most Cited Cases
In insured employee's action challenging employee benefit plan's long-term disability (LTD) insurer's termination of LTD benefits, fact that insurer's consulting physicians did not examine insured or consult with treating physicians did not, by itself, establish that consulting physicians were biased, so as to warrant court's heightened skepticism in applying abuse-of-discretion standard of review, under ERISA, to benefits termination. Employee Retirement Income Security Act, 29 U.S.C.A. § 1132(a)(1)(B).

**[8] Labor and Employment ⚞572**
231Hk572 Most Cited Cases
Employee benefit plan's long-term disability (LTD) insurer did not abuse its discretion under ERISA by terminating LTD benefits to insured employee who had stopped working after complaining of pain, weakness, cognitive issues, and walking problems; some of insured's treating physicians, and many medical tests, contradicted insured's and certain treating physicians' conclusory opinion of disability, and each neurologist seen by insured had opined that insured's symptoms had appearance of functional overlay. Employee Retirement Income Security Act, 29 U.S.C.A. § 1132(a)(1)(B).,.

Glenn R. Kantor, Kantor & Kantor, Northridge, CA, for Plaintiff.

Eric R. McDonough, Julie I. LaRoe, Seyfarth Shaw, Los Angeles, CA, Lawrence E. Butler, Robin M. Cleary, Seyfarth Shaw, San Francisco, CA, for Defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

WALTER, District J.

*1 This action came on for court trial on December 20, 2006. Glenn R. Kantor and Alan E. Kassan of Kantor & Kantor, LLP appeared for Plaintiff Sandra Frost ("Plaintiff"). Julie I. LaRoe of Seyfarth Shaw LLP appeared for Defendants Metropolitan Life Insurance Company and The Wells Fargo & Company Long Term Disability Plan (collectively "Defendants").

After considering the evidence, briefs and argument of counsel, the Court makes the following findings of fact and conclusions of law:

Findings Of Fact [FN1]
I. Introduction

This is an action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA") for recovery of long term disability benefits under a group long term disability plan issued by Metropolitan Life Insurance Company ("MetLife") for the benefit of employees of Wells Fargo & Company ("Wells Fargo"). On April 1, 2005, Plaintiff filed a Complaint with this Court seeking review of MetLife's cancellation of Plaintiff's long term disability ("LTD") benefits under The Wells Fargo & Company Long Term Disability Plan (the "Plan").

II. Facts

Plaintiff commenced her employment with Wells Fargo in 1991. In 2002, she held the position of Operations Manager/Vault Cashier. As a benefit of her employment with Wells Fargo, Plaintiff was eligible for long term disability insurance under a group Plan issued by MetLife. At all relevant times, Plaintiff was a participant in the Plan. Pursuant to the terms of the Plan, MetLife is the claims administrator for claims made under the Plan and is also a Plan fiduciary. (AR 34, 101-02)

"Disability" is defined in the Plan as follows:
"Disabled" or "disability" means that, due to sickness (including a mental or nervous condition), pregnancy or accidental injury, you are receiving appropriate care and treatment from a doctor on a

2007 WL 135625    Page 3
--- F.Supp.2d ----, 2007 WL 135625 (C.D.Cal.)
(Cite as: 2007 WL 135625 (C.D.Cal.))

continuing basis; and
• During your elimination Period and the next 24-month period, you are unable to earn 80% or more of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your local economy; or
• After the 24-month period, you are unable to earn more than 60% of your Indexed Predisability Earnings for any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

(AR 77) Pursuant to the terms of the Plan, LTD benefits granted under the Plan will be discontinued if, *inter alia*, the participant is no longer disabled as defined by the Plan or if the participant fails to provide MetLife with any of the following: proof of disability; evidence of continuing disability; proof that the participant is under the appropriate care and treatment of a doctor throughout disability; information about Other Income Benefits; or any other material information related to the participant's disability that may be requested by MetLife. (AR 73, 76)

*2 In or about 2001, Plaintiff's health began to decline. By December of 2001, Plaintiff claims that she was no longer able to work full time in her position at Wells Fargo. In January of 2002, Plaintiff's treating physician placed her on a restricted part-time work schedule due to severe pain and weakness. (AR 1064)

