LEXSEE 2003 US DIST LEXIS 13682


Caution
As of: Mar 08, 2007

SARAH ROBYNS, Plaintiff, v. RELIANCE STANDARD LIFE INSURANCE
COMPANY, Defendant.

CAUSE NO. IP 98-1241-C H/K

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
INDIANA, INDIANAPOLIS DIVISION

2003 U.S. Dist. LEXIS 13682; 31 Employee Benefits Cas. (BNA) 1903

July 10, 2003, Decided

**SUBSEQUENT HISTORY:** Judgment entered by Robyns v. Reliance Std. Life Ins. Co., 2004 U.S. Dist. LEXIS 9142 (S.D. Ind., May 13, 2004)

**PRIOR HISTORY:** Robyns v. Cmty. Ctrs. of Indianapolis, Inc., 2001 U.S. Dist. LEXIS 8317 (S.D. Ind., May 17, 2001)

**DISPOSITION:** [*1] Court entered final judgment in favor of Defendants.

**COUNSEL:** For Robyns, Sarah, PLAINTIFF: Kenneth E Lauter, Haskin Lauter Cohen & Larue, Lorie A Brown, Brown Law Office, Indianapolis, IN USA.

For Community Centers of Indpls, Inc, DEFENDANT: John W Purcell, Baker & Daniels, Indianapolis, IN USA.

For Reliance Standard Life Insurance, DEFENDANT: Cynthia M Locke, White & Raub, Indianapolis, IN USA.Michael J Burns, Christie Pabarue Mortensent Young, Philadelphia, PA USA.

**JUDGES:** DAVID F. HAMILTON, JUDGE, United States District Court, Southern District of Indiana.

**OPINION BY:** DAVID F. HAMILTON

**OPINION:**

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Sarah Robyns asserts that she has been disabled since 1991 by chronic fatigue syndrome, fibromyalgia, and other conditions. She seeks long-term disability insurance benefits under an employee benefit plan administered by defendant Reliance Standard Life Insurance Company ("Reliance"). The plan and the case are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), [*2] 29 U.S.C. § 1001 et seq. Reliance paid benefits to Robyns until November 1993 and then suspended payments after concluding that she was no longer disabled under the terms of the policy.

Robyns has a lengthy medical history involving a host of illnesses and conditions. The medical history and the case are complicated by the fact that her principal complaints - pain and fatigue due to chronic fatigue syndrome and fibromyalgia - cannot be verified by objective medical tests. See *Hawkins v. First Union Corporation Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (ERISA decision noting: "Pain often and in the case of fibromyalgia cannot be detected by laboratory tests. The disease itself can be diagnosed more or less objectively by the 18-point test ... but the amount of pain and fatigue that a particular case of it produces cannot be."); *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) (Social Security case noting the challenge that both conditions pose for disability law); Tr. 349 (Dr. Hauptman stating no objective tests would be positive for either condition). The legal history of Robyns' dispute with Reliance [*3] is also lengthy and complex, having begun with a separate lawsuit filed in 1994. See *Robyns v. Reliance Standard Life Ins. Co.*, 130 F.3d 1231 (7th Cir.

Case 3:05-cv-00196-TMB    Document 55-4    Filed 03/09/2007    Page 2 of 12

Page 2
2003 U.S. Dist. LEXIS 13682, *; 31 Employee Benefits Cas. (BNA) 1903

1997) (affirming summary judgment of earlier action seeking benefits).

Whether Robyns has actually been disabled under the terms of the plan is a question of fact tried to the court. The court states its findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure. Substance rather than labels should govern whether a matter is treated as a finding of fact or a conclusion of law. In short, the court finds that Robyns has not been disabled under the terms of the plan. This decision is based not solely on the subjective nature of Robyns' complaints, but on the combination of that subjective nature with substantial evidence of manipulative and dishonest behavior by Robyns regarding her condition, and evidence of relatively substantial activities despite her alleged disability. That combination persuades the court that Robyns was not disabled from her sedentary work as a social worker. However, the court finds that Reliance violated ERISA and the terms of the plan by refusing to consider [*4] Robyns' claim in 1998, and the court invites further briefing on the proper remedy for that violation.

*Findings of Fact*

I. *Background* n1

> n1 Many of the background facts are taken from the Seventh Circuit's opinion in the first case. See 130 F.3d at 1233-34.

Plaintiff Sarah Robyns is a social worker by training. She has a bachelor's degree and a master's degree in the field. She began working as a social worker in 1984. In 1991, she began working as a clinical supervisor for Community Centers of Indianapolis, Inc. ("CCI"). She enrolled in an employee welfare benefit plan offered by CCI, which was administered by Reliance Standard Life Insurance Company and governed by ERISA. The plan offered both short-term and long-term disability benefits.

On September 26, 1991, CCI placed Robyns on short-term disability leave due to several ailments, including chronic fatigue syndrome and fibromyalgia. During this leave, she received short-term disability benefits from CCI's employee welfare benefit [*5] plan.

In March 1992, Robyns applied for long-term disability benefits, which Reliance approved on July 20, 1992 retroactive to March 25, 1992. The approval was based on opinions from treating physicians' (Dr. Steven H. Neucks and Dr. Wayne Pribble) about the effects of Robyns' fibromyalgia and depression.

On August 6, 1992, as part of a standard followup procedure, Robyns informed Reliance that she hoped to return to work on a part-time basis in November 1992. She also told Reliance that she had been making and selling jewelry. Upon receiving this information, Reliance requested further medical records from Robyns. In response to this request, Reliance received a diagnosis of fibromyalgia from Dr. Linda Huck.

In early 1993, Reliance re-examined Robyns' disability status in accordance with its long-term disability policy. As part of that review, Reliance asked that Robyns' treating psychologist (Dr. Pribble) evaluate her prognosis for returning to work as a clinical supervisor. Dr. Pribble responded by stating that he did not "feel competent to comment on the medical severity of the conditions," and he suggested that Reliance contact Robyns' treating physician to confirm that she [*6] was totally disabled.

Reliance wrote Dr. Huck on April 30, 1993, requesting her help in "clarifying the claimant's current medical status." It did not receive a response. On June 15, 1993, Reliance wrote Robyns, notifying her that her benefits would be suspended if it did not receive Dr. Huck's reply within thirty days. On July 1, 1993, Reliance received Dr. Huck's response, which stated that there were intervals of time when Robyns' pain "is such that she would be able to carry on duties as described for a social worker," but that frequent exacerbations prevented her from sustaining work at a steady job. Thus, Dr. Huck concluded, Robyns was disabled.

