**GARRETT WILSON Plaintiff, v. METROPOLITAN LIFE INSURANCE COMPANY Defendant.**

**CIVIL ACTION NO. 04-CV-05477**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**2006 U.S. Dist. LEXIS 90044**

**December 13, 2006, Decided**

**COUNSEL:** [*1] For GARRETT WILSON, Plaintiff: JOSEPH M. DEMARCO, LEAD ATTORNEY, MICHELE S. DAVIDSON, LEAD ATTORNEY, MARCH & HURWITZ, P.C., MEDIA, PA.

For METROPOLITAN LIFE INSURANCE COMPANY, Defendant: VERONICA W. SALTZ, LEAD ATTORNEY, SALTZ POLISHER, PC, WAYNE PA.

**JUDGES:** Ronald L. Buckwalter, S. J.

**OPINION BY:** RONALD L. BUCKWALTER

**OPINION:**

**MEMORANDUM**

BUCKWALTER, S. J.

Presently before the Court is Plaintiff Garrett Wilson's ("Wilson") Motion for Summary Judgment, Defendant Metropolitan Life Insurance Company's ("MetLife") response thereto, Defendant's Motion for Summary Judgment, and Plaintiff's response thereto. For the reasons set forth below, Defendant's Motion for Summary Judgment is granted.

**I. BACKGROUND**

The Plaintiff brought this suit under the Employment Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. §§ 1101, et seq., seeking a reversal of MetLife's decision to terminate his long term disability benefits under the Boeing Helicopters Credit Union Long Term Disability Plan (the "Plan"). The Plan is funded by a group disability insurance policy issued by MetLife to Boeing, Plaintiff's employer. Plaintiff worked for Boeing [*2] as a CEO until August 8, 2001 when he went out on disability after sustaining upper body injuries in an auto accident. Plaintiff applied for long term disability benefits on September 12, 2001. MetLife approved Plaintiff's claim effective November 7, 2001. MetLife terminated Plaintiff's benefits on June 6, 2004.

The Plan vests MetLife with the discretionary authority to interpret the terms, conditions and provisions of the Plan. (A.R. 1). In addition to specifically defining "disability," n1 the Plan includes a provision limiting disability benefits arising out of certain conditions. This provision, entitled "Limitation for Disability Due to Particular Conditions," in relevant part provides:

> Monthly Benefits are limited to 24 months during your lifetime if you are Disabled due to a:
> 2. Neuromusculoskeletal and soft tissue disorder including, but not limited to, any disease or disorder of the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles, unless the Disability has objective evidence of:
>
> > a. seropositive arthritis;
> > b. spinal tumors, malignancy, or vascular malformations;
> > c. radiculopathies;
> > d. myelopathies; [*3]
> > e. traumatic spinal cord neurosis; or
> > f. musculopathies.

("neuromusculoskeletal limitation" or "24 month limitation") (A.R. 19-20). n2 MetLife terminated Plaintiff's benefits based on this provision.

n1 The Plan states: "'Disabled' or 'Disability' means that due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

> 1. during your Elimination Period and the next 24 month period, you are unable to earn more than 80 of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
> 2. after the 24 month period, you are unable to earn more than 80 of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings." (A.R. 12).

n2 A subsequent "Glossary of Terms" further defines the conditions listed in (a) through (f). (A.R. 20).

**[*4]**

On June 19, 2003, Tanya Chambers, Plaintiff's case manager at MetLife, sent Plaintiff a letter stating that he was currently approved for long term disability benefits and that in order "to continue to receive benefits beyond November 7, 2003, [Plaintiff] must be totally disabled from any *occupation*." (A.R. 242). MetLife enclosed forms for the Plaintiff and his physician to complete and return to MetLife for their consideration of Plaintiff's continued eligibility for benefits. Id. On August 29, 2003, Chambers sent Plaintiff a letter informing Plaintiff that his claim "remains active and has the possibility of extending to 6/21/2008, if the medical documentation continues to support [Plaintiff's] disability." (A.R. 279). On November 4, 2003, the matter was referred to MetLife's Special Handling Unit. (A.R. 109).

