Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 1999 WL 33320463 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Laucks v. Provident CompaniesM.D.Pa.,1999.Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.
Steven O. LAUCKS, Plaintiff,
v.
PROVIDENT COMPANIES, et al., Defendants.
**No. 1CV971507.**

Oct. 29, 1999.

MEMORANDUM
CAPUTO, District J.
**\*1** Before this court is an action brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1425, seeking to reinstate the plaintiff's benefits which were terminated by defendant Provident on August 1, 1997. The case was tried before the court without a jury, and the trial concluded on June 30, 1999. The parties submitted proposed findings of fact and conclusions of law, and the case is now ripe for decision.

This case involves an anesthesiologist, Dr. Steven O. Laucks, and his battle with the demons of substance addiction. The plaintiff was a successful anesthesiologist at the York Hospital who had attained the position of chief of the department of anesthesiology. His addiction to alcohol became evident in his college days. He also had alcoholic relatives and noted versions of dysfunctional parental behavior. The most recent and relevant facts concern the plaintiff's expansion of substance use to benzodiazepenes (valium and versed), cocaine, and fentanyl. In the early 1990's, while addicted to and regularly using alcohol, plaintiff began to use cocaine, and in mid-1993, he began his use of benzodiazepenes (valium and versed) and fentanyl. Often he would mix a cocktail of versed, valium, and fentanyl and a diet soft drink. Other times he would take cocaine or fentanyl intra-nasally by squirting the mist from a syringe into his nostrils. While engaging in the substance use, he managed to maintain his operating room practice at a competent level, although he testified that he may have underdosed patients in order to save some of the drug for himself. However, no claims were made as a result of any such practice. It was not until March of 1994 when Dr. Laucks entered an operating room area of a day surgery unit and stole cocaine from the anesthesia cart in the presence and full view of an aide that his substance problem became known to his colleagues and superior at the York Hospital. He agreed to enter the Talbott-Marsh Recovery Center in order to address his problem of addiction. [FN1] In March, 1994, when he entered Talbott-Marsh, he began a program of recovery which he has pursued successfully through the time of trial. He was released from Talbott-Marsh in August, 1994 and diligently continued his treatment regime, a regime which seeks to prevent addicts from relapsing by helping them understand their addictions, addressing the causes, and most importantly encouraging and supporting them in the exercise of their will to refrain from relapse, viz renewed use of any of the addictive substances. After Dr. Laucks's release, he was required to register with the Physicians Health Program ("PHP"), a program for impaired physicians, which works closely with the Pennsylvania State Board of Medicine. The goals of the PHP are to rehabilitate the impaired physician, and return him to practice. Dr. Laucks entered an agreement with PHP whereby he agreed, inter alia, to go to therapy for two years, attend AA meetings, submit to drug testing, and maintain regular contact with Dr. Thomas Hobbs, his monitoring physician. He has been in compliance with the agreement since its inception. Moreover, Dr. Laucks continued to practice medicine, having qualified himself after release from Talbott-Marsh as a practitioner of pain management and addictionology.

FN1. Dr. Laucks had made prior gestures toward treatment. By his own admission, her went to a psychiatrist in 1992 because

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 2

Not Reported in F.Supp.2d, 1999 WL 33320463 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

his wife was "harassing" him about his drinking. He also testified he went to Caduceus Club (an AA group for doctors) meetings to get people "off his back". In September, 1993, he went to a rehabilitation center known as Sierra Tuscon, but stayed on a week. In January, 1994, he went back to Sierra Tucson but stayed only 17 of 28 days. According to Dr. Laucks, these efforts were not serious commitments to treatment.

*2 Dr. Laucks had, as a part of an employee benefit plan, what is known as an own occupation disability insurance policy. Own occupation policies insure those policy holders who by reason of illness or injury are unable to perform the substantial and material duties of their particular occupations. This case involves a such a policy.[FN2] In this case, Dr. Laucks claimed that by reason of his illness (substance addiction) he was unable to perform his occupation (anesthesiologist in an operating room).

> FN2. The policy language defines total disability as follows:
> Total Disability or totally disabled means that due to Injuries or Sickness:
> (1) you are not able to perform the substantial and material duties of your occupation; and
> (2) you are receiving care by a Physician which is appropriate for the condition causing the disability.

