IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

DANIELA VALENOTE,

               Plaintiff,

vs.

METROPOLITAN LIFE INSURANCE
COMPANY, and RIM ARCHITECTS
(ALASKA), INC.,

               Defendants.

Case No. 3:05-cv-196   TMB


O R D E R

## I.  MOTIONS PRESENTED

Pending before this Court is Plaintiff's Motion for Summary Judgment, Defendants' Cross-Motion for Summary Judgment, and Defendants' Motion to Strike Evidence Beyond the Administrative Record.[1]  The matters have been fully briefed, and oral argument was held on February 8, 2008.  The Court being fully advised, now enters the following order.

## II.  BACKGROUND

Plaintiff is an architect who was employed by RIM Architects, Inc., ("RIM") from February 2000 until May 2003.  She alleges she became unable to work due to a disability that resulted from an injury incurred in October 2002.  She stopped working on December 18, 2002, due to pain, but attempted to return to work in January 2003.  Due to chronic pain, Valenote ceased working on February 21, 2003, and subsequently resigned her position at RIM on May 1, 2003.  Valenote states that she has been under the continuous care of a doctor since November 5, 2002, for chronic pain, and that she has not worked for RIM or any other employer since February 21, 2003.

Valenote learned after her resignation that as an employee of RIM, she was covered under RIM's employee welfare benefit plan, (the "Plan"), which provides long term disability benefits

---

[1]Docket Nos. 37, 51, and 53.

("LTD") offered and administered by MetLife.  The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA").[2]   The Plan provides for monthly disability payments for a disabled employee under age 60 until the employee reaches age 65.[3]  The LTD policy defines "Disabled" or "Disability" as follows:

> "Disabled or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis and
>
> 1.    During your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability earnings at your Own Occupation for any employer in your Local Economy; or
> 2.    After the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.[4]

The policy defines the "Elimination Period" as the 90 day period beginning "the day you become disabled."[5]  To satisfy the 90-day elimination period, Plaintiff would have had to remain disabled from her last day of work, February 21, 2003, through May 22, 2003.[6]  During the elimination period, no benefits are payable and the employee must be under the continuous care of a doctor.[7]  The Plan provides for a medical records release "for us to obtain and release medical and financial information and any other items we may reasonably require in support of your disability."[8]

---

[2] 29 U.S.C. § 1001 *et seq.*

[3] MR 13.  The reference "MR ____" refers to MetLife's administrative record. References to "V___" refer to Valenote's additional records.  See Docket  37.

[4] MR 17.

[5] MR 12; MR 16.

[6] MR 162B.

[7] MR 16.

[8] MR 29.

2

Elsewhere, the Plan requires the claimant, at his or her expense, to provide a number of documents.[9] The Plan permitted MetLife to examine Valenote by a medical specialist at MetLife's request.[10]

When Valenote sought coverage under the policy, MetLife denied her claim three times. On August 29, 2003, MetLife denied Valenote's claim, relying on the assumption that Valenote had not met the 90 day elimination period. A statement from her treating physician, Dr. Beard, referenced that a work release was provided to Valenote that allowed her to return to work on May 1, 2003.[11] On September 17, 2003, MetLife's records reflect that the August 29th denial (based on failure to meet the 90 day elimination period) was "null," and that the claim should be evaluated on the "basis of the definition of disability."[12] Valenote provided medical releases allowing MetLife to undertake its re-investigation of her claim.[13]

A physician consultant for MetLife, Dr. Gary P. Greenhood, reviewed Valenote's file on November 20, 2003.[14] The report concluded that there were "abnormal findings" which "may

---

[9]"In order to receive benefits under This Plan, you must provide to us at your expense, and subject to our satisfaction, all of the following documents. These are explained in this Certificate. Initial submission of these documents should be made no later than the 12th week following your original date of disability.
- ✓ Proof of Disability.
- ✓ Evidence of continuing Disability.
- ✓ Proof that you are under the Appropriate Care and Treatment of a Doctor throughout your Disability.
- ✓ Information about Other Income Benefits.
- ✓ Any other material information related to your Disability which may be requested by us." MR 14.

[10]MR 31.

[11]Valenote and her former employer have since provided evidence that she was not released to work on May 1, 2003, and at oral argument characterized the statement in Dr. Beard's chart notes as an error by a nurse. MR 232, 237.

