LAW OFFICES OF
# SEAVER & WAGNER, LLC

TIMOTHY W. SEAVER
JENNIFER A. WAGNER

OF COUNSEL TO
MIDDLETON & TIMME, P.C.

421 WEST 1ST AVENUE, SUITE 250
ANCHORAGE, ALASKA 99501
(907) 646-9033
FAX (907) 276-8238

December 29, 2006

VIA ELECTRONIC AND FIRST CLASS MAIL

Brewster Jamieson
Lane Powell LLC
301 W. Northern Lights Blvd., Suite 301
Anchorage, Alaska 99503-2648

    Re:    Valenote v. MetLife

Dear Brewster:

    I write regarding the above referenced matter. In our last conversation with
you and Ian, you referenced the recent decision in Abatie[1] and stated your view that
the case applied to Ms. Valenote's claim. We agree and having reviewed the case
we think that it offers substantial support to her position. Although we had hoped to
have another opportunity to speak with you regarding the matter, we have been
unable to contact you to schedule such a meeting. Consequently, this letter is
intended to address our additional thoughts regarding this case, including Abatie,
and to suggest an approach to settlement.

    At the outset, we note that Abatie specifically rejects Atwood's ridged two
part test for determining whether the existence of a conflict of interest should alter
the Court's standard of review. Instead, Abatie applies a case-by-case analysis that
asks first whether a "structural" conflict exists. Abatie states that a "structural"
conflict is present where "an insurer… acts as both the plan administrator and the
funding source for benefits." Abatie states that, even standing alone, a "structural"
conflict requires some skepticism by a court in reviewing an administrator's denial
of benefits. That skepticism increases in the presence of various other factors
including: 1) "inconsistent reasons for denial;" 2) failure to "adequately investigate
a claim or ask the plaintiff for necessary evidence;" and 3) failure to "credit a
claimant's reliable evidence."[2] Abatie also makes clear that this list is not intended

---

[1]    Abatie v. Alto Health & Life Ins. Co., 458 F.3d 955 (9th Cir. 2006).

[2]    Id. at 968-69.

Brewster Jamieson
December 29, 2006
Page 2

to be exclusive and that other acts of "malice" and "bad faith" can diminish or completely negate any deference to the administrator's decision.

Abatie also addressed the question of when a Court may consider additional evidence outside of the administrative record. As Abatie concluded regarding this issue:

> Even when procedural irregularities are smaller, though, and abuse of discretion review applies, the court may take additional evidence when the irregularities have prevented full development of the administrative record. In that way the court may, in essence, recreate what the administrative record would have been had the procedure been correct.[3]

There is no dispute in this case that MetLife, in denying Ms. Valenote's claim, operated under a "structural" conflict. As discussed further below, several other factors, including the three specifically listed in Abatie (quoted above) are present here. These factors will lead the Court not only to cast a very skeptical eye at the Administrator's decision, but will also require the Court to consider additional evidence outside of the administrative record.

This additional evidence will include the February 16, 2006, opinion from Ms. Valenote's treating physician Dr. Polston that Ms. Valenote meets the definition of disability and disabled under the policy [see V1507-98] and the objective evidence in the related Functional Capacity Examination of Ms. Valenote on February 14, 2005. [See V1607-11]. A full record will also include all of Ms. Valenote's medical records.

Before addressing the details of Ms. Valenote's claim, it is important to note that underlying Abatie and the numerous other cases addressing this issue is ERISA's requirement that every employee benefit plan shall—

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by

---

[3]    Id. at 973.

Brewster Jamieson
December 29, 2006
Page 3

the appropriate named fiduciary of the decision denying the claim.[4]

In a variety of ways, MetLife failed to satisfy this basic statutory requirement.

In our prior discussion, we pointed out our belief that MetLife provided inconsistent reasons for denial, failed to adequately investigate the claim or request relevant evidence and failed to credit Ms. Valenote's reliable evidence. We continue to believe this to be the case and, in fact, our conclusion has been bolstered by further review of the administrative record.

On August 29, 2003, MetLife's denied Ms. Valenote's long term disability claim. [See V-0001][5] This initial denial focused entirely on MetLife's erroneous conclusion that Ms. Valenote was not disabled because she was not under the continuous care of a physician during the 90 elimination period and that she had been discharged by her physician, Dr. Beard, to return to work. This denial also contained the erroneous assertion that Ms. Valenote had been discharged by her physical therapist, Healthsouth.