In early 2002, Plaintiff filed a claim for disability benefits with MetLife claiming that she had become disabled as of January 1, 2002 due to "cognitive issues, pain, bladder, headaches, unable to walk far." (AR 0991) MetLife approved Plaintiff's claim for short term disability ("STD") benefits "on a reduced work schedule" commencing January 1, 2002. (AR 211) MetLife advised Plaintiff that while she was working a reduced work schedule, her STD benefits would be paid in combination with the earnings she received from working. (*Id.*) On February 22, 2002, MetLife extended Plaintiff's reduced work schedule STD benefits through March 25, 2002. (AR 212) On April 3, 2002, MetLife granted Plaintiff full STD benefits through April 22, 2002. (AR 215) On April 10, 2002, MetLife extended Plaintiff's approval for full STD benefits through May 24, 2002. (AR 217) On May 28, 2002, Plaintiff's full STD benefits were extended a final time through June 3, 2002. (AR 224)

In the May 28, 2002 letter regarding the further extension of her STD benefits, MetLife advised Plaintiff that her claim for disability benefits had been referred to a LTD case manager for review of LTD benefits. (*Id.*) In a second letter dated May 28, 2002, Plaintiff's MetLife Case Manager, Kim Malone, informed Plaintiff that her claim for LTD benefits had been approved, effective June 4, 2002. (AR 225-27) Plaintiff was also advised by Ms. Malone to apply for Social Security benefits. (*Id.*)

On September 11, 2002, Plaintiff received another letter from Ms. Malone requesting that Plaintiff provide evidence of continuing disability. (AR 228-29) On September 27, 2002, Plaintiff's primary care physician, Dr. Josette Kohn, responded to MetLife's inquiry with a letter detailing Plaintiff's complaints of pain. (AR 197-98). Dr. Kohn informed MetLife that "[t]he full diagnosis is still under question and is still being investigated" and that Plaintiff's "functional limitations" were based on Plaintiff's own complaints of "cognitive problems, problems with ambulation and problems with the use of her upper extremities." (*Id.*) In that letter, Dr. Kohn offered her opinion that Plaintiff was disabled. (*Id.*)

One of Plaintiff's neurologists, Dr. Eric Van Ostrand, also responded to MetLife's inquiry in a letter dated January 14, 2003 in which Dr. Ostrand stated that he could not provide a neurological diagnosis that would "adequately explain her consolation [sic] of symptoms." (AR 447) Dr. Ostrand further stated that Plaintiff "does appear disabled at present due to her as yet undiagnosed condition," but that he could not provide further comment in terms of diagnosis or prognosis. (*Id.*)

*3 In or about February of 2003, the Social Security Administration determined that Plaintiff was disabled and eligible for social security disability ("SSDI") benefits. (AR 875-79) MetLife assisted with Plaintiff's application for SSDI benefits, and after Plaintiff was awarded SSDI benefits, MetLife received reimbursement from Plaintiff for the overpayment resulting from the retroactive SSDI award. (AR 868-69, 871-72) MetLife also reduced Plaintiff's monthly LTD benefit amount by the amount of the SSDI benefit offset.

On June 2, 2003, Ms. Malone sent Plaintiff a second request that Plaintiff provide evidence of continuing disability. (AR 581) Shortly thereafter, on July 30, 2003, Plaintiff's case file was transferred to a different MetLife LTD claim office. In August of 2003, MetLife initiated a review of Plaintiff's updated file and forwarded her file to an independent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

physician consultant, Dr. Amy Hopkins, for review.

In her August 8, 2003 report, Dr. Hopkins summarized the findings and reports of Dr. Kohn and a number of Plaintiff's specialists. (AR 575-77) After performing her review of the medical documents which had been provided to MetLife, Dr. Hopkins concluded that Plaintiff had a "large number of complaints, many neurological, but little in the way of objective findings to substantiate any of them" and that "extensive testing ha[d] been unrevealing." (*Id.*) Dr. Hopkins noted that there were "numerous mentions of findings on exams consistent w/ somatization versus malingering, and the possibility of a conversion disorder was brought up." (*Id.*) From Plaintiff's medical records, Dr. Hopkins concluded that there was no "objection information" in the file to "support the presence of any physical impairment which would prevent EE [Plaintiff] from performing the material duties of her own or any occupation on a FT [full time] basis without restrictions or limitations." (*Id.*)