After an internal audit of her claim left the insurer with unanswered questions, Reliance wrote Robyns on August 6, 1993 to request: (1) a copy of her 1992 tax returns (for the second time); (2) a completed disability statement form from an attending physician; (3) the names and addresses of all physicians who treated her in 1993 and the conditions for which she was treated; and (4) a listing of all jewelry shows she attended that year. Reliance did not receive a response. It repeated this request on September 7, 1993, and on October 9, 1993. Finally, [*7] Reliance spoke with Robyns on October 12, 1993. Robyns informed Reliance that she had retained an attorney and that the attorney had previously sent the information and had repeatedly called Reliance. Reliance has no record of these contacts.

Unable to contact Robyns' lawyer, Reliance wrote to her on October 19, 1993 to request the same information initially requested in August 1993. It then received some of the requested information, including a list of jewelry shows Robyns had attended in Illinois, Ohio, and Kentucky. These materials, however, did not include a completed disability form from an attending physician. Reliance again contacted Dr. Huck's office. Her staff explained that there would be a delay in Dr. Huck's re-

Case 3:05-cv-00196-TMB   Document 55-4   Filed 03/09/2007   Page 3 of 12

Page 3
2003 U.S. Dist. LEXIS 13682, *; 31 Employee Benefits Cas. (BNA) 1903

sponse because they received the request to complete the form on October 19th and the doctor was on vacation.

On October 25, 1993, Reliance wrote Robyns' attorney requesting additional information because Robyns had not yet satisfied its earlier requests. Reliance did not receive a response. It sent the same letter again on November 11, 1993. At that time, Reliance's Susan Dioguardi, R.N. reviewed these latest events and the entire case file to date. She recommended [*8] that Reliance deny the claim. Robyns, however, received her monthly disability check on November 28.

On December 1, 1993, Reliance received Robyns' attorney's reply to its October 25 letter. This reply did not explain how Robyns could travel through the Midwest to sell her jewelry and yet not perform the sedentary duties associated with her former position as a social worker. To resolve this issue, Reliance elected to conduct an independent medical examination of Robyns. It scheduled this examination through a third party, General Rehabilitation Services, Inc. During this same time period, opposition to Robyns' claim was building within Reliance. By early December, a collection of handwritten notes establish that at least two employees at Reliance thought that her claim should be denied. There is no evidence in the record to suggest that either of these employees had final decision-making authority. Robyns did not receive a disability check from Reliance in December. Robyns believes that these handwritten notes confirm that Reliance had effectively denied her claim and that any subsequent action was simply pretextual.

In early January 1994, Reliance notified Robyns by mail of her [*9] scheduled medical examination. Robyns canceled that appointment because her attorney was unable to attend at the scheduled time and she wished her attorney to be present. Reliance rescheduled the appointment and notified Robyns and her attorney that Reliance would interpret a failure to attend this appointment as an indication that she was not interested in cooperating with Reliance.

The letter further informed Robyns: "Your benefits ceased because your medical condition was not consistent with the physical activities involved with the selling of your jewelry. It was felt you were not totally disabled from performing sedentary duties." The letter continued: "Our decision to have you examined is not an attempt to stall benefit payment, but to determine if you are capable of performing sedentary work ... Upon receipt of the results [of the individual medical examination] and our review, we will notify your attorney of our decision." The letter did not notify Robyns of Reliance's internal appeals procedure.

In response, Robyns filed suit against Reliance and CCI on January 28, 1994. A week later, on February 4, 1994, she submitted to Reliance's independent medical examination. The [*10] examining physician, Dr. Kern, then requested a functional capacity evaluation ("FCE"), which was performed on February 14, 1994. See Ex. 52, 107 (report of FCE to Dr. Kern). Dr. Kern reported the results of this testing to Reliance on February 21, 1994.

According to Dr. Kern, the testing suggested "a high degree of symptom magnification and inappropriate illness behavior. In addition, the patient did not display a bell-shaped curve on the handheld grip strength testing. This indicated a submaximal effort." Dr. Kern admitted that he had "several questions regarding the patient's permanent and total disability status." Ex. 106. Though Dr. Kern had "difficulty understanding why she cannot return to her previous occupation," he recommended a vocational rehabilitation referral to a certified rehabilitation counselor to allow for a final determination. Id. Reliance did not follow through on this recommendation for further evaluation.

Meanwhile, Robyns' first lawsuit proceeded. On October 2, 1996, Judge Tinder granted summary judgment in favor of the defendants. In denying Robyns' claims under 29 U.S.C. § 1132, the court exercised its discretion to require a [*11] plaintiff to exhaust her administrative remedies before filing a claim for wrongful denial of benefits in federal court. On November 25, 1997, the Seventh Circuit affirmed the grant of summary judgment. 130 F.3d 1231.

In the meantime, Robyns had not pursued any of the administrative remedies that Reliance had argued were still available. Instead, on June 16, 1998, several months after the Seventh Circuit decision, Robyns' new lawyer sent Reliance a letter to continue, in his words, Robyns' appeal of her benefits claim. Reliance responded that the request came too late, and it declined to carry out any further review of the claim. Robyns then filed this second lawsuit on September 9, 1998. Count One alleged that both CCI and Reliance wrongfully denied her long-term disability benefits. See 29 U.S.C. § 1132(a)(1)(B) (authorizing actions for denial of benefits). Count Two alleged that defendants failed to provide proper notice of the denial of benefits in violation of 29 U.S.C. § 1133. Count Three alleged that the defendants' actions amounted to breaches of fiduciary duties to Robyns in violation of 29 U.S.C. § 1109. [*12]

The defendants moved for summary judgment. The court granted CCI's motion for summary judgment, finding that Robyns had no basis for obtaining relief from CCI itself. 2000 U.S. Dist. LEXIS 18928, 2000 WL 1902193 (S.D. Ind. 2000). However, the court denied Reliance's motion for summary judgment, finding that Robyns' claim for benefits was not barred by the doctrine of claim preclusion or res judicata based on the first law-

Page 4

2003 U.S. Dist. LEXIS 13682, *; 31 Employee Benefits Cas. (BNA) 1903

suit. The court also found that Robyns' claim for benefits was not barred by the statute of limitations, by any time limits in the benefit plan, or by the doctrine of laches. The court adheres to those conclusions today, without repeating the reasoning. See 2000 WL 1902193. n2

> n2 On the limitations issue, Reliance relied on a March 15, 1995 letter from Robyns' counsel stating that Robyns and her lawyer deemed her application denied. Despite that letter, the litigation continued, and the courts found that administrative remedies had not been exhausted. Indeed, not until 2001 did Reliance issue a firm and final decision on Robyns' challenge to the termination of her long-term disability benefits.