On May 24, 2004, Chambers sent a letter ("initial termination letter") informing Plaintiff that his disability benefits were being discontinued because Plaintiff's claim was paid under "one of the conditions with a limitation of 24 months of benefits under this policy." (A.R. 312). The letter further stated that because the conditional limits of the plan had **[*5]** been reached on November 7, 2003, Plaintiff's benefit payments would terminate on June 6, 2004. Id. Although Chambers notified Plaintiff of his right to appeal the decision and submit additional medical documentation, she did not specify what type of medical diagnostics were required to substantiate a finding of disability. See Pl. Mot. Summ. J. at P 57-58.

On June 2, 2004, Plaintiff requested a copy of the Plan from his case manager, who told him that it was against company policy. (Pl. Mot. Summ. J. at P 61). On June 4, 2004, Plaintiff's attorney sent MetLife a letter requesting the basis for its termination of benefits. (A.R. 313). Plaintiff appealed the termination on June 21, 2004 and subsequently provided MetLife with additional medical records in support of his disability. (A.R. 315, 319, 322; Def. Mot. Summ. J. at P 12).

As part of its appeal process, MetLife referred Plaintiff's claim to an independent physician consultant ("IPC"), Dr. Warren Silverman, an occupational and internal medicine doctor. (Truitt Dep. at 38:6-16, 36:5-22). In the IPC referral form, MetLife requested that Dr. Silverman address whether the medical information on file for Plaintiff supported **[*6]** any of the exclusions to the neuromusculoskeletal provision of the Plan. n3 (A.R. 335). Dr. Silverman rendered a report dated September 28, 2004. (A.R. 337-40). Along with a discussion of Plaintiff's medical history and records, this report contained Dr. Silverman's conclusion that the evidence on file did not support any of the listed exclusions. (A.R. 339-40).

n3 Specifically, the question posed to Dr. Silverman was: "A. Does the medical information on file support (for the period of November 7, 2001 through November 7, 2003) any of the exclusions to the neuromuscular provision: seropositive arthritis, spinal tumors, malignancy, or vascular malformations, radiculopathies, myelopathies, traumatic spinal cord necrosis or musculopathies. B. If yes, please explain: How the medical information/findings support exclusion. Why the medical information does not support exclusion." (A.R. 335).

On October 7, 2004, MetLife sent Plaintiff a letter ("final termination letter") upholding its original decision to terminate **[*7]** Plaintiff's benefits effective June 6, 2004. (A.R. 343-44). MetLife informed Plaintiff that, based the review of Plaintiff's file by an independent physician consultant and language in the Plan limiting benefit payments for certain conditions, Plaintiff's complaints would not be categorized as one of the listed exclusions to the 24 month limitation. (A.R. 345). Because

Plaintiff received 24 months of long-term disability benefits, which is the maximum period payable under the Plan, the decision to terminate his benefits was proper. Id.

On November 23, 2004, Plaintiff filed the instant action pursuant to 29 U.S.C. § 1132, alleging that the Defendant improperly discontinued his disability benefits. (Docket No. 1). On March 27, 2006, both the Plaintiff (Docket No. 35) and the Defendant (Docket No. 37) filed cross-motions for summary judgment. On April 10, 2006, Defendant filed a motion to strike Plaintiff's exhibits D and E from Plaintiff's motion for summary judgment. (Docket No. 43). Plaintiff filed a Praecipe to strike Defendant's motion to strike on April, 12, 2006 and a response to Defendant's motion to strike on April 25, 2006. (Docket Nos. 45, 46). **[*8]** In its order dated December 12, 2006, the Court granted Defendant's motion to strike Exhibits D and E.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.C.P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. Since a grant of summary judgment will deny a party its chance in court, all inferences must be drawn in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962). **[*9]**

## III. DISCUSSION

### A. Standard for Reviewing MetLife's Benefit Determination

Both parties agree that this action and the Plan are governed by ERISA. Before reviewing Defendant's decision, the Court must first determine the appropriate standard. Courts review a denial of ERISA benefits under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). The Supreme Court has noted that in cases where an administrator exercises discretion, "[t]rust principles make a deferential standard of review appropriate" and suggested that courts review such exercises of discretion under the arbitrary and capricious standard. Stratton v. E.I. Dupont De Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004) (quoting Firestone, 489 U.S. at 111-12). Under the arbitrary and capricious standard, the district court must defer to the administrator of a benefit plan unless the administrator's decision is clearly not supported by the evidence **[*10]** in the record or the administrator has failed to comply with the procedures required by the plan. Abnathya v. Hoffman La-Roche, Inc., 2 F.3d 40, 41 (3d Cir. 1993).