He made a claim under the policy, and defendant Provident found he was disabled under the terms of the policy and began paying the monthly benefit amount under the policy on August 12, 1994. Those payments continued until August, 1997, when defendant Provident terminated the benefits because it had concluded the plaintiff was no longer disabled under the policy.

Defendant Provident made the plaintiff aware of this determination and termination by letter dated August 1, 1997. While the letter notified plaintiff of the termination, it did not recite the reasons for the determination that he was no longer disabled, and it

did not notify him of his right of appeal, all of which are required by ERISA.[FN3]

> FN3. The defendant advanced the position that this policy was part of a plan covered by ERISA in its Motion for Partial Summary Judgment and the Court agreed.

It is incumbent upon the Court to determine whether the actions taken by defendant Provident were appropriate.

The court must first determine the standard of review which should be applied in this case. I will exercise a heightened arbitrary and capricious standard of review which first requires a *de novo* review of the termination of the plaintiff's benefits. Because I find that the plaintiff is not disabled within the meaning of the defendants' policy, judgment will be entered in favor of the defendants and against the plaintiff. In addition, the plaintiff has filed a Motion for Injunctive and Monetary Relief. The plaintiff's Motion for Injunctive and Monetary Relief will be granted because the defendants did not give the plaintiff a full and fair review of his denial of benefits prior to this trial. The defendants will be ordered to pay the plaintiff benefits from the date of his termination to the date of this Memorandum and Order.

## I STANDARD OF REVIEW

The heightened arbitrary and capricious standard of review will be applied to the defendants' denial of the plaintiff's benefits. If a plan gives "the fiduciary or administrator discretionary authority to determine eligibility for benefits," the court must apply an arbitrary and capricious standard of review. *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 983 (6th Cir.1991) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 112 (1989)). If the plan does not give the fiduciary or administrator discretion or final authority, the court must review the fiduciary or administrator's decision de novo. *See id.* The Third Circuit has held that "a plan's grant of discretion can either be express or implied." *Heasley v. Belden & Blake*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 3

Not Reported in F.Supp.2d, 1999 WL 33320463 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*Corp.,* 2 F.3d 1249, 1254 (3d Cir.1993) (citing *Luby v. Teamsters Health, Welfare & Pension Trust Funds,* 944 F.2d 1176, 1180 (3d Cir.1991)).

**\*3** If a plan provides that an insured must present " satisfactory proof of loss," courts have found that this impliedly grants the administrator discretion. *See Donato v. Metropolitan Life Ins. Co.,* 19 F.3d 375, 379 (7th Cir.1994) (applying the arbitrary and capricious standard where the plan provided that the insured must provide "proof .. satisfactory to us"); *Miller,* 925 F.2d at 983-84 (applying the arbitrary and capricious standard where the plan provided that insured must present satisfactory medical evidence of disability); *Scarinci v. Ciccia,* 880 F.Supp. 359, 364 (E.D.Pa.1995) (applying the arbitrary and capricious standard where the plan provided the insured must present " 'satisfactory' evidence of disability"). FN4

> FN4. In an unpublished opinion, the Third Circuit has held that " 'the provision of the Plan requiring that a claimant provide ' satisfactory proof' of disability provides the necessary discretion' to justify arbitrary and capricious review." *See Landau v. Reliance Std. Life Ins. Co.,* No. CIV.A.98-903, 1999 W.L. 46585, at * 3 n. 2 (E.D.Pa. Jan. 13, 1999) (quoting *Pinto v. Reliance Std. Life Ins. Co.,* No. 97-5297, at 7 (3d Cir. May 28, 1998)). Although not binding, unpublished Third Circuit opinions may be used by a district court as a persuasive authority. *See* Third Circuit Internal Operating Procedure 5.8.

Here, the plan provides: "You must present satisfactory proof of your loss." (See Def.'s Ex. A.) I find this language grants discretion to the plan administrator. *See id.* Therefore, because the plan administrator has discretion, the administrator's decision will be reviewed under the arbitrary and capricious standard. *See id.*