[12]Docket 51, Ex. A at 3.

[13]MR 70, 111, 126.

[14]MR 244-246.

3

explain some of the patient's pain," and that the plan-of-treatment "implies that the patient's pain is severe."[15]  Nevertheless, on November 26, 2003, MetLife denied Valenote's claim for a second time,  concluding that "[t]he objective medical evidence we have reviewed is incongruent with a long-term disability."[16]  Despite its findings in the case notes on September 17, 2003, MetLife again found that Valenote had been released to and *in fact returned to* work as of May 1, 2003, and that she was "allegedly working 10 hours a week in June of 2003."  MetLife did not make any reference to Dr. Greenhood's November 20th report, or the documentation from Valenote and RIM that she had not worked since February 21, 2003.  Valenote alleges that despite the releases provided, neither MetLife nor its medical consultant ever actually spoke with her treating physicians,  Dr. Anderson or Dr. Lorentzen, before it's November 26, 2003, denial letter.

Valenote sought additional review by letter of May 4, 2004, with 21 pages of supporting documents.[17]  In her letter, Valenote listed, in detail, every doctor and other provider she had seen since November 2002.[18]  She noted: "Attempts were made to contact only three out of nine Doctors I have seen since Nov. 2002.  I ask that you please consider contacting at least the Doctors I saw during my Elimination period."[19]  Although MetLife indicates that Plaintiff did not submit additional medical records in her request for further review, the Court notes that among Valenote's attachments to her letter are physical therapy records, as well as an operative report from the Alaska Surgery Center and a letter from her chiropractor.[20]  In any event, MetLife states that it reviewed the

---

[15]MR 244.

[16]MR 248-49.

[17]MR 261.

[18]MR 261-63.

[19]MR 265.

[20]MR 266-282.

4

materials submitted and obtained the opinion of a second independent physician consultant Dennis S. Gordan, M.D.

Based in large part on Dr. Gordon's opinion, MetLife denied Valenote's claim for a third time on June 22, 2004.[21]  Dr. Gordan concluded after reviewing Valenote's medical history that the records contained "no reference to any atrophy, and atrophy would be expected in any patient who had one and one-half years of severely curtailed physical activity, regardless of the reason. Without atrophy, I can't imagine that function is physiologically significantly impaired."[22]  The denial also cited a lack of formal follow-up following the intradiscal electrothermal therapy ("IDET') which she underwent at the Advanced Pain Centers of Alaska.[23]

The third denial indicated that no further appeal would be considered.  This lawsuit followed, under ERISA's civil remedy provision.

MetLife argues that the final denial was reasonably determined after consulting one nurse manager and two independent board certified medical doctors, and concluding that Valenote was not disabled under the terms of the Plan. MetLife determined that: (a) Valenote and her attending physicians could provide no objective evidence that she was disabled from performing her own occupation, and (b) Valenote was not continuously disabled throughout the Plan's 90-day elimination period.  Specifically, MetLife found that there was no medical documentation to support an inability to work after May 12, 2003.

Valenote alleges that MetLife provided inconsistent reasons for denial, failed to adequately investigate the claim or request relevant evidence, "cherry picked" information and suppressed other information, and failed to credit Valenote's reliable evidence.  Valenote moves for summary

---

[21]MR 321-23.

[22]MR 319.

[23]Valenote alleges that extensive follow-up records from Dr. Anderson and Dr. Lorentzen following the IDET were missing from the second paid consultant's files.  For example, on March 5, 2004, Dr. Lorentzen's notes indicated that Plaintiff's "injuries have been debilitating and at no time since she initiated care with my office has she been able to return to work."  MR 255.

judgment against MetLife and RIM, arguing that MetLife's decision was clearly contrary to the evidence and to Defendants' statutory obligations as an ERISA fiduciary.[24] She seeks a declaration that she is eligible for benefits under the plan, for back benefits from the date of her disability to the date of judgment, for interest, costs and attorney fees.