On September 3, 2003, Ms. Valenote appealed MetLife's decision explaining that she was in fact in the continuous care of a physician and that she had never been "discharged" by anyone to return to work. [ML208] Ms. Valenote informed MetLife that Dr. Beard had referred her to a more sophisticated pain physician named Dr. Anderson at the Advanced Pain Centers of Alaska. The name of the clinic itself put MetLife on notice of the severity of the ongoing pain. Ms. Valenote also informed MetLife that the Healthsouth physical therapy did not release her from its care but that she stopped going to this clinic because it appeared to exacerbate her condition. Ms. Valenote explained that she went from Healthsouth to a physical therapist named Joy Backstrum with The Therapy Place.[6] After this, when she did not see any improvement, Ms. Valenote starting going to a chiropractor named Dr. Lorentzen and his therapist.

On September 11, 2003, MetLife informed Ms. Valenote that it was reviewing her claim and that it had referred her claim for "independent review."

---

[4]     29 U.SC. § 1133.

[5]     We could not find the August 29, 2003 denial letter in MetLife's administrative record supplied in discovery and thus refer you to our discovery disclosures.

[6]     The May 12, 2003 Healthsouth record states that Ms. Valenote was going to continue her physical therapy at the facility of Joy Backstrum. [ML290]

Brewster Jamieson
December 29, 2006
Page 4

[ML180]  MetLife also indicated to Ms. Valenote's patient advocate that it would be conducting an independent "re-investigation" of the claim.[7]

On September 26, 2003, Ms. Valenote sent a letter with attachments to MetLife. [ML184] This letter provided Dr. Orzechowski's September 22, 2003, letter stating the first day Ms. Valenote stopped working was December 22, 2002. The letter set forth the doctors she was seeing for evaluation and that she was under the ongoing care of Dr. Susan Anderson and Dr. Peter Lorenzten. The letter also attached medical records from Alaska Open Imaging Center, and Dr. Anderson of Advanced Physical Therapy of Alaska. The letter also included a June 10, 2003, record from Dr. Beard's office with the suggestion that she "consider part time [work] of 12-14 hr/wk." [ML207]  Ms. Valenote explained in her letter that her pain did not allow her to work part time.

Between September 26 and November 26, 2003, MetLife obtained records directly from Dr. Anderson, a copy of Ms. Valenote's correspondence to Dr. Beard, a letter with an attachment from Dr. Beard, a job description of an architect from Ms. Valenote, a letter from Ms. Valenote's employer stating that her last day of work was February 21, 2003, and a letter from Ms. Valenote stating that she had not worked a day since February 21, 2003.

On November 26, 2003, MetLife again denied Ms. Valenote's application for benefits.  [ML150]  In its denial MetLife ignored the credible and reliable evidence it recieved.  Instead, MetLife again focused on the elimination period and again stated that Ms. Valenote had been released "to return to work as of May 1, 2003."  Indeed, the denial went a step further asserting that Ms. Valenote had been "advised" by her doctor to return to work on May 1, 2003.  Neither of these statements was true.  But to make matters worse, MetLife went on to claim that

---

[7]    On September 3, 2003, Ms. Valenote informed MetLife that she had patient advocate who would be helping her on the claim.  [ML209] The patient advocate understood that MetLife was going to "re-investigate" the long term disability claim because "missing information needed for review had been mistakenly put in her short term disability file."  [ML94]  The patient advocate provided MetLife with the names of Ms. Valenote's treating physicians Dr. Anderson and Dr. Lorentzen and understood that MetLife would be contacting them.  [Id.]    Ms. Valenote provided releases allowing medical providers to provide records so MetLife could undertake its independent re-investigation. [See e.g., ML276, ML236, ML158]  MetLife also knew that she was being treated by Dr. Anderson and Dr. Lorentzen.  [ML210, 185-89, 2002-06, 230]  Despite this, MetLife never actually spoke with Dr. Anderson or Dr. Lorentzen. [Id.] MetLife expressly admits this in the November 26, 2003, denial letter. [ML151]

Brewster Jamieson
December 29, 2006
Page 5

despite Ms. Valenote's "pain predominately in the right buttock region," she was "allegedly working 10 hours a week in June of 2003."[8]