MetLife provided a copy of Dr. Hopkins's report to two of Plaintiff's treating physicians, Dr. Lenson and Dr. Kohn, for comment. (AR 307, 799, 823). In response, Dr. Kohn sent MetLife a letter dated October 15, 2003 in which she reiterated Plaintiff's list of symptoms/complaints. Dr. Kohn noted that "full neurological diagnosis is still under investigation" and concluded that Plaintiff was disabled due to a "yet undiagnosed condition." (AR 193-95) Dr. Klingman, one of Plaintiff's neurologists, also sent a letter to MetLife dated November 25, 2003 in which he stated that Plaintiff was suffering from fibromyalgia and ataxia, but failed to opine whether Plaintiff was disabled as a result of either of those conditions. (AR 196)

On March 8, 2004, MetLife sent Plaintiff a letter informing Plaintiff that her LTD benefits had been terminated, effective February 29, 2004, on the grounds that MetLife's review of Plaintiff's file "failed to establish a pathological level of impairment that would preclude you from performing the material duties of your job as an OPS Manager." (AR 568-570)

*4 Plaintiff appealed MetLife's termination of her LTD benefits in a letter dated July 22, 2004. (AR 411-427) In conjunction with her appeal, Plaintiff provided MetLife with further support for her claim for benefits in the form of letters from her treating physicians and letters from friends and family describing her physical condition.

In a letter dated May 27, 2004, Dr. Kohn reiterated her opinion that Plaintiff was disabled, but included in her summary of Plaintiff's condition that Dr. Klingman had noted that Plaintiff had "neurologic symptoms of an undefinite cause, with a definite appearance of functional overlay." (AR 190) Dr. Klingman also submitted a letter dated June 4, 2004 in which he opined that Plaintiff was disabled based on her own description of her symptoms. (AR 191-92)

In response to Plaintiff's appeal, MetLife obtained reports from three additional reviewing physicians: Dr. Joseph Jares, a neurologist; Dr. Katherine Duvall, a specialist in occupational medicine; and Dr. Reginald Givens, a psychiatrist.

Dr. Jares reviewed MetLife's file and in his ten page report dated August 30, 2004, he provided a thorough summary of Plaintiff's medical history, her reported symptoms, the results of the "exhaustive" medical testing, and the opinions of her various physicians and specialists. (AR 343-54) In his review, Dr. Jares noted that "[m]any examiners have commented upon [Plaintiff's] strongly functional gait and the fact that there is likely embellishment or functional overlay to her presentation." (AR 351) Dr. Jares further noted that "[t]he only uniform comment made by the several neurologists is the likelihood of some degree of a functional overly [sic] to the patient's symptoms." (*Id.*) Dr. Jares concluded that "[f]rom a purely objective standpoint, there is no information submitted which would indicate that Ms. Frost is not capable of working in her usual occupation as an operation manager." However, Dr. Jares also was cognizant of the fact that "[t]here may be subjective factors of disability influencing [Plaintiff's] retained abilities" and he recommended that Plaintiff be subject to certain work restrictions, including that "she should avoid working at heights, around dangerous machinery, and should avoid driving." (*Id.*)

In a six page report dated August 31, 2004, Dr. Duvall stated that she had reviewed Plaintiff's file and she provided a summary of Plaintiff's medical reports. (AR 335-42) Dr. Duvall noted that Plaintiff "has many complaints but little in terms of objective findings." (AR 339) Dr. Duvall concluded that although there were no test results which would confirm neurological problems, the "test results do support degenerative disc disease of her back" and, as a result, Plaintiff "would have mild impairments." (*Id.*) Dr. Duvall recommended that Plaintiff could

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

return to work subject to certain restrictions, such as no heavy lifting, prolonged standing, frequent bending, crouching, or crawling, and no working at heights. (*Id.*)

*5 After reviewing Plaintiff's file, Dr. Givens provided a report on September 28, 2004 in which he stated that "[f]rom a psychiatric perspective [Plaintiff's] primary diagnosis is that of depression." (AR 330-33) Dr. Givens noted that her psychiatric evaluations showed that "her cognitive functioning was within normal limits including attention, concentration, memory and fund of knowledge orientation." (AR 331) From his review of her file, Dr. Givens concluded that Plaintiff "does not have significant impairment from a psychiatric condition" that would preclude her from "fulltime work" at her own occupation or another occupation. (*Id.*)

On October 11, 2004, MetLife denied Plaintiff's appeal. (AR 321-28) MetLife informed Plaintiff that its decision to deny Plaintiff's appeal was based on its conclusion that the "medical information on file does not support a condition(s) of such severity that would preclude [Plaintiff] from working beyond February 29, 2004." (AR 328)

Several months later, on April 1, 2005, Plaintiff filed her complaint with this Court seeking review of MetLife's cancellation of her LTD benefits.