[*13]

Reliance then moved to remand the action to Reliance so that it could complete its administrative review of Robyns' claim for benefits. On May 17, 2001, the court granted that motion to remand for prompt completion of the administrative review. The court retained jurisdiction over the action. On November 13, 2001, Reliance notified the court that it had completed the review process and had found that Robyns was not disabled within the terms of the plan.

The court set the matter for a court trial. One important clarification of Seventh Circuit law shaped the trial. Under *Herzberger v. Standard Insurance Co.*, 205 F.3d 327 (7th Cir. 2000), it had become clear that the court should review Reliance's decision under the *de novo* standard, for the plan did not contain terms giving Reliance discretion to interpret the plan. Accord, *Perugini-Christen v. Homestead Mortgage Co.*, 287 F.3d 624, 626 (7th Cir. 2002) (finding Reliance's disability policy did not give Reliance discretion to interpret policy terms). Also, in a *de novo* review, the court and the parties are not limited to the administrative record of evidence and information that was before the [*14] plan administrator for its final decision. See *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 982 (7th Cir. 1999) ("We have allowed parties to take discovery and present new evidence in ERISA cases subject to *de novo* review."); *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1098-99 & n. 4 (7th Cir. 1994) (district court has discretion to hear new evidence). The admission of additional evidence is not automatic, but several factors in this case warrant opening the record for such additional evidence, which came in the form of live testimony from several witnesses who had submitted written evaluations to Reliance. Those factors include the complexity of the medical problems and the need for interpreting conflicting medical evidence for the benefit of a judge who is not a medical professional, as well as the unusual and irregular course of the administrative review that occurred in this case in the wake of Robyns' premature lawsuit. See *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1026-27 (4th Cir. 1993) (identifying factors that could justify expanding the record), cited with approval [*15] in *Casey*, 32 F.3d at 1098-99.

II. *The Plan Provision*

The long-term disability policy covering Robyns in 1991 defined the relevant standard as follows:

> "Totally Disabled" and "Total Disability" mean that as a result of an Injury or Sickness:
>
> (1) during the Elimination Period and for the first 60 months for which a Monthly Benefit is payable, you cannot perform the material duties of your regular occupation. We consider you Totally Disabled if due to an Injury or Sickness you are capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis; and
>
> (2) after a Monthly Benefit has been paid for 60 months, you cannot perform the material duties of any occupation. Any occupation is one that your education, training or experience will reasonably allow.

Ex. 5 at 2.2. For purposes of this case, Robyns did not receive a monthly benefit for 60 months, so the applicable standard is whether she was able to perform the material duties of her regular occupation as a social worker on a full-time basis.

III. *Evidence Regarding Disability*

A. *Robyns' Testimony*

Robyns was born in [*16] 1956 and began working as a social worker in 1984. In 1989, she was diagnosed with chronic fatigue syndrome. The following year she was diagnosed with fibromyalgia. Two years after her initial chronic fatigue syndrome diagnosis she was diagnosed with major depression. She testified that her work attendance record became poor during 1989 and 1990 as a result of those conditions, as well as others, including migraine headaches, endometriosis, and various infections.

Case 3:05-cv-00196-TMB    Document 55-4    Filed 03/09/2007    Page 5 of 12

Page 5
2003 U.S. Dist. LEXIS 13682, *; 31 Employee Benefits Cas. (BNA) 1903

Robyns worked for CCI as a clinical supervisor for counselors who provided substance abuse counseling to clients. She reviewed files and otherwise supervised the individual counselors. She also had unspecified duties at a homeless shelter and an inpatient facility. Robyns testified that her job at CCI was not sedentary, but the court is not persuaded. The job was sedentary in terms of its physical demands, as Dr. Parsons testified. Tr. 373.

Robyns testified that she suffered from constant pain in her joints and from daily headaches. Tr. 154-55. She said the pain was so severe as to interfere with her ability to think. In September 1991, she stopped working at CCI and applied for disability benefits. She received short-term [*17] disability income benefits through her employer's plan, and the Social Security Administration granted her application for disability insurance benefits under the Social Security Act.

Shortly after leaving CCI, Robyns began making jewelry. She testified that she did so as a hobby on the recommendation of a pain therapist. She then began to sell the jewelry at craft shows to help reimburse her expenses. Tr. 157. On August 6, 1992, she notified Reliance of this activity and of her hope to return to part-time work. Reliance undertook a new look at her condition, which included the inquiries described above.

According to Robyns, at the time Reliance suspended its benefit payments to her in November 1993, she ordinarily slept until 9:30 or 10:00 a.m. and could not get out of bed by herself. She finished breakfast, which her father or brother would make, about noon. On her good days, she would have energy for a couple of hours of activities, such as shopping or making jewelry, but on other days would go back to bed after her breakfast and would sleep until 3:00 or 4:00 p.m. Her jewelry-making involved frequent breaks. Tr. 163.

Overall, Robyns complains that since 1991, she has not had [*18] the energy or stamina to work a consistent full day even in a sedentary job. In addition to her diagnoses of chronic fatigue syndrome and fibromyalgia, Robyns has also been diagnosed with ankylosing spondylitis, degenerative osteoarthritis, migraine headaches, asthma, reactive airway disease, obesity, cervical and lumbar spine syndrome, chronic bronchitis, and irritable bowel syndrome. She has also suffered a variety of temporary conditions that have responded to treatment and do not contribute to the claim of disability. The court notes that Robyns has received disability insurance benefits from the Social Security Administration since she left her job at CCI. The standard for such benefits is even more stringent than the standard in the Reliance policy, but neither Reliance nor the court is bound by the Social Security Administration's decisions based on a less extensive body of evidence.

B. *Credibility of Robyns' Subjective Complaints*

The difficulty in evaluating the evidence in this case stems from the subjective nature of Robyns' principal complaints of disability: pain and fatigue. As noted above, chronic fatigue syndrome and fibromyalgia are not easily quantified by objective [*19] medical tests. The diagnosis and treatment of these conditions depend primarily upon a patient's own account of her symptoms. Thus, in assessing the severity of Robyns' pain and fatigue, the court essentially is assessing the credibility of her complaints. The combination of the relatively substantial activities that Robyns has pursued while supposedly disabled and the manipulative and dishonest behavior noted by physicians casts serious doubt on the credibility of Robyns' subjective complaints.