In addressing the appropriate standard of review, the Third Circuit has held that "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377, 378 (3d Cir. 2000). When applying the heightened arbitrary and capricious standard, district courts must use a "sliding scale" approach, "intensifying the degree of scrutiny to match the degree of conflict." Id. at 392. This approach allows the court to "take notice of discrete factors suggesting that a conflict may have influenced the administrator's decision." Id. at 379. The court may take into account the sophistication of the parties, the information accessible to the parties, the exact financial arrangement between the insurer and the company and the current status of the fiduciary. Id. at 392. In addition **[*11]** to these factors, demonstrated procedural irregularity in the review process may also warrant a heightened standard of review. Kosiba v. Merck & Co., 384 F.3d 58, 66 (3d Cir. 2004).

The record for arbitrary and capricious review is the record made before the plan administrator and cannot be supplemented during litigation. Kosiba, 384 F.3d at 67, n. 5 (citing Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997)); Abnathya, 2 F.3d at 48, n. 8 (refusing to consider medical evaluations submitted in support of plaintiff's claim for continued disability where the evaluations were submitted months after the plan administrator's final decision to discontinue benefits).

The burden of proof is on the claimant to show that a heightened standard of review is warranted in a particular case. Schlegel v. Life Ins. Co. of N. America, 269 F. Supp. 2d 612, 617 (E.D. Pa. 2003). Regardless of whether a court employs the heightened or the deferential arbitrary and capricious standard, a court may not substitute its judgment for that of plan administrators. Stratton, 363 F.3d at 256.

In the **[*12]** instant case, the parties do not dispute, and the evidence is clear that MetLife had the authority and discretion to determine eligibility for benefits; there-

fore the Court must use the arbitrary and capricious standard of review. Because MetLife both administers and funds the benefits program, there is a conflict of interest sufficient to warrant the heightened arbitrary and capricious standard of review. However, the record n4 lacks evidence showing that the conflict actually affected MetLife's final benefit determination. Thus, only a slightly heightened arbitrary and capricious standard is mandated in this case, affording MetLife's determination a moderate degree of deference.

n4 The record in this case is made up of the Administrative Record (Pl. Mot. Summ. J. Ex. A) and the depositions of Cindy S. Broadwater (Pl. Mot. Summ. J. Ex. B) and Beverly J. Truitt (Pl. Mot. Summ. J. Ex. C). For a morecomplete discussion, see the Court's Order dated December 12, 2006, which addressed the Defendant's Motion to Strike Exhibits submitted with Plaintiffs Motion for Summary Judgment (Docket No. 43) and Plaintiffs response thereto (Docket No. 46).

**[*13]**

In support of Plaintiffs argument to heighten the standard of review, n5 he claims that the Defendant's process in reviewing Plaintiffs benefit determination was "replete with numerous incidents of irregularity, bias, unfairness and suspicious activities." (Pl. Mot. Summ. J. Mem. at 9). First, Plaintiff alleges that MetLife's process violated the ERISA statutory and regulatory provisions on notice designed to insure that claimants understand the reasons for the denial of their claims. Second, Plaintiff attacks MetLife's interpretation of "objective evidence" as unreasonable and claims that his medical records constitute objective evidence of myelopathy, radiculopathy and seropositive arthritis. Third, Plaintiff characterizes various actions by MetLife representatives in the handling of his claim as improper and suspicious. Finally, Plaintiff claims that MetLife improperly failed to consider his award of social security benefits. Each of Plaintiffs concerns is discussed below in order to determine where along the sliding scale the Court's review should lie.

n5 Plaintiffs arguments in favor of a substantial heightening of the standard of review are at many points intertwined with his request that the Court overturn MetLife's decision to terminate his benefits. Essentially, Plaintiff argues that the same grounds warranting the heightened standard of review mandate a finding that MetLife's decision was arbitrary and capricious.

**[*14]**

**1. Alleged ERISA Violation**

In support of its allegation that MetLife's communications were insufficient to meet the requirements of ERISA, Plaintiff highlights two portions of the ERISA statutory and regulatory scheme. Specifically, ERISA requires that every employee benefit plan:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. The Department of Labor regulations implementing § 1133 require the notice of denial to provide the claimant with "the specific reason or reasons for the adverse determination" and "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(1) (i) **[*15]** & (iii).