A heightened arbitrary and capricious standard will be applied because there is a conflict of interest since the defendants both issued the policy and administer claims made thereunder. Heightened

scrutiny in the application of the arbitrary and capricious standard is mandated "where the plan administrator is itself the insurance company which stands to lose money by paying benefits [because] the decision to deny benefits 'inherently implicate[s] the hobgoblin of self-interest." ' *Morris v. Paul Revere Ins. Co.,* 986 F.Supp. 872, 881 (D.N.J.1997) (quoting *Brown v. Blue Cross & Blue Shield,* 898 F.2d 1556, 1568 (11th Cir.1990), *cert. denied,* 498 U.S. 1040 (1991)); *see also Rizzo v. Paul Revere Ins. Group,* 925 F.Supp. 302, 309 (D.N.J.1996), *aff'd,* 111 F.3d 127 (3d Cir.1997). Here, the defendants administer the plan and stand to lose money by paying the plaintiff's benefits. Therefore, the decision to deny those benefits, while reviewed under an arbitrary and capricious standard, is subject to heightened scrutiny. *See id .*

In determining whether the denial of benefits was proper under this standard, this court will apply the two prong test set forth in the *Morris* and *Rizzo* decisions. The *Morris* and *Rizzo* courts followed the Eleventh Circuit's two prong test set out in *Brown. See Morris,* 986 F.Supp. at 881-82; *Rizzo* 925 F.Supp. at 309-310 (citing *Brown,* 898 F.2d at 1566-67). These decisions provide that first the court must apply a *de novo* review of the administrator's decision denying benefits. *See, e.g., id.* Second, if the court finds that the administrator's decision is "wrong, but apparently reasonable," the court will determine if that decision was tainted by " self interest." *See id.* If the court finds that the decision is "tainted with self interest," the court will find that the denial of benefits was arbitrary and capricious. *See id.* If not, it will find the denial of benefits was reasonable. *See id.*

## II *DE NOVO* REVIEW

**\*4** The court is confronted with the task of first making a *de novo* determination as to whether Dr. Laucks is totally disabled within the meaning of the policy here at issue. The language of the policy is as follows:
Total disability or totally disabled means that due to injuries or sickness:
(1) you are not able to perform the substantial and material duties of your occupation; and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 4

Not Reported in F.Supp.2d, 1999 WL 33320463 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

(2) you are receiving care by a physician which is appropriate for the condition causing the disability.

The plaintiff contends that he is unable to perform the substantial and material duties of anesthesiology because he is addicted to alcohol, benzodiazepenes ( valium and versed), cocaine, and fentanyl, and while he is now drug free and abstaining from drugs, his addiction constitutes such an overwhelming urge to use the drugs that placing him in their presence in the operating room assures his relapse. In other words, if he goes into an operating room, he will use the drugs located there. He will not be able to control himself to the extent of not using them. Stated another way, plaintiff has no control over his ability to steer clear of the drugs; he will use if he is placed in the environment where they are present.

The plaintiff's contention virtually eliminates choice as an ingredient in this process. Plaintiff is saying because of his addiction, he has no control over his ability to not use. The plaintiff's contention is flawed.

First, if the addiction was the uncontrollable urge the plaintiff proffers, he would not have been able to remain drug free or sober for the five years that he has done so. An uncontrollable urge is just that, and it is inconsistent with what Dr. Laucks has done, namely controlled the urge. Days before intervention in March 1994, on his day off, Dr. Laucks entered the surgery unit, stole cocaine from an anesthesia cart in the presence of an aide, and then left the clinic. Such a blatant move is arguably the manifestation of an uncontrollable urge. He has, however, since his release from the Talbott-Marsh Recovery Center, not repeated this action or anything which approaches it. Again, he has controlled any urge he may have had to do such a thing from 1994 to the present, a period of five years.

Second, Dr. Laucks is also addicted to alcohol. He is an alcoholic whose addiction to alcohol began his bout with addiction. Since his release from Talbott-Marsh in 1994, he has not used alcohol. Any uncontrollable urge to use has been controlled.

Moreover, he has passed countless public places where alcohol was served and was attainable, yet he did not relapse and go in and imbibe. He has been at numerous parties where alcohol was served and was readily available, yet he did not relapse and take a drink. For five years, he did control any urge he had for alcohol and he did so when in the presence of alcohol and when on a daily basis he could walk or drive to a public place and take or use alcohol. He did not do so. He controlled any urge he had for the addictive substance, and he continues to do so.

**\*5** I must conclude the urge of addiction which is described by some as uncontrollable, cannot be uncontrollable, but rather one which is controllable and one which must remain controllable in order for an addict to stay in remission. Indeed it appears that all treatment modalities or regimes are designed to provide that very control. I am inclined to adopt the view expressed by Dr. Joseph Liftik, an expert witness, that when you are involved in the use of addictive substances, the urge may be uncontrollable, but after detoxification, and a period of non-use, choice is involved in controlling the urge.