Defendants have filed a cross-motion for Summary Judgment, seeking dismissal of Valenote's claims in their entirety.[25] Defendants also seek to strike evidence filed in support of Plaintiff's Motion for Summary Judgment, arguing that the evidence is inappropriately filed beyond the administrative record.[26]

### III.  STANDARD OF REVIEW

Denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard <u>unless</u> the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.[27] In that case, the court reviews the administrator's decision for "abuse of discretion."[28]

The "abuse of discretion" standard of review is a deferential standard. An ERISA claim administrator's determination must be upheld unless the court finds that the claim administrator abused its discretion by: (1) rendering decisions without any explanation; (2) construing provisions of the plan in a way that conflicts with the plain language of the plan; or (3) relying on clearly

---

[24] Docket 37.

[25] Docket 51.

[26] Docket 53.

[27] *Bendixen v. Standard Ins. Co.*, 185. F.3d 939, 942 (9th Cir. 1999) (citations omitted).

[28] "Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Id.*

erroneous findings of fact in making benefit determinations.[29]  The Ninth Circuit will "uphold the decision of an ERISA plan administrator 'if it is based upon a reasonable interpretation of the plan's terms and was made in good faith.'"[30]  Where there is relevant evidence in the administrative record "that reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence," the decision must be upheld. [31]

Here, the parties do not dispute that the plan grants discretion to the administrator. However, Plaintiff alleges that the plan administrator has a conflict of interest, as the insurer acted as both the plan administrator and the funding source for benefits.  The Ninth Circuit has held that "an insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest."[32]  Plaintiff alleges that MetLife has this structural conflict of interest.

In *Abatie v. Alta Health & Life Ins. Co*, the Ninth Circuit explained that "the existence of a conflict of interest is relevant to how a court conducts abuse of discretion review. In discussing abuse of discretion review, the Supreme Court cautioned that, 'if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion.'"[33]  Furthermore, the Court "require[s] abuse of discretion review whenever an ERISA plan grants discretion to the plan

---

[29] *See Bendixen*, 185 F.3d at 944.

[30] *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005) (quoting *Estate of Shockley v. Alyeska Pipeline Serv. Co.,* 130 F.3d 403, 405 (9th Cir. 1997)).

[31] *Taft v. Equitable Life Assure. Soc.,* 9 F.3d 1469, 1473 (9th Cir. 1993) ("In the ERISA context, even decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion."); *Gilbrook v. City of Westminster,* 177 F.3d 839, 856 (9th Cir. 1999).

[32] *Abatie v. Alta Health & Life Ins. Co*, 458 F.3d 955, 965 (9th Cir. 2006)

[33] *Abatie*, 458 F.3d at 965 (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)(internal citation omitted)).

administrator, but a review informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record. This standard applies to the kind of inherent conflict that exists when a plan administrator both administers the plan and funds it, as well as to other forms of conflict."[34] However, consideration of structural conflict is not a one-size-fits-all approach:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial . . . ; fails adequately to investigate a claim or ask the plaintiff for necessary evidence . . . ; fails to credit a claimant's reliable evidence . . . ; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.[35]

In crafting this "straightforward abuse of discretion analysis," the Ninth Circuit specifically rejected a "sliding scale" analysis used by other circuits.[36]

However, there are situations in which procedural irregularities are so substantial as to alter the standard of review. "When an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well, we review *de novo* the administrator's decision to deny benefits. We do so because, under *Firestone,* a plan administrator's decision is entitled to deference only when the administrator exercises discretion that the plan grants as a matter of contract."[37]  Decisions taken in wholesale violation of ERISA procedures do not fall within an administrator's discretionary authority.[38]  Where

---

[34] *Id.* at 967.

[35] *Id.* at 968-69 (internal citations omitted).

[36] *Id.* at 967-68.

[37] *Id*. at 971.