MetLife's November 26, 2003, denial was at best shockingly sloppy and at worst malicious. Most importantly, on August 1, 2003, three months prior to the denial letter, MetLife had received confirmation from Ms. Valenote's employer that, in fact, Ms. Valenote last day of work was February 21, 2003, and that her absence from work from that date was "continuous." [ML283] On October 28, 2003, Ms. Valenote's employer again re-confirmed with MetLife that she had never returned to work after February 21, 2003. [ML157] Ms. Valenote's also sent MetLife a letter on November 11, 2003 stating that she had "never" told Dr. Beard or her office that she was working and specifically stated that "I have not worked a day since February 21, 2003." [ML225] Thus, MetLife had unequivocal information that, consistent with Ms. Valenote's claims in her appeal, she had never returned to work. MetLife inexplicably failed to credit this reliable evidence from Ms. Valenote.

MetLife's November 26 assertion that Ms. Valenote was "released to return to work as of May 1, 2003," was equally untenable. On July 2, 2003, MetLife received a statement from Dr. Beard stating that Ms. Valenote's "Expected return to work date" was "unknown at present." [ML291][9] On August 20, 2003, MetLife received records that included a "Return to Work Recommendations" dated April 27, 2003, and signed by a Nurse Practitioner. [ML 275] Yet, the document states only that "Ms. Valenote is being evaluated for persistent pain and should not return to work until at least May 1, 2003." That document neither did nor could it have indicated that Ms. Valenote had been "released" to work.[10]

---

[8]    The November 26, 2003 denial letter again falsely stated that Ms. Valenote was "dismissed" from Dr. Beard's care on July 24, 2003. In fact, MetLife knew that Dr. Beard released Ms. Valenote to Dr. Anderson's care. This information was provided in a letter dated September 3, 2003, from Ms. Valenote to Tanya Chambers. [ML210] On September 26, 2003, Ms. Valenote reiterated to MetLife that she was being treated by Dr. Anderson and Dr. Lorenzten. [ML184, 185-89, 202-06] and provided Dr. Anderson's record showing the referral from Dr. Beard. [ML184, 186] Finally, on October 22, 2003, Dr. Beard confirmed to MetLife that "the plan was for her to continue medical treatment" with Dr. Anderson, and that "[t]o our knowledge, this was ongoing treatment for the pain syndrome which was evaluated at our clinic." [ML230]

[9]    MetLife chose to redact two statements from this letter for some unknown reason.

[10]    Moreover, on October 16, 2003, Ms. Valanote provided MetLife with her correspondence to Dr. Beard that specifically pointed out the mistakes in Dr. Beard's records and by her staff on the return to work issue. [ML164-76]

Brewster Jamieson
December 29, 2006
Page 6

MetLife's additional November 26 claims regarding Ms. Valenote's record were also false. For example, after falsely stating that she had returned to work, MetLife claimed that "[c]alls made to the other two providers, Dr. Downs and Dr. Orzechowski revealed neither advised you to stop working for your condition on or before February 21, 2003," and that "Dr. Orzechowski did not advise you to stop working until September 23, 2003." This is not only completely wrong it is bizarrely so. In fact, the primary treating physician at that time, Dr. Orzechowski, had written a letter dated September 22, 2003, stating that "the first day she stopped working for treatment was December 18, 2002." [ML 128]

MetLife also wrongly asserted on November 26 that "[you] were released from physical therapy on May 12, 2003, per the physical therapy notes supplied by HealthSouth. This information is suggestive that your pain was not sufficiently severe to preclude work prior to March 27, 2003, and subsequent to May 1, 2003." But Ms. Valenote had informed MetLife that she had changed physical therapists because she did not see improvement with Healthsouth. Moreover, Ms. Valenote in her prior September 3 letter of appeal and her September 26 letter informed MetLife that she had been under the continuing care of Drs. Anderson and Lorentzen, and that Dr. Lorentzen was providing physical therapy to Ms. Valenote. [ML208, 184] Ms. Valenote's patient advocate also told MetLife to contact Dr. Anderson and Dr. Lorentzen. [ML209, ML94-95]

Incredibly, MetLife made no effort to contact either of these doctors either before or after its November 26 denial. Had MetLife contacted Dr. Lorentzen it would have learned his conclusion that Ms. Valenote's "injuries have been debilitating and at no time since she initiated care with my office has she been able to return to work." [ML 148] Dr. Anderson had already sent her October 6, 2003, and October 14, 2003, medical records to MetLife. Had MetLife spoken with Dr. Anderson it could have reconfirmed that this doctor recommended a functional capacity examination based on the architect job description, and that Ms. Valenote was suffering "provocative and concordant pain." [ML159, ML163] In any case, MetLife's bizarre distortion of the record simply provides additional evidence of MetLife's total abandonment of its fiduciary obligation as an ERISA administrator.