Conclusions Of Law
I. Jurisdiction And Venue

This action involves a claim for long term disability benefits under an employee welfare benefit plan regulated by ERISA. As such, the Court has original jurisdiction over this matter under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). *See, e.g., Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *Parrino v. FHP, Inc.,* 146 F.3d 699, 703-04 (9th Cir.1998). Venue in the United States District Court for the Central District of California is invoked pursuant to 29 U.S.C. § 1132(e)(2).

The parties do not dispute the facts requisite to federal jurisdiction and venue.

II. Standard Of Review

[1] A "denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where the plan vests such discretionary authority in the administrator or fiduciary, the Court reviews the denial of benefits under the plan for an abuse of discretion. *Id.* However, in order for the abuse of discretion standard to apply, the Plan must unambiguously grant discretion to the administrator or fiduciary. *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1089 (9th Cir.1999).

[2] In this case, the Plan provides in relevant part that:
> The Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

*6 (AR 0102). The Court concludes that the foregoing language contained in the LTD Plan unambiguously grants discretion to MetLife . [FN2]

[3] Once the Court concludes that the Plan vests discretionary authority in the administrator or fiduciary, the Court must determine whether the administrator or fiduciary is operating under a conflict of interest. Under the Ninth Circuit's recent en banc decision in *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955 (2006) in which the Ninth Circuit overruled *Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317 (1995), the **"[a]buse of discretion [standard of] review applies to a discretion-granting plan even if the administrator has a conflict of interest."** *Abatie,* 458 F.3d at 965. However, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' Restatement (Second) of Trusts § 187, Comment d (1959)." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948 (*quoted in Abatie,* 458 F.3d at 965).

[4] Where, as here, an insurer **"acts as both the plan administrator and the funding source for benefits,"** the insurer **"operates under what may be termed a structural conflict of interest."** *Abatie,* 458 F.3d at 965. In the case of such a structural conflict of interest, the Court is to apply an abuse of discretion review which is **"tempered by skepticism**

2007 WL 135625
--- F.Supp.2d ----, 2007 WL 135625 (C.D.Cal.)
(Cite as: 2007 WL 135625 (C.D.Cal.))

Page 6

commensurate with the plan administrator's conflict of interest." *Id. at 968.* As the Ninth Circuit explained in Abatie:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Id.* at 968-69 (internal citations omitted).

[5] "What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." *Id.* at 969. In other words, "[a] district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage." *Id.* at 968. "The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Id.* at 970.

III. Discussion

A. *MetLife's Decision Is Entitled To Deference*

*7 [6] Plaintiff claims that MetLife's decision to discontinue Plaintiff's benefits should be given little or no credit and that the Court should weigh the structural conflict of interest heavily in making its determination as to whether MetLife abused its discretion. Plaintiff's arguments in support of her claim focus almost exclusively on certain alleged inadequacies regarding the investigation and reports of the physician consultants hired by MetLife to review Plaintiff's file.

[7] For example, Plaintiff claims that MetLife's consultants were biased as demonstrated by the fact that they did not examine Plaintiff or consult with Plaintiff's treating physicians. However, as Plaintiff's counsel conceded during the court trial, there is no statutory or other requirement that MetLife's consultants must examine Plaintiff or consult with Plaintiff's treating physicians prior to rendering their opinions.

Plaintiff also claims that MetLife's physician consultants were "financially biased" based on the percentage of their income derived from providing reports to MetLife. Plaintiff's argument might have been more persuasive if MetLife had only relied on the report of Dr. Hopkins in reaching its decision. However, in its independent review of Plaintiff's claim for purposes of her appeal, MetLife relied on the opinions of three different physician consultants who reached similar conclusions regarding the nature and extent of Plaintiff's disability. Dr. Duvall, who prepared only 14 reports for MetLife in 2004 and derived approximately 70% of her income in the years 2002-2005 from treating patients, came to substantially the same conclusion as Dr. Jares who had performed significantly more work for MetLife in 2004. The evidence in the administrative record and the extrinsic evidence provided by Plaintiff fail to establish that financial bias "tainted" the reports prepared by Dr. Jares, Dr. Duvall, or Dr. Givens such that the Court should give less weight to MetLife's decision.