1. *Jewelry Shows*

Robyns began designing, making, and selling jewelry some time in 1992. By 1993, she was making frequent trips to art and craft shows to sell her jewelry. Exhibit 124 is a list of thirteen shows or fairs that she visited in 1993, many in central Indiana, but with shows also in Chillicothe, Ohio, Illinois, Louisville, Kentucky, and the Indiana dunes on the shores of Lake Michigan. Exhibit 125 lists jewelry shows she attended from February 1994 through December 1999. Shows outside of central Indiana, and thus requiring significant travel, included Cincinnati and Columbus, Ohio; Fort Wayne, Indiana; and South Bend, Indiana.

Robyns' efforts in her jewelry business included [*20] time designing and making the jewelry, obtaining the supplies needed to make the jewelry, as well as traveling to shows, setting up for the shows, and attending the booth or exhibit during the show. See Ex. 103 at 0000308 (physical therapy notes of April 26, 1993) (Robyns complained that at a show the previous weekend, "I had to move and carry a lot. My back really hurts."). She also had to keep records and handle other paperwork for arranging these shows. It is difficult to quantify these efforts, but the volume of jewelry she was making was significant enough for her to have a partner and to hire two apprentices to work with her. Tr. 167. The evidence also showed that Robyns was inconsistent as to whether she presented her jewelry activities as a business or as merely a hobby or a form of therapy, depending on whether it is beneficial to her for her audience to have it deemed a business or a hobby, further undermining her credibility. n3

> n3 Robyns promptly informed Reliance of the fact that she was selling jewelry back in 1992, and she told Reliance she would not object to a reduction in her disability benefits equal to her earnings from jewelry sales.

Case 3:05-cv-00196-TMB    Document 55-4    Filed 03/09/2007    Page 6 of 12

Page 6
2003 U.S. Dist. LEXIS 13682, *; 31 Employee Benefits Cas. (BNA) 1903

[*21]

### 2. Care of Father

During most of the period of Robyns' claimed disability, she helped take care of her elderly father, who was in early stages of Alzheimer's disease and who died in January 2002. During times that Robyns claims to have been disabled, she provided substantial care that was physically more demanding than sedentary work. As her father's condition deteriorated from relatively high levels of function to needing much more care, the care she provided included such things as putting on shoes and socks, dealing with incontinence, and helping with bathing. Robyns told a physical therapist in 1999 that she normally felt very strong in her upper body because of her efforts to care for her father. As witnesses testified, it is difficult to quantify Robyns' efforts to care for her father, but that difficulty does not justify, for example, Dr. Wells' approach of essentially ignoring the efforts. Robyns' admirable efforts to care for her doctor weigh against her claim to have been disabled for many years.

### 3. Travel

While Robyns was allegedly disabled from working as a social worker, she traveled to Europe for three weeks in 1999, to Alaska in 1997 where she was in a position [*22] to have fallen off of a log, and to Florida for an unspecified time. These trips all included Robyns' father, and she provided care for him on these trips. Robyns' attempt to minimize the effort required to make these trips has little credibility. Robyns has also engaged in bird-watching, which of course may involve no more than sitting at a breakfast table. But the medical records indicate that in 1994, Robyns was bird-watching in a swamp when something bit her hand, Ex. 103 at 0000519, suggesting more vigorous activity. Robyns' travels and bird-watching tend to undermine her claim to have been unable to handle even sedentary work over the years.

### 4. Continued Social Work

Robyns testified that after she left her job at CCI, she continued to work part-time as a social worker for private practice patients whom she saw in her home. Tr. 208-13. This work has not been extensive in quantity, but the fact that Robyns has continued to work in her chosen field, in addition to her other activities, further weighs against a finding of disability. Also, Robyns told Dr. Kern in March 1995 that she was writing a book. Ex. 108. More specifically, this evidence tends to rebut Robyns' claims [*23] that she has suffered cognitive impairments that render her unable to work as a social worker.

### 5. *Manipulative and Dishonest Behavior Noted by Physicians*

Over the years, Robyns has seen scores of health care providers. Many have noted manipulative, demanding, and dishonest behavior by Robyns related to her conditions and their treatment. As early as February 1992, Robyns' rheumatologist, Dr. Neucks, wrote "that at some levels the patient can be manipulative and that we needed to be aware of that and to deal with it aggressively." Ex. 104 at 00029. n4

> n4 Reliance's expert witness Dr. Hauptman stated in his report, Ex. 110 at 8, that Dr. Neucks had noted on February 13, 1992 that "the patient was quite adamant that she was not capable of returning to work and that we felt that there was a hidden agenda here uncovered." The reference appears to be to handwritten notes in Exhibit 104 at 00040, but the court has not been able to decipher the handwriting in the cited "medical psychology" portion.

In February [*24] 1992, Robyns was also seeing psychologist Dr. Janice M. Singles, Ph.D., for treatment of pain and associated depression. Robyns demanded that Dr. Singles write a letter to her lawyer stating that she suffered post-traumatic stress syndrome as a result of an earlier hospitalization in Colorado. Ex. 104 at 00051. Dr. Singles wrote:

> By the third session, the patient began to relay some information about a past hospitalization in Colorado. She asked that the writer write a letter to her lawyer saying that she obtained post traumatic stress disorder from this hospitalization. It could not be determined at this time that any P.T.S.D. occurred from this experience, although it deemed [sic] very possible that the patient had a very strong reaction to this ordeal, which may also relate back to early childhood abuse. The patient became very upset when it was determined that I would not write this letter and many more issues of trust, feeling victimized, and misinterpreting what was said began. The patient was very angry, demanding and sent a letter outlining her feelings that she was not validated. It quickly became evident that the patient believed there could be no working relationship [*25] with me if I did not agree with her interpretation and give her what she wanted.

Case 3:05-cv-00196-TMB    Document 55-4    Filed 03/09/2007    Page 7 of 12

Page 7
2003 U.S. Dist. LEXIS 13682, *; 31 Employee Benefits Cas. (BNA) 1903

*Id.* Dr. Singles continued: "This patient's manipulation and psychological difficulties make it very difficult to build a relationship." *Id.*

In July 1992, Dr. Neucks terminated his relationship with Robyns. Ex. 104 at 00147-48. He did so because Robyns kept insisting on receiving prescriptions for pain medication without being examined, and because her behavior was "unacceptable in management of complicated soft tissue pain and fibromyalgia patients." Ex. 104 at 000147.