Plaintiff cites Scott v. Hartford Life & Accident Ins. Co., 2004 U.S. Dist. LEXIS 8702, 2004 WL 1090994 (E.D. Pa. May 13, 2004), in support of his position. In Scott, the Court found Hartford's denial of disability benefits to be arbitrary and capricious because its "communications with Scott during the claims process were so opaque that they violated ERISA's most basic notice requirements." n6 2004 U.S. Dist. LEXIS 8702, [WL] at *4. Citing to the same ERISA provisions and regulations as the Plaintiff here does, the court stated that a "[v]iolation of ERISA and its implementing regulations constitutes 'a significant error on a question of law' and may so taint the denial of benefits that it warrants a finding that the plan administrator's decision was arbitrary and capricious." Id. (citing Cook v. N.Y. Times Co. Group Long Term Disability Plan, 2004 U.S. Dist. LEXIS 1259, 2004 WL 203111, at *5 (S.D.N.Y. Jan. 30, 2004)). The court also noted that while ERISA required Hartford to engage in a "meaningful dialogue" n7 with Scott to explain its decision and clarify what information would be necessary to bolster the claim, the court did not mean to imply "that the insurer was obliged to provide Scott with a learned **[*16]** treatise on medical diagnos-

tics, conduct an independent medical examination, sacrifice its contractual rights to interpret the Policy, or give special deference to the views of her treating physicians." Scott, 2004 U.S. Dist. LEXIS 8702, 2004 WL 1090994 at *5.

n6 The opaque communications referred to in Scott were two letters from the insurance company. The first summarized the findings submitted by Scott's primary care physician then concluded that the medical information was not sufficient to support a finding of disability. Scott, 2004 U.S. Dist. LEXIS 8702, 2004 WL 1090994 at *2. Scott appealed the decision and submitted additional medical documentation from a rheumatologist. Id. Hartford again denied the request for benefits "cursorily" concluding that the rheumatologist did not support his findings with test results. Id.

n7 Booton v. Lockheed Med. Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997) (explaining that "[i]f benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis of the denial; if the plan administrators believe that more information is necessary to make an informed decision, they must ask for it.")

[*17]

Here, Plaintiff argues that MetLife withheld its basis for denying Plaintiff's benefits by not informing Plaintiff what records would satisfy its definition of objective evidence. Plaintiff further claims that MetLife, in its correspondence prior to the termination of benefits (A.R. 242, 279), neglected to inform Plaintiff what type of testing was needed in order for Plaintiff to continue receiving benefits. However, these assertions, even if proven, do not rise to the level of so tainting MetLife's decision as to warrant a finding that the benefit denial was arbitrary and capricious. As evidenced by the correspondence between MetLife and Plaintiff, MetLife provided sufficient notice of the reason for the termination of benefits.

First, the initial denial letter dated May 24, 2004 clearly informed Plaintiff of the basis for termination, i.e. the fact that his claim was paid under a condition for which benefit payments were limited to 24 months under the Plan. (A.R. 312). Consistent with the ERISA requirement that claimants be afforded an opportunity for review, MetLife informed Plaintiff of his right to appeal the decision and to submit additional relevant medical documentation. **[*18]** Id. Although Plaintiff did provide additional records, n8 MetLife, in its administration of the Plan, found that the evidence did not support continuing eligibility for disability benefits. MetLife was not obligated to dictate Plaintiff's medical treatment or to instruct Plaintiff as to what medical records were required to avoid the 24 month limitation. Rather, it was Plaintiff's physician's responsibility to determine the appropriate diagnostic methods to sufficiently identify and treat Plaintiff's conditions. Because MetLife identified the basis for terminating Plaintiff's benefits in the initial denial letter, it discharged its duties in accordance with the ERISA provisions on notice.

n8 On appeal, Plaintiff's attorney submitted: (1) office notes from Plaintiff's treating orthopedist, Alex B. Bodenstab, M.D. dated August 5, 2003, August 11, 2003, April 14, 2004, August 6, 2004; (2) MRI Report and photocopy of film for his cervical spine dated October 8, 2001; (3) MRI report of Plaintiff's shoulder dated November 16, 2001; (4) DXA Bone Density Test Report dated January 17, 2002; (5) MRI report of the cervical spine dated April 19, 2003; (6) Doctor's Statement dated March 11, 2002; and (7) an Attending Physician Statement dated August 11, 2003. (A.R. 318-22)