The plaintiff presented testimony from several experts in addiction who opined that Dr. Laucks could never return to anesthesiology, and that if he did so, he was certain to relapse because of his exposure to O.R. drugs. The defendants presented expert testimony that Dr. Laucks was primarily addicted to alcohol and secondarily addicted to O.R. drugs; that after two years of sobriety, he was no longer disabled, and it would be up to him to remain sober. While all experts did not agree that the longer Dr. Laucks remained sober, the less likely he would relapse, those who did not relied on their own opinions which were not supported by anything I found corroborative. At best, those who stated that opinion relied on studies concerning residents and not anesthesiologists who had been in practice for five or more years. In any event, I found those who opined that the passage of time without relapse diminished the likelihood of relapse more convincing.

Further, to say that Dr. Laucks will relapse if he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 5

Not Reported in F.Supp.2d, 1999 WL 33320463 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

performs his profession in an operating room and therefore is disabled, is to say that the very course of treatment advocated and accepted by addictionologists is ineffective. The course of treatment in large part is a program which re-enforces the will to abstain from the substances to which the addict is addicted. While addiction is recognized as a disease, it is not the same as a person disabled by a stroke, debilitating heart condition or loss of a limb. Those conditions are permanent and do not portend a treatment regimen that allows the disabled individual to function as he or she did before the onset. In the case of addiction, the treatment regimen promises just that; its promise is that the use is not permanent even though the disease of addiction is. Indeed the continued avoidance of the temptation of the substance is the promise of the treatment for substance addiction, and few would contend it cannot work.

Another aspect of this case bears on this issue. Dr. Douglas Talbott, a pioneer in the treatment of addiction in physicians, suggested three categories of addicted anesthesiologists, the third of which, Category III, could never return to the practice of anesthesiology. There were seven characteristics in Category III, viz (1) prolonged intravenous use; (2) previous treatment attempts failed/relapse; (3) disease present and attracted the individual to the practice of anesthesiology; (4) severe psychiatric disease/personality disorder; (5) inability to follow a treatment contract; (6) poor recovery skills with no bonding with alcoholics/narcotics anonymous; and, (7) severe family dysfunction. In Dr. Laucks's case: (1) He did not engage in intravenous use. I do not find that intra-nasal use is the equivalent of intravenous use. (2) Since his entering the TalbottMarsh Recovery Center in March, 1994, he has not had a relapse. (3) There is no evidence that Dr. Laucks was attracted to anesthesiology by the existence of addictive disease. (4) No physician or psychiatrist found Dr. Laucks to have suffered from a personality disorder. The dysthemia and the depression he had were never severe, and have been successfully treated. (5) Dr. Laucks has followed his treatment program since August, 1994 without deviation. (6) Dr. Laucks has been attending Alcoholics Anonymous since August, 1994.(7) Dr. Laucks divorced after he began his recovery program, and in view of his ex-wife's lack of support of his efforts at recovery, any dysfunction appears to have been remedied.

**\*6** By comparison, Category II, which dictates a reassessment after 1 year and again at 2 years after initial sobriety contains the following characteristics: (1) relapse occurred but demonstrating recovery; (2) family members improving but remain dysfunctional; (3) involvement, but not yet bonded with Alcoholic/Narcotics Anonymous; (4) healthy attraction to anesthesiology; (5) recovery skills improving; (6) some denial remains; and, (7) continued mood swing but no presence of psychiatric disease or personality disorder. The facts concerning Dr. Laucks recited above in the application of Category III more appropriately fit Category II. In addition, (1) Dr. Laucks has not suffered a relapse; (3) he has bonded with Alcoholics Anonymous; (4) he had a healthy attraction to anesthesiology and (6) there was no evidence of residual denial. Items (2), (5) and (7) likewise fit Dr. Laucks.

Therefore, viewing Dr. Talbott's Category III as a valid test to determine anesthesiologists who cannot return to the operating room, Dr. Laucks would not fit into this category of anesthesiologists who can never return to the O.R. Indeed, Dr. Laucks more closely fits Category II, which is a category allowing for return after reassessment.