[38] *Id.* at 971-72.

an administrator fails to exercise discretion, a claim for benefits is reviewed *de novo.*[39]     In contrast, "a procedural irregularity in processing an ERISA claim does not usually justify *de novo* review."[40]  A procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion.[41]

The Court finds numerous procedural irregularities in this case.  For the reasons discussed below, there is evidence in the record of inconsistent reasons for denial, failure to investigate the claim and obtain necessary evidence, failure to credit reliable evidence, and repeated denials of benefits due to decisions made against the weight of evidence in the record.  The *Abatie* court found all of these factors relevant to the level of skepticism with which the court should view a conflicted administrator's decision.[42]  Accordingly, the application of the abuse of discretion standard, taking into consideration the structural conflict of interest and numerous procedural irregularities, is the appropriate standard of review under *Abatie.*

## IV.  DISCUSSION

### Consideration of Additional Evidence

Defendants have moved to strike any evidence submitted that is beyond the administrative record.[43]   When a plan participant sues a plan administrator, challenging its decision to deny benefits, many circuits limit a district court to the administrative record when the court is reviewing a case for an abuse of discretion; consideration of new evidence is permitted only in conjunction

---

[39] *Id.* at 972.

[40] *Id.*

[41] *Id.* at 972.

[42] *Id.* at 968-69.

[43] Docket 53, indicating that such evidence is contained at Docket Nos. 38, 39, 40, 42, 43 & 44.

with *de novo* review of a denial of benefits.[44]     However, evidence outside of the administrative record may be considered in other select circumstances, such as 1) when a court must decide how much weight to give a conflict of interest under the abuse of discretion standard;[45] 2) when a plan administrator has failed to follow a procedural requirement of ERISA;[46] 3) when an administrator has engaged in a procedural irregularity that has affected the administrative review,[47] or 4) when procedural irregularities have prevented full development of the administrative record, allowing the court to "recreate what the administrative record would have been had the procedure been correct."[48]

Plaintiff argues that MetLife's process prevented full development of the record, and that under *Abatie* additional evidence should be permitted to properly recreate the administrative record. MetLife complains that the documents Plaintiff wishes to add to the record are not contemporaneous with the relevant dates. Specifically, MetLife argues that Plaintiff's submission of documentation from later in 2003 and 2004 is irrelevant to determine whether she was disabled in May 2003 and shortly thereafter.

The Court disagrees with MetLife. As will be discussed herein, the record reflects that MetLife failed to consider the contemporaneous evidence, and failed to obtain records from Plaintiff's treating physicians during its three attempts to resolve Plaintiff's claim. The Court agrees with Plaintiff that she should be permitted to supplement the record to properly recreate the administrative record as it would have appeared, had MetLife obtained the relevant documents. Furthermore, the fact that Plaintiff has submitted records that post-date the 90-day elimination

---

[44] *Abatie*, 458 F.3d at 969.

[45] *Id.* However, the decision on the merits "must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Id.* at 970.

[46] *Id.* at 972-73.

[47] *Id.* at 973 (citing *VanderKlok v. Provident Life & Accident Ins. Co.*, 956 F.2d 610, 617 (6th Cir.1992)).

[48] *Id.*

period indicates that her treatment for her pain was ongoing, and that she continued to be unable to work following the elimination period. The Court concludes that the best solution is to allow Plaintiff to supplement the administrative record with any additional evidence up to and including May 2005. This resolution gives Valenote the opportunity to show whether she remained disabled through the initial 24 month period contemplated by the terms of the Plan, while respecting MetLife's concern that the administrative record not be bogged down with documents which were not relevant to her claim.

**Objective Evidence**

MetLife argues Valenote did not meet her burden of proof because she did not submit objective evidence of the impact of her medial conditions on her ability to work, as required by the language of the Plan. In response, Plaintiff complains that MetLife improperly injected into the claim process a requirement of "objective evidence." In *Sin v. MetLife*, the district court found that "insufficient information" was an improper ground for denial of disability payments because it introduced a requirement of objective evidence when the plan included no such requirement.[49] *Sin* also noted that the plaintiff's condition did not typically yield objective evidence. Plaintiff argues that her chronic pain is similarly not easily identified by objective evidence, and it is unfair of MetLife to require such objective evidence in order to find her disabled. MetLife argues that a claim administrator's decision to deny a claim where a participant failed to provide proof of objective evidence of disability— regardless of whether a plan explicitly requires proof of objective evidence—will be enforced.[50]

In *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, the claimant was diagnosed with fibromyalgia. The administrator in that case acknowledged that Jordan had been diagnosed as having fibromyalgia, and did not dispute the diagnosis or demand objective evidence that she had it.

---

[49]2006 WL 3716750 (D.Or.Dec. 13, 2006).

[50] *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 876-77 (9th Cir. 2003).