In addition to relying on claims that it did or should have known to be false, MetLife did have information indicating the extensive and substantial pain Ms. Valenote was suffering on an ongoing basis. Specifically, on August 18, 2003 [ML 276], MetLife received records from Drs. Mary and Wayne Downs, which stated that Ms. Valenote had "chronic pain" including, among other things, pain in her

Brewster Jamieson
December 29, 2006
Page 7

arms "down the biceps region on the right into a radial distribution." [ML 278]
MetLife also had important information in its files from her treating physician Dr.
Anderson.[11]  For example, on October 6, Dr. Anderson stated that Ms. Valanote
"was not medically stable." [ML 163].     Then, on October 14, Dr. Anderson
observed at L5-S1 that Ms. Valanote had "posterior tear at extreme increase in pain
that is concordant with patient's complaint" and concluded that Ms. Valenote
suffered "provocative and concordant pain" at L-5-S1. [ML159] By November 11,
2003, MetLife was also aware that Dr. Anderson was going to perform a surgical
procedure on December 3, 2003, called a "nucleolysis" [ML153] and that this
would require "some time for post-operative recovery." [ML156]  These records
demonstrate that MetLife had substantial information contradicting its claim that
Ms. Valenote's pain was essentially limited to her "right buttock." [12]

          Significantly, MetLife's November 26, 2003, denial made no mention of the
"independent examination" it had previously stated it was seeking.  This omission is
particularly curious given that on November 20, 2003, six days before issuing its
denial letter, MetLife received the results of this "examination." [ML 153-56] At
the same time that MetLife it suppressed the existence of the report, MetLife also
cherry-picked certain parts of the report verbatim.  Nor can MetLife claim that its
failure to mention the report was somehow an oversight.   In the body of the
November 26 denial, MetLife meticulously catalogued every document on which it
supposedly relied for its denial.  Yet nowhere in that list is there any mention of the
report. This was particularly misleading given that MetLife told Ms. Valenote on
September 11, 2003, that her claim had been referred for an independent review.
[ML180] [13]

---

[11]     *See* Dr. Anderson's records in MetLife file dated July 21, 2003 [ML186-189],
August 5, 2003 [ML204-05], August 12, 2003 [ML185], September 4, 2003 [ML206],
September 16, 2003 [ML202-203], October 6, 2003 [ML158-161] and October 14, 2003.
[Id.]

[12]     Dr. Anderson's October 6, 2003, record recommended a "functional capacity
examination to determine limitations regarding her job description submitted today."
[ML163] Ms. Valenote provided MetLife with the job description of an architect on
October 8, 2003. [ML177]  MetLife did not speak with Dr. Anderson about the FCE and
did not try to obtain a FCE.  This is important because the objective finding of the FCE
later conducted in February 2005 shows Ms. Valenote met the definition of disability or
disabled within the meaning of the policy.  [See V1607-11]

[13]     Notably, MetLife's November 26, 2003 "list" of documents that it claims it relied
upon completely ignores numerous important documents submitted to MetLife. For
example, this "list" does not include any of the important records from Ms. Valenote's
treating physician Dr. Anderson dated July 21, 2003 [ML186-189], August 5, 2003

Brewster Jamieson
December 29, 2006
Page 8

As stated above, the law requires that MetLife not only state the specific reasons for its denial, but that it "afford [Ms. Valenote] a reasonable opportunity ... for a full and fair review" of the denial. MetLife's affirmative efforts to suppress the existence of the report at the same time that it selectively relied on the report violated the most basic requirements of fairness and indicate nothing if not bad faith. But MetLife's conduct becomes even more problematic upon examination of the actual report.

The report sought to answer two questions presumably posed by MetLife. The first of these questions was whether there was information in the file to "provide an objectively abnormal basis for the patient's pain." The report stated that there were "abnormal findings" and that these findings "may explain some of the patient's pain." Thus, the report neither confirmed nor denied the existence of an "objectively abnormal basis." The second question asked whether "the plan-of-treatment [was] consistent with severe impairment." In response to this question, the physician summarized Ms. Valenote's treatment and stated that "such intensity-of-service implies that the patient's pain is severe." In the next sentence the report reiterated the false claim that Ms. Valenote was allegedly working 10 hours per week "despite the pain." Tellingly, this false fact found its way into the denial letter. But like the fact of the report itself, the physician's conclusion that "the intensity of service implies that the patients pain is severe," was conspicuously absent from the denial letter.