Plaintiff claims that even if MetLife's doctors were not financially biased, MetLife's decision should be given less deference because its consultants failed to properly credit the opinions of Plaintiff's treating physicians. The Court disagrees, as each of MetLife's consultants considered and summarized the findings of Plaintiff's treating physicians in their reports, and Dr. Duvall and Dr. Jares based their recommended work restrictions in part on the findings of those physicians. Indeed, it is important to note that neither Dr. Duvall nor Dr. Jares concluded that Plaintiff was not suffering from any pain. Rather, they concluded that given the evidence of her retained cognitive ability and functional gait, coupled with the lack of any objective medical evidence to support her complaints, her condition did not rise to such severity that it would render her totally disabled from working.

The Court concludes that Plaintiff failed to establish that MetLife failed to adequately investigate or failed to credit Plaintiff's evidence. MetLife's reasons for discontinuing Plaintiff's LTD benefits were consistent with its reasons for denying Plaintiff's appeal. There

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 135625
--- F.Supp.2d ----, 2007 WL 135625 (C.D.Cal.)
(Cite as: 2007 WL 135625 (C.D.Cal.))

Page 7

is simply no evidence in the record of any malice, self-dealing, or that MetLife has a "parsimonious claims-granting history." Accordingly, the Court concludes that MetLife's decision is entitled to credit and that the structural conflict of interest should not be weighed heavily by the Court in deciding whether MetLife abused its discretion

B. *MetLife Did Not Abuse Its Discretion In Terminating Plaintiff's LTD Benefits*

*8 [8] The Court concludes that there was ample evidence in the administrative record to support MetLife's decision that Plaintiff was not suffering from a "condition of such severity" that would preclude her from working after February 29, 2004. It is apparent that Plaintiff believes that MetLife should have relied solely on the conclusory opinions of Dr. Kohn and Dr. Klingman as to Plaintiff's disability in making its determination regarding Plaintiff's entitlement to LTD benefits. However, neither MetLife or its physician consultants were required to disregard the opinions of Plaintiff's other doctors which were less than favorable to her, nor were they required to ignore the medical tests and evidence which contradicted Plaintiff's subjective complaints of pain and lack of cognitive ability.

For example, Plaintiff's treating physician, Dr. Kohn, referred Plaintiff to Dr. Chad Christine, a neurologist, who met with and examined Plaintiff in 2003. Dr. Christine was aware of and cataloged each of Plaintiff's complaints in a report to Dr. Kohn. (AR 448-49) However, despite Plaintiff's complaints that she was suffering from cognitive impairment, Dr. Christine found that Plaintiff was not only "alert and oriented x 3" but was able to relate "a clear and coherent history" with "detailed" and "organized" notes. (AR 449) Dr. Christine also found that Plaintiff's motor exam demonstrated "normal bulk and tone" and that Plaintiff's gait abnormality appeared to be "elaborated." (*Id.*) Indeed, each of the several neurologists Plaintiff chose to see, including Dr. Klingman, expressed concern that Plaintiff's symptoms had an appearance of functional overlay, and the possibility of a conversion disorder was raised more than once.

As the foregoing demonstrates, there was sufficient evidence in the medical information provided by Plaintiff from *Plaintiff's own doctors* for MetLife to conclude that Plaintiff was not disabled under the terms of the Plan. MetLife was entitled to exercise its discretion in determining Plaintiff's continued entitlement to LTD benefits, and the Court concludes that MetLife did not abuse that discretion in terminating Plaintiff's LTD benefits.

IV. Conclusion

For all of the foregoing reasons, the Court finds in favor of Defendants.

> FN1. The Court has elected to issue its decision in narrative form because a narrative format more fully explains the reasons behind the Court's conclusions, which aids appellate review and provides the parties with more satisfying explanations. Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.
>
> FN2. Plaintiff argues that the grant of authority in the Summary Plan Description ("SPD") and the Plan conflict, thereby creating an ambiguity which would permit this Court to apply a *de novo* standard of review. The Court disagrees and concludes that the relevant provisions of the SPD and the Plan do not conflict in such a manner that would result in an ambiguity.

--- F.Supp.2d ----, 2007 WL 135625 (C.D.Cal.)

**Motions, Pleadings and Filings (Back to top)**

• 2:05cv02486 (Docket) (Apr. 1, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.