In June 1992, a treating psychologist, Dr. Wayne Pribble, Ph.D., stated: "the therapist should be wary for invalidism in this patient." Ex. 103 at 0000961. "Invalidism" refers to behavior in which a patient plays the invalid, exaggerating her impairments or pain and minimizing her ability because of the care and attention she receives as a result. Dr. Pribble also cautioned: "issues of secondary gain are a potential as Ms. Robyns may use her physical condition as a means of gaining care and support from others." *Id.* In September 1992, Dr. Pribble wrote that Robyns was angry because her "new rheumatologist" was telling [*26] her that her condition was "all psychological." Ex. 103 at 0000959. In December 1992, Dr. Pribble wrote to Reliance saying: "Ms. Robyns is a frequently depressed woman who's [sic] psychological condition would make full time employment difficult" but that there was "nothing in her psychological condition which would suggest complete or permanent disability." Ex. 103 at 0000956.

In February 1993, Dr. Michael Stack was treating Robyns for pain. He wrote to Robyns' primary care physician that Robyns "also requests that I inform the Federal Government that her jewelry making business is 'occupational therapy' only." Ex. 104 at 00030. n5

   n5 Robyns testified that she made no such statement. Tr. 200 ("I would never be stupid enough to say anything like that."). In light of all the evidence, the court credits the doctor's contemporaneous account in Ex. 104 at 00030.

In October 1996, Dr. Timothy Pettigrew, a neurologist, evaluated Robyns' fatigue complaints. Dr. Pettigrew diagnosed her with obstructive sleep apnea. [*27] Ex. 103 at 0000800-01. Robyns asked him about chronic fatigue syndrome. Dr. Pettigrew told her that it was a "diagnosis of exclusion," so that a patient with signs of sleep apnea would need a trial of treatment for that condition before they could be diagnosed with chronic fatigue syndrome. His notes then contain this comment: "She asked that I not share any of the information with her primary care physician at this time. I did inform her that if my records were subpoenaed, I would have to share this information." *Id.* at 0000801. In other words, Robyns did not want to undermine her primary care physician's belief that she had disabling chronic fatigue syndrome, even if her real problem was sleep apnea that could be treated.

Similar behaviors were also noted by Robyns' physical therapists. In May 1991, Robyns insisted that she wanted only manual work to her neck and upper back, and possibly ultrasound." Ex. 103 at 0000442. In 1994, the physical therapy notes state: "The patient noted at her last treatment session that the only reason she attends physical therapy is to receive modalities (primarily ultrasound) which she feels helps her to manage her pain. The patient was counseled [*28] and told that she must take responsibility for her complaints of pain by utilizing the pain control techniques taught during treatment sessions and by complying with her home exercise program." Ex. 103 at 0000453-54.

As noted above, the Functional Capacity Evaluation in February 1994 showed substantial evidence of symptom magnification. See Ex. 52. Robyns scored high on symptom magnification. *Id.* at 2. She was inconsistent in her limp and use of a cane. *Id.* at 2 & 5. The examiners questioned whether Robyns was making a maximal effort on hand strength tests and other tests. *Id.* at 4. Robyns' attorney (not one of her current attorneys) even attended and appears to have coached her on showing fatigue. During a job simulation test that had been proceeding well, the attorney conferred with Robyns. She then said she wanted to stop the test and could no longer continue because of severe fatigue. Her heart rate and blood pressure had remained stable, however. *Id.* at 5. At one point, Robyns' attorney had to remind her that she would need her cane to walk to some vending machines. *Id.* at 6. Also, when Robyns complained of a significant increase in pain, the complaint was [*29] not accompanied by increases in heart rate and blood pressure that would have been expected with a genuine increase in pain. *Id.* at 6-7.

Dr. Ronda Wells, a consulting physician who examined Robyns' medical records but did not examine Robyns herself, criticized such functional capacity evaluations. The court does not find those criticisms persuasive, especially as applied to the behaviors noted in Exhibit 52. Those behaviors indicate reliably that Robyns was, with the assistance of her prior attorney, deliberately exaggerating her symptoms as part of an effort to secure long-term disability benefits.

C. *Treating Physicians Who Regard Robyns as Disabled*

Case 3:05-cv-00196-TMB    Document 55-4    Filed 03/09/2007    Page 8 of 12

Page 8
2003 U.S. Dist. LEXIS 13682, *; 31 Employee Benefits Cas. (BNA) 1903

Between 1992 and 2001, nine treating health care providers opined that Robyns is or was disabled at least in terms of being unable to work on a full-time basis. Exs. 36-39, 41-45, 47, 49-51. Although the volume of evidence is impressive, on closer examination, it is less persuasive because it is based in large part on Robyns' subjective complaints, which the court does not fully credit in terms of their severity. In chronological order:

On June 30, 1992, Dr. Steven H. Neucks, a rheumatologist wrote a detailed letter to Reliance [*30] about Robyns. He reviewed her condition and treatment history. Regarding ability to work, Dr. Neucks wrote:

> The items that prevent her gainful employment include pain with repetitive activities, pain and stiffness from posture maintenance, fatigue, particularly in light of poor sleep, and I suspect some emotional difficulty dealing with the stress of both work and the workplace. I see a very low prognosis for this patient returning to work. The patient does have some aptitude in alternate areas, but in light of her course at the pain center, I see very low likelihood of her adapting to a new workplace or a new training situation.

Ex. 48. He noted Robyns' "difficult and rather stormy course" under his care and her dismissal of two medical psychologists who were working on her pain treatment. Id. He further wrote "significant disturbances in this patient's family," and Robyns' "significant 'pain' behavior, as noted by several physical therapists." n6 These opinions, however, must be examined in context. Just a month after writing the letter, Dr. Neucks essentially fired Robyns as a patient, as discussed above. He told Robyns that he would not continue to prescribe [*31] pain medication without seeing her, or allow her to dictate her treatments. Ex. 104 at 000147-48. n7

> n6 "Pain behavior" is a phrase used to indicate that the patient's outward response to pain is out of proportion to the stimulus, and it refers to symptom magnification or exaggeration. Tr. 286 (Dr. Hauptman).