[*19]

Second, contrary to Plaintiff's contentions, the letters from Tanya Chambers dated June 19, 2003 and August 29, 2003 are not misleading. The June 19, 2003 letter concludes with "[w]e will notify you when we have reached a decision concerning your continued eligibility for benefits." (A.R. 242). The August 29, 2003 letter states that "[y]our claim remains active and has the possibility of extending to 6/21/2008, if the medical documentation continues to support your disability." (A.R. 279). Thus, it was unreasonable for Plaintiff to interpret these letters as guaranteeing the continued receipt of benefit payments when the explicit language indicated otherwise.

**2. MetLife's Interpretation of "Objective Evidence"**

As stated above, to avoid the 24 month limitation for neuromusculoskeletal conditions a claimant was required to submit "objective evidence" of any of six specifically enumerated conditions. Plaintiff argues that MetLife narrowly and unreasonably interpreted "objective evidence," thus failing to recognize that Plaintiff's medical records contained objective evidence of myelopathy, radiculopathy and seropositive arthritis, three of the listed exclusions. Defendant **[*20]** responds that "objec-

tive evidence" was interpreted consistent with its plain meaning and that the independent physician consultant reviewed Plaintiff's medical records and concluded that they did not support a finding that Plaintiff's conditions fell within any of the exclusions.

The Plan does not define the term "objective evidence" nor specify what type of diagnostic testing is considered objective evidence of radiculopathy, myelopathy or seropositive arthritis. However, the Plan vested MetLife with the authority to interpret the terms of the contract, which necessarily included "objective evidence." (A.R. 1). As further guidance, the "Glossary of Terms" defines the aforementioned excluded conditions as: (1) "Seropositive Arthritis: An inflammatory disease of the joints *supported by clinical findings of arthritis plus positive serological tests for connective tissue disease* [;]" (2) "Radiculopathies: Disease of the peripheral nerve roots *supported by objective clinical findings of nerve pathology* [;]" and (3) "Myelopathies: Disease of the spinal cord *supported by objective clinical findings of nerve pathology*." (A.R. 20) (emphasis added).

Under the Plan, the **[*21]** claimant is responsible for demonstrating continued eligibility for benefits, which necessarily entails submitting supporting medical documentation. (A.R. 9). It is the role of the claimant's physician to determine the appropriate diagnostic test given the particular symptoms presented. Then, based on the medical documentation provided by the claimant, the administrator will make an eligibility determination. To assist in making its determination, MetLife enlisted Dr. Silverman to review Plaintiff's medical documentation in search of evidence that Plaintiff's medical conditions fell within an exclusion to the 24 month limitation. In his report, Dr. Silverman discussed the Plaintiff's medical history following his motor vehicle accident, specifically addressing Plaintiff's shoulder complaints, knee pain and back pain. (A.R. 337-40). After a thorough review of the medical documentation submitted by the Plaintiff, Dr. Silverman concluded that the evidence did not support a finding that Plaintiff's conditions could be characterized as seropositive arthritis, radiculopathy, or myelopathy. n9

n9 For Dr. Silverman's discussion, see A.R. 339-340.

**[*22]**

The process used by MetLife in interpreting the terms of the Plan to determine a claimant's eligibility does not raise the same type of concerns as in Pinto n10 and thereby does not justify elevating the degree of scrutiny. Furthermore, to the extent that Plaintiff is challenging Defendant's final benefit determination, as discussed more fully below, this decision was supported by substantial evidence in the record.

n10 In discussing problems with the administrator's process in Pinto, the court highlighted: (1) inconsistent treatment of the same facts, i.e. reversing an initial determination that the claimant was totally disabled based on the rejection of claimant's application for social security benefits, but failure to give any effect to the subsequent reversal by the Social Security Administration; (2) self-serving selectivity in crediting some advice of a treating doctor, but not others; and (3) the administrator's rejection of a staff worker's recommendation that benefits be resumed. Pinto, 214 F.3d at 393-394.