Further, it is my view from the evidence in this case that although there may well be cases where addicted and recovering anesthesiologists can never return to the O.R. and are therefore disabled within the policy language here, it is my view that Dr. Laucks is not one of them.

Dr. Laucks does not suffer from any cognitive defect which would impair his mental skill. While there was some evidence from testing when he entered Talbott-Marsh in March, 1994 that he had some cognitive deficit, there were no subsequent tests and there was no dispute that with abstention from substance use the cognitive function would improve. Moreover, there was never any testing or other evidence that the cognitive deficit manifested

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 1999 WL 33320463 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

in March, 1994 would have disqualified Dr. Laucks from practicing anesthesiology in the operating room. In addition, Dr. Laucks has no motor skill deficit that would prevent him from practicing anesthesiology in the operating room.

In sum, it is my view that Dr. Laucks had remained in recovery for a period of three years prior to the defendants' determination that he was no longer disabled, and that he was, at that time, no longer disabled within the meaning of the policy. Further, he has continued to remain substance free through the conclusion of the testimony, a period in excess of five years. I reject the testimony proffered by his expert witnesses that he can never return to the operating room and I conclude in performing a review *de novo* that Dr. Laucks is not disabled within the meaning of the Provident policy.

Since I have so determined, there is no need to consider whether Provident's termination of Dr. Laucks was arbitrary and capricious under a heightened scrutiny standard. *See Morris,* 986 F.Supp. at 881-82; *Rizzo* 925 F.Supp. at 309-310 (citing *Brown,* 898 F.2d at 1566-67). Likewise I need not determine whether Dr. Laucks's current practice of pain medicine is the practice of anesthesiology within the meaning of the policy.

### III PLAINTIFF'S MOTION FOR INJUNCTIVE AND MONETARY RELIEF

*7 Prior to trial, the plaintiff filed a motion for injunctive and monetary relief which this court deferred until all evidence was submitted at trial. The plaintiff contends that he is entitled to injunctive and monetary relief because the defendants failed to give him a full and fair review of his claim. *See Grossmuller v. International Union,* 715 F.2d 853, 857 (3d Cir.1983). Specifically, the plaintiff argues that his termination letter of August 1, 1997 did not advise him of 1) the disability policy's coverage under ERISA; 2) his rights to appeal; 3) the steps necessary to file an appeal; 4) the information he needed to provide for an appeal; and 5) to where and whom he should submit information pertinent to an appeal, all in violation of 29 U.S.C. § 1133.

29 U.S.C. § 1133 provides:
In accordance with regulations of the Secretary, every employee benefit plan shall-
(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

*Id.* The Secretary has required that the following also be included in the notice of the denial of benefits:(1) The specific reason or reasons for the denial;
(2) Specific reference to pertinent plan provisions on which the denial is based;
(3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and,
(4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503-1(f).

In *Grossmuller,* the plaintiff began receiving retirement benefits from the defendants in July of 1973. *See id.* at 855. A condition of the plaintiff continuing to receive benefits was that he "could not engage in regular employment or in an occupation for remuneration or profit." *See id.* at 855. In 1977, an employee of the defendant obtained information from which he concluded that the plaintiff was employed. *See id.* The defendant hired a private investigator who filmed the plaintiff allegedly engaged in employment, and as a result, the defendant terminated the plaintiff's benefits on August 10, 1977. *See id.* On September 14, 1977, the defendant sent the plaintiff "instructions and a form with which to appeal the decision." *See id* at 856. The plaintiff returned the completed form to the defendant. *See id.* On October 12, 1977, the defendant affirmed the denial of benefits without allowing the plaintiff to appear before it, but informed the plaintiff he had a right to appeal that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 7

Not Reported in F.Supp.2d, 1999 WL 33320463 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

decision. *See id.* On December 20, 1977, the decision to deny the plaintiff's benefits was reviewed, and that denial was affirmed. *See id.* The district court held that the defendant did not afford the plaintiff a full and fair review of his denial of benefits and awarded the plaintiff reinstatement of his benefits. *See id.* at 859. The Third Circuit affirmed and held that the plaintiff was not given a full and fair review of his denial of benefits. *See id.* The Third Circuit found that the defendant neither informed the plaintiff of the information upon which it relied in making its decision to deny his benefits nor allowed him to examine or rebut this evidence. *See id* . at 858. The defendant also did not interview the defendant or explain a method upon which he could appeal the decision. *See id.* The court then remanded the case holding "the district court should enter an order prohibiting the plan from terminating [the plaintiff's] benefits until that court has approved the plan's claims procedure consistent with section 1133 and until [the plaintiff] has received full and fair review." *Id.* at 859.