"Rather, the administrator asked for evidence that the fibromyalgia she suffered from disabled her

from working at her job."[51]  The Ninth Circuit observed:

> MetLife's letter to her doctors acknowledged their diagnosis of fibromyalgia, and
> asked "based on her diagnosis ... what prevented your patient from performing her
> occupation" and also asked "what objective findings prevented her from performing
> sedentary work." If Jordan's physicians believed that the effects of her fibromyalgia
> disabled her from performing her occupation, those medical experts could have
> responded to the administrator's request for further information with at least some
> answer explaining why the illness prevented Jordan from performing her work as a
> secretary.[52]

Here, MetLife did not make such a request to Plaintiff's physicians.  Rather, the Plan administrator

simply, and repeatedly, denied Plaintiff's claim for lack of "objective evidence."

> [The failure to communicate] is an all-too-common occurrence when
> ERISA-covered health benefit plans deny claims. While a health plan administrator
> may-indeed must-deny benefits that are not covered by the plan, it must couch its
> rulings in terms that are responsive and intelligible to the ordinary reader. See 29
> C.F.R. § 2560.503-1(f). If the plan is unable to make a rational decision on the basis
> of the materials submitted by the claimant, it must explain what else it needs.[53]

Although MetLife is able to point to various scans and examinations that were "unremarkable,"[54]

the record contains extensive evidence that Plaintiff suffers from chronic pain.  The absence of

medical evidence from one scan does not invalidate the findings of a disabling condition elsewhere

in the record.  Furthermore, the statement that Valenote's own health care providers were not

supportive of her claim is not accurate.  As discussed herein, her healthcare providers repeatedly

noted in their files that Plaintiff was unable to work due to her constant pain.

**Failure to Adequately Investigate Claim**

Under ERISA, the burden is on the claimant to demonstrate she is entitled to benefits

---

[51]*Id.* at 877.

[52]*Id.*

[53]*Booten v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997) (internal citation omitted).

[54]Docket 51 at 13.

under the plan, not on the administrator to demonstrate that the claimant is not disabled.  Plaintiff does not dispute this.  However, she complains that MetLife failed to adequately investigate the claim or ask Plaintiff for necessary evidence.  In support of this, she relies on *Abatie*[55] and *Sin*.[56]

In seeking Summary Judgment, Plaintiff's motion contains an extensive, detailed listing of the medical records that MetLife possessed when it considered her claim, and details how she believes MetLife's findings are inapposite to the contents of those records.[57]  Plaintiff further discusses the records that are missing from the administrative record, despite her repeatedly informing MetLife of her care providers.  Specifically, Plaintiff notes that the November 26, 2003, denial lists the documents considered in denying the claim the second time, and that list does not include any reference to numerous important documents received after the August 29th denial, including medical records, her job description, and the first consultant's report.[58]  Such omission is critical, she argues, "because the failure to consider evidence that is offered after an initial denial of benefits renders a final denial of benefits arbitrary and capricious."[59]  Plaintiff notes that MetLife obtained releases from her, yet failed to obtain various relevant records, including follow-up medical records after her December 3, 2003, operation.  Plaintiff argues that MetLife's failure to investigate and obtain records or information from any of these care providers constitutes a procedural irregularity.

In response, MetLife states that it sent letters to Valenote inviting her to submit additional evidence to support her claim, and that she was also told this during her conversations with her case

---

[55] 458 F.3d at 968.

[56] 206 WL 3716750 at 4.

[57] See Docket 37.

[58] MR 248-250.

[59] *Glenn v. MetLife*, 461 F.3d 660, 672 (6th Cir. 2006).

manager. MetLife's August and November 2003 letters articulated Valenote's failure to provide medical documentation as a basis for the decision.[60]

The question, therefore, is whether MetLife or Valenote had the ultimate responsibility to obtain relevant medical records. This question is addressed in *Sin,* where the District of Oregon noted that "ERISA itself does not require administrators to seek out evidence. However, the statute is not the sole source prescribing the duties of the administrator. The terms of the Plan further explain how the process works."[61]