Also absent from the denial letter is the fact that nowhere in the "independent" report was there any statement from the physician that Ms. Valenote was not disabled as defined by the plan. Indeed, the report made absolutely no mention of whether Ms. Valenote was physically capable of performing the functions of an architect. Rather, the report concluded that "if the patient has surgery on 12/3/03, then some time for post-operative recovery will be needed." Certainly, nothing in that conclusion indicated that Ms. Valenote failed to meet the definition of disability under the plan document. On the contrary, taken as a whole, the report supported Ms. Valenote's claims of severe, chronic and widespread pain.

---

[ML204-05], August 12, 2003 [ML185], September 4, 2003 [ML206], September 16, 2003 [ML202-203], October 6, 2003 [ML158-161] and October 14, 2003. [Id.] The "list" also does not include the correspondence showing that Ms. Valenote had not worked a day after February 21, 2003. [See August 1, 2003 at ML283; October 28, 2003 at ML157; November 11, 2003 at ML225] Ironically, on the other hand, the "list" includes a supposed letter dated November 11, 2003 from Nurse Kiley in Dr. Beard's office that we have not been able to find in the administrative record provided in discovery.

Brewster Jamieson
December 29, 2006
Page 9

On May 4, 2004, Ms. Valenote appealed the November 26, 2003, denial. The May 4, 2004 appeal and attachments provided a detailed response that meticulously explained why MetLife's factual conclusions in the November 26, 2003, denial were contradicted by the record. [ML96-120] Specifically, Ms. Valenote again pointed out that she had performed no work after February 21, 2003, and that she had never been released by any care provider to return to work. Moreover, she offered extensive rebuttal to each of and every one of MetLife's factual assertions.

In response to Ms. Valenote's May 4, 2004 appeal, and apparently unhappy with the conclusion of the prior undisclosed "independent" review, MetLife shopped for another review. This second report noted that on "12/3/03 she underwent discography, with finding that injection of L5-S1 gave pain concordant with that of which she complained. At that sitting, therefore, she also underwent intradiscal electrothermal therapy (IDET) of L5-S1." [ML312]    The report then stated that "there seems to be no formal follow up re: the effect of the IDET." This statement, however, was totally false. As MetLife knew, Ms. Valenote was under the continual care of Dr. Lorentzen and Dr. Anderson after the IDET.   Dr. Lornentzen's March 5, 2004 letter to MetLife notes this continual care. [ML 148-49 and 116-17] Indeed, the records from Dr. Anderson reflect extensive follow up including the performance of an intralaminar epidural on January 13, 2004 [V-0244]. Of course, MetLife could have easily requested these records, since it had previously requested records from Dr. Anderson. [See ML161] [14]

Regardless, the continual care and follow-up by Dr. Lorentzen and Dr. Anderson after the IDET was evident from Ms. Valenote's May 4, 2004 letter appealing MetLife's November 26, 2003 denial.   Thus, even if the physician's ignorance was innocent (it is hard to know given that the physician fails to state on what he relied for his conclusions), MetLife upon receiving the report cannot possibly claim that it was unaware of the truth. Thus, MetLife essentially relied on a report that it knew to be based on false statements.

Even putting aside MetLife's bad faith regarding the factual claims in the second report, the actual conclusions of the second report also offer little support for

---

[14]    Dr. Polston also worked at the Advanced Pain Centers of Alaska clinic and first saw Ms. Valenote on June 18, 2004. [See V-0267]   Dr. Anderson left Advanced Pain Centers of Alaska at some point in 2004. Between February 2004 and June 2004 Ms. Valenote continued with physical therapy in Eagle River pursuant to Dr. Lorentzen's recommendation.  During this same time, Dr. Lorentzen helped arrange treatment for Ms. Valenote by Dr. Polston.