> n7 Robyns also points to a form that Dr. Neucks signed on October 9, 1992. Ex. 102 at H000208. Dr. Neucks indicated on the form that Robyns could sit for up to three hours at a time, stand for up to two hours at a time, and walk for up to three hours at a time, plus drive on the job for an hour at a time. He also indicated on the adjoining table that Robyns could sit no more than two hours in a work-day, could stand no more than one hour in a work day, could walk no more than two hours in a work day, and could drive no more than one hour in a work day. These answers were obviously inconsistent with one another, though they might be explained by Dr. Neucks having confused the answers for total at one time and total in a work day. At the bottom of the form, however, Dr. Neucks indicated that Robyns was not able to work full-time.

[*32]
On July 1, 1993, Robyns' primary care physician, Dr. Linda A. Huck, wrote a short letter to Reliance in support of continued long-term disability benefits. Ex. 36. Dr. Huck wrote that Robyns had fibromyalgia and suspected ankylosing spondylitis. Dr. Huck stated that Robyns sometimes had periods of pain that would prevent her from working as a social worker. Dr. Huck acknowledged Robyns' part-time jewelry efforts, but she stated that frequent exacerbations of pain and fatigue would prevent full-time work. Dr. Huck's letter supports Robyns' claim, but the conclusion of disability is obviously based on Robyns' own reports about the extent of her pain and fatigue, which the court does not fully credit.

On October 10, 1995, a treating neurologist, Dr. David A. Josephson, wrote to Robyns. Dr. Josephson noted her care for chronic fatigue syndrome, low back pain, neck pain, previous hyperextension/flexion injury, migraine headaches and memory loss. He opined: "The fatigue, concentration problem and memory problem that you are having precludes you from maintaining employment. You would not be able to be employed either for active or a sedentary life because of these disabilities." Ex. 37. [*33] n8

> n8 On January 30, 1995, Dr. Josephson reported to Dr. Greenbaum on his neurological evaluation of Robyns. Dr. Josephson stated that her "overall cognitive status seemed good." Ex. 63. He also noted "mild impairment of brain function" and "impairment of mental flexibility or set-shifting problems." Dr. Josephson also noted IQ scores in the 90's for verbal, full scale, and performance tests. In his recommendations, Dr. Josephson acknowledged that the test results had been good, but indicated they did not change his conclusion: "We did mention to her that despite the neuropsychological testing that certainly she is still impaired ...."

Case 3:05-cv-00196-TMB   Document 55-4   Filed 03/09/2007   Page 9 of 12

Page 9
2003 U.S. Dist. LEXIS 13682, *; 31 Employee Benefits Cas. (BNA) 1903

Also, on March 30, 1995, Robyns told Dr. Kern that she was writing a book, Ex. 59, which does not seem compatible with the claims of significant cognitive deficits. The court does not have detailed information about Dr. Josephson's tests or the validity of Robyns' scores. In light of Robyns' statement about writing a book and her testimony that she continued to provide counseling to private clients on a part-time basis after leaving CCI, Robyns has not shown by a preponderance of the evidence that she suffered from disabling cognitive impairments.

[*34]

In October 1995, Robyns also visited a leading doctor in the diagnosis and treatment of chronic fatigue syndrome, Dr. David S. Bell of New York. Dr. Bell's physical examination found nothing out of the ordinary. Ex. 38. In a follow-up letter, Dr. Bell expressed the view that Robyns was then not able to work full-time in a sedentary occupation. Ex. 39. That conclusion and the rest of Dr. Bell's conclusions, however, were all based on Robyns' own account of her condition, pain levels, and activities in that one examination, without the sort of long-term doctor-patient relationship that might add more insight into the patient's condition. Accordingly, Dr. Bell's evaluation adds little independent weight to Robyns' case. n9

> n9 Dr. Bell gave Robyns a "modified Karnofsky score" of 40. Ex. 38. That score is used most often with cancer patients to evaluate their pain and the effects of therapy. A patient whose score is below 60 is generally considered disabled. Tr. 26 (Dr. Wells). A Karnofsy score is assigned according to a physician's assessment of a patient history. Id. at 118, 27-28 (estimating with a reasonable degree of medical certainty, without examining Robyns, that her score would be between 50 and 60). In other words, a Karnofsy score is assigned based on a patient's own account of his or her complaints. In this case, where substantial evidence in the record indicates that Robyns exaggerated her symptoms to her physicians, the score is no more reliable than her own reports and thus adds little to her case.

[*35]

On April 13, 1998, Dr. Timothy J. Pettigrew reported to Robyns' primary care physician on an evaluation of her fatigue. Ex. 41. Dr. Pettigrew had not seen Robyns since October 1996. Examinations in 1996 had shown obstructive sleep apnea. Dr. Pettigrew reported that Robyns stated her complaints in terms of disability for full-time work. Ex. 41 at 1. His own statement on the issue was:

> With regards to disability, she definitely voices symptoms that would prevent her from being productive for a typical work day shift. She certainly has the ability to put in some hours; however, she could not at this point put in a full eight hours. Therefore, her above named medical condition certainly gives her at least a partial disability.

Ex. 41 at 3-4. This opinion is hardly a ringing endorsement of disability. Dr. Pettigrew carefully phrased the letter in terms of the symptoms that Robyns had "voiced," rather than as an independent finding. The fact that Robyns viewed herself as disabled was not remarkable, and the letter adds little independent weight to her claim.

On July 24, 2001, Dr. Brian K. Nichelson, Ph.D., a treating psychologist, wrote to Robyns' attorney with an evaluation. [*36] Ex. 42. Dr. Nichelson provided psychotherapy to Robyns on a frequent and regular basis from 1995 forward, with an interruption of about two years from 1997 to 1999. Dr. Nichelson had initially diagnosed Robyns with dysthymic disorder and post-traumatic stress disorder, and he noted that she had qualified for diagnoses of generalized anxiety disorder and major depression at various times during his therapy. (At times Robyns has also expressed suicidal thoughts.) Dr. Nichelson reported that Robyns had been unable to continue her employment "due to some stress-related physical problems that she was experiencing." On this point, it must be noted that Robyns left that job nearly four years before Dr. Nichelson first treated her. He did not have an independent basis for evaluating her disability or lack thereof before 1995. Dr. Nichelson wrote also that Robyns had been "unable to work at any type of job for at least the past two years or more due to deterioration in her physical and mental health." These conditions included chronic fatigue syndrome, fibromyalgia, and chronic lung problems. He also noted that the combination of limited physical stamina and limited ability to deal with stress [*37] led him to assess "her ability to hold a regular job as being very poor." Id. Dr. Nichelson did not provide treatment notes or records, which made it difficult for anyone else to evaluate his conclusions.