**[*23]**

**3. Other Alleged Improper and Suspicious Conduct**

After a thorough examination of the improper and suspicious conduct alleged by Plaintiff, this Court concludes that these allegations do not warrant a significant heightening of the standard of review. Below, the allegations are addressed briefly.

First, Plaintiff claims that the 2003 letters sent and 2004 computer entries made by Chambers are suspicious in that they imply that she believed Plaintiff's benefits would be ongoing through June 21, 2008. Then, despite Chambers' supposed original intent to grant ongoing benefits, her "handling of the matter suddenly changed and she suddenly terminated benefits." (Pl. Mot. Summ. J. Memo. at 24). It is not clear what bearing these allegations, even if true, have for the level of scrutiny. They are not evidence of procedural irregularity but rather mere speculation as to the initial thoughts of a case manager regarding a particular claim.

In her deposition, Cindy Broadwater, corporate designee for MetLife, conceded that Chambers's failure to address the 24 month limitation in November, 2003 did not conform with proper procedures. (Broadwater Dep. at 88:16-22, 90:3-7). Although Plaintiff **[*24]** points to this as evidence of MetLife's conflict of interest, the effect of this oversight was that Plaintiff received benefit payments for 31 months despite the fact that his condition was subject to a 24 month limitation. In addition, there is no evidence that MetLife requested that Plaintiff return the overpayment. (Broadwater Dep., at 180:25-181:7). Because MetLife did inform Plaintiff of the 24 month limitation when it notified Plaintiff of the termination of benefits, the failure to address the limitation in November, 2003 does not warrant heightening the level of scrutiny.

Second, Plaintiff asserts that Beverly Truitt, an appeals department employee of MetLife, improperly handled Plaintiff's claim by not understanding the plan, choosing an inappropriate doctor to perform a medical record review, and placing too much importance on the doctor performing the review. These claims do not warrant a heightening of the standard of review. With regard to the weight given to treating physicians, the Supreme Court has stated:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, **[*25]** we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003). Thus, any greater weight that MetLife chose to afford to its reviewing physician over Plaintiff's physicians does not raise the level of scrutiny in this case. This is especially appropriate given the fact that MetLife did not necessarily credit Dr. Silverman's opinion as opposed to Plaintiff's treating physicians, but rather relied on Dr. Silverman's interpretation of the medical records.

Finally, Plaintiff asserts that Truitt failed to address whether Plaintiff's knee injury substantiated a concurrent disability. The Plan provision entitled "Concurrent Disability" states:

> If a new Disability occurs while Monthly Benefits are payable, it will be treated as part of the same period of Disability. Monthly Benefits will continue while you remain Disabled. They will **[*26]** be subject to both of the following:
> 1. The Maximum Benefit Duration; and
> 2. Limitations and Exclusions that apply to the new cause of Disability.

(A.R. 19). According to this provision, concurrent disabilities are subject to the same limitations as other disabilities. Thus, if a "new" disability arose, and it was subject to the neuromusculoskeletal limitation, benefit payments would still expire in 24 months. In other words, the new disability will not "reset" the 24 month period. In order to avoid the termination of benefits, a claimant must submit objective evidence of a listed exclusion. Here, MetLife did address Plaintiff's knee injury, but determined that Plaintiff's knee injury was not seropositive arthritis and therefore subject to the 24 month limitation. n11

> n11 In his report Dr. Silverman stated "[w]ith regard to the question of whether this finding of medial compartmental arthritis is affected by the exclusions to the neuromuscular provisions, it would not seem that it was a seropositive arthritis[.]" (A.R. 339).

**[*27]**

**4. Social Security Award**

Plaintiff argues that MetLife improperly failed to consider his award of Social Security benefits. While a Social Security Administration (SSA) award is not dispositive in determining whether an ERISA administrator's decision was arbitrary and capricious, it may be considered as a factor. Dorsey v. Provident Life & Accident Ins. Co., 167 F. Supp. 2d 846, 856, n.11 (E.D. Pa. 2001). However, plan administrators are not bound by SSA determinations. Id. A plan administrator's decision that differs from the SSA is not arbitrary and capricious provided it is reasonable and supported by substantial evidence. Id. (citing Russell v. Paul Revere Life Ins. Co., 148 F. Supp. 2d. 392, 409 (D. Del. 2001)). Thus, MetLife was not required to give controlling weight to the SSA determination. Furthermore, as discussed below, MetLife's decision was reasonable and based on substantial evidence in the record.