**\*8** In the instant case, the plaintiff received a letter on August 1, 1997 informing him that defendant Provident was terminating his benefits. On January 26, 1999, defendant Provident sent a letter to the plaintiff under the auspices that it was sent to comply with the provisions of ERISA. I find that both letters do not comply with the provisions of ERISA. Neither the August 1, 1997 nor the January 26, 1999 letters provide the specific reasons for the denial of benefits. *See id.* Both letters provide that the decision to terminate the plaintiff was partially based on information in the defendants' file. The letters do not provide the information contained in the defendants' file upon which it relied. The letters provide the termination was based on "the inf ormation in the claim file," but the letters do not reveal that specific information. Therefore, the letters do not comport with section 1133 requiring the defendants to give the plaintiff the specific reasons for the denial of benefits. *See* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(f). In addition, the defendants' August 1, 1997 letter does not provide the plaintiff with the "[a]ppropriate information as to the steps to be taken if [he] wishes to submit his ... claim for review." *See id.* Moreover, the defendants' January 26, 1999 letter does not satisfy

the requirements of ERISA because it did not promptly notify the plaintiff of his rights. *See Grossmuller,* 715 F.2d at 858 (holding that in order to satisfy the requirements of section 1133, "[t]he fiduciary must notify the participant promptly").

The defendants argue that they did comply with ERISA after this court determined that the plaintiff's policy was an ERISA plan. I disagree. First, in their motions for summary judgment, defendants advanced the position that the plaintiff's disability policy was part of an ERISA plan. The defendants' belief that this was an ERISA plan required them to comply with the provisions of ERISA. Defendants cannot under these circumstances claim to be excused from complying with ERISA prior to this court's determination that the defendants' contention that it was an ERISA plan was correct. Second, as noted above, the January 26, 1999 letter still did not provide the specific reasons for termination pursuant to ERISA.

During the trial that was held in this matter, the defendants submitted evidence that the plan now provides for a full and fair review of an insured's denial of benefits. I am of the opinion that, but for the notification letter, the plan now provides for a full and fair review consistent with section 1133. *See id.* at 859. Therefore, unlike the court in *Grossmuller,* I am not required to enter an order prohibiting the defendants from terminating the plan until I have approved the plan's claims procedure because I find, but for the notification letter, the procedure is acceptable. *See id.*

Although I have ultimately decided that the plaintiff is not disabled under the plan and the plan now provides for a full and fair review, this decision does not cure the fact that the plaintiff was not given a full and fair review of his denial of benefits and the letters of August 1, 1997 and January 26, 1999 did not comply with the provisions of ERISA. In *Grossmuller,* the Third Circuit found that the lack of a written claims procedure and the deficiency in the plan's unwritten practices " deprived [the plaintiff] of the protections afforded by ERISA for his interests in the ...plan." *See id.* at 858. Here, there was also a lack of a written claims procedure and failure to provide a full and fair

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 8

Not Reported in F.Supp.2d, 1999 WL 33320463 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

review of the plaintiff's denial of benefits which denied the plaintiff the protections afforded by ERISA. *See id.*

**\*9** I find that the plaintiff was not given the full benefit of ERISA in that he was not given an opportunity for a full and fair review of his denial of benefits. Instead, the plaintiff was left to determine himself how to proceed without instruction from the defendants. The plaintiff's only recourse was to file this action. This is unacceptable under ERISA. " [F]ederal courts have consistently favored internal resolution procedures in order to promote orderly settlement of disputes, to assure uniform processing and treatment of claims, and to avert whenever possible the expense and delay incident to resort to the courts." *Id.* (citing *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554 (1976); *Vaca v. Sipes,* 386 U.S. 171 (1967); 29 U.S.C. § 173(d) (footnote) ). The defendants did not afford the plaintiff the rights to which he was entitled under ERISA because the defendants did not allow the plaintiff the opportunity to resolve this dispute internally under the plan. The Third Circuit has noted that ERISA gives a district court discretion "in forging equitable remedies." *See id.* at 859. Therefore, the plaintiff will be awarded benefits from the date of his termination until the date of this Memorandum and Order because I find the failure of the defendants to give the plaintiff a full and fair review of his denial of benefits prior to this trial was improper and in violation of the requisites of ERISA.