The language in the Plan in *Sin* was virtually identical to the language in the Plan in this case. Although the Plan requires the claimant "to provide documented proof" of the disability, the Plan language also requires the claimant to sign a medical release for "any other items we may reasonably require."[62] The *Sin* court found that the language of the Plan was contradictory, making it the claimant's burden to provide documentation, but elsewhere requiring authorization "for us to obtain" medical information. In light of the conflicting statements in the Plan, the *Sin* court found it was procedural error for MetLife to fail to obtain additional medical records in that case.[63]

This Court agrees with the rationale in *Sin*. Plaintiff implored MetLife to contact her treating physicians, and specifically listed every physician who had treated her.[64] MetLife possessed medical releases that allowed it to do so. Ironically, the third denial asserted the lack of follow-up as a reason for the denial, even though medical records regarding follow-up treatment existed. The failure to obtain these records was a procedural error on the part of MetLife. That error was then

---

[60] See MR 0162C (no medical documentation to support your inability to work); MR 0249 (objective medical evidence presented is incongruent with longterm disability); MR 0321-23 (lack of medical information).

[61] *Sin,* 2006 WL 3716750 at *4.

[62] MR 29.

[63] *Sin*, 2006 WL 3716750 at *5.

[64] MR 265.

compounded when MetLife failed to provide relevant records to its independent medical consultants.

**Independent Medical Consultants**

At oral argument, the Court asked counsel for MetLife why an independent medical examination ("IME") was not sought in this case. Defendant responded that because Valenote's own physicians and health care providers were not supportive of her claim, MetLife did not even consider this case a "close call," and therefore an IME was not deemed necessary.  MetLife did, however, engage two separate independent medical consultants to conduct file reviews of Valenote's claim.

The first medical consultant, Dr. Greenwood,  reviewed Plaintiff's file and determined that "positive diskogram at L5-S1 may explain some of the patient's pain," and that "such intensity-of-service [to include steroid injections, acupuncture and multiple oral medications] implies that the patient's pain is severe."[65]  Dr. Greenwood also suggested that Plaintiff's treating doctors had not indicated that her pain was sufficiently severe to preclude work.  However, none of Dr. Greenwood's comments - favorable or unfavorable - were referenced in MetLife's denials.

The second medical consultant, Dr. Gordan, concluded that the records supported at least an ongoing slight functional impairment on the basis of pain, limiting Plaintiff to sedentary and perhaps light work.  However, Dr. Gordan also noted that important records may have been missing from his file review, mentioning that "there are references to the importance of Dr. Schlosstein's evaluation, but I did not see it."[66]  Dr. Gordan also noted that "there seems to be no formal followup re: the effect of the IDET," but agreed that Plaintiff would be "limited by her pain tolerance."[67]  As the Court has discussed previously, follow-up records after the IDET procedure were not obtained

---

[65] MR 244.

[66] MR 318.

[67] MR 318-319.

by MetLife, which subsequently denied the claim on the basis of a failure to follow-up after the procedure.

Although MetLife cannot be compelled to order an independent medical exam, neither can it be permitted to omit relevant records from an independent medical consultant's file review. Indeed, MetLife completely ignored the first consultant's opinion, selectively quoted the second consultant's report, and in both cases, failed to provide the consultants with all of the relevant records. Accordingly, MetLife failed to adequately investigate Plaintiff's claim, and failed to credit reliable evidence.

**Elimination Period**

MetLife argues Valenote did not meet her burden of proof as she failed to establish disability throughout the 90-day elimination period. MetLife's first two denials concluded that Plaintiff worked, or was not medically precluded from working, during the elimination period (2/21/03-5/22/03). MetLife has inexplicably clung to this argument throughout the briefing, despite exhibits to the contrary. The Court finds that Plaintiff did not return to work, and remained under the care of multiple physicians, during the 90-day period, and therefore satisfied the elimination period.[68]

**Inconsistent Reasons for Denial**

ERISA requires that every employee benefit plan shall:

> **(1)** provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> **(2)** afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.[69]

---

[68] See MR 232, 237.

[69] 29 U.S.C. § 1133.