Brewster Jamieson
December 29, 2006
Page 10

MetLife's denial. On the contrary the report's conclusion was at best equivocal. For example, the report states that "it does not appear to me that there was any amelioration of symptoms following 2/22/03 [the first day of the elimination period] that would have rendered EE more able to work, at least until the IDET." [ML 313] This statement implies that Ms. Valenote was unable to work long past her elimination period. Moreover, in its conclusion, the report states that "in sum, unless something is missing, the records support at least an ongoing slight functional impairment on the basis of pain, limiting EE to sedentary and perhaps light duty work from 2/22/03 through IDET." As stated above, MetLife knew full well that "something was missing" including extensive follow-up records from Dr. Anderson after the IDET. But there is nothing in this report to suggest that the "independent" physician made even a cursory attempt to analyze Ms. Valenote's actual functional work capacity, the demands of her job as intern architect, and MetLife's actual definition of disability. Indeed, the absence of any mention of these things suggests that MetLife, even though it had the job description, failed even to provide the physician with the relevant definition or the actual duties of Ms. Valenote's job.

The above facts demonstrate that because Ms. Valenote had completely rebutted the November 26 denial, MetLife decided to come up with a completely new and previously undisclosed reason for denying the May 4, 2003 appeal. Not surprisingly, given the equivocal nature of the second report, MetLife again cherry-picked from the second report to deny Ms. Valenote's claim. As its June 22, 2004, letter stated:

> There did not appear to be a formal follow-up regarding the effect of the IDET and it was your chiropractor's opinion that you needed to become involved in a more frequent and active physical therapy program. The medical records support a slight impairment on the basis of pain and this would not limit you from your own occupation.

By setting forth a completely different reason for denial, MetLife once again failed to discharge its fiduciary duty.

First, MetLife knew or could have easily confirmed that there had been formal follow-up regarding the IDET.[15]

---

[15]    The May 20, 2004 letter to MetLife from Ms. Valenote's patient advocate states that "[w]e trust that you will avail yourself of the opportunity to contact all of Daniela's physicians to assist you in making a fair determination." [ML95]

Brewster Jamieson
December 29, 2006
Page 11

Second, the reliance on the chiropractor's "opinion" is so distorted as to support no conclusion other than bad faith. Dr. Lorentzen's <u>actual</u> "opinion" on March 5, 2004 was that Ms. Valenote's "injuries have been debilitating and at no time since she initiated care with my office has she been able to return to work." [ML 148 and 116] Incredibly, although relying on Dr. Lorentzen's "opinion" for its denial, MetLife failed to mention that his opinion actually supported Ms. Valenote's claim. As for Dr. Lorentzen's statement that Ms. Valenote needed to become "involved" in more frequent physical therapy, the letter makes clear that this statement was merely offered to explain his belief that she should engage in physical therapy in Eagle River because her chronic pain made it impossible for her to drive the two hours to attend therapy in Anchorage. The letter also makes clear that this therapy was related both to Ms. Valenote's chronic pain and her nucleoplasty. In fact, Mr. Lorentzen made such a referral and Ms. Valenote diligently followed up on it. This also was known to MetLife when it made its decision, since Ms. Valenote included the Eagle River therapist's record in her May 4, 2004 appeal. [ML136] For MetLife to misrepresent Dr. Lorentzen's statement to imply that Ms. Valenote was somehow failing to take the necessary steps for her own care borders on the sinister.

Third, although using the "independent" physician's statement regarding a "slight impairment on the basis of pain," MetLife then distorts the physician's actual statement from something highly equivocal to something far less so. But nowhere did MetLife have any support for its new and unsupported assertions that Ms. Valenote's pain "would not limit her from her own occupation." Indeed, MetLife had Ms. Valenote's architect job description. MetLife was aware on June 5, 2003 that Dr. Beard had recommended a functional capacity examination. [ML301] MetLife was also aware that Dr. Anderson recommended a functional capacity examination on October 6, 2003. [ML163] Moreover, MetLife knew that Ms. Valenote had not been able to work at all since February 21, 2003.[16]

Whatever justification MetLife might offer for its completely new rational in the June 22, 2004, denial (there is none), it cannot possibly defend the fact that it altered its rationale for denying the claim without giving Ms. Valenote an opportunity to respond. In other words, the final denial completely abandoned any claims that Ms. Valenote had been "released" for work during the elimination period or that she continued to work during the elimination period, as MetLife recognized that these reasons could not be supported any longer. Instead, the final

---

[16]    The May 4, 2004, appeal supplied another letter from Ms. Valenote's employer dated December 10, 2003, reiterating that she had not worked since February 21, 2003. [ML115]

Brewster Jamieson
December 29, 2006
Page 12

denial decided to come up with the new and factually unsupported assertion that she
was not generally disabled. Moreover, the claim of "no follow up" regarding the
IDET was both false and new (necessarily so) without giving Ms. Valenote any
opportunity to refute the claim.