On March 30, 2001, Lisa A. Merrero, a family nurse practitioner, wrote a letter "to whom it may concern" about Robyns' application for financial assistance. Ex. 43. Nurse Merrero noted that the practice's medical re-

Case 3:05-cv-00196-TMB   Document 55-4   Filed 03/09/2007   Page 10 of 12

Page 10

2003 U.S. Dist. LEXIS 13682, *; 31 Employee Benefits Cas. (BNA) 1903

cords showed that Robyns had chronic fatigue syndrome, fibromyalgia, irritable bowel disease, gastro-esophageal reflux disease, chronic migraine headaches, chronic bronchitis accompanied by small airway disease, asthma, and multiple environmental allergies. She concluded: "The combination of the above problems would make it very difficult for this patient to find a working environment that she would be able to tolerate without an exacerbation of one or more of the problems." Her letter was not accompanied by a more detailed explanation of her conclusions or support from treatment notes and tests.

On August 2, 2001, Dr. Abboud Kawak, a treating pulmonologist stated that he had seen Robyns for six months. Ex. 50. He wrote: "It is my belief she suffers from small airway [*38] disease as well as chronic bronchitis and asthma. This would make maintaining employment very difficult due to constant flare-ups and infections, as well as the fatigue associated with the conditions adding to the fatigue she already experiences from her fibromyalgia. These are chronic conditions and are likely to linger." Dr. Kawak also did not support his conclusion with test results or contemporaneous treatment notes. Dr. Hauptman, an internist who reviewed Robyns' file for Reliance, persuasively described the conclusion as "absolutely ridiculous," since Dr. Kawak had found that Robyns' pulmonary function tests showed normal results. Tr. 344.

Dr. Larry M. Greenbaum, a treating rheumatologist, wrote two letters "to whom it may concern." On November 14, 1995, he wrote:

> Sarah Robyns suffers from fibromyalgia, irritable bowel syndrome and chronic fatigue syndrome as well as frequent episodes of bronchitis. She has had these problems for six years and she has been unable to work. I think it's unlikely that she will be able to return to work in the future.

Ex. 45. On March 19, 2001, Dr. Greenbaum wrote exactly the same letter, word for word. Ex. 44. He did not support [*39] his conclusions with the type of more detailed analysis needed to evaluate such a complex and difficult case in terms of whether Robyns could actually work.

In addition to this evidence tending to show disability, the court heard testimony at trial from Dr. Ronda Wells. See Ex. 9 (written report by Dr. Wells). Dr. Wells found that Robyns had a "quite poor" prognosis for returning to work of any kind at 30 hours per week or more. Ex. 9 at 6; Tr. 15-16. Dr. Wells was also critical of Reliance's evaluation of Robyns. Dr. Wells did not address the extensive evidence of symptom magnification and other exaggerations and manipulations discussed above. She had not seen some important pieces of that evidence before reaching her conclusion. See, e.g., Tr. 122 (Dr. Wells had not seen Dr. Neucks' July 30, 1992 letter terminating Robyns as a patient). The court is not persuaded by Dr. Wells' ultimate conclusion that Robyns has been disabled from full-time work.

Plaintiff also presented testimony from Michael L. Blankenship, a vocational rehabilitation counselor, who also reviewed Robyns' records but did not examine or test her. Blankenship opined that Robyns could not reliably engage in sedentary [*40] work. Ex. 11.

These opinions do not persuade the court that Robyns is disabled under Reliance's long-term disability policy. The opinions of disability are either based on Robyns' own characterization of the severity of her symptoms, which the court does not credit, or they lack detailed explanations of the underlying conclusions. As discussed earlier, whether Robyns is disabled within the meaning of Reliance's benefit plan, hinges upon the credibility of her subjective complaints of disabling pain and fatigue. Extensive evidence in the record indicates that Robyns engaged in considerable activity during the time of her claimed disability and that she exhibited manipulative and dishonest behavior with respect to treatment. That evidence is inconsistent with disabling complaints of pain and fatigue and any medical opinions based on those same complaints. While the court is persuaded that Robyns' conditions cause her pain and fatigue, the evidence does not support a finding that her pain and fatigue have been severe enough to preclude her from performing the material duties of a social worker on a full-time basis.

V. *Ultimate Finding as to Disability*

The weight of the evidence [*41] shows that, since September 26, 1991, plaintiff Robyns has had the physical ability, vocational aptitude, and training and experience to perform the material duties of her regular occupation as a social worker on a full-time basis. Accordingly, Reliance's decisions to terminate benefits and to adhere to that decision on further review did not violate the terms of the applicable benefit plan.

VI. *Reliance's Final Handling of Robyns' Case*

After the remand by this court, Reliance assigned Robyns' case to Karen McGill, a lawyer and a member of its Quality Review Unit who had not worked on the case before that time. McGill has substantial experience in disability evaluations. McGill reviewed the existing claim file and obtained additional information from

Case 3:05-cv-00196-TMB   Document 55-4   Filed 03/09/2007   Page 11 of 12

Page 11
2003 U.S. Dist. LEXIS 13682, *; 31 Employee Benefits Cas. (BNA) 1903

Robyns' counsel. McGill requested reviews by an independent physician and psychologist. Dr. William S. Hauptman, an internist with a subspecialty in gastroenterology reviewed Robyns' medical records. He wrote reports on August 30, 2001 and September 22, 2001 concluding that Robyns' medical records did not support any impairment that would preclude sedentary work based on either musculoskeletal complaints or the diagnosis of fibromyalgia. [*42] Exs. 110 & 111.

Dr. Gladys S. Fenichel, M.D., a psychiatrist, also reviewed Robyns' medical records and found no disability resulting from any psychiatric impairment. Ex. .114.

McGill reviewed the reports from Dr. Hauptman and Dr. Fenichel, as well as the earlier reports of Dr. Kern and the Functional Capacity Evaluation from 1994. McGill also reviewed information about Robyns' jewelry business, travel, bird-watching, and care of her father, plus her tax returns. On October 26, 2001, McGill wrote to Robyns through her counsel and stated her conclusion that Robyns was capable of sedentary work and was not disabled from her regular occupation. Ex. 118.