**5. Pinto Factors**

Although neither party extensively addressed the Pinto factors, I briefly address two factors which appear to be relevant here - information accessible to the parties and the sophistication of the **[*28]** parties. Plaintiff claims that he never received a copy of the Plan from his employer or MetLife (Pl. Memo. Summ. J. at 14). To the extent that Plaintiff is arguing that MetLife was obligated to do so, he has presented no evidence or language within the Plan itself in support of this claim. In her deposition, Cindy Broadwater testified that although MetLife did not provide a copy of the Plan, it would have been logical for Plaintiff to request a copy from his employer. Plaintiff served as Board Member and President of Boeing Helicopters Credit Union from 1992 through 1997 and CEO from 1997 until August 8, 2001 presumably placing him in a position to make such a request. (A.R. 271). Plaintiff presented no evidence that

he actually requested a copy of the Plan from Boeing. Thus, there is no significant imbalance present here that would justify heightening the standard of review under the factors from Pinto.

**C. MetLife's Claim Determination**

Based on the record in this case, this Court finds that even under the heightened arbitrary and capricious standard, MetLife's decision to terminate Plaintiff's benefits under the 24 month limitation in the Plan should be upheld. Given **[*29]** the information available to MetLife at the time it rendered its decision, there was a reasonable basis for its conclusion that Plaintiff's file did not contain objective evidence that he suffered from one of the listed exclusions.

There is no evidence that MetLife acted in violation of any specific requirements of the Plan. Under the language of the Plan, benefits for neuromusculoskeletal disorders are limited to 24 months unless there is objective evidence of any of six specifically enumerated conditions. When MetLife recognized that Plaintiff had received benefits in excess of the 24 month limitation, MetLife notified Plaintiff that his benefits would terminate. (A.R. 312). During the appeal process, MetLife permitted Plaintiff to submit additional medical documentation. Then, after consideration of all of the available information, MetLife concluded that there was no objective evidence of any of the listed exclusions and consequently upheld its decision to discontinue benefits.

Furthermore, MetLife's decision to terminate benefits based on the 24 month limitation is supported by substantial evidence. MetLife primarily relied upon the report of Dr. Silverman in interpreting Plaintiff's **[*30]** medical records. Dr. Silverman addressed the limited issue of whether the medical records supported any of the exclusions and supported his conclusion with specific references to the records. (A.R. 337-38). Dr. Silverman discussed all of the bases for Plaintiff's claim for disability including his shoulder complaints, n12 spinal/neck issues, n13 knee pain n14 and low back pain. n15 (A.R. 339-40). Also, Dr. Silverman addressed the concerns raised by Plaintiff's counsel in his letter of August 17, 2004. (A.R. 318, 340). Based on the all of the medical documentation submitted by Plaintiff, Dr. Silverman concluded that the evidence did not support a finding that Plaintiff's conditions could be characterized as seropositive arthritis, radiculopathy, or myelopathy.

n12 As to Plaintiff's shoulder, Dr. Silverman stated: "At this point there is really no anatomical or pathological explanation to his ongoing symptomatology. He appears to have demonstrated less than ideal efforts at rehabilitation following the surgery. The rotator cuff appears to have been intact. It had some inflammation, but he refused injections on at least two documented occasions to attempt to decrease the inflammation in the area. Any compression from the acromioclavicular joint would have been adequately treated by the distal clavicle resection. Any impingement due to the acromion process would have been treated by the acromioplasty. There really does not appear to be the presence of any pathology that would explain any significant limitation other than inadequate rehabilitation. With regard to the condition itself, it would not be one of the aforementioned exclusions to the neuromuscular provision." (A.R. 339).