Accordingly, the plaintiff's motion for injunctive and monetary relief will be granted in part and denied in part. The plaintiff's motion for injunctive relief will be denied because as of the date of this Memorandum and Order the defendants are in compliance with ERISA. The motion will be granted as to the plaintiff's motion for monetary relief. The defendants will be ordered to pay the plaintiff benefits from the date of his termination to the date of this Memorandum and Order.

## IV CONCLUSION

For the foregoing reasons, I find the plaintiff is not

disabled under the terms of the policy, the plaintiff's motion for injunctive relief shall be denied, and the plaintiff's motion for monetary relief shall be granted to the extent that defendants shall pay benefits from the date of termination to the date of this Memorandum and Order.

The following are my Findings of Fact and Conclusions of Law:

## V FINDINGS OF FACT

1) The plaintiff, Dr. Stephen Laucks, is a medical doctor who practiced in the field of anesthesiology including anesthesiology in an operating room.
2) Dr. Laucks was a holder of an own occupation disability policy issued by the defendant, Provident Life and Accident Insurance Company.
3) The disability policy was part of an employee welfare benefit plan.
4) The policy language defines total disability as follows:
Total Disability or totally disabled means that due to Injuries or Sickness:
(1) you are not able to perform the substantial and material duties of your occupation; and
**\*10** (2) you are receiving care by a Physician which is appropriate for the condition causing the disability.
5) The policy provides: "You must present satisfactory proof of your loss."
6) Dr. Laucks's occupation for purposes of the policy is anesthesiologist.
7) On March 17, 1994, Dr. Laucks was observed stealing cocaine from a cart of anesthetic drugs in the operating room area of a day surgery unit in the York area.
8) On or about March 19, 1994, Dr. Laucks was admitted to the Talbot Marsh Recovery Campus where he remained until August, 1994.
9) The Talbot Marsh Recovery Campus is a substance rehabilitation center for members of the medical profession.
10) While at Talbot Marsh, Dr. Laucks underwent detoxification, evaluation and treatment for his addictions.
11) Dr. Laucks is addicted to alcohol, benzodiazepenes (valium and versed), cocaine, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 9

Not Reported in F.Supp.2d, 1999 WL 33320463 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

fentanyl.

12) He took alcohol by drinking it.

13) He took the benzodiazepenes and fentanyl orally by drinking them after mixing them with a diet soft drink, and the cocaine and fentanyl intranasally by squirting the mist from a syringe into his nostrils.

14) Dr. Laucks did not engage in intravenous use.

15) Intra-nasal use is not the equivalent of intravenous use.

16) On or about April 26, 1994, Dr. Laucks submitted a claim of total disability to the defendant.

17) On August 12, 1994 Dr. Laucks received his first disability benefit check for the period of June 17, 1994 to July 17, 1994.

18) He received monthly payments thereafter until August 1, 1997 when the defendant terminated Dr. Laucks' disability benefits.

19) Dr. Laucks has remained drug free and sober since March 1994.

20) Dr. Laucks has followed his treatment program since August 1994 without deviation.

21) Since August, 1994, Dr. Laucks has passed countless public places where alcohol was served and was attainable, yet he did not relapse and go in and imbibe.

22) Since August, 1994, Dr. Laucks has been at numerous parties where alcohol was served and readily available, yet he did not relapse and take a drink.

23) Since August, 1994, Dr. Laucks has not secured any of the drugs to which he is addicted by stealing or prescribing them.

24) He has continued to practice medicine in the fields of addictionology and pain management.

25) While at Talbot Marsh from March to April, 1994, Dr. Laucks was tested for and was found to have some cognitive impairment.

26) Subsequent to the cognitive skill testing at Talbot Marsh, no further testing for cognitive skills was performed.

27) There is no evidence that the cognitive deficit Dr. Laucks manifested in the tests performed at Talbot Marsh disabled or disqualified him from practicing anesthesiology in an operating room.

28) Any cognitive deficit Dr. Laucks had manifested at Talbot Marsh would diminish over time and the non-use of the addictive substances.

29) Dr. Laucks does not suffer from a cognitive impairment that would disable or disqualify him from practicing anesthesiology in an operating room.