The first denial found that Plaintiff had not met the 90-day elimination period, and that no medical documentation supported an inability to work after 5/12/03.[70]  Although Plaintiff provided documentation showing she had not, in fact, returned to work, the second denial again found that she had not met the elimination period, and that the medical evidence was "incongruent with a long-term disability."[71]  The third denial concluded that Plaintiff was not in fact disabled, but did not allow for an appeal from that decision.[72]

Plaintiff complains that although the first two denials both concluded that Plaintiff had returned to work during the elimination period, the third denial concluded for the first time that Plaintiff was generally not disabled at all.  Despite the new finding that Plaintiff was not disabled, the third denial letter indicated that Plaintiff had "exhausted administrative remedies under the plan, and no further appeals will be considered."  Essentially, MetLife's denials represented a moving target.  While Plaintiff put forth effort to dispute their findings that she had not satisfied the elimination period, subsequent denials ignored the new information and medical records, finding different reasons to deny the claim, and ultimately denied the claim on the merits without an opportunity to appeal.

**Nature and Duration of Plaintiff's Disability**

The Court has reviewed Plaintiff's medical records through May 2005.  Her chronic pain is discussed throughout the records, with no indication that she was malingering.  A brief overview reveals the following:

**June 2003** - Dr. Beard's records indicate that in that Plaintiff had been unable to work since 2/21/03, and that she could sit only 15 minutes before experiencing pain.  MR 90.  July notes indicate extensive pain in the hip, leg, foot and hands, and indicates a history of "chronic back pain."  MR 106.

---

[70] MR 162B.

[71] MR 249.  Plaintiff suggests that repeating the same false statements in the second denial that Plaintiff contradicted after the first denial constitutes "bad faith in the extreme."

[72] MR 322.

17

**July 7, 2003** - Dr. Downs opined that Valenote suffered from "chronic pain" and that Valenote "feels very frustrated that she is now unable to work at her chosen profession due to her pain." MR 112, 113. Valenote was referred to a pain clinic in July 2003. MR 112. Dr. Downs suggested the possibility of screening for Multiple Sclerosis. MR 114. In a consult with the Advance Pain Centers of Alaska that same month, Plaintiff described her pain as 6 out of 10 on average, with the worst pain at 9 out of 10, and best at 4 out of 10. MR 183.

**July and September 2003** - Physical therapy records indicate that Valenote could only sit for 30 minutes and walk for 15-25 minutes without experiencing severe pain MR 188.

**September 2003** - Claimant's pain had improved from continuous to intermittent, but still was described as "stabbing and shooting" as well as "burning." MR 181.

**October 2003** - Plaintiff's care was transferred from Dr. Beard to the Advanced Pain Center of Alaska (Dr. Anderson). MR 220. The Pain Clinic's records indicate numerous medications had been tried to ease Plaintiff's pain. MR 183-185. Dr. Anderson's notes indicate a "posterior tear extreme increase in pain that is concordant with patient's complaint." MR 228. Dr. Anderson concluded that "patient is not medically stable." MR 229. She was still unable to walk on uneven surfaces or sit for long periods of time. Dr. Downs noted that she had chronic pain with mild improvement in symptoms and continued therapy with the pain clinic. V970.

**December 2003** - Plaintiff underwent a surgical procedure to attempt to alleviate the pain.

**March 5, 2004** - Peter Lorentzen, Plaintiff's chiropractor, indicated that she had not worked since becoming his patient on May 11, 2003. He said her "injuries have been debilitating and at no time since she initiated care with my office has she been able to return to work." MR 281.

**October 26, 2004** - Advanced Pain Center records indicate Plaintiff has had no relief from her back pain, following a right stellate ganglion block. V358.

**December 2004** - her pain continued. Her assessment indicated myofascial pain, cervical facet arthropathy, degenerative disk disease of the cervical and lumbar spine, and right hip osteoarthritis. V 366. Shortly thereafter, Valenote developed worsening headaches and neck pain. V 372.

**January 2005** - Steroid injections for pain relief. V 379. The pain continued. V 392.

**February 2005** - Significant pain continued, although she reported a slight improvement. V 408.

**March 2005** - The chronic pain continued. A functional capacity evaluation showed limited function and very light duty. Plaintiff was referred to massage therapy. V 418.

**April 2005** - Plaintiff continued to report significant pain in the head, back and neck. Plaintiff underwent a procedure to administer a cervical epidural steroid, "RACS epidural lysis of adhesion," despite the fact that her insurance declared it "investigative and experimental." V 427, 431-432.