The long term disability policy provides coverage (1) where the employee is
under the continual care of a doctor and (2) is unable to earn more than 80% of her
predisability earnings during the elimination period and the next twenty-four month
period or unable to earn more than 80% of her predisability earnings after the
twenty-four month period. Ms. Valenote showed MetLife several times that she
satisfied these terms. MetLife's failures on May 4, 2004 appeal, along with all of
the other failures discussed above, leads us to the firm belief that the Court will
reject MetLife's denial of benefits and order MetLife to provide Ms. Valenote
benefits under the plan. This award would require payment of all monthly benefits
from 2003 to the present and add-ons for interest, attorney fees and costs.

Settlement Proposal. When we met with Ian and you previously, you
explained another issue to us that MetLife had not brought up before. This issue
involved the supposed "neuromusculoskeletal" exclusion in the policy and its
limitation of benefits to a twenty-four month period. We have reviewed this issue
with Ms. Valenote and informed her that MetLife may try to assert this exclusion at
some point. However, even if MetLife was successful in asserting this exclusion,
MetLife would still be liable for the benefits for the twenty-four month period, as
well as add-ons for interest, attorney fees and costs.

In an effort to resolve this matter, Ms. Valenote is willing to settle the
present litigation based on three main terms: (1) MetLife would pay Ms. Valenote
the amount due for the twenty-four month period, plus interest to date, attorney fees
and costs, (2) MetLife would put Ms. Valenote back on claim, and (3) MetLife
would have to start a new process for termination of the claim if it decides that it
wants to assert the above-referenced exclusion. The third term would allow Ms.
Valenote to challenge any termination of benefits based on the exclusion in the
normal manner contemplated by ERISA. Of course, settlement would require the
preparation and execution of mutually agreeable settlement documents and an
appropriate stipulation to dismiss the court action.

We calculate the sum that MetLife would pay Ms. Valenote under this
settlement proposal at this time would be $73,342. We calculate this based on the
following. According to the Long Term Disability Insurance Policy, Ms. Valenote
was entitled to a monthly benefit of sixty percent of her predisability salary. (See
DEF 00012). RIM states that her pre-disability monthly salary was $4,250. (See V-
1324). This amounts to a monthly disability payment of $2,550. In addition, the

Brewster Jamieson
December 29, 2006
Page 13

policy provides that payment will increase by seven percent on the thirteenth month of payments and on each subsequent anniversary. (See V-1348). Consequently, year one equals $30,600 ($2,550 x 12), and year two equals $32,742 ($2,728 x 12). In addition, under the standards discussed in various federal court decisions, Ms. Valenote is entitled to prejudgment interest on this amount.[17] Pursuant to 28 U.S.C.A. § 1961, interest should be calculated on a daily basis and compounded annually. We estimate this amount to be approximately $10,000.

In addition to the above amounts, we have expended attorneys' fees of $44,660 and costs of $622.23. Consequently, we are willing to offer to settle this matter in the total amount of $128,624 inclusive of costs and attorneys fees.

Please note that it is our belief that in the event we prevail in court, MetLife will be obligated to pay benefits up to the present time regardless of its ability to ultimately show that Ms. Valenote is subject to the exception for "neuromuskuloskeletal" conditions. We base this belief on the fact that the 24 month period has already passed without the assertion of the exception and therefore without any opportunity on Ms. Valenote's part to challenge the exception. In other words, MetLife cannot reach back in time to assert the exception. Under this scenario, MetLife's liability for back payments alone would amount to approximately $140,000 as of the present date (almost double the amount of our current offer) with that amount, and the interest on it, increasing with each passing day.

As you can see, we are getting prepared to submit our motion for summary judgment on the scheduled date of January 12, 2007. Accordingly, this settlement proposal terminates on January 8, 2007.

Very truly yours,

Timothy W. Seaver

George Freeman

---

[17]    Ehrman v. Henkel Corp. Long Term Disability Plan, 194 F.Supp.2d 813 (C.D.Ill. 2002).

Brewster Jamieson
December 29, 2006
Page 14

Enclosure

cc:     Daniela Valenote
        George T. Freeman, Esq.