The court is satisfied that McGill's review was thorough and fair. McGill reached the same ultimate conclusion that the court reaches. Her analysis was certainly reasonable.

*Conclusions of Law*

I. *Claim for Denial of Benefits*

The court has jurisdiction over the parties and the subject matter of this action. Robyns' claims arise under ERISA, for she seeks to enforce terms of an employee welfare benefit plan. Reliance administered the plan and acted as the claim fiduciary.

Robyns has the burden of proving by a preponderance [*43] of the evidence that she has been totally disabled, meaning that she was unable to perform the material duties of her prior occupation as a (supervisory) social worker, which is a sedentary job for which she had sufficient education and training. Robyns has not met that burden of proof.

Plaintiff Robyns has argued that the court must give substantial deference to the judgment of her treating physicians, citing *Regula v. Delta Family-Care Disability Survivorship Plan,* 266 F.3d 1130, 1139 (9th Cir. 2001). The Supreme Court, however, has vacated the judgment in *Regula,* and remanded the case to the Ninth Circuit for further consideration in light of *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 155 L. Ed. 2d 1034, 123 S. Ct. 1965 (2003), in which the Court expressly rejected the Ninth Circuit's treating physician rule stated in *Regula.* See 156 L. Ed. 2d 109, 123 S. Ct. 2267, 538 U.S. (2003). Instead, the deference, if any, to which a treating physician's views might be entitled is a matter of contract. *Hawkins v. First Union Corp. Long-Term Disability Plan,* 326 F.3d 914, 917 (7th Cir. 2003). In this case, as [*44] in *Hawkins,* there is no provision requiring any special deference.

The court finds on *de novo* review that Reliance's termination of benefits to plaintiff Robyns was consistent with the plan in question. Accordingly, defendant Reliance is entitled to judgment on Count One, Robyns' claim for denial of benefits under ERISA.

II. *Notice Claim*

ERISA requires each employee benefit plan to:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. In Count Two of the First Amended Complaint, Robyns alleges that Reliance violated § 1133 by failing to provide her a full and fair opportunity for review of her claim. To the extent this claim is based on Reliance's original suspension of benefits, Judge Tinder ruled in Reliance's favor [*45] in the earlier lawsuit and the current claim therefore would be barred by the doctrine of *res judicata.*

To the extent this claim is based on Reliance's 1998 refusal to consider the claim any further, that refusal was improper under the terms of the plan and denied Robyns a full and fair review of the decision denying her claim. Reliance relied upon plan language stating:

> No legal action may be brought against us to recover on the Policy within sixty (60) days after written proof of loss has been given as required by the Policy. No action may be brought after three (3) years ... from the time written proof of loss is received.

Case 3:05-cv-00196-TMB   Document 55-4   Filed 03/09/2007   Page 12 of 12

Page 12
2003 U.S. Dist. LEXIS 13682, *; 31 Employee Benefits Cas. (BNA) 1903

Reliance has never explained adequately how this three year limit, triggered by Reliance's receipt of "written proof of loss," should be applied to this case involving the suspension and then termination of benefits that were already being paid. It is difficult to see how it could be applied to such a case, for two reasons. First, the reason Reliance terminated Robyns' benefits was that it did *not* receive "written proof of loss," at least in the sense of proof of continuing disability. Without such receipt, the three-year clock never started. [*46] Second, Reliance had never definitively rejected Robyns' claim for benefits before the June 1998 letter. That's the argument Reliance used to win dismissal of Robyns' first lawsuit. Reliance's approach of defending Robyns' first case on the (persuasive) ground that it was premature, but then defending the second case on the theory that her request came too late hardly seems equitable. n10

> n10 The court finds this position to have been sufficient reason for this court to exercise its discretion under ERISA to deny defendant Reliance's request for an award of attorney fees in this case. Robyns' position in the lawsuit on procedural issues has certainly been substantially justified, and on substantive matters she did have extensive evidence tending to show actual disability. A fee award against her would not be justified in this case. See generally *Bittner v. Sadoff & Rudoy Industries,* 728 F.2d 820, 830 (7th Cir. 1984) (stating one standard for fee award under ERISA is whether losing party's position was "substantially justified"); accord, *Hooper v. Demco, Inc.,* 37 F.3d 287, 294 (7th Cir. 1994).

[*47]

Reliance argues that even if it did violate ERISA's procedural or notice provision in 29 U.S.C. § 1133, this court's remand in 2001 provided all the remedy that might be appropriate. Robyns argues that the proper remedy for Reliance's improper refusal to consider her claim should simply be the reinstatement of benefits, without further inquiry into her actual condition.

The issue of a remedy here is difficult, briefing on it has been sparse, and the court's findings stated in today's entry may give the parties additional guidance in addressing the issue. Each party may file a short supplemental brief on the issue of remedy for Count Two no later than August 10, 2003. Each party may file a short reply brief no later than August 24, 2003. The parties may address the issue as they see fit, but submissions will be most helpful if they take as a given the court's findings in this entry and if they address the following questions: (1) Whether the Seventh Circuit's decision in *Hackett v. Xerox Corp Long-Term Disability Income Plan,* 315 F.3d 771, 775-77 (7th Cir. 2003), requires reinstatement of long-term disability benefits for Robyns, and if so, [*48] for what period of time? (2) Whether this case is closer to *Hackett* or to *Quinn v. Blue Cross and Blue Shield Ass'n,* 161 F.3d 472, 477-78 (7th Cir. 1998)? (3) Whether the court has any discretion in fashioning a remedy for Reliance's procedural error in failing to consider Robyns' request in 1998? (4) Whether the court's findings on the issue of disability may be considered in deciding whether any remedy beyond the earlier remand is appropriate?

III. *Fiduciary Duty Claim*

Robyns has also alleged in Count Three that Reliance breached fiduciary duties to her under ERISA. Robyns has not explained how this claim adds anything to her claims in Counts One and Two. It is possible for a plan administrator and fiduciary to err without breaching fiduciary duties under ERISA. Reliance is entitled to judgment on Count Three.

*Conclusion*

After ruling on the remedy issue on Count Two, the court will enter final judgment in favor of defendant Reliance Standard Life Insurance Company and Community Centers of Indianapolis, Inc. on Counts One and Three consistent with these findings of fact and conclusions of law, and the court's earlier decision granting summary judgment [*49] to CCI, and with the appropriate disposition of Count Two.

So ordered.

Date: July 10, 2003

DAVID F. HAMILTON, JUDGE

United States District Court

Southern District of Indiana