**[*31]**

n13 As to Plaintiff's cervical spine disease, Dr. Silverman stated: "Dr. Sugarman did not feel that the MRI identified any compressive neuropathy as the result of the small disk herniation. There does not appear to be any nerve conduction study or EMG that would support any neural compression that would be diagnostic of radiculopathy. There does not appear to be any evidence of myelopathy. At this point, there does not appear to be any objective evidence that would categorize the disease in the neck as one of those entities listed as exclusions to the neuromuscular provision." (A.R. 339).

n14 As to Plaintiff's knee, Dr. Silverman stated: "this appears to be a new problem. It appears to have developed in the beginning of this year somewhere around February 2004 based upon the notations made in the medical records. This appears to be evidence of arthritis and there is not actually a physical examination that documents the limitations related to this problem other than by establishing a history of it affecting his ability to ambulate as much as he had." (A.R. 339).

n15 As to Plaintiff's low back, Dr. Silverman stated: "there is insufficient information in the medical record to establish pathology in the low back." (A.R. 340)

**[*32]**

Plaintiff challenges Dr. Silverman's interpretation of objective evidence as limited and self-serving. Specifically, Plaintiff argues that (1) his MRIs were positive for myelopathy and radiculopathy; (2) radiating pain, numb-

ness and tingling, when coupled with positive MRIs, is objective evidence of radiculopathy; and (3) his shoulder injury was post-traumatic and thus not subject to the 24 month limitation for neuromusculoskeletal disorders. Keeping in mind that the heightened arbitrary and capricious standard requires a court to be deferential, but not absolutely deferential, Pinto, 214 F.3d at 393, the Court finds that Plaintiff's challenges to Dr. Silverman's interpretation of the medical records lack merit. First, Dr. Silverman concluded that there was no evidence of radiculopathy or myelopathy due to the absence of MRIs, EMGs, or other nerve conduction studies showing neural compression resulting from Plaintiff's small disk herniation, (A.R. 339). Dr. Silverman's conclusion as to the MRI evidence was partly based on the observation of Michael G. Sugarman, M.D. n16 who personally observed Plaintiff in his neurosurgery office on June 19, 2003. (A.R. 285). Dr. **[*33]** Sugarman noted that he "reviewed an MRI of the cervical spine which shows a small disc protrusion at the C6-7 level. This is small and does not seem to compress the neural elements." (A.R. 285). Second, in his report, Dr. Silverman recognized that Plaintiff complained of radicular symptoms, n17 but noted that there were no objective studies to confirm a diagnosis of radiculopathy. Finally, Dr. Silverman evaluated the evidence associated with Plaintiff's shoulder injury and concluded that there was no anatomical or pathological explanation to his ongoing symptomatology (A.R. 339).

n16 Dr. Sugarman was a member of the Delaware Neurosurgical Group, who evaluated Plaintiff for his physician, Thomas Neef, M.D. (A.R. 285).

n17 Referring to the August 6, 2004 notes of Alex B. Bodenstab, M.D., Dr. Silverman stated "[t]here is also mention about radicular symptoms returning to his neck and arms, shoulder motion getting worse, an increase of low back and buttock pain, history of lumbar disk disease, but this note does not include any physical examination or any other objective studies." (A.R. 338).

**[*34]**

Plaintiff also identifies various observations made by Doctors Neef, Lobis and Bodenstab as objective clinical findings that Plaintiff suffered from radiculopathy, myelopathy and seropositive arthritis (Pl. Mot. Summ. J. at PP 15-44). However, after a careful review of these statements, the Court finds them insufficient to warrant a finding that MetLife's determination was arbitrary and capricious. The Court is not permitted to substitute its judgment for that MetLife. Because MetLife's decision was supported by substantial evidence in the record and given the appropriate level of deference that must be afforded to plan administrators, the Court finds that, even under a heightened standard, MetLife's decision that Plaintiff's medical records did not contain objective evidence of the listed exclusions was not arbitrary and capricious.

## IV. CONCLUSION

Based on the foregoing, the Court finds that Defendant's decision to terminate Plaintiff's benefits was not arbitrary and capricious, was supported by substantial evidence in the record and was in accordance with the benefits plan. Additionally, the Court finds that there are no genuine issues of material fact, and accordingly **[*35]** the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment.

An appropriate Order follows.

**ORDER**

AND NOW, this 13th day of December, 2006, upon consideration of Plaintiff's Motion for Summary Judgment (Docket No. 35), Defendant's response thereto (Docket No. 44), Defendant's Motion for Summary Judgment (Docket No. 37), and Plaintiff's response thereto (Docket No. 42), it is hereby **ORDERED** that Defendant's Motion is GRANTED, Plaintiff's Motion is **DENIED**, and judgment is entered on behalf of Metropolitan Life Insurance Company and against Garrett Wilson.

This case is now **CLOSED**.

BY THE COURT:

s/ Ronald L. Buckwalter, S. J.