**\*11** 30) Dr. Laucks does not suffer from an impairment of his motor skills that would disable or disqualify him from practicing anesthesiology in an operating room.

31) The treatment which Dr. Laucks undergoes consists in part of continued encouragement and support to exercise his will to refrain from the substances to which he is addicted.

32) Dr. Laucks continues to control any urge he has for any addictive substance and he has been substance free since March, 1994.

33) Defendants' letters of August 1, 1997 and January 26, 1999 to plaintiff did not provide the plaintiff with the specific reasons for the denial of his benefits.

34) Defendants' letter of August 1, 1997 to plaintiff does not provide plaintiff with the steps to be taken to achieve a review of his claim.

35) Defendants' letter of January 26, 1999 to plaintiff does not promptly notify the plaintiff if his rights under ERISA.

## VI CONCLUSIONS OF LAW

1. This court has jurisdiction under 28 U.S.C. § 1331.

2. This is an action brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1425, seeking to reinstate the plaintiff's benefits which were terminated by the defendant on August 1, 1997.

3. The plan's provision "You must present satisfactory proof of your loss," grants the plan administrator discretion to determine eligibility for benefits. *See Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 983 (6th Cir.1991) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 112 (1989)).

4. Because the language of the policy gives the administrator discretion, an arbitrary and capricious standard will be applied. *See id.*

5. A heightened arbitrary and capricious standard will be applied because there is a conflict of interest since the defendants both issued the policy and administer claims made thereunder. *See Morris v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 10

Not Reported in F.Supp.2d, 1999 WL 33320463 (M.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

*Paul Revere Ins. Co.,* 986 F.Supp. 872, 881 (D.N.J.1997) (quoting *Brown v. Blue Cross & Blue Shield,* 898 F.2d 1556, 1568 (11th Cir.1990), *cert. denied,* 498 U.S. 1040 (1991)); *see also Rizzo v. Paul Revere Ins., Group,* 925 F.Supp. 302, 309 (D. N . J.1996), *aff'd,* 111 F.3d 127 (3d Cir.1997).

6. This heightened standard of review necessitates a *de novo* review of the termination of benefits. *See id.*

7. As a result of the *de novo* review, I find the plaintiff is not disabled under the terms of the disability policy.

8. I also find the plaintiff is able to perform the substantial and material duties of an anesthesiologist in an operating room.

9. Judgment will be entered in favor of the defendants and against the plaintiff on the claim for relief in the complaint.

10. Defendants' letters to plaintiff of August 1, 1997 and January 26, 1999 do not satisfy ERISA because they do not advise the plaintiff of the specific reasons for the denial of his benefits. 29 U.S.C. § 1133, 29 C.F.R. § 2560.503-1(f).

11. Defendants' letter to plaintiff of August 1, 1997 does not satisfy ERISA because it fails to provide plaintiff with the appropriate information as to the steps to be taken for him to submit his claim for review. 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(f).

*12 12. Defendants' letter to plaintiff of January 26, 1999 does not satisfy ERISA because it does not promptly notify plaintiff of his rights. *Grossmuller v. International Union,* 715 F.2d 853, 858 (3d Cir.1983).

13. The plan now provides for a full and fair review which is consistent with 29 U.S.C. § 1133.

14. Plaintiff was not given an opportunity for a full and fair review of the denial of his benefits at the time his benefits were terminated in August, 1997.

15. Plaintiff's motion for injunctive relief will be denied because as of the date hereof, the defendants are in compliance with ERISA.

16. The plaintiff's motion for monetary relief will be granted, and defendants will be ordered to pay plaintiff benefits from the date of the termination of benefits to the date of this Memorandum and Order.

An appropriate order will follow.

ORDER

NOW, this 28 day of October, 1999, it is hereby ORDERED that:

1) Judgment is entered in favor of the defendants, and against the plaintiff;

2) The plaintiff's Motion for Injunctive and Monetary Relief is granted in part and denied in part as follows:

(A) The motion for injunctive relief is denied.

(B) The motion for monetary relief is granted.

3) The defendants shall pay the plaintiff benefits from the date of his termination to the date of this Memorandum and Order; and

4) The Clerk of the Court is directed to close this case.

M.D.Pa.,1999.
Laucks v. Provident Companies
Not Reported in F.Supp.2d, 1999 WL 33320463 (M.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.