**May 2005** - Pain continued, though the April procedure appeared to provide some relief. V 445.

It is apparent from the foregoing records that Plaintiff suffered from a condition that caused her a considerable amount of pain. Her treatment with multiple providers was ongoing, with no suggestion in any of the medical records that she was malingering. The repeated denials by MetLife due to lack of objective medical evidence, or failure to provide evidence, were without support in the record. Had MetLife credited Plaintiff's reliable evidence, and obtained the medical records that were readily available, the Court concludes that MetLife should have reached the conclusion that Valenote was disabled beginning at the end of her 90 day elimination period for a period of at least 24 months. To conclude otherwise was arbitrary and capricious.

**Nature of Remand**

MetLife argues that if this Court concludes that MetLife's determination was arbitrary and capricious, the proper remedy would be remand to the claim administrator, not retroactive reinstatement of benefits. In this case, MetLife argues remand would be necessary to determine whether Valenote qualifies for benefits under the "any occupation" standard of disability which she must satisfy after 24 months of benefits have been paid.[73] To date, her claim has never been evaluated on that standard. Similarly, the Plan limits benefits to a maximum of 24 months for disabilities due to "neuromusculoskeletal and soft tissue disorders" as defined in the Plan. Evaluation of whether Valenote's disability is due to a condition subject to a limited benefit duration must also be undertaken by MetLife. Moreover, remand would also be necessary if the Court determines that MetLife should have considered the documents Valenote has attempted to submit in support of her claim for the first time during this litigation.

[73]MR 17-18.

19

_____In response, Valenote notes that the court has the discretion under ERISA "in forging equitable remedies."[74]  Valenote further argues that judgment awarding benefits is a proper remedy, even under the abuse of discretion standard of review.[75]  Plaintiff states that "the formulation of the remedy will need to be the subject of further briefing and proceedings."[76]

The Court finds that both parties are only partly correct.

The Plan requires that a claimant receive appropriate care and treatment from a doctor on a continuing basis and:

1.    During your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability earnings at your **Own Occupation** for any employer in your Local Economy; or

2.    After the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at **any gainful occupation** for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.[77]

The "any occupation" standard would not have applied until 24 months after the expiration of the elimination period.  Although her claim never has been evaluated under that standard, this Court is not precluded from finding that disability benefits should have been awarded at the end of Valenote's elimination period in May 2003.  Presumably the Plan allows for follow-up investigation of a claimant's condition once the initial 24 month period has expired.   MetLife is not precluded from conducting any follow-up investigation that would have been performed in the normal course of the Plan following the expiration of the first 24 months.  The Court finds that no further briefing is required in order to formulate a remedy.

---

[74]*Grossmuller v. International Union*, 715 F.2d 853, 859 (3rd Cir. 1983).

[75]See *Canseco v. Const. Laborers Pension Trust*, 93 F.3d 600, 609 (9th Cir. 1996).

[76]Docket 64-2 at 19.

[77]MR 17.

20

## V. CONCLUSION

An ERISA claim administrator's determination must be upheld unless the court finds that the claim administrator abused its discretion. In this case, for the reasons discussed herein, the Court concludes that the claim administrator has abused its discretion. The Court does not find that "reasonable minds might accept as adequate" the conclusion drawn by the administrator in this case.[78] Based on the record before this Court, as supplemented by the Plaintiff, it is apparent that Plaintiff was under the care of numerous physicians for a condition that manifested chronic pain for an extended period of time, making her eligible for long term disability under the Plan.

In light of the foregoing, Defendant's Motion to Strike Additional Evidence at **Docket 53** is GRANTED IN PART AND DENIED IN PART. Plaintiff is permitted to supplement the administrative record with documents through May 2005.

Plaintiff's Motion for Summary judgment at **Docket 37** is GRANTED IN PART. Defendants' Cross-Motion for Summary Judgment at **Docket 51** is DENIED. Plaintiff is entitled to payment under the Plan from May 2003 through May 2005. Subsequent eligibility under the Plan is subject to further administrative proceedings.

Dated at Anchorage, Alaska, this 26th day of March, 2008.

/s/ Timothy Burgess
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

[78] *Gilbrook v. City of Westminster,* 177 F.3d 839, 856 (9th Cir. 1999).

21